PATRICK J. MURCH, ESQ.
Nevada Bar No. 10162
RORY T. KAY, ESQ.
Nevada Bar No. 12416
McDONALD CARANO WILSON LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Tel: (702) 873-4100
Fax: (702) 873-9966
pmurch@mcdonaldcarano.com

DAVID A. COLVIN, ESQ.
Nevada Bar No. 4096
MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
Tel: (702) 942-2145
Fax: (702) 856-8944
dcolvin@maclaw.com

*Attorneys for the Las Vegas Tribe of Paiute Indians*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

THE LAS VEGAS TRIBE OF PAIUTE
INDIANS, a federally recognized Indian tribe,

                                        Plaintiff,

vs.

CHRISTOPHER W. PHEBUS, an individual,

                                        Defendant.

CASE NO.: 2:13-cv-02000-RCJ-CWH

**THE LAS VEGAS TRIBE OF PAIUTE INDIANS' MOTION FOR DECLARATORY JUDGMENT**

Pursuant to 28 U.S.C. §§ 1362 and 2201 and Rule 57 of the Federal Rules of Civil Procedure, the Las Vegas Tribe of Paiute Indians (the "Tribe") moves for the entry of a declaratory judgment that the Las Vegas Paiute Tribal Court can exercise criminal jurisdiction over Christopher W. Phebus ("Phebus") and other non-member Indians under the Indian Civil Rights Act, 25 U.S.C. § 1301 *et seq.* (ICRA).[1] This motion is made and based on the following Memorandum of Points and Authorities, the attached exhibits, the entire case file, and any arguments of counsel and/or the parties at any hearing on this matter.

---

[1] Phebus did not file an answer to the Tribe's complaint (#1).

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 · LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 · FAX (702) 873-9966

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

In May 2013, a Tribal Court of Appeals was convened to adjudicate an appeal by Phebus relative to a six-month sentence of imprisonment imposed by the Las Vegas Paiute Tribal Court after Phebus was adjudicated guilty of violating Tribal Code Section 5-60-020, Improper Influence in Official Matters.  Following oral argument, the Tribal Court of Appeals entered a written decision that the Tribal Court cannot exercise criminal jurisdiction over Phebus because he is not an enrolled member in any federally-recognized Indian tribe.  Because the decision improperly and substantially interferes with the Tribe's ability to govern criminal conduct that occurs on Tribal property, the Tribe seeks a declaratory judgment that the Tribal Court can, in fact, exercise criminal jurisdiction over non-member Indians under the ICRA.

## II.   RELEVANT FACTS

### A.   Background Information.

#### 1.   Tribal Organization and Governance.

Pursuant to the Indian Reorganization Act of June 18, 1934, 25 U.S.C. § 461 *et seq.* the Tribe is a federally-recognized Indian tribe.  <u>See</u> Declaration of the Members of the Tribal Council of the Las Vegas Tribe of Paiute Indians, attached as <u>Exhibit 1</u>, at ¶ 3.  The Tribal Constitution, which the Tribe first adopted on July 22, 1970, provides the framework for Tribal governance.  <u>Id.</u>  In accordance with the Tribal Constitution, the Tribal Council acts as the Tribe's legislative body.  <u>Id.</u>  In addition, a Tribal Code governs civil and criminal conduct on Tribal property, which primarily consists of the Las Vegas Paiute Colony near downtown Las Vegas, Nevada, and the Snow Mountain Reservation near Northwest Las Vegas.  <u>Id.</u>

#### 2.   Tribal Courts.

Pursuant to the Tribal Code, the Tribe established a Tribal Court, which adjudicates civil and criminal matters that are subject to the jurisdiction conferred on it by the Tribal Code and/or federal law (including the ICRA).  <u>Id.</u> at ¶ 4.  In addition, the Tribal Code provides for the empanelment of an appellate court (the Tribal Court of Appeals) when necessary to adjudicate appeals from decisions of the Tribal Court.  <u>Id.</u>  The Tribal Court of Appeals is the court of last

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 • FAX (702) 873-9966

1   resort for Tribal Court disputes.  Id.

2                    **3.    Phebus' Tribal Enrollment History.**

3          Phebus was enrolled as a member of the Tribe between 1983 and 1999.  Id. at ¶ 5.  In

4   July 1999, the Tribal Council voted to disenroll approximately one-fourth of the then-Tribal

5   members, including Phebus, based on a review and recalculation of Las Vegas Paiute ancestral

6   blood quanta.  Id.[2]

7          Prior to his disenrollment, Phebus held himself out as a Las Vegas Paiute, he received

8   health services from the Tribal health center, and he attended Tribal pow-wows.  See Transcript

9   of Status Check Hearing (Oct. 19, 2011), attached as Exhibit 3, at 7:2-24; 9:13-24.  He also

10  served on the Tribe's enrollment committee.  See Oct. 17, 2012 Trial Tr. (Exh. 2) at 22:7-9.

11                   **4.    Phebus' Conduct Following Disenrollment.**

12         Following his disenrollment, Phebus has obtained various Tribal or Bureau of Indian

13  Affairs services that are only available to, or accessible by, Tribal members and Indians,

14  including, among other things, health services and counseling.  See Tribal Council Decl. (Exh.

15  1) at ¶ 6.

16         In addition, Phebus has been cited, arrested, convicted, and/or sentenced numerous times

17  for engaging in illegal and/or socially inappropriate conduct while attempting to persuade the

18  Tribal Court, Tribal members, Tribal police officers, and Tribal Council members that his

19  disenrollment was improper.  Id. at ¶ 7.  He has consistently disregarded the orders of the Tribal

20  Court, which has resulted in several jail sentences for contempt, and at least one trespass order

21  that barred him from being present on Tribal property for an extended period.  Id.  Moreover, he

22  has been incarcerated in BIA facilities on several occasions in connection with sentences

23  imposed by the Tribal Court.  Id.  With the exception of the period of time that Phebus was

24  incarcerated or subject to the trespass order, he has resided with his mother on the Colony.  Id.

25

26

27  [2]  As a result of the recalculation, the Tribal Council determined that Phebus' Las Vegas Paiute
    blood quantum was 3/16, which is less than the 1/4 quantum required for Tribal membership.
28  See, e.g., Transcript of Trial (Oct. 17, 2012), attached as Exhibit 2, at 20:17-22:2.

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 · LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 · FAX (702) 873-9966

**5.     Tribal Court Enrollment Litigation.**

Between 2000 and 2005, Phebus and other individuals who were disenrolled conducted civil litigation in the Tribal Court for purposes of contesting the disenrollments. Id. at ¶ 8. Although the Tribal Court of Appeals ultimately ruled that the disenrollments were improper, the Tribal Council made the final decision to uphold the disenrollments.[3] Id.

**B.     Tribal Court Determination Regarding Criminal Jurisdiction.**

Between July 1999 and December 2012, Phebus routinely raised his disenrollment as both a barrier to the Tribal Court's jurisdiction and a justification for his criminal conduct. Id. at ¶ 9. However, the Tribal Court expressly determined that it can exercise criminal jurisdiction over Phebus pursuant to United States v. Bruce, 394 F.3d 1215 (9th Cir. 2005), based on his status as an Indian. See Oct. 19, 2011 Hearing Tr. (Exh. 3) at 6:10-11:11; 14:19-24; see also Paiute Tribal Court Order of Remand (filed Oct. 28, 2011), attached as Exhibit 4, at p. 2.

**C.     Recent Criminal Convictions.**

On October 10, 2012, Phebus entered the Tribal Police Department (which also houses the Tribal Court), and began yelling at Don Belcher, the Tribal Chief of Police. See Oct. 17, 2012 Trial Tr. (Exh. 2) at 10:14-12:11. After Phebus ignored several directives to stop yelling, he was arrested and charged with disorderly conduct. Id. at 12:1-13:24.

The matter was tried to the Tribal Court bench on October 17, 2012. At the close of the Tribe's case-in-chief, the Tribal Court gave Phebus an opportunity to provide a rationale for his behavior. Id. at 17:22-32:6. Phebus generally discussed matters pertaining to his disenrollment, including, among other things, the Tribe's recalculation of his Las Vegas Paiute blood quantum from 5/16 to 3/16. Id. at 20:17-22:2. He also reiterated his argument that his disenrollment prohibits the Tribal Court from exercising criminal jurisdiction over him. Id. at 22:21-23:23. The Tribal Court rejected that argument. Id. at 26:8-13. Ultimately, the Tribal Court adjudicated Phebus guilty of disorderly conduct and sentenced him to time served. Id. at 30:22-32:6.

---

[3]   Certain of the disenrolled members (not including Phebus) were later reenrolled.

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 · LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 · FAX (702) 873-9966

Less than three weeks later, Phebus entered the Tribal Police Department and demanded that Chief Belcher contact the Tribe's general counsel to obtain a copy of a court order pertaining to Phebus' disenrollment. See Trial Transcript (Dec. 27, 2012), attached as Exhibit 5, at 4:5-5:19. When Chief Belcher refused, Phebus threatened to wrap his Certificate of Indian Blood around a rock and throw it through Chief Belcher's office window. Id. at 6:3-15. The next day, Phebus returned to the Tribal Police Department with his Certificate of Indian Blood wrapped around a large rock, and told the dispatcher to "tell Belcher when he comes in tomorrow I got something for him." Id. at 23:5-24:24. As a result, Phebus was charged with violating Tribal Code Section 5-60-020, Improper Influence in Official Matters.

The matter was tried to the Tribal Court bench on December 27, 2012. See generally Exh. 5. Based on Phebus' express admissions (see id. at 37:20-38:25) and other evidence presented at trial, the Tribal Court adjudicated Phebus guilty of the offense. The Tribal Court then gave Phebus numerous opportunities to present mitigating arguments to avoid the six-month jail sentence that the Tribe requested. Id. at 41:15-47:22. However, Phebus continued to raise tangential issues in an attempt to justify the conduct that led to his conviction. Id. Accordingly, the Tribal Court sentenced Phebus to six months in jail. Id. at 48:3-49:11; see also Order and Judgment of Conviction (entered Jan. 4, 2013), attached as Exhibit 6. Thereafter, Phebus was remanded to the custody of the Owyhee Detention Facility, a BIA facility in northern Nevada.

**D.      Appeal and Decision.**

　　　　**1.      Notice of Appeal.**

In January 2013, Phebus filed a motion in the Tribal Court, wherein he requested that the sitting Tribal Court judge recuse himself from all future matters involving Phebus. See Motion (filed Jan. 10, 2013), attached as Exhibit 7. The Tribal Court decided to treat the motion as a notice of appeal from the January 4 Order and Judgment of Conviction (Exh. 6). See Order (entered Jan. 16, 2013), attached as Exhibit 8.

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 · LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 · FAX (702) 873-9966

**2.    Order of Stay on Appeal.**

In accordance with the foregoing order and the Tribal Code, the Clerk of the Tribal Court convened an appellate panel to adjudicate Phebus' appeal.  On May 6, 2013, the Tribal Court of Appeals entered an order scheduling the appeal hearing and directing Phebus' release from BIA custody.  See Order of Stay on Appeal, Temporary Release and Restraining Order (filed May 6, 2013), attached as Exhibit 9.  The Tribal Court of Appeals also directed the Tribal prosecutor to file a brief addressing (1) the sufficiency of the evidence presented to convict Phebus of the crime of Improper Influence in Official Matters, and (2) whether the sentence imposed was unreasonable or cruel and unusual in light of all of the relevant circumstances.  Id.

**3.    Briefing.**

Phebus filed an appeal brief on March 18, 2013, wherein he reiterated his arguments pertaining to the alleged impropriety of his disenrollment.  See Phebus Appeal Brief, attached as Exhibit 10.  The Tribe filed its brief on May 15, 2013, wherein it addressed, in detail, the two issues presented by the Tribal Court of Appeals.  See Respondent's Appeal Brief, attached (without appendix of exhibits) as Exhibit 11.

**4.    Hearing.**

The Tribal Court of Appeals conducted the appeal hearing on May 17, 2013.  In addition to entertaining the Tribe's arguments regarding the issues raised in its appeal brief, the Tribal Court of Appeals directed the Tribal prosecutor to discuss whether the Tribal Court could exercise criminal jurisdiction over Phebus because he is not enrolled in any federally-recognized Indian tribe.  See Transcript of Appeal Hearing (May 17, 2013), attached as Exhibit 12.  At the conclusion of the hearing, the Tribal Court of Appeals determined that the Tribal Court did not have criminal jurisdiction over Phebus because he is not enrolled in any federally-recognized Indian tribe.  Id.

**5.    Decision.**

Three weeks later, the Tribal Court of Appeals entered its written decision on the appeal. See Tribal Court of Appeals Decision (entered June 10, 2013), attached as Exhibit 13.

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 · LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 · FAX (702) 873-9966

**E.    Ramifications of Decision.**

As a result of the decision of the Tribal Court of Appeals, the Tribal Court cannot exercise criminal jurisdiction over Phebus or any other individual who satisfies the definition of "Indian" under the ICRA, but who is not enrolled in a federally-recognized Indian tribe. This ruling is contrary to federal statutory and common law, and infringes on the Tribe's right to prosecute non-member Indians (including Phebus) who commit certain crimes on Tribal property. For that reason, and because the Tribe has exhausted all available Tribal judicial remedies, the Tribe seeks a declaratory judgment that the Tribal Court can, in fact, exercise criminal jurisdiction over Phebus and other non-member Indians.

**III.    ARGUMENT**

**A.    Legal Standards.**

**1.    Federal Court Jurisdiction (General).**

Pursuant to 28 U.S.C. § 1362, federal district courts have original jurisdiction over any civil action brought by a federally-recognized Indian tribe if the matter in controversy arises under federal law. 28 U.S.C. § 2201 provides, in relevant part, that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . ." Finally, Rule 57 of the Federal Rules of Civil Procedure permits a federal court to "order a speedy hearing of a declaratory judgment action."

**2.    ICRA.**

a.    Tribal Court Jurisdiction Over Indians.

The ICRA grants all federally-recognized Indian tribes "powers of self-government," including the "inherent power . . . to exercise criminal jurisdiction over all Indians." 25 U.S.C. § 1302(2).

b.    Definition of "Indian".

Under the ICRA, "Indian" is defined as "any person who would be subject to the jurisdiction of the United States as an Indian under [19 U.S.C. § 1153 (the Major Crimes Act)], if that person were to commit an offense listed in that section in Indian country to which that

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 • FAX (702) 873-9966

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 · LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 · FAX (702) 873-9966

1   section applies." 25 U.S.C. § 1301(4).  In other words, the ICRA and the Major Crimes Act

2   utilize the same definition of "Indian."

3        In <u>United States v. Bruce</u>, 394 F.3d 1215 (9th Cir. 2005), the Ninth Circuit Court of

4   Appeals set forth a test for determining whether an individual is an "Indian" for purposes of the

5   Major Crimes Act.  The first prong of this test is satisfied by demonstrating that a defendant has

6   "some" Indian blood.  Although courts have not determined the minimum necessary blood

7   quantum to meet this requirement, at the very least, a quantum of 1/8 is sufficient.  <u>Id.</u> at 1223-

8   24.

9        Under the second prong of the test, courts analyze whether a tribe or government has

10  recognized the defendant as an Indian, which requires an assessment of four factors:  "(1) tribal

11  enrollment; (2) government recognition formally and informally through receipt of assistance

12  reserved only to Indians; (3) enjoyment of benefits of tribal affiliation; and (4) social

13  recognition as an Indian through residence on a reservation and participation in Indian social

14  life."  <u>Id.</u> at 1224 (citations omitted).  Standing alone, tribal enrollment is not determinative of

15  Indian status.  <u>Id.</u> at 1224 (citations omitted) ("A person may still be an Indian though not

16  enrolled with a recognized tribe . . . ; enrollment, and, indeed, even eligibility therefor, is not

17  dispositive of Indian status.").

18       In <u>United States v. LaBuff</u>, 658 F.3d 873, 877-79 (9th Cir. 2011), the Ninth Circuit

19  Court of Appeals held that the definition of "Indian" under the Major Crimes Act includes

20  individuals whom the Tribal Court of Appeals identified as "generic Indians": people who

21  satisfy the <u>Bruce</u> test, but are not enrolled in a federally-recognized Indian tribe.  However,

22  there do not appear to be any published decisions that utilize the <u>Bruce</u> test (or a similar test) for

23  purposes of determining whether an individual meets the definition of "Indian" under the ICRA.

24  Nevertheless, because the term "Indian" has the same meaning under both the ICRA and the

25  Major Crimes Act, the <u>Bruce</u> test can be used in making that determination.

26            **3.    Federal Court Review of Tribal Court Jurisdiction.**

27       The ICRA affords the privilege of habeas corpus to any individual who wishes to "test

28  the legality of his detention by order of an Indian tribe."  25 U.S.C. § 1303.  It does not afford

1 an analogous right to Indian tribes (i.e., an Indian tribe cannot seek federal court review of a

2 tribal court judgment of acquittal). Nevertheless, in certain instances, federal courts may review

3 issues of tribal court jurisdiction after a party has exhausted all available tribal remedies. See,

4 e.g., Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 19 (1987) (once a petitioner exhausts all

5 tribal remedies, "determination of tribal jurisdiction is ultimately subject to review . . . in the

6 District Court"); see also Nat'l Farmers Union Ins. Cos. v. Crow Tribe, 471 U.S. 845, 856-57

7 (1985).

**B. This Court Has Jurisdiction to Adjudicate This Dispute.**

**1. This Court Has Jurisdiction Pursuant to 28 U.S.C. § 1362.**

10 As an initial matter, this case arises under federal law, in that the Tribe is seeking a

11 declaration that Phebus is subject to Tribal Court criminal jurisdiction under the ICRA because

12 he satisfies the definition of "Indian" under Bruce. Therefore, this Court has jurisdiction to

13 adjudicate this matter under 28 U.S.C. § 1362.

**2. This Court Has Jurisdiction under LaPlante and Crow Tribe.**

15 Moreover, while LaPlante and Crow Tribe both examined the propriety of a tribal

16 court's exercise of civil jurisdiction over non-Indians, they are sufficiently analogous to the

17 issue presented here to be instructive. Specifically, in both of those cases, the petitioners (an

18 Iowa insurance company in LaPlante, and a Montana school district in Crow Tribe) alleged that

19 the tribal court could not exercise civil jurisdiction over them because they were non-Indian

20 entities. In both cases, the United States Supreme Court stated that district courts could

21 examine the jurisdictional issues presented, but only after the parties had exhausted their tribal

22 remedies. LaPlante, 480 U.S. at 19; Crow Tribe, 471 U.S. at 856-57.

23 If federal courts are permitted to review matters that originate in tribal courts to

24 determine when tribal courts cannot exercise jurisdiction, it stands to reason that federal courts

25 are permitted to review matters that originate in tribal courts to determine when tribal courts can

26 exercise jurisdiction. Therefore, this Court can adjudicate the jurisdictional issue presented

27 because the Tribe has exhausted all available Tribal remedies.

28

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 · LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 · FAX (702) 873-9966

**3.**     **The Issue Presented is Not Moot.**

As a general rule, Article III of the Constitution requires that there be a live case or controversy at the time that a federal court decides a case. Issues that are "capable of repetition, yet avoiding review," however, present an exception to the mootness doctrine. Doe v. Madison School Dist. No. 321, 177 F.3d 789, 798 (9th Cir. 1999). In order for the exception to apply, the duration of the challenged action must be "too short to be fully litigated before it ceases," and there must be "a reasonable expectation that the plaintiffs will be subjected to the same action again." Id. (citation omitted).

The underlying dispute between Phebus and the Tribe relative to the criminal conviction at issue arguably ended when the Tribal Court of Appeals issued its decision, as the Tribe will not seek any further criminal sanctions against Phebus in connection with that conviction in the event that the Court enters a declaratory judgment in favor of the Tribe. Because of the decision of the Tribal Court of Appeals, however, the Tribe has been deprived of its Congressionally-granted authority to prosecute Phebus and/or other non-member Indians (i.e., individuals who are not enrolled in a federally-recognized Indian tribe, but who satisfy the definition of "Indian" under Bruce) for future offenses in Tribal Court because the Tribal Court will dismiss for lack of jurisdiction. Therefore, the challenged action (the Tribe's ability to prosecute non-member Indians in Tribal Court) is "too short to be fully litigated before it ceases."

Similarly, it is an absolute certainty that Phebus and/or other non-member Indians will be arrested on Tribal property in the future. Thus, there is "a reasonable expectation that the [Tribe] will be subject to the same action (i.e., the application of the Tribal Court of Appeals' decision) again."

As the foregoing makes clear, the issue of Tribal Court criminal jurisdiction is "capable of repetition, yet evading review," in that the issue will arise every time that the Tribe arrests a non-member Indian who, but for the decision of the Tribal Court of Appeals, would be subject to prosecution in Tribal Court. Therefore, the mootness doctrine is inapplicable.

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 · LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 · FAX (702) 873-9966

C.     **The Tribal Court Has Jurisdiction Over Phebus.**

As the Tribal Court has previously decided on more than one occasion, Phebus satisfies the definition of "Indian" under Bruce.  See, e.g., Exhs. 3 and 4.  Phebus has never appealed this determination to the Tribal Court of Appeals.  Therefore, this Court should not conduct a Bruce analysis relative to Phebus, on the grounds that Phebus has not exhausted his Tribal remedies relative to that issue.  Nevertheless, if the Court determines that such an analysis is necessary to the resolution of this motion, certain of the attached exhibits clearly support the Tribal Court's determination that Phebus meets the definition of "Indian" under Bruce.  See, e.g., Exhs. 1-4; 11.

More importantly, as previously discussed, LaBuff makes clear that if Phebus commits a serious crime on Tribal property, he can be prosecuted in federal court under the Major Crimes Act.  658 F.3d at 877-79.  Given that the Major Crimes Act and the ICRA contain the same definition of "Indian," it makes no sense that the Tribal Court cannot exercise criminal jurisdiction over Phebus for minor crimes under the ICRA.

D.     **This Court's Ruling On The Issue of Criminal Jurisdiction is Critical to Tribal Self-Governance.**

Finally, the hearing transcript and the decision on Phebus' Tribal Court appeal suggest that the Tribal Court of Appeals was attempting to right a perceived wrong (i.e., it appears that the Tribal Court of Appeals decided that because the Tribal Council upheld Phebus' disenrollment in spite of a prior ruling that the disenrollment was improper, the Tribal Court should not be permitted to exercise criminal jurisdiction over Phebus.)  The decision, however, affects all non-member Indians; it is not limited to Phebus.  Specifically, if non-member Indians are arrested on Tribal property, they must be transported to a local municipal jail for processing.  Because the State of Nevada and local jurisdictions cannot prosecute Indians for crimes committed on Tribal property (see, e.g., 25 U.S.C. § 1326 (absent tribal consent, states cannot prosecute Indians for crimes committed on tribal property)), non-member Indians can assert their Indian status and completely avoid prosecution.  Therefore, this Court's ruling on the issue

1   presented in this motion is critical to the Tribe's ability to govern the conduct of non-member

2   Indians on Tribal property.

3   **IV.     CONCLUSION**

4          Based on the foregoing, the Court should enter a declaratory judgment in favor that the

5   Tribe can exercise criminal jurisdiction over Phebus and other non-Tribal members who satisfy

6   the definition of "Indian" under <u>Bruce</u>.

7          Dated:  February *10*, 2014.

8                                          McDONALD CARANO WILSON LLP

9                                          By: _____

10                                              Patrick J. Murch (#10162)
                                               Rory T. Kay (#12416)
11                                             2300 West Sahara Avenue, Suite 1200
                                               Las Vegas, Nevada 89102
12
13                                             *Attorneys for the Las Vegas Tribe*
                                               *of Paiute Indians*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 · LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 · FAX (702) 873-9966

1

**CERTIFICATE OF SERVICE**

2

I certify that I am an employee of the law firm of McDonald Carano Wilson LLP and,

3

on February 11, 2014, I caused a copy of the foregoing **THE LAS VEGAS PAIUTE TRIBE**

4

**OF INDIANS' MOTION FOR DECLARATORY JUDGMENT** to be served, via U.S. Mail,

5

upon the following:

6

Christopher W. Phebus
1309 Ken Street

7

Las Vegas, Nevada  89106

8

*Defendant*

9

10

/s/ Melissa A. Merrill

An employee of McDonald Carano Wilson LLP

11

12

293541

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 · LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 · FAX (702) 873-9966

**EXHIBIT 1**

**EXHIBIT 1**

### DECLARATION OF THE MEMBERS OF THE TRIBAL COUNCIL OF THE LAS VEGAS TRIBE OF PAIUTE INDIANS  IN SUPPORT OF THE LAS VEGAS TRIBE OF PAIUTE INDIANS' MOTION FOR DECLARATORY JUDGMENT

The undersigned declare as follows:

1.     We are current members of the Tribal Council for the Las Vegas Tribe of Paiute Indians (the "Tribe"), plaintiff in Case No. 2:13-cv-02000-RCJ-CWH, <u>The Las Vegas Tribe of Paiute Indians v. Christopher W. Phebus</u>, pending in the United States District Court for the District of Nevada.

2.     This declaration, which is submitted in support of the Tribe's Motion for Declaratory Judgment, is made of our own personal knowledge.

3.     Pursuant to the Indian Reorganization Act of June 18, 1934, 25 U.S.C. § 461 *et seq.* the Tribe is a federally-recognized Indian tribe.  The Tribal Constitution, which the Tribe first adopted on July 22, 1970, provides the framework for Tribal governance.  In accordance with the Tribal Constitution, the Tribal Council acts as the Tribe's governing body.  In addition, a Tribal Code provides the legislative authority for the regulation of civil and criminal conduct on Tribal property, which primarily consists of the Las Vegas Paiute Colony near downtown Las Vegas, Nevada, and the Snow Mountain Reservation near Northwest Las Vegas.

4.     Pursuant to the Tribal Code, the Tribe established a Tribal Court, which adjudicates civil and criminal matters that are subject to the jurisdiction conferred on it by the Tribal Code and/or federal law (including the Indian Civil Rights Act, 25 U.S.C. §§ 1301-1303).  In addition, the Tribal Code provides for the empanelment of an appellate court (the Tribal Court of Appeals) when necessary to adjudicate appeals from decisions of the Tribal Court.  The Tribal Court of Appeals is the court of last resort for Tribal Court disputes.

5.     Defendant Christopher Phebus ("Phebus") was enrolled as a member of the Tribe between 1983 and 1999.  In July 1999, the Tribal Council voted to disenroll approximately one-fourth of the then-tribal members, including Phebus, based on a review and recalculation of ancestral Las Vegas Paiute blood quanta.

6.      Following his disenrollment, Phebus has obtained various Tribal or Bureau of Indian Affairs services that are only available to, or accessible by, Tribal members and Indians, including, among other things, health services and counseling.

7.      Also following his disenrollment, Phebus has been cited, arrested, convicted, and/or sentenced numerous times for engaging in illegal and/or socially inappropriate conduct while attempting to persuade the Las Vegas Paiute Tribal Court, Tribal members, Tribal police officers, and Tribal Council members that his disenrollment was improper.  He has consistently disregarded the orders of the Tribal Court, which has resulted in several jail sentences for contempt, and at least one trespass order that barred him from being present on Tribal property for a period of two years.  In addition, he has been incarcerated in BIA facilities on several occasions in connection with sentences imposed by the Tribal Court.  With the exception of the period of time that Phebus was incarcerated or subject to the trespass order, he has resided with his mother on the Colony.

8.      Between 2000 and 2005, Phebus and other individuals who were disenrolled from the Tribe conducted civil litigation in the Tribal Court for purposes of contesting the disenrollments.  Although the Tribal Court of Appeals ultimately ruled that the disenrollments were improper, the Tribal Council made the final decision to uphold the disenrollments.

9.      Between July 1999 and December 2012, Phebus routinely raised his disenrollment as both a barrier to the Tribal Court's criminal jurisdiction over him, and as a justification for his criminal conduct.

We declare under penalty of perjury that the foregoing is true and correct.

Executed on January ~~Feb~~ 3 , 2014.

_____
BENNY TSO, Tribal Council Chair

_____
DARREN SACKETT, Tribal Council Vice-Chair

_____
~~LUCILLE CAMPA, Tribal Council Member~~

_____
~~DEBRA FARIA, Tribal Council Member~~

_____
ROBERT SEGMILLER, Tribal Council Member

_____
CHRIS SPOTTED EAGLE, Tribal Council Member

_____
CURTIS ANDERSON, Tribal Council Member

**EXHIBIT 2**

**EXHIBIT 2**

PHEBUS                              CondenseIt!™                              10/17/12

Page 3

1   CASE NO. CR12-007

2

3               LAS VEGAS PAIUTE TRIBAL COURT

4

5                       -oOo-

6

7   LAS VEGAS PAIUTE TRIBE,  )

8       Plaintiff,          )   REPORTER'S TRANSCRIPT

9       vs.                 )          OF

10  CHRISTOPHER PHEBUS,     )        TRIAL

11      Defendant.          )

12

13

14

15  BEFORE THE HON. CAL J. POTTER, III, TRIBAL JUDGE

16          WEDNESDAY, OCTOBER 17, 2012

17                3:13 p.m.

18

19  APPEARANCES:

20  For the Tribe:     PATRICK J. MURCH, ESQ.

21  For the Defendant: In Proper Person

22

23

24

25  Reported by:  CHERYL GARDNER, RMR-RPR
                  CCR No. 230

---

Page 3 (right column)

1               at 3:32 p.m.)

2           THE COURT: I appreciate your patience

3   both of you for the juvenile case being taken out

4   of order.  This is the time set for Tribe versus

5   Christopher Phebus in CR12-007, the time set for

6   trial.  The defendant was arraigned on October the

7   11th on a charge of disorderly conduct.  The Court

8   entered a not guilty plea on behalf of the

9   defendant and released him from custody on his own

10  recognizance.

11          The defendant was ordered to stay away

12  from the administration building and the police

13  department.  He was also ordered to have no contact

14  with Chief Belcher, Officer Bell, Officer Dawkins,

15  and Everson Nakai.

16          Let the record reflect Mr. Phebus is

17  here out of custody and Mr. Murch is representing

18  the Tribe.  Are we ready to proceed?

19          MR. MURCH: We are, Your Honor.

20  Mr. Phebus indicated that he'd like to go to trial.

21          THE COURT: Okay.

22          MR. MURCH: I'm prepared to start.

23          THE COURT: Any opening statements?

24          MR. MURCH: No.

25          THE COURT: Mr. Phebus.

---

Page 2

1   LAS VEGAS, CLARK COUNTY, NV, WED., OCTOBER 17, 2012

2                3:13 p.m.

3                  -oOo-

4         P R O C E E D I N G S

5           THE COURT: The next case on the

6   calendar is Mr. Phebus's case.  Is that going

7   forward?

8           MR. MURCH: I haven't had a chance to

9   speak with Mr. Phebus about the case today because

10  we got into a discussion about his past history and

11  I cut that off because we got into a discussion

12  about the Tribe's jurisdiction and the issues that

13  have already been resolved by this Court.

14          THE COURT: Okay.  Can I ask you to

15  have a conference so I can deal with the matter of

16  Jewel Chee.  It's a juvenile matter.  It needs to

17  be in a closed session.

18          MR. PHEBUS: Can't we just get mine

19  done?

20          THE COURT: Not right now.

21          MR. PHEBUS: You see what's happening

22  to me.

23          (Whereupon a recess was

24          taken at 3:13 p.m. and

25          the proceedings resumed

---

Page 4

1           THE DEFENDANT: Judge, this disorderly

2   conduct I have a reason for why I am disorderly but

3   after 13 years of disenrollment --

4           MR. MURCH: I would object, Your

5   Honor, to any comments or statements about

6   disenrollment, any issues that relate to the

7   determination by this Court.  The Court has

8   jurisdiction over Mr. Phebus because of his status

9   as an Indian and it has nothing to do with his

10  status or lack of status as a Paiute.

11          THE DEFENDANT: And I would like to

12  clarify what this Court has established with those

13  decisions.

14          THE COURT: That's fine as long as

15  it's preliminary.  You understand the Court has

16  jurisdiction over the matter but if you want to

17  explain what happened in that context, that's fine.

18          THE DEFENDANT: Can I also explain the

19  Court's jurisdiction and what it has established

20  and why it has jurisdiction because it affects me

21  when you guys prosecute me.  It does.  You don't

22  understand that so if we can have the time, will

23  you let me explain some of the things I have down.

24          THE COURT: What I'm just asking now

25  is an opening statement on the charge of disorderly

---

CHERYL GARDNER, CCR 230, RPR, RMR                    Page 2 - Page 4

**PHEBUS**                     CondenseIt!™                          10/17/12

Page 5

1 conduct.  You'll have an opportunity to tell your
2 side of the case.
3        THE DEFENDANT:  Okay.  An opening
4 statement?  What does that include?  What am I
5 supposed to say?  Why I did it, why?
6        THE COURT:  You can tell me whether
7 you consider -- I mean the focus that I would look
8 at would be the statements that you made when you
9 believe that they were protected speech if it's
10 speech or if it's conduct.  I will try to focus on
11 those issues.  You clearly have a first amendment
12 right to make statements.  Okay?  The issue is
13 whether you were disorderly or whether you were
14 trying to explain.  Okay?
15        THE DEFENDANT:  Okay.  Yes.  I was
16 angry which caused me to be disorderly.  Of this
17 13 years and the time that Belcher is police chief
18 for things that have happened with law enforcement
19 and the tribal court as I tried to explain to
20 Mr. Belcher I get angry.  Okay?
21        Now, when I try to explain things
22 about the tribal court when I have grievances with
23 Belcher which I do which affect me with law
24 enforcement and affect my tribal court, I cannot go
25 across the street and complai on Belcher because he

Page 6

1 is protected because he is an employee of the
2 Tribe.  I am Chris, a person who is Tribe.  I may
3 not be a member but I am still an Indian.
4        THE COURT:  Correct.
5        THE DEFENDANT:  Okay.  So I have to
6 get in trouble because I have before gave you a
7 case which in fact you trespassed me for Lucille
8 Campa which again I tried to reasonably go across
9 the street and speak about the differences that I
10 have the right to speak to Lucille about as a
11 Paiute, but I cannot because this Court enforces
12 laws and order against me.
13        I am stuck in a parallel where I got a
14 court order saying I'm a Las Vegas Paiute but the
15 Court put me in jail as an Indian and what good is
16 the court.  Is it only meant for me to prosecute me
17 because it ain't meant for me to be a Las Vegas
18 Paiute.
19        I have a problem.  That's why I get
20 angry.  That's why I get disorderly because you've
21 left me in a parallel where my family cannot get
22 due process or we get no justice.  Today you, what
23 you have left me, you -- I have a court order
24 explaining why I'm a Las Vegas Paiute.  You sit up
25 there I hate to say it like that but take Las Vegas

Page 7

1 Paiute and the name for granted when you prosecute
2 me.
3        If I cannot use that court order, what
4 are you using because I don't understand it.  I'm
5 confused seriously.  You cause an issue where my
6 family cannot even live on this reservation and may
7 jeopardize our future here.  My family's already
8 been kicked out.  We've got an open court case and
9 that is effected by my disenrollment.  Everything
10 this court does to me is effected by those
11 disenrollments which you do not even look at.
12        I drew a paper, sir, about the Bruce
13 test and how it esbablishes and how I get the blood
14 quantum that gives you guys the right to use the
15 Bruce test on me.  When you use that Bruce test on
16 me, it verifies that I am still an Indian because I
17 am a member of, I am a descendant of a tribal
18 member who is Las Vegas Paiute.
19        Well, the reason why my mom is a Las
20 Vegas Paiute is because she is a descendant of two
21 parents that were Las Vegas Paiute.  So when you
22 use that Bruce test on me and limit my blood
23 quantum to only an Indian just above an eight, how
24 do you do it for the rest of these people back here
25 when they don't got grandmas and grandpas and

Page 8

1 they're claiming one individual great grandparent.
2        Where does this Court get Las Vegas
3 Paiute?  Where do you get it when I've got a court
4 order proving it?  You're putting us in jeopardy
5 when you put them people in jail and they don't
6 have the blood quantum.  I don't get the chance to
7 explain that to you because you keep putting me in
8 jail.
9        THE COURT:  Okay.  Do you understand
10 that the blood quantum has nothing to do with what
11 we're doing here?
12        THE DEFENDANT:  When you use Bruce
13 test yes, it does.  To put me in jail yes, it does.
14        THE COURT:  Do you live on the Colony?
15        THE DEFENDANT:  Yes, I do.
16        THE COURT:  And you've been a member
17 of the tribe.
18        THE DEFENDANT:  That's right, and I'm
19 an Indian.
20        THE COURT:  See, you're confusing
21 being a Paiute with jurisdiction for this court.
22        THE DEFENDANT:  Isn't this court Las
23 Vegas Paiute tribal court, not Las Vegas Indian
24 court.  Las Vegas tribal court you defeat my
25 purpose in that court order all the court orders.

PHEBUS                     CondenseIt!™                    10/17/12

Page 9

1    THE COURT: I don't.
2    THE DEFENDANT: You do.
3    THE COURT: You have a court order
4    saying you're a Paiute. Okay.
5    THE DEFENDANT: But when you let the
6    Tribe issue a certificate of blood, another blood
7    quantum, you defeat that court order and the blood
8    quantum that's listed on it. You defeat my
9    mom's -- when this Court made the court order for
10   you to put me in that jail for Bruce test my mom as
11   soon as they were going to get disenrolled through
12   Terry Coffing and Dave Colvin.
13   Terry Coffing issued a court order
14   where the Tribe could not touch her record. Well,
15   the Tribe touched her record anyway and you let
16   them but I'm not going to give you that court order
17   because of your own record. You ought to know
18   about it. You want me to present a case to you. I
19   already have a case. What do these guys have?
20   You're just sitting up there using our name. I am
21   proof of it.
22   THE COURT: All right. Anything
23   else?
24   THE DEFENDANT: I don't know what you
25   want from me.

Page 10

1    THE COURT: I want to find out from
2    you what happened and I think we'll do that in the
3    trial. Do you have anything else you want to say?
4    THE DEFENDANT: No.
5    THE COURT: Okay. Have a seat.
6    MR. MURCH: The Tribe calls Chief
7    Belcher.
8
9    DON BELCHER,
10   having been first duly sworn to testify to the
11   truth, the whole truth and nothing but the truth,
12   was examined and testified as follows:
13
14   DIRECT EXAMINATION
15   BY MR. MURCH:
16   Q. Good afternoon, chief.
17   A. Good afternoon.
18   Q. Will you state your name for the
19   record, please.
20   A. Don Belcher. I'm the police chief
21   with the Las Vegas Paiute Tribe.
22   Q. How long have you been employed in
23   that position?
24   A. About five years.
25   Q. Do you know Christopher Phebus?

Page 11

1    A. Yes, I do.
2    Q. How do you know him?
3    A. From personal contact around the
4    Colony.
5    Q. Is Mr. Phebus present in the
6    courtroom?
7    A. Yes, he is.
8    Q. Can you identify him, please.
9    A. Yes. He's sitting at the table
10   sitting in the blue jeans and the striped shirt.
11   Q. Were you working the night of
12   October 10, 2012?
13   A. Yes.
14   Q. Did you have an encounter with
15   Mr. Phebus that night?
16   A. It was around 2:00 o'clock.
17   Q. I'm sorry. Can you describe the
18   encounter that you had with Mr. Phebus.
19   A. Yes. I was here in a meeting with my
20   Halloween party that we were planning for the 25th
21   and when I come out of the meeting, we had
22   personnel here from the health clinic, our CDC
23   facility, and a couple of tribal members were over
24   and when I come out of the meeting, Chris Phebus
25   was at the front door.

Page 12

1    Q. I'm sorry. Let me interrupt for one
2    second. When you say "here," do you mean in this
3    building?
4    A. Yeah. I was in the courtroom right
5    here, and he started yelling at me halfway from the
6    bathroom. He was right outside the front door to
7    the front door when he seen me. He was yelling at
8    me. When I opened the door, I said, "Stop
9    yelling." He told me, "Fuck you, you're fucking my
10   family," and saying in such a tone I couldn't calm
11   him down. I said, "Stop right now."
12   THE DEFENDANT: You are.
13   THE WITNESS: And he continued to do
14   that and became even more in my opinion violent so
15   I went out the door and he started saying
16   motherfuck this and that so I arrested him outside
17   for disorderly conduct.
18   MR. MURCH: Okay.
19   Q. When you first came to the front door,
20   it's a double set of doors out there. Are you
21   talking about the outside front door or the inside
22   front door by the --
23   A. Well, he's inside at the dispatch
24   area.
25   Q. So you're talking about the inside.

**PHEBUS**                    CondenseIt!™                    10/17/12

Page 13

1    A.   Yes, the inside two front doors.
2    Q.   And were there other people in the
3   area?
4    A.   Yes, my dispatcher was in there and
5   like I said the other personnel here.
6    Q.   How many people were there?
7    A.   In this meeting?
8    Q.   Yes.
9    A.   One, two, three, four, five, six -- at
10   least six, maybe seven.
11    Q.   And were those people in an area where
12   you believe could have heard Mr. Phebus yelling at
13   the front door?
14    A.   Without a doubt, yes.
15    Q.   Do you believe that they did hear
16   Mr. Phebus yelling at the front door?
17    A.   I know some did.  I know the captain
18   was back there also.  He said he could hear him in
19   his office.  It was right outside the door.
20    Q.   And then you went outside with
21   Mr. Phebus and you asked him to calm down.
22    A.   Yes.  I asked him several times and he
23   just continued to get louder so that's why I had to
24   arrest him.
25        MR. MURCH:  Okay.  I have no further

Page 14

1   questions.
2        (Whereupon Mr. Murch concluded
3        his examination at 3:39 p.m.)
4        THE COURT:  Do you have
5   cross-examination, Mr. Phebus?
6        THE DEFENDANT:  Yeah.
7
8        CROSS-EXAMINATION
9   BY THE DEFENDANT:
10    Q.   Mr. Belcher, you're an employee.  Are
11   you a Las Vegas Paiute?
12    A.   No.
13    Q.   All right.  Do you make determinations
14   who is Indian and who is not before you arrest
15   them.  Yes or no?
16    A.   I do.
17    Q.   So it's at your discretion.
18    A.   Yes.
19    Q.   Okay.  All right.  I apologize.  I was
20   disorderly, but when I come to this office, do I
21   ask you questions or not regarding our
22   disenrollment and how I am effected by law
23   enforcement when you guys arrest me because when I
24   come over -- do I ask you those questions?
25    A.   You have.

Page 15

1    Q.   And haven't they always been part of
2   my -- when I come over here to talk to you, haven't
3   they always where I have tried to explain to you
4   and sit down and explain to you why I get so angry
5   and you don't let me.
6    A.   I do let you, Chris.  As long as
7   you're not gelling and cussing and calling me
8   names.
9        THE DEFENDANT:  I don't have no more.
10        (Whereupon the defendant
11        concluded his examination
12        at 3:41 p.m.)
13        THE COURT:  Did you consider him to be
14   a threat?
15        THE WITNESS:  Yes, I did.  In the past
16   Chris has been threatening.  He's busted out one of
17   our police units as far as the windows.  He's --
18        THE COURT:  I don't want to get into
19   the past.
20        THE WITNESS:  Yes.
21        THE COURT:  I'm talking about the
22   incident here.
23        THE WITNESS:  Yes.
24        THE COURT:  I mean as a judge I
25   believe people have a first amendment right.  I

Page 16

1   mean if it was just the swearing or is it the
2   message behind the swearing, you know, is what I'm
3   trying to find out.  If you were in fear.
4        THE WITNESS:  Well, I do protect and
5   watch myself when I'm with him because I have been
6   hit by Chris before and so I do watch that and I
7   feel like when he gets to a point in time he has
8   lost control.  Whether he means to or not I have to
9   be cautious with that and I felt like I was in that
10   position at this time.
11        THE COURT:  All right.  I don't have
12   any other questions.  As a result of my questions
13   if you have any questions, you can follow-up on my
14   questions.
15        MR. MURCH:  I don't have any other
16   questions, Your Honor.
17        THE COURT:  Okay.  Can the witness be
18   excused?  Step down.
19        (Whereupon Don Belcher was
20        excused from the witness stand
21        at 3:42 p.m.)
22        MR. MURCH:  Your Honor, that's my only
23   witness.
24        THE COURT:  All right.  Mr. Phebus,
25   you have the right to testify or call witnesses in

**CHERYL GARDNER, CCR 230, RPR, RMR**                    Page 13 - Page 16

Page 17

1  your own behalf if you see fit. Do you wish to put
2  on a defense?
3         THE DEFENDANT: I didn't -- I wasn't
4  aware from last time I was in court that this day
5  in court was going to be a trial where I could call
6  anybody in my defense. No. I don't have anybody
7  for this particular case to call in my subpoena
8  anybody but, Your Honor, I have tried to subpoena
9  people before in my defense and you won't let me.
10  One of those cases was Lucille Campa's
11  where I was trying to speak of the same issues that
12  I am in trouble for today and you wouldn't let me
13  so what good does it do for me to call anybody
14  now?
15         THE COURT: Who do you have that you
16  wanted to call?
17         THE DEFENDANT: Nobody. I have nobody
18  to call because there was no witness. They're all
19  police of the Tribe. Who is going to defend me or
20  who is going to stand up for me? There was nobody
21  around so I don't have any witness to call.
22         THE COURT: Do you wish to testify?
23  If you do, you need to be sworn in. Do you want to
24  testify?
25         THE DEFENDANT: I have nothing to

Page 18

1  testify about. What am I supposed to testify on?
2         THE COURT: Based on the statements
3  against you that you acted in a disorderly conduct
4  by exclaiming and yelling obscenities and
5  profanities, and the chief has testified that he
6  was in fear of your actions and that there were
7  other people present, so those are the issues.
8         THE DEFENDANT: I don't think -- I am
9  not harmful to anybody. I get loud and voice my
10  opinion.
11         THE COURT: If you want to testify,
12  you have to be sworn here.
13         THE DEFENDANT: No, I don't want to
14  testify because it don't do no good. It don't do
15  no good. If you don't recognize me as a Las Vegas
16  Paiute with the court order that I got, you're not
17  going to recognize me any other way. You're going
18  to do what you're going to do. It does no good.
19         THE COURT: Okay. Final arguments,
20  closing.
21         MR. MURCH: Your Honor, the tribal
22  code section 5-70-010, disorderly conduct
23  subsection B, no person shall disturb the peace or
24  quiet of any person, family, or neighborhood by
25  making loud noises, or by violent or offensive

Page 19

1  language, or by the threatening, quarreling,
2  fighting, or offering or challenging to fight, or
3  in any other way or manner shall disturb the peace,
4  quiet, and decency of any person, street, or
5  neighborhood.
6         Mr. Phebus has admitted that he was,
7  quote, unquote, disorderly. Chief Belcher
8  testified that there were a number of people around
9  at the time Mr. Phebus came to the front door and
10  began yelling obscenities, and Chief Belcher gave
11  him an opportunity to calm down and asked him to
12  calm down and went outside with him and he
13  continued to yell obscenities related to the same
14  issues that we've been discussing over and over
15  again with Mr. Phebus.
16         This is an improper forum for him to
17  continue to bring up jurisdictional issues. It's
18  already been decided. So the Tribe would request,
19  suggest that the charge of disorderly conduct has
20  been proven and request the Court impose the
21  maximum 20-day sentence with credit for time served
22  for the one night that he did stay in jail. He has
23  three days' credit for that.
24         THE COURT: Mr. Phebus, do you want to
25  respond to that?

Page 20

1         THE DEFENDANT: Yeah. Once again
2  Mr. Murch is a representative of Las Vegas Paiute
3  Tribe, I wrote you a brief deal with this to the
4  court clerk. On the bottom I asked where I would
5  like a written explanation between you two what Las
6  Vegas Paiute Tribe is because my disorderly conduct
7  has a purpose which you completely ignore but yet
8  you sit up there biasly (sic) as a Las Vegas Paiute
9  tribal judge.
10         You don't give me any kind of respect
11  as a Paiute person, a Las Vegas Paiute person. You
12  rely over there. That's what you consider Las
13  Vegas Paiute. That's not true. When you use that
14  Bruce test against me to put me in jail for this
15  Tribe you established -- I have a chart I wanted to
16  show you.
17         THE COURT: Bring your chart in.
18         THE DEFENDANT: All right.
19         I just want to explain this. Let me
20  explain. My two grandparents come from the 1940
21  census roll. The Tribe's constitution and bylaw
22  bases this reservation and its enrollment on that
23  1940 census roll. When this Tribe did those
24  disenrollments, it discovered two things against
25  two individual families. Because the other family

PHEBUS                              CondenseIt!™                              10/17/12

Page 21

1  and their disenrollment has left my family and me
2  where I am a victim of their actions because they
3  are all now council members.
4          When those people decided this
5  disenrollment, they discovered errors in their own
6  blood quantums.  Okay.  So those blood quantums our
7  council are now sitting on are illegal.  The only
8  one who is sitting up there with a legal blood
9  quantum is Debra Fry because she used this court to
10 prove that blood quantum.
11         So when this Tribe allows you to use
12 Bruce to convict me as an illegal, this is what you
13 establish and this is what Mr. Murch has
14 established from the last court where he said how
15 Bruce is used because of blood quantum.
16         My grandparents are 1940 enrollees.
17 They are what makes me Tribe.  When the Tribe took
18 away my grandmother's blood quantum, they left my
19 mother at five-sixteenths.  Okay?  My grandpa is
20 three-fourths.  That's where she gets -- she is
21 three-eighths.  That's where she gets her
22 three-eighths is from that three-fourths.
23 If my grandmother who is also written
24 on that 1940 roll is half would raise my mom's
25 blood quantum to five-sixteenths but now that the

Page 22

1  Tribe and the Bruce does not let her use that, I am
2  at three-sixteenths, less than a quarter.  Okay?
3          This blood quantum for me is
4  established because of that 1940 census role and
5  because I have a grandfather on there to let that
6  Bruce be used.  Well, all these other people like
7  Drew who you just put in jail -- I was on the
8  enrollment committee two years before I got
9  disenrolled.  As soon as I gave up my position on
10 the enrollment committee, 30 days later the Tribe
11 kicked my family out.
12         These blood quantums and these people
13 I know intimately.  This Tribe is small enough that
14 I can do that.  As an enrollment member when you
15 arrest Drew, he does not have a grandparent.  He is
16 claiming a great great grandfather, one great great
17 grandparent and that grandparent ain't even a full
18 blood.  She was half.  You break that half down for
19 Drew he is less than a thirty-second.  When you
20 give him --
21         THE COURT:  You need to stick with
22 yourself.  We're not trying other people here.
23         THE DEFENDANT:  Okay.  Well, if you
24 can use Bruce on me legally, how are you using it
25 on him.  If you're doing wrong for him, then give

Page 23

1  me a break because I'm trying to prove to you what
2  Las Vegas Paiute is and if anything, I'm trying to
3  prove to you what an Indian is but you don't give
4  me that.
5          You will put me in jail no matter
6  what, if I'm Las Vegas Paiute or Indian or not.
7  I'm not claiming to be Indian.  You made that
8  record for me when you made that certificate of
9  Indian blood.  What about my mom?  You want me to
10 create a court case.  Why should I?  You have one.
11 It's Las Vegas Paiute.
12         THE COURT:  You're not dealing with
13 the issue that we're dealing with here.
14         THE DEFENDANT:  I feel I am unfairly
15 prosecuted by this Tribe.  I feel that my
16 disorderly conduct is fair.  I feel what you're
17 doing to me and letting me be prosecuted by this
18 Tribe is unfair because of Bruce and because I have
19 a court order which you're allowing them to -- the
20 court order already says that the Tribe violated
21 the constitution.
22         What are you doing?  Why are you doing
23 this?  I'm trying to prove a point.
24         THE COURT:  You're not proving the
25 point by coming in and taking it out on the chief.

Page 24

1          THE DEFENDANT:  How do I complain to
2  the chief when he is a police -- he's got more
3  right on this reservation than I do.
4          THE COURT:  That's because he's the
5  chief of police.
6          THE DEFENDANT:  I'm the Paiute that
7  made him chief of police for this reservation.  I'm
8  the Indian.
9          THE COURT:  No, you're not.
10         THE DEFENDANT:  When you use Bruce,
11 yes, I am.
12         THE COURT:  No, you're not because
13 you're not in the power that the council is and
14 that's what you're missing here.  You have a right
15 to go in and object.  You have a right to go and
16 petition the Tribe about your situation, but you
17 can't go in and cause problems with the chief.
18         THE DEFENDANT:  Okay.
19         THE COURT:  You're talking about civil
20 disobedience on your part.  You're saying that you
21 have a right to cause a disorderly situation
22 because you want to get your message across.
23 Okay?  He's not the person you need to go to and I
24 told you this before.  This Court ruled in your
25 favor, an appellate court ruled in your favor.  The

CHERYL GARDNER, CCR 230, RPR, RMR                          Page 21 - Page 24

Page 25

1 council ruled against you. The council is the
2 supreme court.
3        I'm here on a misdemeanor criminal
4 charge which you've admitted to that you were
5 disorderly but you had a point you wanted to make.
6        THE DEFENDANT: Mr. -- can I please.
7        THE COURT: It's judge. Okay?
8        THE DEFENDANT: Mr. Potter, I just go
9 back to where you just mentioned the appellate
10 court. I just made him a copy of those two
11 appellate court decisions. I would like you to
12 look at those.
13        THE COURT: I have. I read them.
14 Neither one of us are involved. You don't have an
15 actual court case involving those issues.
16        THE DEFENDANT: I haven't had to make
17 one.
18        THE COURT: You're here on a criminal
19 case because you let your anger get the best of
20 you. You tried to make a point where it didn't
21 really matter because the chief can't do anything.
22 The police officers can't do what you're asking
23 them to do. The prosecutor can't do what you're
24 asking and I can't as the judge. I cannot overrule
25 the council.

Page 26

1        Your options -- and I told you this
2 before. There's now another option. You can go
3 down to federal district court and sue on a civil
4 rights action if you feel you've been unjustly
5 treated. This is the function of a criminal court
6 right now. Okay? If I agreed with you a hundred
7 percent, I can't do anything.
8        THE DEFENDANT: But it's okay for you
9 to prosecute me despite my civil case.
10        THE COURT: No. I can prosecute you
11 because you're a Native American and and you're
12 subject to the jurisdiction because you live here
13 on this Colony.
14        THE DEFENDANT: But that's Las Vegas
15 Paiute.
16        THE COURT: It doesn't have anything
17 to do with it.
18        THE DEFENDANT: It does when you're
19 sitting up here prosecuting me.
20        THE COURT: No, it doesn't, because I
21 prosecute or we prosecute in this court and we have
22 jurisdiction over many different members of very
23 different tribes. I mean we had Navajo in here.
24 We had people not only living in Nevada but live in
25 Arizona that come over here and have their business

Page 27

1 in this Colony.
2        THE DEFENDANT: They're Indian. I'm
3 talking about Las Vegas Paiute.
4        THE COURT: That's what the Bruce test
5 talks about though.
6        THE DEFENDANT: Are you using it
7 fairly for them? Can I ask you something just
8 because those council people are not in court for
9 this Bruce test, could be used on them, is it fair
10 for them to use that Bruce test and are they
11 subject to be able to use it as council members
12 because right now when you use that Bruce test
13 against me and determine what my little blood
14 quantum is because of this 1940 census roll those
15 council members don't even have the blood quantum
16 number. If they're illegal, so are you.
17        THE COURT: No, it isn't. You're here
18 on an issue as a Native American, not a Paiute.
19        THE DEFENDANT: For your information
20 at least I did this.
21        THE COURT: I understand. What you
22 need to do is what you're doing here now. You're
23 talking to me and you're trying to convince me of
24 your argument. You don't establish anything when
25 you yell and scream at people.

Page 28

1        THE DEFENDANT: Yes, I understand, but
2 13 years -- you've got to understand.
3        THE COURT: I do understand.
4        THE DEFENDANT: I am in the position
5 of losing our home on this reservation and you're
6 delaying us due process of law.
7        THE COURT: No, I'm not. I'm giving
8 you due process in a criminal case. That's all I
9 can do.
10        THE DEFENDANT: That's all you can do.
11        THE COURT: That's all I can do is
12 give you due process here. Okay?
13        THE DEFENDANT: Okay.
14        THE COURT: If you look at it from a
15 standpoint of what we're looking at here is
16 disorderly conduct where you disrupt things to try
17 to make your point and then apparently, you know,
18 you get angry and sometimes you can't deal with it
19 and therefore you become violent and that's why
20 people are afraid of you.
21        THE DEFENDANT: Okay. Other than
22 today and this disorderly conduct case, do I have
23 the right to ask you and get your opinion legally
24 through this court if that decision of the Tribe
25 where they believe they have the right to review

Page 29

1 their own orders is being used correctly.  Do I
2 have the right to ask you that for your opinion of
3 that?
4          THE COURT:  No.  Because I'm not
5 sitting in judgment of the council in your case.
6          THE DEFENDANT:  I know.  Other than
7 this case, do I have the right to write the Court
8 and ask you that?
9          THE COURT:  No.  You haven't.  I can't
10 do that.  I only can deal with actual cases before
11 me.
12          THE DEFENDANT:  So I can't write and
13 ask you.
14          THE COURT:  No.  I'm not here as an
15 attorney to give you advice.  I'm sitting here as a
16 judge.
17          THE DEFENDANT:  Okay.  Again, once
18 again with my disenrollment case that is an open
19 pending case.  When you let these guys use the
20 Bruce test against me, it's no longer open because
21 you concluded by letting them make a blood quantum
22 for me.  Aren't they in violation?  Aren't you?
23          THE COURT:  No.
24          THE DEFENDANT:  Who is Tribe, you or
25 me?

Page 30

1          THE COURT:  It doesn't matter.
2          THE DEFENDANT:  It does matter.  You
3 use our name in vane.
4          THE COURT:  No, it doesn't matter for
5 the jurisdiction of this criminal court.
6          THE DEFENDNAT:  Okay.  I understand.
7          THE COURT:  I'm allowed to when
8 Navajos come in or -- we had one out of Window Rock
9 that was on calendar today.
10          THE DEFENDANT:  But do you think
11 that's fair when this disenrollment questions what
12 a Las Vegas Paiute is.  Do you think that's fair
13 you as a judge to do that?
14          THE COURT:  It isn't a question of
15 fairness.  Okay?  That's what I'm saying.  You're
16 asking me were you treated fairly in this court.
17          THE DEFENDANT:  I'm asking what a Las
18 Vegas Paiute is.
19          THE COURT:  That isn't the issue.
20          THE DEFENDANT:  That's right.  I
21 understand.  I have no more to say.
22          THE COURT:  All right.  I'm going to
23 find you guilty of the disorderly conduct and I'd
24 like to address -- Mr. Murch has already told me
25 what he thinks you should receive for it.  What do

Page 31

1 you think should be the punishment?  That's really
2 the issue here.
3          THE DEFENDANT:  I don't know.
4 Because, you know, when I leave this courtroom
5 today, it's going to go back.  It's a rotating
6 cycle.  I'm trying to convince you of this pattern
7 and all these other things but I don't know.  I
8 don't know how to calm my anger because I'm --
9          THE COURT:  Well, you apologized.  You
10 did apologize which shows some remorse.  I mean you
11 have to, I think if you have valid arguments they
12 have to be addressed to the people that can deal
13 with them.
14          THE DEFENDANT:  But they won't let
15 me.  And then --
16          THE COURT:  So you're in a box where
17 you have to go somewhere else to make your
18 arguments then.  Okay?
19          THE DEFENDANT:  Okay.  Thank you,
20 that's good.
21          THE COURT:  You need to go to a
22 courthouse that has jurisdiction over the issue
23 you're talking about.
24          THE DEFENDANT:  Do you understand what
25 I'm talking about?

Page 32

1          THE COURT:  Yes.
2          THE DEFENDANT:  Okay.  I can deal with
3 that.
4          THE COURT:  I'm going to give you
5 credit for time served.  Okay?
6          THE DEFENDANT:  Thank you.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

PHEBUS                         CondenseIt!™                            10/17/12

Page 33

1               REPORTER'S CERTIFICATE
2
3   STATE OF NEVADA        )
4                          ) ss
5   COUNTY OF CLARK        )
6
7        I, Cheryl Gardner, RMR-RPR, CCR 230,
8   do hereby certify that I took down in Stenotype all
9   of the proceedings had in the before-entitled
10  matter at the time and place indicated and that
11  thereafter said shorthand notes were transcribed
12  into typewriting by me and that the foregoing
13  transcript constitutes a full, true, and accurate
14  record of the proceedings had.
15        IN WITNESS WHEREOF, I have hereunto
16  set my hand and affixed my official seal of office
17  in the County of Clark, State of Nevada, this 31st
18  day of October, 2012.
19
20
21
22
23       /s/ Cheryl Gardner
24           CHERYL GARDNER, RMR-RPR, CCR 230
25

CHERYL GARDNER, CCR 230, RPR, RMR                    Page 33 - Page 33

# EXHIBIT 3

# EXHIBIT 3

CR11-005 ◯ 10/19/11          ◯

1

1    CASE NO. CR11-005

2

3              LAS VEGAS PAIUTE TRIBAL COURT

4

5                          -oOo-                    COPY

6

7    LAS VEGAS PAIUTE TRIBE,    )

8          Plaintiff,          )   REPORTER'S TRANSCRIPT

9          vs.                 )            OF

10   CHRISTOPHER PHEBUS,       )      STATUS CHECK

11         Defendant.          )

12

13

14   BEFORE THE HON. CAL J. POTTER, III, TRIBAL JUDGE

15        WEDNESDAY, OCTOBER 19, 2011

16                 3:32 p.m.

17

18   APPEARANCES:

19     For the Tribe:     PATRICK J. MURCH, ESQ.

20     For the Defendant:  In Proper Person

21

22

23

24   Reported by:  CHERYL GARDNER, RMR-RPR
                    CCR No. 230

25

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005 10/19/11

2

```
 1   LAS VEGAS, CLARK COUNTY, NV, WED., OCTOBER 19, 2011
 2                       3:32 p.m.
 3                       -oOo-
 4              P R O C E E D I N G S
 5        THE COURT:  The next matter is
 6   CR11-0005, Tribe versus Chris Phebus.
 7             MR. MURCH:  Patrick Murch and Rory Kay
 8   on behalf ofthe Tribe.
 9             THE COURT:  Can you state your
10   appearance, Mr. Phebus.
11             MR. PHEBUS:  Chris Phebus on behalf of
12   myself.
13             THE COURT:  All right.  This is the
14   time set pursuant to an order to show cause why
15   sentence should not be imposed in this matter.  I
16   requested the tribe brief the jurisdictional
17   elements of the issues that Mr. Phebus had brought
18   up in this matter and I received a copy of the
19   brief.
20             Have you received a copy?
21             MR. PHEBUS: Uh-huh.
22             THE COURT:  Mr. Murch, I'll go ahead
23   and allow you to make your representations to the
24   Court.  You can be seated if you want, Chris.
25             MR. MURCH:  Your Honor, the brief lays
```

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005◯10/19/11

3

1   out the Bruce test requirements for determining

2   whether Mr. Phebus falls under the jurisdiction of

3   this Court.  I'm not going to read the brief to the

4   Court, but if the Court has any questions, I'd be

5   happy to answer them.

6            But in essence Mr. Phebus has a

7   sufficient amount of Indian blood and he has

8   received benefits through the Tribe and through the

9   Tribe's recognition of him as an Indian so the

10  argument that the Tribe doesn't have jurisdiction

11  over Mr. Phebus because he's not a member -- he's

12  an Indian but he's not a Paiute -- can't continue

13  to be asserted in the courts.

14           The argument that because the Court

15  doesn't have jurisdiction he doesn't have to do his

16  community service and he's not subject to the rules

17  of the Court that can't continue, and the Tribe is

18  asking the Court recognize that Mr. Phebus is

19  subject to the jurisdiction and that the Court

20  enter an order prohibiting Mr. Phebus from

21  asserting that same argument.

22           THE COURT:  And do you know the

23  sentence that you're seeking on this?

24           MR. MURCH:  It's the remaining

25  sentence.  I can look it up.  It's the remaining

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005   10/19/11

4

1   sentence on the --

2             MR. PHEBUS:  66 days.

3             MR. MURCH:  It's been months so I --

4             THE COURT:  My calculations looking at

5   my note it was 66 days that he had as a sentence

6   that had been suspended.

7             MR. MURCH:  I will accept the Court

8   and Mr. Phebus's representation.  They match so

9   I'll accept 60 days as the time.

10            THE COURT:  All right.  Mr. Phebus,

11  have you had a chance to read the brief?

12            MR. PHEBUS:  Yeah.

13            THE COURT:  And do you have any

14  position?

15            MR. PHEBUS:  Well, yeah, I'd like to

16  ask some questions because he's saying right now

17  that -- I guess when I read this brief I take it

18  that the Tribe, the Bruce test benefits the Tribe

19  in both ways.  Either I'm not a member or I'm just

20  an Indian.

21            What choice was it ever to be mine

22  because I never had a choice.  It's always been law

23  enforcement's choice to put me in jail as an

24  Indian.  The only choice I had was to commit the

25  crime so when he uses that the Tribe has the right

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005◯10/19/11

5

1   to prosecute me as an Indian, well, I don't claim

2   to be an Indian.   I claim to be a Las Vegas

3   Paiute.

4           I have a court order.  If this Court

5   can enforce its court orders, then how come a court

6   order for my membership can't be enforced also?  If

7   I'm going to be taken to jail as an Indian, then

8   take me to jail as a Las Vegas Paiute like the

9   Court says I am.

10          THE COURT:  And the reference that

11   you're making, I had some questions for you.

12          MR. PHEBUS:  I want to ask you one

13   more thing.  When this -- when I was allowed to ask

14   how the Tribe has jurisdiction over me, if I would

15   have known you was going to let me ask the

16   question, I wouldn't have asked this because you

17   already put me in jail.

18          You should have known better

19   yourself.  You put me in jail under this Bruce test

20   anyway.  You delayed my family's interest for

21   30 days just for this Court just to prove this.

22   The question I should have asked you was I gave you

23   minutes over five months ago about the Tribe

24   refusing the court orders.

25          Well, those minutes explain to you

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005   10/19/11

6

1   that you have the authority assert those court

2   orders because they don't have the right to review

3   them.   Now I'm sitting in here fighting over

4   whether or not I can be prosecuted under this Bruce

5   test or not.

6           Well, if I have to obey court orders

7   and I don't and I go to jail, what about those

8   council people across the street that you consider

9   Las Vegas Paiute.

10          THE COURT:  I have some questions for

11  you.  You were enrolled in the Tribe.

12          MR. PHEBUS:  That's right.

13          THE COURT:  And what years were you

14  enrolled?

15          MR. PHEBUS:  From 1983 to 1999.  Our

16  Tribe did not become a federally recognized tribe

17  until 1983 when I became enrolled and I've got the

18  paperwork to support that, those minutes.

19          THE COURT:  And I've looked at the

20  minutes that you submitted.

21          MR. PHEBUS:  I know but if I can

22  explain, those minutes -- when you read it, it

23  lists where some people were enrolled and then

24  there was another group.  Well, I got the paperwork

25  to show you both of those groups and I was the

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005 10/19/11

7

```
 1    first one to be enrolled.
 2              THE COURT:  And you held yourself out
 3    as a Paiute during the period of 1983 to 1999.
 4              MR. PHEBUS:  Yes, sir, a Las Vegas
 5    Paiute.
 6              THE COURT:  And you accepted
 7    assistance.  I mean did you receive Indian health
 8    services?
 9              MR. PHEBUS:  Well, this is another
10    question.  I was just having to go over some law
11    and some court cases now.  When I answered that
12    question that I accepted health assistance, how can
13    the Court use that against me especially when I'm
14    going to jail and I'm being housed in jail.
15              I understand that law enforcement
16    having or the Court being able to maintain my
17    medical records for that purpose but how can they
18    use my medical or me going to Equity Health against
19    me in this situation right now because this Court
20    does not pay for my medical health.  Equity Health
21    does and this ain't nothing to do with this court.
22              THE COURT:  But you did receive the
23    health services during that period.
24              MR. PHEBUS:  Yes, I have.
25              THE COURT:  And then you had made
```

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

1    representations last month dealing with the Bureau

2    of Indian Affairs, that you'd been incarcerated in

3    Peach Springs.

4              MR. PHEBUS:   That's right, but this

5    last time I was incarcerated at Peach Springs I

6    went there just as an Indian.   Before when I went

7    to jail at Peach Springs I went as a Las Vegas

8    Paiute tribal member and this second time I went I

9    wasn't even supposed to be put down there.

10             THE COURT:   You were brought back.

11             MR. PHEBUS:   I was brought back to

12   North Las Vegas and then after I wrote the BIA and

13   told them my situation and what had happened there,

14   they ordered me to come back.   I do not have the

15   paperwork to prove their order because it was done

16   through the jail, a guy at the jail but he brought

17   me back to North Las Vegas and he told me that he

18   was given orders by the superintendent in Arizona

19   that the BIA does not have jurisdiction over me

20   because I am just an Indian.

21             I have to be a federally recognized

22   Indian to be in their jail.   After I realized that

23   somehow law enforcement was able to get me sent

24   back to Peach Springs despite what their own

25   attorneys had told them.

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

1            THE COURT:  All right.  And did you

2     also attend these language classes?

3            MR. PHEBUS:  Those language classes

4     anybody can go to them.  All they have to look up

5     is Learning the Numu with Leroy Howl (phonetic) dot

6     com and you can learn it on the computer.  I did

7     not go to language classes.  I don't sign no

8     statement saying I do and their Tribe can't prove I

9     do.

10           THE COURT:  That's your answer that

11    you haven't attended language classes.

12           MR. PHEBUS:  That's right.

13           THE COURT:  How about the dance

14    festivals?

15           MR. PHEBUS:  I do not go to powwows

16    because I don't believe in them.

17           THE COURT:  Have you ever been to a

18    powwow?

19           MR. PHEBUS:  Yes, I have, but I don't

20    participate in them.

21           THE COURT:  During the 1983 to 1999

22    period?

23           MR. PHEBUS:  Yes, as a tribal member.

24    I represented our Tribe.

25           THE COURT:  Okay.  And do you have

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005◯10/19/11

10

1   anything else to speak about in terms of

2   mitigation?

3        MR. PHEBUS:  Yes.  This Bruce test I

4   don't understand because in his relevant facts in

5   No. 2 he states under this case United States

6   versus Lara where the Tribe Las inherent

7   self-government powers, well, does that mean

8   sovereign immunity, would that be considered

9   sovereign immunity where the tribe has inherent

10  self-government powers?  That would be considered

11  sovereign immunity, correct?

12       Under United States versus Lara the

13  Tribe has sovereign immunity and the right to

14  exercise their criminal or jurisdiction over

15  nonmember Indians.  Under that court case sovereign

16  immunity, well, I don't understand that because

17  when I got to court and I got reinstated as a

18  tribal member when we was -- because of what the

19  Tribe did by disenrolling how has the Tribe lost

20  their sovereign immunity.  How does the Bruce test

21  apply to me when the Tribe has no sovereign

22  immunity against me?  They wavered (sic) that.

23       MR. GONZALES:  Well, that isn't the

24  test that you're stating.

25       MR. PHEBUS:  I know but under this

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005◯10/19/11

11

1    Bruce test, yes.

2              THE COURT:  No, under the Bruce test

3    the factors that I've asked you and you've answered

4    are the basis for finding that the Court has

5    jurisdiction over you.

6              MR. PHEBUS:  Because I can't.

7              THE COURT:  Because of the

8    representations -- we have jurisdiction over you as

9    an Indian, as a Native American.  You don't have to

10   be a member of the Tribe which is what you've been

11   arguing.

12             MR. PHEBUS:  But don't I have the

13   right to choose what I am because it's been choosed

14   (sic) for me.

15             THE COURT:  It's been chosen by the --

16   it's by Congress is the one who made the

17   determination.

18             MR. PHEBUS:  Can I show you something,

19   a document 'cause I want to explain something.

20             THE COURT:  Have you presented it to

21   the Tribe?

22             MR. PHEBUS:  I'm scared to give my

23   paperwork to the Tribe because it can be turned

24   around and used some other way.  If you don't see

25   it first, I'm not going to give them their own

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005⬭10/19/11

12

1    record because they have themselves, law

2    enforcement has it and this Court has it, I'm not

3    going to give it to them again.

4           THE COURT:   What we have to do,

5    Mr. Phebus, is try to be fair to both sides.

6    That's why I asked to put this in writing.

7           MR. PHEBUS:   No, they don't.   If I may

8    mention there was a situation in disenrollment when

9    it first happened.   There was two families, my

10   family and another family.   One of those people was

11   trespassed by the tribal council without any court

12   orders so when law enforcement went to go apprehend

13   them, they apprehended them up at Equity Health

14   taking her child to go see the doctor.

15          When they arrested that person for

16   trespassing, they -- instead of taking them to

17   North Las Vegas and booking them in as an Indian

18   like they do me as a disenrolled person, they took

19   her to the county and booked her in as a white

20   person.

21          She had a choice but yet they don't

22   give me a choice.   They take me to North Las Vegas

23   and book me as an Indian.   This woman's sitting in

24   the council.   I've got the arrest record and

25   everything.

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005◯10/19/11

13

1    THE COURT:  I understand.  Do you have

2  anything else you want to bring up in terms of

3  mitigation?

4    MR. PHEBUS:  I don't understand how

5  this Tribe, is it fair to you that they can use

6  this Bruce test in both ways.  If I'm not a Las

7  Vegas Paiute Indian, then is it fair to use this

8  Bruce test to prosecute me as an Indian.

9    THE COURT:  Yes.  That's what we're

10  making a finding here.  The issue as the law as has

11  to be applied by the Court is governed by not only

12  the Bruce test but there's another case cited in

13  here in the brief that I've reviewed, United States

14  of America versus Maggi which is a 2010 case March

15  16th.

16    MR. PHEBUS:  In the Bruce test.

17    THE COURT:  No.  It applies to the

18  Bruce test again and it's cited in the brief which

19  is probably the most current.  It's footnote 9.  It

20  says it's important to note the Court only consider

21  native blood from a federally-recognized tribe and

22  also the defendant may meet this test by

23  showing Indian blood from many federally-recognized

24  tribes.  Accordingly four-64ths Paiute blood . . .

25    In the representations made here is

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005◯10/19/11                   ◯

14

1    that based upon the sufficiency of the blood, the

2    Tribe had recognized you in the past but doesn't

3    currently recognize you for Paiute purposes so the

4    Court adopts those findings and what I'm asking you

5    is there any mitigation, you know, you kind of took

6    a stance that you weren't going to do the requested

7    community service and that you were going to take

8    these issues.

9              I'm just asking you before I make the

10   decision if you have any type of mitigation meaning

11   do you have anything to say on behalf of yourself

12   to deal with the 66 days that have been -- you've

13   previously been sentenced to 60 days.  It was

14   suspended.  We're here to impose that sentence on

15   you now.

16             MR. PHEBUS:  So all the paperwork I've

17   given you before has nothing to do with what you're

18   going to do to me now.

19             THE COURT:  We're finding we have

20   jurisdiction over you again.

21             MR. PHEBUS:  So you're claiming you do

22   have jurisdiction over me.

23             THE COURT:  Yes.  I'm making a finding

24   I have jurisdiction.

25             MR. PHEBUS:  What about the fact we

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005◯10/19/11                    ◯

15

1   have a council member that was disenrolled.

2              THE COURT:  That isn't before me.

3              MR. PHEBUS:  That's the way I'm

4   prosecuted in this court.  It effects you, the way

5   you conceive a Las Vegas Paiute because I don't

6   know what you're calling a Las Vegas Paiute.  It

7   sure can't be them.

8              THE COURT:  It doesn't have to be what

9   we're calling.  That's what I'm telling you.

10             MR. PHEBUS:  It can just be an Indian.

11             THE COURT:  Yes.

12             MR. PHEBUS:  When is it my choice to

13  be an Indian?

14             THE COURT:  Well, apparently it was

15  your choice all along.

16             MR. PHEBUS:  I committed the crime was

17  my choice.  It was never my choice to decide my

18  ethnicity.  You people have been doing it for me.

19  He has been doing it for me.  He has even decided

20  my mom's blood quantum and she didn't give him

21  permission to.  I can't approach that because

22  you're going to put me in jail for not doing my

23  community service.  That's a bunch of bull.

24             THE COURT:  Is that your mitigation?

25             MR. PHEBUS:  I'm not doing the

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005( )10/19/11

16

1    community service because I'm trying to prove a

2    point here.

3                    THE COURT:  I understand.  That's what

4    I'm asking.

5                    MR. PHEBUS:  That's my mitigation.

6                    THE COURT:  You're doing this to prove

7    a point.

8                    MR. PHEBUS:  If that's the way you're

9    going to put -- I don't want to -- I feel that you

10   are an attorney.  You're going --

11                   THE COURT:  I'm your judge.

12                   MR. PHEBUS:  You're going to put me in

13   a position where I'm going to hang myself.  I'm not

14   trying to do that.  Okay?  You know, I don't know.

15   I just don't get what you're doing here.

16                   THE COURT:  Do you have anything else

17   you want to bring before the Court?

18                   MR. PHEBUS:  No, I don't.

19                   THE COURT:  The Court orders the

20   sentence of 60 days will be imposed.  You'll be

21   turned over to the custody of the chief of police

22   at this time.  Stand up.

23                   MR. PHEBUS:  You're a sorry judge.

24   You need to remove yourself not like Greg Koppe at

25   his own.  Just remove yourself.  You're not needed

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005◯10/19/11

17

1    here.  You kiss ass.

2            CHIEF BELCHER: (Inaudible).

3            MR. PHEBUS:  You shut up.  All you

4    have done is -- you piece of shit.  I could just

5    kick you in the face, you ugly asshole.  Don't you

6    touch me.  You are so wrong.  You are so wrong.

7            You need to remove yourself from this

8    reservation or I'll run you off of here.

9            CHIEF BELCHER:  We'll file for

10   threats.

11           MR. PHEBUS:  You shut up, Belcher, you

12   sorry ass, you piece of shit.

13

14

15

16

17

18

19

20

21

22

23

24

25

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

CR11-005  10/19/11

18

```
 1                    REPORTER'S CERTIFICATE

 2

 3     STATE OF NEVADA              )

 4                                  ) ss

 5     COUNTY OF CLARK              )

 6

 7              I, Cheryl Gardner, RMR-RPR, CCR 230,

 8     do hereby certify that I took down in Stenotype all

 9     of the proceedings had in the before-entitled

10     matter at the time and place indicated and that

11     thereafter said shorthand notes were transcribed

12     into typewriting by me and that the foregoing

13     transcript constitutes a full, true, and accurate

14     record of the proceedings had.

15              IN WITNESS WHEREOF, I have hereunto

16     set my hand and affixed my official seal of office

17     in the County of Clark, State of Nevada, this 20th

18     day of October, 2011.

19

20

21

22

23          _____

24          CHERYL GARDNER, RMR-RPR, CCR 230

25
```

PURSUANT TO NRS 239.053 AND 3.370.6, ILLEGAL TO COPY
WITHOUT PAYMENT TO CHERYL GARDNER, CCR 230

EXHIBIT 4

EXHIBIT 4



Filed in L.V. Paiute Court

Date: *10/28/11*   Time: *0845*

Court Clerk: _____.

# LAS VEGAS PAIUTE TRIBAL COURT

## ORDER OF REMAND

IN THE MATTER OF:

LAS VEGAS PAIUTE TRIBE
         Plaintiff

vs.                                                CASE NO. CR11-004
                                                   CASE NO. CR11-005
CHRISTOPHER W. PHEBUS
DOB: 07-31-69
                  Defendant

   This matter came before the Las Vegas Paiute Tribal Court on Wednesday, October 19, 2011.  Defendant Christopher Phebus (Defendant) appeared *pro se*.  The Las Vegas Paiute Tribe (the Tribe) was represented by Tribal Prosecutor Patrick Murch.

**FINDINGS OF FACT:**

1.  On January 31, 2011, the Court entered a plea of not guilty on Defendant's behalf on the following charges:

    a.  Las Vegas Paiute Tribal Code 5-70-010: Disorderly Conduct (CR11-004).

    b.  NRS 200.571: Harassment and Stalking (CR11-005).

2.  After a trial on February 17, 2011, the Court found Defendant guilty of the following:

    a.  Las Vegas Paiute Tribal Code 5-70-010 – Disorderly Conduct (CR11-004).

   b. NRS 200.571 – Harassment and Stalking (CR11-005).

3. On February 17, 2011, the Court sentenced the Defendant to the following:

   a. Violation of Tribal Code § 5-70-010 – Disorderly Conduct (CR11-004): $2,000 fine, with a credit of $100.00, payable by community service at the rate of $100.00 per eight hours worked AND incarceration for 20 days at the City of North Las Vegas Detention Center, with credit for time served of 21 days.

   b. Violation of NRS 200.571 – Harassment and Stalking (CR11-005): $2,500 fine, with a credit for $100.00, payable by community service at the rate of $100.00 per eight hours worked.

4. On March 31, 2011, the Court entered an order requiring Defendant to show cause why he should not be held in contempt for failing to comply with the community service requirements that were imposed in connection with the above-referenced convictions.

5. On April 21, 2011, the Court held a hearing on the order to show cause and found Defendant to be in contempt of court. The Court entered an order (the April 21 Order) sentencing Defendant to 60 days in jail, suspended. The Court also suspended Defendant's remaining six days of jail time on the disorderly conduct conviction in Case No. CR11-004. In addition, the Court ordered Defendant to attend anger management classes and complete the remainder of his community service at a rate of no less than 15 hours per week.

6. On May 19, 2011, the Court conducted a status check hearing to assess Defendant's progress in fulfilling his community service hours and anger management classes. The Court determined that Defendant was satisfactorily completing his community service hours, but that he had failed to complete his anger management classes.

7. On June 16, 2011, the Court conducted another status check hearing, wherein it determined that Defendant was satisfactorily completing his community service hours, but that he had failed to complete his anger management classes.

8. On July 20, 2011, the Court conducted another status check hearing, wherein it determined that Defendant had not made satisfactory progress on his community service hours, and also that he had failed to complete his anger management classes.

9. On September 14, 2011, the Court conducted another status check hearing, wherein it determined that Defendant had not made satisfactory progress on his community service hours, and also that he had failed to complete his anger management classes. The Court entered an order requiring Defendant to show cause why he had not complied with the February 17 order.

10. On October 19, 2011, the Court held a hearing on the order to show cause.  The Court also heard arguments from Defendant and the Tribe regarding the Court's jurisdiction over Defendant.

11. Based on the arguments and evidence presented by Defendant and the Tribe, the Court finds that Defendant is in contempt for violating the April 21 Order.

12. In addition, the Court finds that although Defendant is not a member of the Tribe, he is an Indian under the test enunciated by the Ninth Circuit Court of Appeals in <u>United States v. Bruce</u>, 394 F.3d 1215 (9th Cir. 2005).

**THEREFORE, IT IS ORDERED:**

1. The Court has jurisdiction over Defendant pursuant to <u>Bruce</u>.

2. Defendant shall serve the remainder of the suspended sentence (66 days) that was imposed pursuant to the April 21 Order.

3. Defendant's current release date is December 23, 2011.

SO ORDERED this 27 day of October 2011.

_____
Cal J. Potter III
Las Vegas Paiute Tribal Judge

Copies distributed to:
Patrick Murch, Las Vegas Paiute Tribal Prosecutor
Las Vegas Paiute Tribal Police Department
Bureau of Indian Affairs Detention

# EXHIBIT 5

# EXHIBIT 5

**COPY**

1

CASE NO. CR12-008

LAS VEGAS PAIUTE TRIBE,

       Plaintiff,

   vs.                        REPORTER'S TRANSCRIPT
                                      OF
CHRISTOPHER PHEBUS,                PROCEEDINGS

       Defendant.

BEFORE THE HON. CAL J. POTTER, III, TRIBAL JUDGE

       THURSDAY, DECEMBER 27, 2012
              3:00 P.M.

APPEARANCES:

For the Tribe:        PATRICK J. MURCH

For the Defendant:    PROPER PERSON

Reported by:  Gerri De Lucca, R.M.R., C.C.R. No. 82

---

2

INDEX

WITNESSES FOR THE TRIBE                          PAGE

DON BELCHER
   Direct Examination by Mr. Murch:                4
   Cross-Examination by Mr. Phebus:                8

EVERSON NAKAI
   Direct Examination by Mr. Murch:               22
   Cross-Examination by Mr. Phebus:               24

WITNESSES FOR THE DEFENSE

MARIE WILSON
   Examination by The Court:                      29

CHRISTOPHER PHEBUS
   Proper Person Statement:                       32
   Cross-Examination by Mr. Murch:                37

---

3

LAS VEGAS, NEVADA, THURSDAY, DECEMBER 27, 2012

       *    *    *    *    *

       THE COURT:  The next matter is CR12-008,
the Tribe v. Christopher Phebus.  The charge is
improper influence on official matters.  This is the
time set for the trial.

       The record will reflect Mr. Murch
is here representing the Tribe, and Mr. Phebus is
here out of custody.

       Are the parties ready to proceed?

       MR. MURCH:  The Tribe's ready to proceed,
your Honor.

       THE COURT:  Mr. Phebus, are you ready to
proceed?

       MR. PHEBUS:  Yes.

       MR. MURCH:  The Tribe calls Chief
Belcher.

---

4

D O N   B E L C H E R, having been first duly sworn to
testify to the truth, the whole truth, and nothing
but the truth, testified as follows:

       DIRECT EXAMINATION

BY MR. MURCH:

       Q.   Good afternoon, Chief Belcher.

       A.   Good afternoon.

       Q.   State your name for the record.

       A.   Don Belcher.

       Q.   And are you employed by the tribal
police?

       A.   Yes, I am.

       Q.   In what capacity?

       A.   I'm a chief with the Las Vegas Paiute
Police Department.

       Q.   Do you know Christopher Phebus?

       A.   Yes, I do.

       Q.   Could you point Mr. Phebus out to us.

       A.   Yes.  He's sitting at the table on the
right.

       THE COURT:  The record will reflect that
Mr. Phebus has been identified by Chief Belcher.

BY MR. MURCH:

       Q.   Were you working on the morning of

5

1  November 6, 2012?
2      A.    I was.
3      Q.    And were you involved in an incident with
4  Mr. Phebus?
5      A.    Yes.
6      Q.    Can you describe that incident to me?
7      A.    Yes.  It was around 10:00 and Mr. Phebus
8  had come into the front entry of the police
9  department and had requested to talk to me and I
10 stepped out to speak with him and he immediately told
11 me that he wanted a court order from Dave Colvin.
12           And I told him there was no way
13 that I could provide a court order of any kind and
14 any paperwork whatsoever, that he would have to go
15 through Colvin or go through an attorney to get that
16 type of paperwork, that I didn't have access to it.
17     Q.    Who's Dave Colvin?
18     A.    He's the Las Vegas Paiute Tribe's
19 attorney.
20     Q.    Do you know Mr. Colvin?
21     A.    I do.
22     Q.    Do you have any professional relationship
23 with him?
24     A.    I do.
25     Q.    Do you have a personal relationship with

6

1  him?
2      A.    No.
3      Q.    So Mr. Phebus asked you to get a court
4  order from Mr. Colvin, and what happened after that?
5      A.    When I told him no, that I couldn't do
6  that, he turned to me and he got loud and he was
7  telling me that I kicked his family in the ass.  And
8  I could tell at that time that Chris was getting out
9  of line.
10           I told him, calm down, and he
11 said, I'll tell you what, he said, if I go up to the
12 health clinic and my Certificate of Indian Blood's in
13 the file up there, I'm going to get it out, I'm going
14 to wrap it in a rock, and I'm going to throw it
15 through your office window.
16           And I said, Chris, I said, you
17 don't need to be threatening me.  I said, calm down.
18 I said, you need to leave the facility right now.
19 And he turned around and when he did I shut the door
20 and went back in and he left.
21     Q.    Do you have the ability to contact
22 Mr. Colvin?
23     A.    Yes.
24     Q.    Could you, if you wanted to, could you
25 call him and ask him for a court order?

7

1      A.    I could.
2      Q.    Then are you aware of an incident that
3  happened the next day after Mr. Phebus was in the
4  office and threatened to throw a rock through the
5  window?
6      A.    Yes, I'm aware that it occurred.
7      Q.    What's your understanding of that
8  incident?
9      A.    Well, what I understand is that Chris
10 Phebus brought a boulder or a big rock inside the
11 facility.  Well, I know that he did.  And he had it
12 wrapped in paper around it.  And he told the
13 dispatcher, I've got this for Chief Belcher when he
14 returns.  Look what I've got for him, indicating that
15 he was going to throw the rock through the window,
16 what I took it to mean.
17     Q.    And did you have any reaction to that in
18 terms of your behavior in the police station after
19 that incident occurred?
20     A.    Yes, I did.  I had to kind of change the
21 way I was doing business in the office because
22 anybody that come in, I had to make them aware that,
23 hey, I could have a boulder come through my window at
24 any time because I had someone threaten to throw one
25 through the window.  And I was advising them of that

8

1  for their sake because it is glass and I wanted them
2  to be aware that I had been threatened.
3      Q.    And where is your office in this
4  building?
5      A.    It's at the front just as you come in the
6  door on the left.
7      Q.    And where is the window in the office,
8  which way does it face?
9      A.    It faces east, and it's right along the
10 building right by my desk.
11     Q.    Is it something that somebody would be
12 able to access from the front of the building?
13     A.    Yes.
14           MR. MURCH:  I don't have any more
15 questions for Chief Belcher.
16           THE COURT:  Cross-examination,
17 Mr. Phebus.
18
19           CROSS-EXAMINATION
20 BY MR. PHEBUS:
21     Q.    Officer Belcher, if you felt threatened
22 by me when I came in and said what I was going to do
23 to you the very first time, like any other time, why
24 didn't you just arrest me and charge me for something
25 like harassment or something like that; why didn't

9

1  you just do that then?

2      A.    Well, I wasn't here at the time that you

3  brought the rock into the --

4      Q.    I know, but there was other officers that

5  were here the same time that the next incident

6  happened.  They didn't do it then either.  You wanted

7  to wait till -- I don't want to have to ask them,

8  because I don't have that kind of relationship,

9  employee, you know, I don't have that.

10          All right.  And so the incident

11  about the Certificate of Indian Blood, do you know

12  why I'm angry about that?

13          MR. MURCH:  Objection, your Honor.

14          MR. PHEBUS:  No objection.  You got to

15  hear this, your Honor.

16          THE COURT:  I think it's relevant.  Go

17  ahead.

18          MR. PHEBUS:  It does affect me.  All this

19  time I've been coming to court with Greg Koppe and

20  his five years of being a judge here, he always said

21  that these civil matters, that certificate, my blood

22  quantum never had anything to do with civil matters,

23  with my criminal matters it does.  My anger --

24          THE COURT:  At this point you have to ask

25  questions.

10

1          MR. PHEBUS:  This is for your

2  information.  I'm going to.  I have to reflect on

3  this in order to get what I'm going to ask him so you

4  can put two together.

5          THE COURT:  You'll get an opportunity to

6  make a statement or testify, but right now we're

7  questioning the chief, so --

8

9          (Overlapping speakers)

10

11  BY MR. PHEBUS:

12      Q.    Do you know why I'm upset with that

13  Certificate of Indian Blood?

14      A.    Yes, I do.

15      Q.    And then you think I'm going to throw a

16  rock through your window?  If I don't have a way to

17  complain about this -- wait.

18          I came over here to file or ask

19  for an incident report because this Certificate of

20  Indian Blood affected me at Equity Health.  When I

21  went up to look at my records, my medical records, I

22  had requested all my information on my native status.

23          Well, the information that I had

24  in there before is missing.  Now, wait.  Because I

25  was sent to jail previously by this man, okay, and

11

1  his paperwork, he had made that Certificate of Indian

2  Blood, which ended up in my medical file that had

3  nothing to do with my court case or my criminal

4  matters in this court, but, yes, it does affect me.

5          I'm angry because I don't get the

6  opportunity to correct it through him, through this

7  Court or across the street, and I get persecuted for

8  being an Indian, but yet you can sit up there and say

9  Las Vegas Paiute, that's the Las Vegas Paiute.

10          THE COURT:  Do you have any other

11  questions?

12          MR. PHEBUS:  Why do you put me at the

13  last when I can't say it in front of all these other

14  people, because when do you this --

15          THE COURT:  Because yours takes longer.

16          MR. PHEBUS:  When you do this against me

17  and you let this man make that Certificate of Indian

18  Blood and you do not acknowledge it or address it,

19  you affect us.  For instance, child welfare cases.

20  When my brother and his kids want --

21          MR. MURCH:  Your Honor, if I could make

22  an objection for the record.

23          MR. PHEBUS:  No, no, no, no, no.

24          THE COURT:  Okay.

25          MR. PHEBUS:  Now you're going to send me

12

1  to jail, you're going to --

2          THE COURT:  Mr. Phebus, you're going to

3  get an opportunity to explain all that.  All I'm

4  asking you is to do it in an orderly fashion, okay?

5          MR. PHEBUS:  I'm not an attorney.

6          THE COURT:  That's why I'm trying to help

7  you here, okay?  I'm trying to explain to you --

8          MR. PHEBUS:  Now you're going to try to

9  help me.

10          THE COURT:  Do you have any other

11  questions of the chief?

12  BY MR. PHEBUS:

13      Q.    How do I resolve my Certificate of Indian

14  Blood if I cannot get cooperation through your police

15  to get an incident report so I can file a complaint,

16  how do I resolve it?

17      A.    The question that you're asking me is --

18  I'm not sure what you're trying to resolve, but --

19  whether you're trying to eliminate it or trying to

20  get how it came about or what's the question?

21      Q.    Yeah, I did ask your officer that.

22      A.    No, no, what are you asking me?  I want

23  you to ask me.

24      Q.    When I asked for this, to get this

25  incident report, that there was questions I had

13

1  asked, just what you did, who did this, where did my
2  paperwork go, can I get rid of it.  And then I was
3  directed to go to the -- from Equity Health and the
4  people there to go to the Council over here, but when
5  I go over there, I'm turned down, it causes a
6  problem.
7          When that problem arises, you guys
8  come and arrest me.  It's been that way since our
9  disenrollment and I don't know what to do.
10         THE COURT:  Let me ask the questions then
11 that I think would be pertinent here.
12         Chief, do you have -- did you have
13 an understanding of a court order from Dave Colvin
14 being in existence?
15         THE WITNESS:  No.  He's asking for one.
16 I don't know what it says.
17         MR. PHEBUS:  It's a court order because
18 when we were disenrolled, that chairman at that time
19 disenrolled us, wanted to get rid of my mom, my aunt,
20 my two aunts, and then my mom and them guys, my mom
21 and her two sisters had hired an attorney for their
22 case alone and Colvin ruled that their enrollment
23 files were to remain sealed.  So he's allowed to get
24 a certificate and put me in jail.
25         THE WITNESS:  He wants to know how it

14

1  came about.  I can explain that.
2          THE COURT:  But my initial question is do
3  you have the order in your possession?
4          THE WITNESS:  No.
5          THE COURT:  Do you know where the order
6  is?
7          THE WITNESS:  I don't.
8          THE COURT:  And Mr. Colvin that we're
9  talking about, Dave Colvin, the tribal attorney, does
10 he have a set of records that are in question here?
11         THE WITNESS:  Well, I believe what the
12 situation is, he is the tribal attorney, and when he
13 would not entertain any requests from me because it's
14 an enrollment issue, and supposedly Mr. Phebus has a
15 court of record attorney, and that they have to go
16 through certain protocol, I couldn't get anything
17 from him, even though I could call, he would say no.
18 BY MR. PHEBUS:
19    Q.    How did it end up in my medical file to
20 send me to jail?
21    A.    That's the CIB you're asking about.
22    Q.    That's right.  That's enrollment.  You
23 shouldn't have nothing to do with it.
24    A.    I can explain that.
25    Q.    No, you can't because she never gave you

15

1  permission to.
2          THE COURT:  Wait a minute.  You were
3  asking about the chief contacting Dave Colvin and
4  he's just testified that he could not contact him
5  because it was a legal matter with counsel of record.
6          Why do you believe that the chief
7  is the individual to contact Colvin?
8          MR. PHEBUS:  I don't believe he needs to.
9  I'm accusing him about the Certificate of Indian
10 Blood and making a false document to put me in jail.
11 That's why I came down to threaten him with that
12 rock, because I was angry over it, because I cannot
13 resolve that issue because of the disenrollment that
14 you say have nothing to do with the criminal matters,
15 but it does.  It affects us, child welfare, it
16 affects everything.
17         THE COURT:  But right now we're dealing
18 with the chief.  Why do you believe the chief -- what
19 I'm trying to ask you is if there's questions you
20 have of the chief, why are you blaming the chief for
21 something someone else did?
22         MR. PHEBUS:  Who did it?
23         THE WITNESS:  I'm going to explain it.
24         THE COURT:  Go ahead.
25         THE WITNESS:  Yes, he did get a

16

1  Certificate of Indian Blood for medical assistance.
2  Now, this was back when he was in custody a couple
3  years ago.  He went to jail.  Now, his mother is
4  sitting here.  She did come in to see me and she
5  said, I am concerned about Chris' medical, his
6  ability to receive medical treatment.
7          And I said, well, why?  Well, he
8  can't receive it there.  And so I said, okay, I said,
9  if he can't get medical treatment, I'll see what I
10 can do as far as make those powers to be aware of
11 this.  That's all I can do, because I don't know what
12 the procedure is myself.
13         So at that particular time when
14 she left I contacted the court and Judge Tsosi was
15 the judge that was in charge of his incarceration at
16 that time and ordered him to jail, and from that
17 point she took everything into consideration as far
18 as him being in custody, and she did know that his
19 mom had come in concerned about his medical and
20 wanted him to be able to receive medical treatment.
21         Now, when I contacted the Bureau
22 of Indian Affairs they said, well, one of two things
23 is going to happen.  We need a Certificate of Indian
24 Blood to show that he is a descendent of Native
25 American.  Tribal member will work.  That's all.

**17**

1  That's all the Certificate of Indian Blood is.  It
2  has nothing to do with anything else except for
3  medical assistance.
4          Or we're going to send him to a
5  facility outside the BIA, which would be a county
6  hospital or whatever.  Say something happened to him
7  and he needed medical, they would transport him over.
8  They would not pay for it.  That they would come back
9  to him or his mother.
10         Now, that's the two choices we
11 have, so when I contacted the Judge or I may have
12 went through the court clerk and said, hey, this is
13 what's happening, this is what we need.  The Judge
14 comes back, Judge Tsosi, and orders that CIB be
15 provided for Chris Phebus because one, not that only
16 his mother come in requesting assistance, but two, in
17 her opinion we didn't need that because he was in our
18 custody, he's our responsibility, and we have to
19 provide medical treatment to him.
20 BY MR. PHEBUS:
21    Q.     Her opinion.
22    A.     That was her opinion.
23    Q.     You never gave her one.  You didn't ask
24 her -- you didn't give her -- you didn't even tell
25 her you were going to make one.

**18**

1          THE COURT:  Who's she?
2
3          (Overlapping speakers)
4
5          THE WITNESS:  She told us to make one.
6          THE COURT:  We'll let you testify is.
7
8          (Overlapping speakers)
9
10 BY MR. PHEBUS:
11    Q.     What did Judge Tsosi have to do with her
12 blood quantum?  You tell me that.
13    A.     Can I finish?
14    Q.     No, no, no, no.
15          THE COURT:  Go ahead, Chief.
16
17          (Overlapping speakers)
18
19          You're going to get an opportunity
20 to ask questions.  You asked question.  He's answered
21 it.  Go ahead.
22          THE WITNESS:  That's how the Certificate
23 of Indian Blood came about.  And then when I received
24 it, I provided it to the Bureau of Indian Affairs,
25 because that's what they needed to provide medical

**19**

1  assistance.
2          Now, how it got in his file up
3  here at the health clinic, which he's wanting to
4  know, there's only a couple ways that that could have
5  happened.  Either the director got a copy from our
6  counsel, or two, the facility where he was at, it was
7  New Mexico, wherever it might have been, I don't
8  remember, when they treated him, even if it was on an
9  intake for a physical to make sure he was okay, they
10 would bill our facility, because this Tribe would be
11 paying for whatever it is that they do for him, and
12 they have to have that Certificate of Indian Blood at
13 our health clinic to pay for whatever medical cost
14 he's created for the BIA.
15         Now, that could have been how that
16 got to your file.  That's all I know.
17         THE COURT:  And the rock that was brought
18 forward, were you here when that rock was --
19         THE WITNESS:  No.  When it was brought
20 into the station, sir, no.
21         MR. PHEBUS:  Can I ask him something?
22         THE COURT:  Go ahead.
23 BY MR. PHEBUS:
24    Q.     Again, you didn't need permission to ask
25 Tsosi to get that.

**20**

1          Can you distinguish -- I need to
2  get this clarified.  When you asked Tsosi to make
3  that Certificate of Indian Blood for purposes of
4  getting me in jail, it wasn't -- your paperwork don't
5  say that.  Your paperwork says this Certificate of
6  Indian Blood --
7     A.     Whatever it says, Chris, that's what she
8  came back with, and she also said, as far as I
9  know --
10    Q.     You have a choice, this Tribe has a
11 choice.  It can either pay for me at North Las Vegas
12 or Henderson or it can send me to BIA.  You had that.
13 You don't need a Certificate of Indian Blood to leave
14 me in North Las Vegas.  You needed one to get me to
15 the BIA.  The Tribe can pay for my stay in North Las
16 Vegas.  You can determine that.
17    A.     That's not correct.  I don't need one to
18 get you to BIA.  I need one or we do to get you
19 services through medical.
20    Q.     But, now, again, that Certificate of
21 Indian Blood got into my record after you had Ramona
22 Tsosi make it.  It became -- it came from you.
23    A.     She decided to do it.  I just told her
24 what the BIA requested.
25    Q.     In your Tribe?

21

1      A.      No, I said the Bureau of Indian Affairs.
2  What they requested to --
3      Q.      What about us, not the Bureau of Indian
4  Affairs.  You know what's really funny --
5           THE COURT:  You have to ask questions,
6  Mr. Phebus.
7           MR. PHEBUS:  Can I direct something to
8  you?
9           THE COURT:  No, not at this point.  Do
10  you have any other questions?
11          MR. PHEBUS:  No.
12          THE COURT:  Do you have any redirect?
13          MR. MURCH:  No, your Honor.
14          THE COURT:  Thank you.  You're excused.
15
16           (Witness excused)
17
18          MR. MURCH:  The Tribe calls Everson
19  Nakai.
20
21
22
23
24
25

22

1  E V E R S O N  N A K A I, having been first duly
2  sworn to testify to the truth, the whole truth, and
3  nothing but the truth, testified as follows:
4
5           DIRECT EXAMINATION
6  BY MR. MURCH:
7      Q.      State your name for the record, please.
8      A.      Everson Nakai.
9      Q.      Mr. Nakai, who's your employer?
10      A.      Las Vegas Paiute Police Department.
11      Q.      What is your job title?
12      A.      I'm the tech radio department
13  coordinator.
14      Q.      Can you explain that in layman's terms,
15  what responsibility you have?
16      A.      I communicate between our police
17  department and the Department of Public Safety for
18  the State of Nevada and make sure our department is
19  in compliance with the daily policy and procedures.
20      Q.      Do you also perform dispatch duties for
21  the Tribe?
22      A.      Yes, I do.
23      Q.      Where is your desk located?
24      A.      In the front of the building.
25      Q.      In this building?

23

1      A.      Yeah.
2      Q.      Just inside the front door?
3      A.      Yes.
4      Q.      So if you come in the front door and look
5  to the right, is that where you sit?
6      A.      That's the office.
7      Q.      And do you know Christopher Phebus?
8      A.      Yes, I do.
9      Q.      Can you identify Mr. Phebus?
10      A.      He's right here, sitting right here.
11          MR. MURCH:  Let the record reflect he
12  identified the defendant Mr. Phebus.
13          THE COURT:  The record will so reflect.
14  BY MR. MURCH:
15      Q.      Were you working on the night or the
16  afternoon of November 7, 2012.
17      A.      Yes, I was.
18      Q.      Do you recall an incident that happened
19  with Mr. Phebus on that day?
20      A.      Yes.
21      Q.      Can you describe that for me?
22      A.      He came into the department holding a
23  rock, saying, tell Belcher when he comes in tomorrow
24  I got something for him.
25      Q.      Then what happened after that?

24

1      A.      He left.
2          MR. MURCH:  I have no further questions
3  for this witness.
4          THE COURT:  Cross-examination,
5  Mr. Phebus.
6
7           CROSS-EXAMINATION
8  BY MR. PHEBUS:
9      Q.      Everson, have you ever felt any danger of
10  me?  Have I ever made you feel in danger?
11      A.      No.
12          THE COURT:  At any time did you see a
13  rock?
14          THE WITNESS:  Yes.
15          THE COURT:  And where did you see the
16  rock?
17          THE WITNESS:  In his right hand.
18  BY MR. PHEBUS:
19      Q.      Did it have a paper on it?
20      A.      Yes.
21          THE COURT:  How big was the rock?
22          THE WITNESS:  I'd say a good size.  About
23  that size.
24          THE COURT:  Just for the record you're
25  holding your two hands up apart --

**25**

```
 1              THE WITNESS:  Pretty big.
 2              THE COURT:  -- six to eight inches?
 3              THE WITNESS:  Yeah.
 4              THE COURT:  Go ahead.
 5    BY MR. PHEBUS:
 6         Q.   Did you see the video?
 7         A.   Yes, I did.
 8         Q.   The first time when I came in -- nothing.
 9    I have no questions.
10              THE COURT:  What was your understanding
11    when he showed you the rock?
12              THE WITNESS:  That he was going to throw
13    it through Chief Belcher's and basically the paper
14    was his CIB?
15    BY MR. PHEBUS:
16         Q.   Were you here when the first incident
17    happened when I came in and talked to Belcher?
18         A.   The first incident --
19         Q.   When I came in and told Belcher what I
20    was going to do, were you here?
21         A.   Yes, I was.
22              THE COURT:  Any other questions?
23              MR. MURCH:  No, your Honor.
24              THE COURT:  You may be excused.
25              Is he free to leave?
```

**26**

```
 1              MR. MURCH:  He's free to leave.
 2
 3              (Witness excused)
 4
 5              That's all of my witnesses.
 6              THE COURT:  What about the videotape?
 7              MR. MURCH:  I do have a copy of the
 8    videotape.
 9              THE COURT:  Is there any way to play it?
10              MR. MURCH:  I don't have a way to play
11    it.
12              THE CLERK:  In my desktop computer.
13              THE COURT:  Have you seen the tape,
14    Mr. Phebus?
15              MR. PHEBUS:  I don't care to.  I know
16    what I did.
17              MR. MURCH:  I don't know that we need the
18    videotape unless your Honor wants to see it.
19              THE COURT:  He's had an opportunity to
20    see it.  He's not taking exception to the statements.
21              This is your time to call
22    witnesses or you can testify.
23              MR. PHEBUS:  I'll testify.  Can I speak?
24              THE COURT:  Yes.
25              MR. PHEBUS:  I don't know.  I have
```

**27**

```
 1    questions to ask you.  I don't know what direction
 2    I'm going here really.  I just --
 3              THE COURT:  Is your mother involved in
 4    this at all?
 5              MR. PHEBUS:  Well, yes, because the
 6    certificate.
 7              THE COURT:  Do you want to call her as a
 8    witness?
 9              MR. PHEBUS:  I don't want my mom to be in
10    court because you just don't understand these civil
11    matters, you know, when you --
12              THE COURT:  This isn't a civil matter.
13
14              (Overlapping speakers)
15
16              MR. PHEBUS:  Mom, I'm not an attorney.
17              MS. WILSON:  Listen to me.  You need to
18    tell the Judge sometime that I'm sick all the time.
19              MR. PHEBUS:  You're here to tell him now.
20              THE COURT:  Ma'am, do you want to
21    testify?
22              MS. WILSON:  All I know is --
23              THE COURT:  If you do, we need to have
24    you come up and state your name.
25              MS. WILSON:  My son supposedly --
```

**28**

```
 1              THE COURT:  We'll give you an oath and
 2    we'll have you sit here.
 3
 4
 5    M A R I E   W I L S O N, having been first duly sworn
 6    to testify to the truth, the whole truth, and nothing
 7    but the truth, testified as follows:
 8
 9
10              THE COURT:  Can you state your name for
11    the record?
12              THE WITNESS:  Marie Wilson, 1308 Kent
13    Street.
14              THE COURT:  Go ahead and have a seat.
15              THE WITNESS:  I'm going to stand.
16              THE COURT:  That's fine.
17              Chris, do you want to ask her
18    questions?
19              THE WITNESS:  You really don't have to.
20              MR. PHEBUS:  I can't ask her nothing
21    because everything the Court done was in her favor.
22    If you don't understand it by now, there ain't no
23    need for me to have to question my mom.  The
24    Certificate of Indian Blood came from this court.
25    You want to know about it, you ask her.
```

29

```
 1              If you're going put me in jail
 2  under the Certificate of Indian Blood using her blood
 3  quantum, you ask her about it, but don't involve her
 4  in it.  I don't want her here as it is, but I can't
 5  explain to you why I was angry, why I came and did
 6  that.  It's affecting my whole family.
 7
 8              EXAMINATION
 9  BY THE COURT:
10      Q.    Were you aware that Chris had problems
11  with trying to get some kind of information
12  concerning his Certificate of Blood?
13      A.    Not till after the fact.  After he told
14  me way later.  Other than that, I usually don't know
15  much of what he does because he doesn't want for me
16  to hear anything because I'm not in very good health.
17              MR. PHEBUS:  I tell you, I ask you all
18  the time, what do you and Gloria do, you guys get
19  stressed, and you leave.  I tell you all the time.
20              THE WITNESS:  I know.  It's very
21  stressful in here.
22              MR. PHEBUS:  Don't argue.  Tell him.
23  BY THE COURT:
24      Q.    Do you have any recollection of Chris
25  taking a rock and --
```

30

```
 1      A.    No.  I didn't even know he did that.
 2  Usually, when my sister comes and I'm at the house --
 3              MR. PHEBUS:  It's not about my mom and
 4  what she knows.  It's about the legal part.  You're
 5  trying to blame me and the rock, but you got to go
 6  back.  Why I'm doing this.  I'm trying to set a point
 7  with you.
 8              THE COURT:  You're going to either have
 9  to ask questions or you can make your statement, if
10  you don't want to ask any questions.
11
12              (Overlapping speakers)
13
14              The reason I wanted to ask her
15  some questions, I was curious as to what she knew
16  about our activities, because I don't have any
17  objection to trying to get legal material, but I'm
18  just concerned that you're repeatedly in here with
19  threats and violence for intimidating people, and I'm
20  just trying to find out.  I don't want to cause any
21  stress for your mother either, but I don't believe
22  that I'm the one causing the stress.
23              MR. PHEBUS:  I feel a victim by you.
24  She's a victim by you.
25              THE WITNESS:  Well, here, I think we've
```

31

```
 1  all been victimized by the Tribal Council.  As long
 2  as they're getting the money, they're happy.
 3  BY THE COURT:
 4      Q.    Do you understand that the charges that
 5  are against him at this point, they're not dealing
 6  with the Council, they're dealing with his
 7  activities?
 8      A.    I understand that.
 9      Q.    Is there anything else you'd like to tell
10  me?
11      A.    Well, I don't want my son going to jail
12  because, you know, I do need my son.  He helps me an
13  awful lot at the house because there's stuff that I'm
14  just not able to do anymore.  I'm 70 years old.  I'm
15  not a kid anymore.
16              THE COURT:  Thank you.
17
18              (Witness excused)
19
20              All right.  Chris, this is your
21  opportunity.  You can take the stand, if you wish,
22  testify, or you can question yourself, make a
23  presentation or statement to the Court.
24              And, likewise, if you don't want
25  to make a statement, the burden is upon the Tribe to
```

32

```
 1  prove their case.  It's up to you the way you want to
 2  handle it.
 3              MR. PHEBUS:  I would like to say
 4  something, yes.  I have questions to ask.
 5              THE COURT:  All right.  We'll put you
 6  under oath.
 7
 8
 9  C H R I S T O P H E R   P H E B U S, having been first
10  duly sworn to testify to the truth, the whole truth,
11  and nothing but the truth, testified as follows:
12
13
14              THE COURT:  Go ahead.  State your name
15  for the record.
16              MR. PHEBUS:  Chris Phebus, P-h-e-b-u-s.
17              You know, I'm so confused.  It's
18  like when I come to this court it's, you know, my --
19  I just got to tell you, don't feel sympathy for me,
20  just understand I'm really angry here.
21              Last week my first cousin on Moapa
22  Reservation has issues, and the issues were between
23  law enforcement, which he did not like dealing with,
24  but yet I come and try to be reasonable.
25              Well, he got killed by police
```

33

1   because he had a gun.  Well, I don't carry no gun.  I
2   come over here and I try to be reasonable.  This
3   young man tried to go to the Council and present
4   himself.  He could not speak.  He wasn't intimidated
5   by anything.  He walked up to that Council and tried
6   to talk.  They wouldn't let him.
7              I am intimidated by law
8   enforcement where I can't go to the Council.  I can't
9   because of you, because you've ordered it for me,
10  trespassed me before.  You won't explain to me what
11  Las Vegas Paiute is, and I'm sitting in here fighting
12  for it.
13             Now, no, no, no.  What does that
14  have to do with this case?  That's why I went to
15  Equity Health to get that Certificate of Indian
16  Blood, because after two years I can't file a
17  complaint and make it legal because all this time
18  you've been allowing the Tribe to prosecute me, an
19  Indian.
20             My two years for filing a
21  complaint against what they're doing has passed.  I
22  don't know what to say.  All I can say is that I did
23  it out of anger, and if you was going to arrest me
24  for something, why did it have to seem like it was
25  going to happen after I went and started doing my

34

1   incident report for my complaint, then I get a
2   notice --
3              THE COURT:  What incident report are you
4   referring to?
5              MR. PHEBUS:  I have Officer Dawkins go up
6   before and make an incident report at Equity Health
7   because of that Certificate of Indian Blood that she
8   requested be made.
9              THE COURT:  Do you mean Jay Alter?
10             MR. PHEBUS:  Yes.  That ended up in my
11  file.  So when I found it in my files, why I came
12  down to get Dawkins is because all the other
13  information that was -- all my other Indian papers
14  that identified me was gone.  They don't know where
15  it's at.  They don't know who it was given to.  So I
16  cannot get it.
17             I'm angry about it, so I come to
18  have Officer Dawkins make an incident report.  Next
19  thing I know days later Belcher is filing complaint
20  against me because of my incident over here with the
21  rock.  I still can't get any cooperation to complete
22  that incident report, so I can't even make the damn
23  complaint because I ain't got nothing to back it up
24  because you already allowed it.
25             If you were to allow people to use

35

1   that Bruce test equally around here, you would not
2   have a Tribe, but you're not there.
3              THE COURT:  Do you have questions of
4   Mr. Phebus, counsel?
5              MR. PHEBUS:  No, no, no, Mr. Murch, just
6   because -- can I say one more thing, Officer?
7              THE COURT:  Go ahead.
8              MR. PHEBUS:  You believe because Dave
9   Colvin went to Federal Court and Mr. Stuff for habeas
10  corpus, that that Federal Judge ruled in the Tribe's
11  favor that according to the constitution and bylaws
12  they have the right to review their own court orders.
13             You believe that that's what Tribe
14  is, correct, because I have asked you, what is Tribe,
15  and you said Tribal Council.  Well, individually,
16  Tribal Council is individual members.  In order to be
17  a Council member you must be a tribal member.  In
18  order to be a tribal member, you must have blood
19  quantum and history.
20             Well, them people don't have it,
21  and when you decide Bruce to put me in jail all the
22  time with that Certificate of Indian Blood, they get
23  away with child welfare cases and everything.  What
24  do we get?  Nothing.  Nothing from you.  You don't do
25  nothing.

36

1              You tell me you can't initiate
2   when you allowed him to make in his court paperwork
3   what that Certificate of Indian Blood is.  My grandma
4   has a blood quantum right along with my grandpa's.
5   If she did not have that blood quantum, they would
6   not have put it on there.
7              Just because the Tribe don't want
8   to recognize her for not being federally recognized
9   from a reservation does not mean she's Indian.
10  Indians don't come from a reservation.  They were put
11  on it.  I have a different blood quantum.  What do
12  you got?
13             THE COURT:  That's not the issue.
14             MR. PHEBUS:  Yes, that's right.  All
15  in-house, whenever something happens to me here with
16  something on this Tribe that is an employee here, I
17  got to go to court for it.  Mr. Belcher knows --
18             THE COURT:  No, you don't have to go to
19  court on it.  What happened here is you threatened
20  someone with a rock.
21             MR. PHEBUS:  Why didn't I go to jail when
22  it happened?
23             THE COURT:  Because they were trying to
24  summons you in here to deal with you in a fashion
25  that didn't put you in jail, okay?

**37**

```
1              Do you have anything else to say
2  or questions?
3          MR. PHEBUS:  I don't have nothing to say.
4  I'm just lost.
5          THE COURT:  Any other evidence you want
6  to present?
7          MR. PHEBUS:  No.
8          THE COURT:  Are you resting your case at
9  this point?
10         MR. PHEBUS:  I'm sorry I did what I did
11 and came in here with that rock like that.
12         THE COURT:  Do you have an argument to
13 make at this point?
14         MR. MURCH:  I could argue or ask him a
15 couple questions.
16         THE COURT:  Go ahead and ask.
17
18              CROSS-EXAMINATION
19 BY MR. MURCH:
20    Q.    You admit that you spoke with Chief
21 Belcher on November 6, 2012?
22    A.    Mm-hmm.
23    Q.    You admit that you stated to him that if
24 your Certificate of Blood was at the health clinic,
25 you would get it and throw it through his window with
```

**38**

```
1  the rock, words to that effect?
2     A.    To that effect.
3     Q.    Then you came back to the police station
4  on November 7, 2012, correct?
5     A.    Mm-hmm.
6     Q.    And you had a rock in your hand?
7     A.    Mm-hmm.
8     Q.    And you heard Mr. Nakai describe the size
9  of the rock?
10    A.    And even got it on video.
11    Q.    Would you agree that that statement is
12 accurate, that the size of the rock was as he
13 described?
14    A.    Just like that.
15    Q.    Was wrapped in a piece of paper?
16    A.    Yeah, and the paper was Certificate of
17 Indian Blood.
18    Q.    You made a statement to the effect to
19 tell Belcher when he comes in tomorrow I have
20 something for him?
21    A.    Mm-hmm.
22    Q.    You admit that?
23    A.    But --
24    Q.    You admit that?
25    A.    Mm-hmm.
```

**39**

```
1          MR. MURCH:  I don't have any more
2  questions.
3
4              (Witness excused)
5
6          THE COURT:  Argument.
7          MR. MURCH:  That's it, your Honor.
8              Looking at Tribal Code Section
9  5-60-020 --
10         MR. PHEBUS:  Is argument from him or is
11 it my turn?
12         THE COURT:  He gets to go first because
13 he has the burden, then you get to go second and then
14 he gets to rebut.
15         MR. MURCH:  A person is guilty of
16 improper influence on official matters if, among
17 other things, he threatens harm to a public servant.
18 That doesn't say to a public servant directly.  It
19 can be threatening harm as when someone threatens
20 harm to the President, doesn't have to be to the
21 President directly.  I read the statute to mean the
22 same thing here.
23         THE COURT:  What's his decision that's
24 being influenced?
25         MR. MURCH:  I believe the testimony was
```

**40**

```
1  that Mr. Phebus believes that Mr. Belcher, Chief
2  Belcher, had something to do or has the ability to do
3  something about this Certificate of Indian Blood.
4              And we keep coming back here with
5  Mr. Phebus on the same types, seems to be an
6  escalation, but the same types of behavior where
7  Mr. Phebus is expecting Chief Belcher can do
8  something for him or will do something for him and
9  comes in and behaves in a way that is detrimental to
10 the police station and to the Tribe and to the
11 welfare of the people in this building and the
12 threats have seemed to escalate.  There we are.
13         THE COURT:  Mr. Phebus, you have an
14 opportunity to address the Court as to the case.
15         MR. PHEBUS:  I just can't understand.  I
16 don't know what to say because you just --
17         THE COURT:  All right.  Do you have
18 anything else you want to bring before the Court?
19 This is your opportunity now.
20              If not, there's no need to rebut
21 since he's waiving his closing, I guess.
22              Do you have anything else you want
23 to bring before the Court as to whether you were
24 involved in threatening Chief Belcher with the rock?
25              I'm going to find you guilty as
```

**41**

1  charged in the Criminal Complaint.
2        What's the Tribe's pleasure on the
3  case?
4        MR. MURCH:  Your Honor, I'm going to ask
5  for the full sentence at least in terms of
6  imprisonment, six months.  The fine I don't think is
7  going to make a difference, so that's why I'm asking
8  for the full sentence in terms of time, because he's
9  not going to pay the fine.  He's not going to do the
10  community service is my understanding, based on his
11  past conduct.
12        So I would ask the Court to take
13  Mr. Phebus' history into account and impose the full
14  six month sentence.
15        THE COURT:  Can you speak as to your
16  sentence?
17        MR. PHEBUS:  He offered me 10 days if I
18  would have accepted his deal.  Now that he don't and
19  now it's six months.
20        THE COURT:  It's a Class B offense.
21        MR. PHEBUS:  Is A like the worst or is D
22  the worst?
23        THE COURT:  A is the worst.  That's why
24  you're receiving a Class B offense.
25        MR. PHEBUS:  My record's escalating, but

**42**

1  do you ever recognize the pattern of a Tribe?  Here's
2  the court case where, please let me explain this.
3  Here's a court case where a Tribal Council, a tribal
4  member, as well as a Tribal Council member, as well
5  as Chief of Police had a court case where a tribal
6  member was suing her for a hundred thousand dollars
7  for kicking in her house.
8        Well, the prosecuting attorney at
9  that time was allowed by Tribe to defend the police
10  chief, okay, but yet when he's sitting up here
11  defending off of his own record why he was allowed to
12  make this Certificate of Indian Blood, why he was
13  allowed to defend it, what is it doing for my mom who
14  was a tribal member.
15        THE COURT:  Your mother's not in here
16  today, you are.  The Court case isn't relevant to the
17  criminal proceeding here.  What we're talking about
18  here is -- what you need to be listening to is you
19  need to present to me why six months is not
20  appropriate for you to spend in jail, okay?
21        I found you guilty of these
22  charges.  I would note that you were just given an
23  opportunity for credit for time served, which was a
24  couple of days just before this, and your response
25  was then to go in, and I've said this before, I

**43**

1  believe you're a terrorist.  I believe you try and
2  instill fear in these people.
3        So unless you can convince me
4  something differently, this Tribe has requested,
5  because on the scale of what I have seen in this
6  court, is that you're here to cause problems for the
7  Tribe, and you don't have any remorse.  You feel
8  you're the victim in all of these cases, and you
9  continue to terrorize people.
10        You were given an opportunity to
11  previously --
12        MR. PHEBUS:  Who am I terrorizing?
13        THE COURT:  You're terrorizing the
14  employees.
15        MR. PHEBUS:  Whose Tribe?  Whose Tribe?
16  Who, you?
17        THE COURT:  The Tribe is the Paiute
18  Tribe.
19        MR. PHEBUS:  You said Tribal Council.
20        THE COURT:  And you're here to try and
21  intimidate the people.  You're missing the issue.
22        MR. PHEBUS:  No, no, no.  What people?
23        THE COURT:  You're missing the issue.
24
25        (Overlapping speakers)

**44**

1        You're a member of the Tribe.
2        MR. PHEBUS:  I'm coming over here trying
3  to help myself.  You're turning it against me.
4        THE COURT:  You're turning it against
5  yourself.  I gave you the benefit the last time you
6  were in here to act like a mature adult.
7        MR. PHEBUS:  I'm not a lawyer.  What do
8  you want me to act like.  If I had a vocabulary like
9  you, maybe you would think different, but you're
10  looking down on me.
11        THE COURT:  I'm looking at you because
12  you don't act normally.  I'm trying to give you
13  counseling.  I've tried to give you an opportunity to
14  act like a rational person.  You've thrown fits in
15  here.  You've been taken out of custody.  You've
16  refused to go to get counseling.  You're bringing
17  your mother in here, and now all you're doing is
18  arguing again.
19        I let you out on a credit for time
20  served and your response was to come over just a few
21  days later and threaten Chief Belcher with a rock,
22  which you admitted to.
23        MR. PHEBUS:  Because of what the
24  Certificate of Indian Blood --
25        THE COURT:  If you believe that you have

45

```
 1   been treated unfairly, explain to me why I shouldn't
 2   put you --
 3        MR. PHEBUS:  I can't do it.  It's too
 4   much.  Don't you understand that?  I have to account
 5   for everything I've done here.  I have to account for
 6   the disenrollments.  How can I do that.  I can't
 7   write it.  I'm trying.  I can't do it for you.
 8        THE COURT:  Tell me why I shouldn't put
 9   you in jail for six months.  That's the issue right
10   now.  You're going to jail for six months unless you
11   can tell me one reason why I shouldn't do it.
12        MR. PHEBUS:  Because I'm not -- I
13   don't -- I'm not against this Tribe.  I want to work
14   with everybody, but I can't because you don't -- you
15   intimidate me.  You don't help me.  You don't try
16   to -- you say you do by sending me to all of this.
17   What about my legal issues here.
18        THE COURT:  What about the Tribe?  What
19   about the people that work here that are afraid of
20   you that come to work every day worried about Chris
21   Phebus flipping out and causing some type of problem.
22   What about your family.  What about your family, what
23   you're putting them through.
24        MR. PHEBUS:  Right now Belcher has an
25   incident up the street where --
```

46

```
 1        THE COURT:  You're not telling me
 2   anything other than you're giving me excuses and
 3   blaming everyone.
 4        MR. PHEBUS:  You're not letting me
 5   explain something.  I'm not blaming nobody because
 6   you never let me say it yet.  Please, may I speak?
 7        THE COURT:  Go ahead.
 8        MR. PHEBUS:  There was an incident up the
 9   street between a tribal member and a nonmember and a
10   property dispute.  Instead of going to tribal court,
11   because the incident led to a police having to go up
12   to the house on an incident because they were called.
13        Well, instead of that incident
14   being held in the court, okay, between a nonmember
15   and a tribal member, it was allowed to be taken
16   across the street simply because the family and
17   handled in the Council room.
18        I don't get that option.  You're
19   forcing me to have to go to court, to have to write
20   all this down.  I wouldn't act this way, but you do
21   not look at what you have --
22        THE COURT:  You're not convincing me by
23   blaming.  You won't take responsibility for anything
24   you've ever done.  You haven't taken responsibility
25   for anything you've done.  Unless you can tell me
```

47

```
 1   something --
 2
 3             (Overlapping speakers)
 4
 5        Unless you can tell me something
 6   here, you're going away for six months.
 7        MR. PHEBUS:  I'm sorry for what I did in
 8   the manner that I did it.  I don't deserve six
 9   months.  I don't deserve a day.  I need help.  I need
10   you to tell me why are they doing this.
11        THE COURT:  Because they made a
12   determination that you're not of the quantum
13   necessary.  You know that.  We've gone through this
14   several times.  You came in here and made those
15   determinations.  I let you draw your pictures.  You
16   explained it all to me.  I've read your entire file.
17        I know everything about your case,
18   okay, but all you want to do is cause more problems
19   and you won't do anything constructive, okay?  You
20   have your mother here now, and I'm trying to find out
21   from your family why you believe you have the right
22   to terrorize people.
23        MS. WILSON:  I don't know that he
24   terrorizes people.  He grew up here.  You talk to the
25   old people like me, they'll tell you where to get off
```

48

```
 1   and how to get on that cart and go.  That's just the
 2   way --
 3        THE COURT:  The problem is --
 4
 5             (Overlapping speakers)
 6
 7        MR. PHEBUS:  You don't give me --
 8        THE COURT:  I'm talking to your mother.
 9        The problem is he comes over with
10   a rock --
11        MS. WILSON:  I understand that.
12        THE COURT:  -- and threatens to throw the
13   rock through the window.  If this was the first time
14   that this had happened, I might be sympathetic to
15   what his plight is, okay, but he is in here
16   repeatedly.  They tried to bar him from the
17   reservation here, and we didn't do that because I
18   believed that he had already been convicted.
19        Then he came in here on another
20   charge and drew the pictures for me and explained it
21   to me, what I already knew, but he felt justified in
22   it and said he had a right to use the language that
23   he thought was appropriate if he thought he was
24   victimized because as mature adults we talk to one
25   another and express.
```

**49**

```
1              I've let you get away and express
2    yourself here in the court, but your response then
3    was to bring a rock here and threaten the chief, and
4    you haven't denied that.  In fact, you felt that you
5    were responsible for it.  So my concern is protecting
6    the other people here.
7              The Tribe has brought forward
8    these charges against you.  You haven't denied them,
9    but you're trying to then make some type of response.
10   So I'm going to follow the recommendation of the
11   Tribe.  You're going to be sentenced to six months.
12             MS. WILSON:  Where are you going to send
13   him to?
14             MR. PHEBUS:  What did I do so bad?
15             THE COURT:  You threatened the Chief of
16   Police here.  You have contempt for authority here on
17   the Tribe.  Your choice would be to go and live
18   somewhere else.  What I'm going to do here, unless
19   you and your mother can convince me that you would
20   try and do something, but all you want to do is make
21   further accusations, and you'll be away for six
22   months, and that way the Tribe won't have to worry
23   about you threatening anyone else or causing other
24   problems.
25             MR. PHEBUS:  What about my future here.
```

**50**

```
1    If we can get kicked out like this, what's going to
2    happen to my family when she goes.  What are you
3    going to do then.  You going to still be a judge
4    here?  No, because at any time you can be kicked out
5    of here.  So can I.  I'm trying to fight for that.
6              THE COURT:  They were trying to remove
7    you before from here.  You were going to be
8    trespassed.
9              MR. PHEBUS:  After my disenrollment.
10             THE COURT:  This was after your
11   disenrollment, but you still haven't told me
12   anything --
13             MR. PHEBUS:  Give me some advice.
14             THE COURT:  I already gave you advice.  I
15   gave you numerous advice.
16             MR. PHEBUS:  Why?
17             THE COURT:  You're placed in the custody
18   of the Chief.  He's to make arrangements and advise
19   you.
20             MS. WILSON:  Where are they going to
21   place him?
22             THE COURT:  He'll probably go to Peach
23   Springs.
24
25             (Overlapping speakers)
```

**51**

```
1    Ma'am, it's not up to you.
2              MS. WILSON:  It is going to be up to me.
3              THE COURT:  Officer, can you remove him.
4              MR. PHEBUS:  Why did you make me leave in
5    front of all these people so you could hide me.
6              THE COURT:  I told you before we were
7    taking the cases.  This is the longest case.  The
8    other people don't want to be here.  They're afraid
9    of you.
10             MR. PHEBUS:  Who?
11             THE COURT:  Everybody that deals with you
12   is afraid of you.
13             MR. PHEBUS:  I live here.  Do you have
14   everybody's complaint against me?  Who?
15             THE COURT:  The Chief for one was here as
16   a complaining witness.
17             MR. PHEBUS:  Why do you have to put me in
18   jail for six months?
19             THE COURT:  Because you haven't learned,
20   okay?  I've given you every break I can, and all you
21   want to do is blame other people.  So I'm giving you
22   an opportunity to isolate you from the rest of the
23   Tribe here, okay?
24             MR. PHEBUS:  What happens after the six
25   months?
```

**52**

```
1              THE COURT:  I don't know.  It's up to the
2    Tribe.
3              MS. WILSON:  You'll get to come back.
4              MR. PHEBUS:  Wait, mom, wait.
5              What do you mean it's up to the
6    Tribe?  And then they can bring it in front of you
7    and you can order to trespass me again?  He tried
8    that last month, and then you wouldn't even write
9    down an explanation that I asked for it.
10             THE COURT:  You've been sentenced to six
11   months, okay.
12             MR. PHEBUS:  You're a fucking asshole.
13             THE COURT:  That motion's denied too.
14             ---oOo---
15   ATTEST:  Full, true and accurate transcript of
16   proceedings.
17
18             GERRI DE LUCCA, C.C.R. NO. 82
19
20
21
22
23
24
25
```

.
---oOo [1]  52/14

0
008 [2]  1/1 3/5
020 [1]  39/9

1
10 [1]  41/17
10:00 [1]  5/7
1308 [1]  28/12

2
2012 [6]  1/13 3/1 5/1 23/16
37/21 38/4
22 [1]  2/8
24 [1]  2/9
27 [2]  1/13 3/1
29 [1]  2/14

3
32 [1]  2/16
37 [1]  2/17
3:00 [1]  1/14

5
5-60-020 [1]  39/9

7
70 [1]  31/14

8
82 [2]  1/25 52/17

A
ability [3]  6/21 16/6 40/2
able [3]  8/12 16/20 31/14
about [32]  9/11 9/12 10/17
12/20 14/1 14/9 14/21 15/3 15/9
16/5 16/19 18/23 21/3 24/22
26/6 28/25 29/3 30/3 30/4 30/16
34/17 40/3 42/17 45/17 45/18
45/19 45/20 45/22 45/22 47/17
49/23 49/25
accepted [1]  41/18
access [2]  5/16 8/12
according [1]  35/11
account [3]  41/13 45/4 45/5
accurate [2]  38/12 52/15
accusations [1]  49/21
accusing [1]  15/9
acknowledge [1]  11/18
across [2]  11/7 46/16
act [5]  44/6 44/8 44/12 44/14
46/20
activities [2]  30/16 31/7
address [2]  11/18 40/14
admit [4]  37/20 37/23 38/22
38/24
admitted [1]  44/22
adult [1]  44/6
adults [1]  48/24
advice [3]  50/13 50/14 50/15
advise [1]  50/18
advising [1]  7/25
Affairs [4]  16/22 18/24 21/1
21/4
affect [3]  9/18 11/4 11/19
affected [1]  10/20
affecting [1]  29/6
affects [2]  15/15 15/16
afraid [3]  45/19 51/8 51/12

after [12]  6/4 7/3 7/18 20/21
23/25 29/13 29/13 33/16 33/25
50/9 50/10 51/24
afternoon [2]  4/8 23/16
afternoon, [1]  4/7
afternoon, Chief [1]  4/7
again [4]  19/24 20/20 44/18
52/7
against [9]  11/16 31/5 33/21
34/20 44/3 44/4 45/13 49/8
51/14
ago [1]  16/3
agree [1]  38/11
ahead [11]  9/17 15/24 18/15
18/21 19/22 25/4 28/14 32/14
35/7 37/16 46/7
ain't [2]  28/22 34/23
all [35]  9/10 9/18 10/22 11/13
12/3 12/3 16/11 16/25 17/1
19/16 26/5 27/4 27/18 27/22
29/17 29/19 31/1 31/20 32/5
33/17 33/22 34/12 34/13 35/21
36/14 40/17 43/8 44/17 45/16
46/20 47/16 47/18 49/20 51/5
51/20
allow [1]  34/25
allowed [7]  13/23 34/24 36/2
42/9 42/11 42/13 46/15
allowing [1]  33/18
alone [1]  13/22
along [2]  8/9 36/4
already [4]  34/24 48/18 48/21
50/14
also [2]  20/8 22/20
Alter [1]  34/9
always [1]  9/20
am [4]  4/13 16/5 33/7 43/12
American [1]  16/25
among [1]  39/16
anger [2]  9/23 33/23
angry [6]  9/12 11/5 15/12 29/5
32/20 34/17
another [2]  48/19 48/25
answered [1]  18/20
any [25]  5/13 5/14 5/22 7/17
7/24 8/14 8/23 11/10 12/10
14/13 21/10 21/12 24/9 24/12
25/22 26/9 29/24 30/10 30/16
30/20 34/21 37/5 39/1 43/7 50/4
anybody [1]  7/22
anymore [2]  31/14 31/15
anyone [1]  49/23
anything [14]  9/22 14/16 17/2
29/16 31/9 33/5 37/1 40/18
40/22 46/2 46/23 46/25 47/19
50/12
apart [1]  24/25
APPEARANCES [1]  1/18
appropriate [2]  42/20 48/23
are [17]  3/12 3/15 4/11 7/2
12/22 14/10 15/20 31/5 34/3
37/8 40/12 42/16 45/19 47/10
49/12 50/2 50/20
argue [2]  29/22 37/14
arguing [1]  44/18
argument [3]  37/12 39/6 39/10
arises [1]  13/7
around [4]  5/7 6/19 7/12 35/1
arrangements [1]  50/18
arrest [3]  8/24 13/8 33/23
as [28]  4/3 8/5 16/10 16/10
16/17 16/18 20/8 20/8 22/3 27/7

28/7 29/4 30/15 31/1 31/2 32/11
38/12 39/19 40/14 40/23 40/25
41/15 42/4 42/4 42/5 48/24
51/15
ask [28]  6/25 9/7 9/24 10/3
10/18 12/21 12/23 13/10 15/19
17/23 18/20 19/21 19/24 21/5
27/1 28/17 28/20 28/25 29/3
29/17 30/9 30/10 30/14 32/4
37/14 37/16 41/4 41/12
asked [7]  6/3 12/24 13/1 18/20
20/2 35/14 52/9
asking [7]  12/4 12/17 12/22
15/15 14/21 15/3 41/7
ass [1]  6/7
asshole [1]  52/12
assistance [4]  16/1 17/3 17/16
19/1
ATTEST [1]  52/15
attorney [9]  5/15 5/19 12/5
13/21 14/9 14/12 14/15 27/16
42/8
aunt [1]  13/19
aunts [1]  13/20
authority [6]  7/2 7/6 7/22 8/2
9/2 20/2 35/14 52/9
aware [6]  7/2 7/6 7/22 8/2
9/19 29/10
away [4]  35/23 47/6 49/1 49/21
awful [1]  31/13

B
back [10]  6/20 16/2 17/8 17/14
20/8 30/6 34/23 38/3 40/4 52/3
bad [1]  49/14
bar [1]  48/16
based [1]  41/10
basically [1]  25/13
be [31]  6/17 8/2 8/11 13/11
16/10 16/20 17/5 17/14 19/10
25/24 27/9 32/24 33/2 34/8
35/16 35/17 35/18 39/19 39/20
40/5 42/18 46/15 48/14 49/11
49/17 49/21 50/3 50/4 50/7 51/2
51/8
became [1]  20/22
because [61]
been [16]  4/1 4/23 8/2 9/19
13/8 19/7 19/15 22/1 28/5 31/1
32/9 33/18 44/15 45/1 48/18
52/10
before [10]  1/11 10/24 33/10
34/6 40/18 40/23 42/24 42/25
50/7 51/6
behaves [1]  40/9
behavior [2]  7/18 40/6
being [7]  9/20 11/8 13/14 16/18
36/8 39/24 46/14
BELCHER [21]  2/4 3/19 4/7 4/10
42/3 7/13 8/15 8/21 23/23 25/17
25/19 34/19 36/17 37/21 38/19
40/1 40/2 40/7 40/24 44/21
45/24
Belcher's [1]  25/13
believe [12]  14/11 15/6 15/8
15/18 30/21 35/8 35/13 39/25
43/1 43/1 44/25 47/21
believed [1]  48/18
believes [1]  40/1
benefit [1]  44/5
between [4]  22/16 32/22 46/9
46/14
BIA [6]  17/5 19/14 20/12 20/15

**B**

BIA... [2]   20/18 20/24
big [3]   7/10 24/21 25/1
bill [1]   19/10
blame [2]   30/5 51/21
blaming [4]   15/20 46/3 46/5
  46/23
blood [35]   9/11 9/21 10/13
  10/20 11/2 11/18 12/14 15/10
  16/1 16/24 17/1 18/12 18/23
  19/12 20/3 20/6 20/13 20/21
  28/24 29/1 29/2 29/12 33/16
  34/7 35/18 35/22 36/3 36/4 36/5
  36/11 37/24 38/17 40/3 42/12
  44/24
Blood's [1]   6/12
boulder [2]   7/10 7/23
break [1]   51/20
bring [4]   40/18 40/23 49/3 52/6
bringing [1]   44/16
brother [1]   11/20
brought [5]   7/10 9/3 19/17
  19/19 49/7
Bruce [2]   35/1 35/21
building [6]   8/4 8/10 8/12
  22/24 22/25 40/11
burden [2]   31/25 39/13
Bureau [4]   16/21 18/24 21/1
  21/3
business [1]   7/21
bylaws [1]   35/11

**C**

C.C.R [2]   1/25 52/17
CAL [1]   1/11
call [4]   6/25 14/17 26/21 27/7
called [1]   46/12
calls [2]   3/18 21/18
calm [2]   6/10 6/17
came [19]   8/22 10/18 12/20 14/1
  15/11 18/23 20/8 20/22 23/22
  25/8 25/17 25/19 28/24 29/5
  34/11 37/11 38/3 47/14 48/19
can [44]   5/6 10/4 11/8 12/15
  13/2 14/1 14/24 16/10 16/11
  18/13 19/21 20/1 20/11 20/12
  20/15 20/16 21/7 22/14 23/9
  23/21 26/22 26/23 28/10 30/9
  31/21 31/22 33/22 35/6 39/19
  40/7 41/15 43/3 45/6 45/11
  46/25 47/5 49/19 50/1 50/4 50/5
  51/3 51/20 52/6 52/7
can't [17]   11/13 14/25 16/8
  16/9 28/20 29/4 33/8 33/8 33/16
  34/21 34/22 36/1 40/15 45/3
  45/6 45/7 45/14
cannot [3]   12/14 15/12 34/16
capacity [1]   4/14
care [1]   26/15
carry [1]   33/1
cart [1]   48/1
case [14]   1/1 11/3 13/22 32/1
  33/14 37/8 40/14 41/3 42/2 42/3
  42/5 42/16 47/17 51/7
cases [4]   11/19 35/23 43/8 51/7
cause [3]   30/20 43/6 47/18
causes [1]   13/5
causing [3]   30/22 45/21 49/23
certain [1]   14/16
certificate [32]   6/12 9/11 9/21
  10/13 10/19 11/1 11/17 12/13

13/24 15/9 16/1 16/23 17/1
18/22 19/12 20/3 20/5 20/13
20/20 27/6 28/24 29/2 29/12
33/15 34/7 35/22 36/3 37/24
38/16 40/3 42/12 44/24
chairman [1]   13/18
change [1]   7/20
charge [4]   3/6 8/24 16/15 48/20
charged [1]   41/1
charges [3]   31/4 42/22 49/8
chief [28]   3/18 4/7 4/15 4/23
  7/13 8/15 10/7 12/11 13/12 15/3
  15/6 15/18 15/18 15/20 15/20
  18/15 25/13 37/20 40/1 40/7
  40/24 42/5 42/10 44/21 49/3
  49/15 50/18 51/15
child [3]   11/19 15/15 35/23
choice [3]   20/10 20/11 49/17
choices [1]   17/10
Chris [11]   6/8 6/16 7/9 17/15
  20/7 28/17 29/13 29/24 31/20
  32/16 45/20
Chris' [1]   16/15
CHRISTOPHER [5]   1/6 2/15 3/6
  4/17 23/7
CIB [3]   14/21 17/14 25/14
civil [4]   9/21 9/22 27/10 27/12
clarified [1]   20/2
Class [2]   41/20 41/24
clerk [1]   17/12
clinic [4]   6/12 19/3 19/13
  37/24
closing [1]   40/21
Code [1]   39/8
Colvin [13]   5/11 5/15 5/17 5/20
  6/4 6/22 13/13 13/22 14/8 14/9
  15/3 15/7 35/9
come [19]   5/8 7/22 7/23 8/5
  13/8 16/4 16/19 17/8 17/16 23/4
  27/24 32/18 32/24 33/2 34/17
  36/10 44/20 45/20 52/3
comes [6]   17/14 23/23 30/2
  38/19 40/9 48/9
coming [3]   9/19 40/4 44/2
communicate [1]   22/16
community [1]   41/10
complain [1]   10/17
complaining [1]   51/16
complaint [8]   12/15 33/17 33/21
  34/1 34/19 34/23 41/1 51/14
complete [1]   34/21
compliance [1]   22/19
computer [1]   26/12
concern [1]   49/5
concerned [3]   16/5 16/19 30/18
concerning [1]   29/12
conduct [1]   41/11
confused [1]   32/17
consideration [1]   16/17
constitution [1]   35/11
constructive [1]   47/19
contact [3]   6/21 15/4 15/7
contacted [3]   16/14 16/21 17/11
contacting [1]   15/3
contempt [1]   49/16
continue [1]   43/9
convicted [1]   48/18
convince [3]   43/3 49/19
convincing [1]   46/22
cooperation [2]   12/14 34/21
coordinator [1]   22/13
copy [2]   19/5 26/7

corpus [1]   35/10
correct [4]   11/6 20/17 35/14
  38/4
cost [1]   19/13
could [15]   4/19 5/13 6/8 6/24
  6/24 7/1 7/23 11/21 14/17 15/4
  19/4 19/15 33/4 37/14 51/5
couldn't [2]   6/5 14/16
Council [13]   13/4 31/1 31/6
  33/3 33/5 33/8 35/15 35/16
  35/17 42/3 42/4 43/19 46/17
counsel [3]   15/5 19/6 35/4
counseling [2]   44/13 44/16
county [1]   17/5
couple [4]   16/2 19/4 37/15
  42/24
court [38]   2/14 5/11 5/13 6/3
  6/25 9/19 11/3 11/4 11/7 13/13
  13/17 14/15 16/14 17/12 27/10
  28/21 28/24 29/22 31/23 32/18
  33/12 38/24 36/2 36/17 36/19
  40/14 40/18 40/23 41/12 42/2
  42/3 42/5 42/16 43/6 46/10
  46/14 46/19 49/2
cousin [1]   32/21
CR12 [2]   1/1 3/5
CR12-008 [2]   1/1 3/5
created [1]   19/14
credit [2]   42/23 44/19
criminal [5]   9/23 11/3 15/14
  41/1 42/17
Cross [8]   2/6 2/9 2/17 8/16
  8/19 24/4 24/7 37/18
Cross-Examination [8]   2/6 2/9
  2/17 8/16 8/19 24/4 24/7 37/18
curious [1]   30/15
custody [6]   3/11 16/2 16/18
  17/18 44/15 50/17

**D**

daily [1]   22/19
damn [1]   34/22
danger [2]   24/9 24/10
Dave [6]   5/11 5/17 13/13 14/9
  15/3 35/8
Dawkins [3]   34/5 34/12 34/18
day [4]   7/3 23/19 45/20 47/9
days [4]   34/19 41/17 42/24
  44/21
De [2]   1/25 52/17
deal [2]   36/24 41/18
dealing [4]   15/17 31/5 31/6
  32/23
deals [1]   51/11
DECEMBER [2]   1/13 3/1
decide [1]   35/21
decided [1]   20/23
decision [1]   39/23
defend [2]   42/9 42/13
defendant [3]   1/7 1/20 23/12
defending [1]   42/11
DEFENSE [2]   2/11
denied [3]   49/4 49/8 52/13
department [4]   4/16 5/9 22/10
  22/12 22/17 22/18 23/22
descendent [1]   16/24
describe [3]   5/6 23/21 38/8
described [1]   38/13
deserve [2]   47/8 47/9
desk [2]   8/10 22/23
desktop [1]   26/12
determination [1]   47/12

**D**

determinations [1]  47/15
determine [1]  20/16
detrimental [1]  40/9
did [34]  6/19 7/11 7/17 7/20
 12/21 13/1 13/1 13/1 13/12
 14/19 15/21 15/22 15/25 16/4
 16/18 18/11 24/12 24/15 24/19
 25/6 25/7 26/16 29/5 30/1 32/23
 33/22 33/24 36/5 37/10 37/10
 47/7 47/8 49/14 51/4
didn't [13]  5/16 8/24 8/25 9/6
 17/17 17/23 17/24 17/24 19/24
 30/1 36/21 36/25 48/17
difference [1]  41/7
different [2]  36/11 44/9
differently [1]  43/4
direct [5]  2/5 2/8 4/5 21/7
 22/5
directed [1]  13/3
direction [1]  27/1
directly [2]  39/18 39/21
director [1]  19/5
disenrolled [2]  13/18 13/19
disenrollment [4]  13/9 15/13
 50/9 50/11
disenrollments [1]  45/6
dispatch [1]  22/20
dispatcher [1]  7/13
dispute [1]  46/10
distinguish [1]  20/1
do [94]
document [1]  15/10
does [9]  8/8 9/18 9/23 11/4
 14/9 15/15 29/15 33/13 36/9
doesn't [3]  29/15 39/18 39/20
doing [7]  7/21 30/6 33/21 33/25
 42/13 44/17 47/10
dollars [1]  42/6
DON [1]  4/4 4/10
don't [64]
done [4]  28/21 45/5 46/24 46/25
door [4]  6/19 8/6 23/2 23/4
down [8]  6/10 6/17 13/5 15/11
 34/12 44/10 46/20 52/9
draw [1]  47/15
drew [1]  48/20
duly [4]  4/1 22/1 28/5 32/10
duties [1]  22/20

**E**

east [1]  8/9
effect [3]  38/1 38/2 38/18
eight [1]  25/2
eight inches [1]  25/2
either [5]  9/6 19/5 20/11 30/8
 30/21
eliminate [1]  12/19
else [8]  15/21 17/2 31/9 37/1
 40/18 40/22 49/18 49/23
employed [1]  4/11
employee [2]  9/9 36/16
employees [1]  43/14
employer [1]  22/9
end [1]  14/19
ended [1]  11/2 34/10
enforcement [2]  32/23 33/8
enrollment [3]  13/22 14/14
 14/22
entertain [1]  14/13
entire [1]  47/16

entry [1]  5/8
equally [1]  35/1
Equity [4]  10/20 13/3 33/15
 34/6
escalate [1]  40/12
escalating [1]  41/25
escalation [1]  40/6
even [7]  14/17 17/24 19/8 30/1
 34/22 38/10 52/8
even write [1]  52/8
ever [4]  24/9 24/10 42/1 46/24
EVERSON [4]  2/7 21/18 22/8 24/9
every [2]  45/20 51/20
everybody [2]  45/14 51/11
everybody's [1]  51/14
everyone [1]  46/3
everything [6]  15/16 16/17
 28/21 35/23 45/5 47/17
evidence [1]  37/5
examination [14]  2/5 2/6 2/8
 2/9 2/14 2/17 4/5 8/16 8/19
 22/5 24/4 24/7 29/8 37/18
except [1]  17/2
exception [1]  26/20
excused [6]  21/14 21/16 25/24
 26/3 31/18 39/4
excuses [1]  46/2
existence [1]  13/14
expecting [1]  40/7
explain [11]  12/3 12/7 14/1
 14/24 15/23 22/14 29/5 33/10
 42/2 45/1 46/5
explained [2]  47/16 48/20
explanation [1]  52/9
express [2]  48/25 49/1

**F**

face [1]  8/8
faces [1]  8/9
facility [5]  6/18 7/11 17/5
 17/9 19/12 52/12
fact [2]  29/13 49/4
false [1]  15/10
family [7]  6/7 29/6 45/22 45/22
 46/16 47/21 50/2
far [1]  16/10 16/17 20/8
fashion [2]  12/4 36/24
favor [2]  28/21 35/11
fear [1]  43/2
Federal [2]  35/9 35/10
federally [1]  36/8
feel [4]  24/10 30/23 32/19 43/7
felt [4]  8/21 24/9 48/21 49/4
few [1]  44/20
fight [1]  50/5
fighting [1]  33/11
file [10]  6/13 10/18 11/2 12/15
 14/19 19/2 19/16 33/16 34/11
 47/16
files [1]  13/23 34/11
filing [2]  33/20 34/19
find [3]  30/20 40/25 47/20
fine [3]  28/16 41/6 41/9
finish [1]  18/13
first [11]  4/1 8/23 22/1 25/8
 25/16 25/18 28/5 32/9 32/21
 39/12 48/13
fits [1]  44/14
five [1]  9/20
flipping [1]  45/21
follow [1]  49/10
follows [4]  4/3 22/3 28/7 32/11

forcing [1]  46/19
forward [2]  19/18 49/7
found [2]  34/11 42/21
free [2]  25/25 26/1
front [9]  5/8 8/5 8/12 11/13
 22/24 23/2 23/4 51/5 52/6
fucking [1]  52/12
full [4]  41/5 41/8 41/13 52/15
funny [1]  21/4
further [2]  24/2 49/21
future [1]  49/25

**G**

gave [5]  14/25 17/23 44/5 50/14
 50/15
Gerri [2]  1/25 52/17
get [43]  5/15 6/3 6/13 10/3
 10/5 11/5 11/7 12/3 12/14 12/15
 12/20 12/24 13/2 13/19 13/23
 14/16 15/25 16/9 18/19 19/25
 20/2 20/14 20/18 20/18 29/11
 29/18 30/17 33/15 34/1 34/12
 34/16 34/21 35/22 35/24 37/25
 39/13 44/16 46/18 47/25 48/1
 49/1 50/1 52/3
gets [2]  39/12 39/14
getting [3]  6/8 20/4 31/2
give [6]  17/24 28/1 44/12 44/13
 48/7 50/13
given [4]  34/15 42/22 43/10
 51/20
giving [2]  46/2 51/21
glass [1]  8/1
Gloria [1]  29/18
go [35]  5/14 5/15 6/11 9/16
 13/2 13/3 13/4 13/5 14/15 15/24
 18/15 18/21 19/22 25/4 28/14
 30/5 32/14 33/2 33/8 34/5 35/7
 36/7 36/18 36/21 37/16 39/12
 39/13 42/25 44/16 46/7 46/11
 46/19 48/1 49/17 50/22
goes [1]  50/2
going [44]  6/13 6/13 6/14 7/15
 8/22 10/2 10/3 10/15 11/25 12/1
 12/2 12/18 15/23 16/23 17/4
 17/25 18/19 28/12 25/20 27/2
 28/15 29/1 30/8 31/11 33/23
 33/25 40/25 41/4 41/7 41/9 41/9
 45/10 46/10 47/6 49/10 49/11
 49/12 49/18 50/1 50/3 50/3 50/7
 50/20 51/2
gone [2]  34/14 47/13
good [4]  4/7 4/8 24/22 29/16
got [16]  6/6 7/13 7/14 9/14
 19/2 19/5 19/16 20/21 23/24
 30/5 32/19 32/25 34/23 36/12
 36/17 38/10
grandma [1]  36/3
grandpa's [1]  36/4
Greg [1]  9/19
grew [1]  47/24
guess [1]  40/21
guilty [3]  39/15 40/25 42/21
gun [1]  33/1 33/1
guys [3]  13/7 13/20 29/18

**H**

habeas [1]  35/9
had [27]  5/8 5/9 7/11 7/20 7/22
 7/24 8/2 9/22 10/22 10/23 11/1
 11/2 12/25 13/21 16/19 20/12
 20/21 26/19 29/10 33/1 38/6

56

**H**

had... [6]   40/2 42/5 44/8 48/14
48/18 48/22
hand [2]   24/17 38/6
handle [1]   32/2
handled [1]   46/17
hands [1]   24/25
happen [3]   16/23 33/25 50/2
happened [11]   6/4 7/3 9/6 17/6
19/5 23/18 23/25 25/17 36/19
36/22 48/14
happening [1]   17/13
happens [2]   36/15 51/24
happy [1]   31/2
harassment [1]   8/25
harm [3]   39/17 39/19 39/20
has [12]   4/23 14/14 17/2 20/10
32/22 33/21 36/4 39/13 40/2
43/4 45/24 49/7
have [95]
haven't [5]   46/24 49/4 49/8
50/11 51/19
having [5]   4/1 22/1 28/5 32/9
46/11
he [75]
He'll [1]   50/22
he's [18]   4/20 5/18 13/15 13/23
15/4 17/18 18/20 19/3 19/14
23/10 26/1 26/19 26/20 40/21
41/8 41/9 42/10 50/18
health [9]   6/12 10/20 13/3 19/3
19/13 29/16 33/15 34/6 37/24
hear [2]   9/15 29/16
heard [1]   38/8
held [1]   46/14
help [5]   12/6 12/9 44/3 45/15
47/9
helps [1]   31/12
Henderson [1]   20/12
her [23]   13/21 17/17 17/21
17/22 17/23 17/24 17/24 17/25
18/11 20/23 27/7 28/17 28/20
28/21 28/25 29/2 29/3 29/3 29/4
30/14 36/8 42/6 42/7
here [70]
Here's [2]   42/1 42/3
hey [2]   7/23 17/12
hide [1]   51/5
him [42]   6/7 9/20 11/1 11/20
16/3 16/5 16/15 16/18 16/19
17/9 17/16 19/2 24/17 25/14
29/12 31/6 36/2 37/25 39/23
40/21 41/10 41/18 42/11 48/15
history [2]   35/19 41/13
hmm [5]   37/22 38/5 38/7 38/21
38/25
holding [2]   23/22 24/25
HON [1]   1/11
Honor [9]   3/14 9/13 9/15 11/21
21/13 25/23 26/18 39/7 41/4
hospital [1]   17/6

**I**

I'd [1]   24/22
I'll [3]   6/11 16/9 26/23
I'm [59]
I've [9]   7/13 7/14 9/19 42/25
44/13 45/5 47/16 49/1 51/20
identified [3]   4/23 23/12 34/14
identify [1]   23/9
III [1]   1/11
immediately [1]   5/10
impose [1]   41/13
imprisonment [1]   41/6
improper [2]   3/7 39/16
in-house [1]   36/15
incarceration [1]   16/15
inches [1]   25/2
incident [24]   5/3 5/6 7/2 7/8
7/19 9/5 9/10 10/19 12/15 12/25
23/18 25/16 25/18 34/1 34/3
34/6 34/18 34/20 34/22 45/25
46/8 46/11 46/12 46/13
INDEX [1]   2/1
Indian [35]   6/12 9/11 10/13
10/20 11/1 11/8 11/17 12/13
15/9 16/1 16/22 16/23 17/1
18/23 18/24 19/12 20/3 20/6
20/13 20/21 21/1 21/3 28/24
29/2 33/15 33/19 34/7 34/13
35/22 36/3 36/9 38/17 40/3
42/12 44/24
Indians [1]   36/10
indicating [1]   7/14
individual [2]   15/7 35/16
individually [1]   35/15
influence [2]   3/7 39/16
influenced [1]   39/24
information [5]   10/2 10/22
10/23 29/11 34/13
initial [1]   14/2
initiate [1]   36/1
inside [2]   7/10 23/2
instance [1]   11/19
instead [2]   46/10 46/13
instill [1]   43/2
intake [1]   19/9
intimidate [2]   43/21 45/15
intimidated [2]   33/4 33/7
intimidating [1]   30/19
involve [1]   29/3
involved [3]   5/3 27/3 40/24
is [82]
isn't [2]   27/12 42/16
isolate [1]   51/22
issue [6]   14/14 15/13 36/13
43/21 43/23 45/9
issues [3]   32/22 32/22 45/17
it [113]
it's [20]   8/5 8/9 9/16 13/8
13/17 14/13 29/6 29/20 30/3
30/4 32/1 32/17 32/18 34/15
41/19 41/20 45/3 51/1 52/1 52/5

**J**

jail [17]   10/25 12/1 13/24
14/20 15/10 16/3 16/16 20/4

29/1 31/11 35/21 36/21 36/25
42/20 45/9 45/10 51/18
Jay [1]   34/9
job [1]   22/11
judge [11]   1/11 9/20 16/14
16/15 17/11 17/13 17/14 18/11
27/18 35/10 50/3
just [25]   8/5 8/24 9/1 13/1
15/4 20/23 23/2 24/24 27/2
27/10 30/18 30/20 31/14 32/19
32/20 35/5 36/7 37/4 38/14
40/15 40/16 42/22 42/24 44/20
48/1
justified [1]   48/21

**K**

keep [1]   40/4
Kent [1]   28/12
kicked [3]   6/7 50/1 50/4
kicking [1]   42/7
kid [1]   31/15
kids [1]   11/20
killed [1]   32/25
kind [4]   5/13 7/20 9/8 29/11
knew [2]   30/15 48/21
know [40]   4/17 5/20 7/11 9/4
9/9 9/11 10/12 13/9 13/16 13/25
14/5 16/11 16/18 19/4 19/16
20/9 21/4 23/7 26/15 26/17
26/25 27/1 27/11 27/22 28/25
29/24 29/20 30/1 31/12 32/17
32/18 33/22 34/14 34/15 34/19
40/16 47/13 47/17 47/23 52/1
knows [2]   30/4 36/17
Koppe [1]   9/19

**L**

language [1]   48/22
LAS [11]   1/3 3/1 4/15 5/18 11/9
11/9 20/11 20/14 20/15 22/10
33/11
Las Vegas [6]   4/15 5/18 11/9
11/9 22/10 33/11
last [4]   11/13 32/21 44/5 52/8
later [3]   29/14 34/19 44/21
law [2]   32/23 33/7
lawyer [1]   44/7
layman's [1]   22/14
learned [1]   51/19
least [1]   40/23
leave [6]   6/18 20/13 25/25 26/1
29/19 51/4
led [1]   46/11
left [4]   6/20 8/6 16/14 24/1
legal [5]   15/5 30/4 30/17 33/17
45/17
let [10]   11/17 13/10 18/6 23/11
33/6 42/2 44/19 46/6 47/15 49/1
letting [1]   46/4
like [17]   8/23 8/25 8/25 31/9
32/3 32/18 32/23 33/24 37/11
38/14 41/21 44/6 44/8 44/8
44/14 47/25 50/1
likewise [1]   31/24
line [1]   6/9
Listen [1]   37/2
listening [1]   42/18
live [2]   49/17 51/13
located [1]   22/23
long [1]   31/1
longer [1]   11/15
longest [1]   51/7

**L**

look [4]   7/14 10/21 23/4 46/21
looking [3]   39/8 44/10 44/11
lost [1]   37/4
lot [1]   31/13
loud [1]   6/6
Lucca [2]   1/25 52/17

**M**

Ma'am [2]   27/20 51/1
made [6]   11/1 24/10 34/8 38/18
 47/11 47/14
make [26]   7/22 10/6 11/17 11/21
 16/10 17/25 18/5 19/9 20/2
 20/22 22/18 30/9 31/22 31/25
 33/17 34/6 34/18 34/22 36/2
 37/13 41/7 42/12 49/9 49/20
 50/18 51/4
making [1]   15/10
man [3]   10/25 11/17 33/3
manner [1]   47/8
MARIE [2]   2/13 28/12
material [1]   30/17
matter [3]   3/5 15/5 27/12
matters [8]   3/7 9/21 9/22 9/23
 11/4 15/14 27/11 39/16
mature [4]   44/6 48/24
may [3]   17/11 25/24 46/6
maybe [1]   44/9
me [89]
mean [5]   7/16 34/9 36/9 39/21
 52/5
medical [15]   10/21 11/2 14/19
 16/1 16/5 16/6 16/9 16/19 16/20
 17/3 17/7 17/19 18/25 19/13
 20/19
member [11]   16/25 35/17 35/17
 35/18 42/4 42/4 42/6 42/14 44/1
 46/9 46/15
members [1]   35/16
Mexico [1]   19/7
might [2]   19/7 48/14
minute [1]   15/2
missing [3]   10/24 43/21 43/23
Mm [5]   37/22 38/5 38/7 38/21
 38/25
Mm-hmm [5]   37/22 38/5 38/7
 38/21 38/25
Moapa [1]   32/21
mom [10]   13/19 13/20 13/20
 16/19 27/9 27/16 28/23 30/3
 42/13 52/4
money [1]   31/2
month [2]   41/14 52/8
months [12]   41/6 41/19 42/19
 45/9 45/10 47/6 47/9 49/11
 49/22 51/18 51/25 52/11
more [4]   8/14 35/6 39/1 47/18
morning [1]   4/25
mother [9]   16/3 17/9 17/16 27/3
 30/21 44/17 47/20 48/8 49/19
mother's [1]   42/15
motion's [1]   52/13
Mr [13]   2/5 2/6 2/8 2/9 2/17
 4/6 4/19 8/20 14/14 22/6 23/19
 24/8 37/19
Mr. [31]   3/9 3/10 3/15 4/23 5/4
 5/7 5/20 6/3 6/4 6/22 7/3 8/17
 12/2 14/8 21/6 22/9 23/9 23/12
 24/5 26/14 35/4 35/5 35/9 36/17
 38/8 40/1 40/1 40/5 40/7 40/13

41/13
Mr. Belcher [2]   36/17 40/1
Mr. Colvin [4]   5/20 6/4 6/22
 14/8
Mr. Murch [2]   3/9 35/5
Mr. Nakai [2]   22/9 38/8
Mr. Phebus [19]   3/10 3/15 4/23
 5/4 5/7 6/3 7/3 8/17 12/2 21/6
 23/9 23/12 24/5 26/14 35/4 40/1
 40/5 40/7 40/13
Mr. Phebus' [1]   41/13
Mr. Stuff [1]   35/9
much [2]   29/15 45/4
MURCH [9]   1/19 2/5 2/8 2/17 3/9
 4/6 22/6 35/5 37/19
must [2]   35/17 35/18
my [55]
myself [2]   16/12 44/3

**N**

NAKAI [5]   2/7 21/19 22/8 22/9
 38/8
name [5]   4/9 22/7 27/24 28/10
 32/14
native [2]   10/22 16/24
necessary [1]   47/13
need [20]   6/17 6/18 16/23 17/13
 17/17 19/24 20/1 20/13 20/17
 20/18 26/17 27/22 27/23 28/23
 31/12 40/20 42/18 42/19 47/9
 47/9
needed [3]   17/7 18/25 20/14
needs [1]   15/8
NEVADA [2]   3/1 22/18
never [4]   9/22 14/25 17/23 46/6
New [1]   19/7
New Mexico [1]   19/7
next [4]   3/5 7/3 9/5 34/18
night [1]   23/15
no [48]   1/1 1/25 5/12 6/2 6/5
 9/14 11/23 11/23 11/23 11/23
 11/23 12/22 12/22 13/15 14/4
 14/17 14/25 18/14 18/14 18/14
 18/14 19/19 19/20 21/1 21/9
 21/11 21/13 24/2 24/11 25/9
 25/23 28/22 30/1 33/1 33/13
 33/13 33/13 35/5 35/5 35/5
 36/18 37/7 40/20 43/22 43/22
 43/22 50/4 52/17
nobody [1]   46/5
nonmember [2]   46/9 46/14
normally [1]   44/12
North [3]   20/11 20/14 20/15
not [42]   11/18 12/5 12/18 14/13
 15/4 17/8 17/15 20/17 21/3 21/9
 26/20 27/16 29/13 29/16 30/3
 31/5 31/14 31/15 32/23 33/4
 35/1 35/2 36/5 36/6 36/8 36/9
 36/13 40/20 41/9 41/9 42/15
 42/19 44/7 45/12 45/13 46/1
 46/4 46/5 46/21 46/22 47/12
 51/1
note [1]   42/22
nothing [15]   4/2 11/3 14/23
 15/14 17/2 22/3 25/8 28/6 28/20
 32/11 34/23 35/24 35/24 35/25
 37/3
notice [1]   34/2
November [4]   5/1 23/16 37/21
 38/4
November 6 [2]   5/1 37/21
November 7 [2]   23/16 38/4

now [23]   6/18 10/6 10/24 11/25
 12/8 15/17 16/2 16/3 16/21
 17/10 19/2 19/15 20/20 27/19
 28/22 33/13 40/19 41/18 41/19
 44/17 45/10 45/24 47/20
numerous [1]   50/15

**O**

ooo [1]   52/14
oath [2]   28/1 32/6
objection [4]   9/13 9/14 11/22
 30/17
occurred [2]   7/6 7/19
off [2]   42/11 47/25
offense [2]   41/20 41/24
offered [1]   41/17
office [6]   6/15 7/4 7/21 8/3
 8/7 23/6
officer [8]   8/21 12/21 34/5
 34/18 35/6 51/3
officers [1]   9/4
official [2]   3/7 39/16
okay [16]   10/25 11/24 12/4 12/7
 16/8 19/9 36/25 42/10 42/20
 46/14 47/18 47/19 48/15 51/20
 51/23 52/11
old [2]   31/14 47/25
one [15]   7/24 13/15 16/22 17/15
 17/23 17/25 18/5 19/24 21/7
 20/18 30/22 35/6 45/11 48/24
 51/15
only [2]   17/15 19/4
opinion [3]   17/17 17/21 17/22
opportunity [12]   10/5 11/6 12/3
 18/19 26/19 31/21 40/14 40/19
 42/23 43/10 44/13 51/22
option [1]   46/18
order [12]   5/11 5/13 6/4 6/25
 10/3 13/13 13/17 14/3 14/5
 35/16 35/18 52/7
ordered [2]   16/16 33/9
orderly [1]   12/4
orders [2]   17/14 35/12
other [17]   8/23 9/4 11/10 11/13
 12/10 21/10 25/22 29/14 34/12
 34/13 37/5 39/17 46/2 49/6
 49/23 51/8 51/21
our [8]   13/8 17/17 17/18 19/5
 19/10 19/13 22/16 22/18
out [13]   3/11 4/19 5/10 6/8
 6/13 30/20 33/23 44/15 44/19
 45/21 47/20 50/1 50/4
outside [1]   17/5
over [10]   10/18 13/4 13/5 15/12
 17/7 33/2 34/20 44/2 44/20 48/9
Overlapping [10]   10/9 18/3 18/8
 18/17 27/14 30/12 43/25 47/3
 48/5 50/25
own [2]   35/12 42/11

**P**

P-h-e-b-u-s [1]   32/16
P.M [1]   1/14
PAGE [1]   1/1
PAIUTE [8]   1/3 4/15 5/18 11/9
 13/2 22/10 33/11 43/17
paper [5]   7/12 24/19 25/13
 38/15 38/16
papers [1]   34/13
paperwork [7]   5/14 5/16 11/1
 13/2 20/4 20/5 36/2
part [1]   30/4

**P**

particular [1]  16/13
parties [1]  3/12
passed [1]  33/21
past [1]  41/11
PATRICK [1]  1/19
pattern [1]  42/1
pay [5]  17/8 19/13 20/11 20/15 41/9
paying [1]  19/11
Peach [1]  50/22
people [18]  11/14 13/4 30/19 34/25 35/20 40/11 43/2 43/9 43/21 43/22 45/19 47/22 47/24 47/25 49/6 51/5 51/8 51/21
perform [1]  22/20
permission [2]  15/1 19/24
persecuted [1]  11/7
person [4]  1/20 2/16 39/15 44/14
personal [1]  5/25
pertinent [1]  13/11
PHEBUS [35]  1/6 2/6 2/9 2/15 3/6 3/10 3/15 4/17 4/19 4/23 5/4 5/7 6/3 7/3 7/10 8/17 8/20 12/2 14/14 17/15 21/6 23/7 23/9 23/12 23/19 24/5 24/8 26/14 32/16 35/4 40/1 40/5 40/7 40/13 45/21
Phebus' [1]  41/13
physical [1]  19/9
pictures [2]  47/15 48/20
piece [1]  38/15
place [1]  50/21
placed [1]  50/17
Plaintiff [1]  1/4
play [2]  26/9 26/10
please [3]  22/7 42/2 46/6
please let [1]  42/2
pleasure [1]  41/2
plight [1]  48/15
point [8]  4/19 9/24 16/17 21/9 30/6 31/5 37/9 37/13
police [14]  4/12 4/16 5/8 7/18 12/14 22/10 22/16 32/25 38/3 40/10 42/5 42/9 46/11 49/16
policy [1]  22/19
possession [1]  14/3
POTTER [1]  1/11
powers [1]  16/10
present [3]  33/3 37/6 42/19
presentation [1]  31/23
President [2]  39/20 39/21
Pretty [1]  25/1
previously [2]  10/25 43/11
probably [1]  50/22
problem [5]  13/6 13/7 45/21 48/3 48/9
problems [4]  29/10 43/6 47/18 49/24
procedure [1]  16/12
procedures [1]  22/19
proceed [3]  3/12 3/13 3/16
proceeding [1]  42/17
proceedings [1]  1/6 52/16
professional [1]  5/22
PROPER [2]  1/20 2/16
property [1]  46/10
prosecute [1]  33/18
prosecuting [1]  42/8
protecting [1]  49/5

protocol [1]  14/16
prove [1]  32/1
provide [3]  5/13 17/19 18/25
provided [2]  17/15 18/24
public [3]  22/17 39/17 39/18
purposes [1]  20/3
put [13]  10/4 11/12 13/24 15/10 29/1 32/5 35/21 36/6 36/10 36/25 45/2 45/8 51/17
putting [1]  45/23

**Q**

quantum [8]  9/22 18/12 29/3 35/19 36/4 36/5 36/11 47/12
question [7]  12/17 12/20 14/2 14/10 18/20 28/23 31/22
questioning [1]  10/7
questions [23]  8/15 9/25 11/11 12/11 12/25 13/10 15/19 18/20 21/5 21/10 24/2 25/9 25/22 27/1 28/18 30/9 30/10 30/15 32/4 35/3 37/2 37/15 39/2

**R**

R.M.R [1]  1/25
radio [1]  22/12
Ramona [1]  20/21
rational [1]  44/14
reaction [1]  7/17
read [2]  39/21 47/16
ready [3]  3/12 3/13 3/15
really [4]  21/4 27/2 28/19 32/20
reason [2]  30/14 45/11
reasonable [2]  32/24 33/2
rebut [2]  39/14 40/20
recall [1]  23/18
receive [3]  16/6 16/8 16/20
received [1]  18/23
receiving [1]  41/24
recognize [2]  36/8 42/1
recognized [1]  36/8
recollection [1]  29/24
recommendation [1]  49/10
record [14]  3/9 4/9 4/22 11/22 14/15 15/5 20/21 22/7 23/11 23/13 24/24 28/11 32/15 42/11
record's [1]  41/25
records [3]  10/21 10/21 14/10
redirect [1]  21/12
referring [1]  34/4
reflect [5]  3/9 4/22 10/2 23/11 23/13
refused [1]  44/16
relationship [3]  5/22 5/25 9/8
relevant [2]  9/16 42/16
remain [1]  13/23
remember [1]  19/8
remorse [1]  43/7
remove [2]  50/6 51/3
repeatedly [2]  30/18 48/16
report [8]  10/19 12/15 12/25 34/1 34/3 34/6 34/18 34/22
Reported [1]  1/25
REPORTER'S [1]  1/5
representing [1]  3/10
requested [6]  5/9 10/22 20/24 21/2 34/8 43/4
requesting [1]  17/16
requests [1]  14/13
reservation [4]  32/22 36/9 36/10 48/17

resolve [4]  12/13 12/16 12/18 15/13
response [4]  42/24 44/20 49/2 49/9
responsibility [4]  17/18 22/15 46/23 46/24
responsible [1]  49/5
rest [1]  51/22
resting [1]  37/8
returns [1]  7/14
review [1]  35/12
rid [2]  13/2 13/19
right [22]  4/21 6/18 8/9 8/10 9/10 10/6 14/22 15/17 23/5 23/10 23/10 24/17 31/20 32/5 35/12 36/4 36/14 40/17 45/9 45/24 47/21 48/22
rock [28]  6/14 7/4 7/10 7/15 9/3 10/16 15/12 19/17 19/18 23/23 24/14 24/16 24/21 25/11 29/25 30/5 34/21 36/20 37/11 38/3 38/6 38/9 38/12 40/24 44/21 48/10 48/13 49/3
room [1]  46/17
ruled [2]  13/22 35/10

**S**

Safety [1]  22/17
said [20]  6/11 6/11 6/16 6/16 6/17 6/18 8/22 9/20 16/5 16/7 16/8 16/8 16/22 17/12 20/8 21/1 35/15 42/25 43/19 48/22
sake [1]  8/1
same [4]  9/5 39/22 40/5 40/6
say [17]  11/8 11/13 14/17 15/14 17/6 20/5 24/22 32/3 33/22 33/22 35/6 37/1 37/3 39/18 40/16 45/16 46/6
saying [1]  23/23
says [3]  13/16 20/5 20/7
scale [1]  43/5
sealed [1]  13/23
seat [1]  28/14
second [1]  39/13
Section [1]  39/8
see [9]  16/4 16/9 24/12 24/15 25/6 26/18 26/20
seem [1]  33/24
seemed [1]  40/12
seems [1]  40/5
seen [2]  26/13 43/5
send [5]  11/25 14/20 17/4 20/12 49/12
sending [1]  45/16
sent [1]  10/25
sentence [4]  41/5 41/8 41/14 41/16
sentenced [2]  49/11 52/10
servant [2]  39/17 39/18
served [2]  42/23 44/20
service [1]  41/10
services [1]  20/19
set [3]  3/8 14/10 30/6
several [1]  47/14
she [16]  14/25 16/4 16/4 16/14 16/17 16/18 18/1 18/5 20/7 20/8 20/23 30/4 30/15 34/7 36/5 50/2
she's [2]  30/24 36/9
shouldn't [4]  14/23 45/1 45/8 45/11
show [1]  16/24
showed [1]  25/11

**S**

shut [1]  6/19
sick [1]  27/18
simply [1]  46/16
since [2]  13/8 40/21
sir [1]  19/20
sister [1]  30/2
sisters [1]  13/21
sit [1]  11/8 23/5 28/2
sitting [5]  4/20 16/4 23/10 33/11 42/10
situation [1]  14/12
six [14]  25/2 41/6 41/14 41/19 42/19 45/9 45/10 47/6 47/8 49/11 49/21 51/18 51/24 52/6
size [4]  24/22 24/23 38/8 38/12
so [25]  6/3 9/10 10/3 10/7 12/15 13/23 16/8 16/13 17/11 23/4 23/13 32/17 34/11 34/15 34/17 34/22 41/7 41/12 42/3 49/5 49/10 49/14 50/5 51/5 51/21
some [5]  29/11 30/15 45/21 49/9 50/13
somebody [1]  8/11
someone [4]  7/24 15/21 36/20 39/19
something [22]  8/11 8/24 8/25 15/21 17/6 19/21 21/7 23/24 32/4 33/24 36/15 36/16 38/20 40/2 40/3 40/8 43/4 46/5 47/1 47/5 49/20
sometime [1]  27/18
somewhere [1]  49/18
son [3]  27/25 31/11 31/12
sorry [2]  37/10 47/7
speak [5]  5/10 26/23 33/4 41/15 46/6
speakers [10]  10/9 18/3 18/8 18/17 27/14 30/12 43/25 47/3 48/5 50/25
spend [1]  42/20
spoke [1]  37/20
Springs [1]  50/23
stand [2]  28/15 31/21
started [1]  33/25
state [6]  4/9 22/7 22/18 27/24 28/10 32/14
stated [1]  37/23
statement [7]  2/16 10/6 30/9 31/23 31/25 38/11 38/18
statements [1]  26/20
station [4]  7/18 19/20 38/3 40/10
status [1]  10/22
statute [1]  39/21
stay [1]  20/15
stepped [1]  5/10
still [3]  34/21 50/3 50/11
street [5]  11/7 28/13 45/25 46/9 46/16
stress [2]  30/21 30/22
stressed [1]  29/19
stressful [1]  29/21
stuff [2]  31/13 35/9
suing [1]  42/6
summons [1]  36/24
supposedly [2]  14/14 27/25
sure [3]  12/18 19/9 22/18
sworn [4]  4/1 22/2 28/5 32/10
sympathetic [1]  48/14

sympathy [1]  32/19

**T**

table [1]  4/20
take [3]  31/21 41/12 46/23
taken [3]  44/15 46/15 46/24
takes [1]  11/15
taking [3]  26/20 29/25 51/7
talk [4]  5/9 33/6 47/24 48/24
talked [1]  25/17
talking [3]  14/9 42/17 48/8
tape [1]  26/13
tech [1]  22/12
tell [20]  6/8 6/11 17/24 18/12 23/23 27/18 27/19 29/17 29/19 29/22 31/9 32/19 36/1 38/19 45/8 45/11 46/25 47/5 47/10 47/25
telling [2]  6/7 46/1
terms [4]  7/18 22/14 41/5 41/8
terrorist [1]  43/1
terrorize [2]  43/9 47/22
terrorizes [1]  47/24
terrorizing [2]  43/12 43/13
test [1]  35/1
testified [5]  4/3 15/4 22/3 28/7 32/11
testify [10]  4/2 10/6 18/6 22/2 26/22 26/23 27/21 28/6 31/22 32/10
testimony [1]  39/25
than [2]  29/14 46/2
Thank [2]  21/14 31/16
that [175]
that's [28]  11/9 12/6 14/21 14/22 14/22 15/11 16/11 16/25 17/1 17/10 18/22 18/25 19/16 20/7 20/17 23/6 26/5 28/16 33/14 35/13 36/13 36/14 39/7 39/23 41/7 41/23 45/9 48/1
their [5]  8/1 13/21 13/22 32/1 35/12
them [8]  7/22 7/25 8/1 9/7 13/20 35/20 45/23 49/8
then [20]  7/2 9/1 9/6 10/15 13/2 13/10 13/20 18/23 23/25 34/1 38/3 39/13 39/13 42/25 48/19 49/2 49/9 50/3 52/6 52/8
there [16]  5/12 6/13 9/4 10/24 11/8 12/25 13/4 13/5 16/8 26/9 28/22 31/9 35/2 36/6 40/12 46/8
there's [4]  15/19 19/4 31/13 40/20
these [8]  9/21 11/13 27/10 42/21 43/2 43/8 49/8 51/5
they [27]  9/6 14/15 16/22 17/7 17/8 18/25 19/8 19/9 19/11 19/12 21/2 33/6 34/14 34/15 35/12 35/22 36/5 36/10 36/23 46/12 47/10 47/11 48/16 50/6 50/20 52/6
they'll [1]  47/25
they're [6]  31/2 31/2 31/5 31/6 33/21 51/8
thing [3]  34/19 35/6 39/22
things [2]  16/22 39/17
think [6]  9/16 10/15 13/11 30/25 41/6 44/9
this [64]
those [2]  16/10 47/14
though [1]  14/17
thought [2]  48/23 48/23

thousand [1]  42/6
threaten [4]  7/24 15/11 44/21 49/3
threatened [5]  7/4 8/2 8/21 36/19 49/15
threatening [4]  6/17 39/19 44/9 44/23
threatens [3]  39/17 39/19 48/12
threats [2]  30/19 40/12
through [19]  5/15 5/15 6/15 7/4 7/15 7/23 7/25 10/16 10/16 11/6 11/6 12/14 14/16 17/12 20/19 25/13 37/25 45/23 47/13 48/13
throw [8]  6/14 7/4 7/15 7/24 10/15 25/12 37/25 48/12
thrown [1]  44/14
THURSDAY [2]  1/13 3/1
till [2]  9/7 29/13
time [26]  3/8 6/8 7/24 8/23 8/23 9/2 9/5 9/19 13/18 16/13 16/16 24/12 25/8 26/21 27/18 29/18 29/19 33/17 35/22 41/8 42/9 42/23 44/5 44/19 48/13 50/4
times [1]  47/14
title [1]  22/11
today [1]  42/16
together [1]  10/4
told [1]  5/10 5/12 6/5 6/10 7/12 18/5 20/23 25/19 29/13 50/11 51/6
tomorrow [2]  23/23 38/19
too [2]  45/3 52/13
took [2]  7/16 16/17
transcript [2]  1/5 52/15
transport [1]  17/7
treated [2]  19/8 45/1
treatment [4]  16/6 16/9 16/20 17/19
trespass [1]  52/7
trespassed [2]  33/10 50/8
trial [1]  3/8
tribal [20]  1/11 4/11 14/9 14/12 16/25 31/1 35/15 35/16 35/17 35/18 39/8 42/3 42/3 42/4 42/5 42/14 43/19 46/9 46/10 46/15
TRIBE [38]  1/3 1/19 2/2 3/6 3/10 3/18 19/10 20/10 20/15 20/25 21/18 22/21 31/25 33/18 35/2 35/13 35/14 36/7 36/16 40/10 42/1 42/9 43/4 43/7 43/15 43/15 43/17 43/18 44/1 45/13 45/18 49/7 49/11 49/17 49/22 51/23 52/2 52/6
Tribe's [4]  3/13 5/18 35/10 41/2
tried [5]  3/13 33/5 44/13 48/16 52/7
true [1]  52/15
truth [12]  4/2 4/2 4/3 22/2 22/2 22/3 28/6 28/7 32/10 32/10 32/11
try [7]  12/8 32/24 33/2 43/1 43/20 45/15 49/20
trying [19]  12/6 12/7 12/18 12/19 12/19 15/19 29/11 30/5 30/6 30/17 30/20 36/23 44/2 44/12 45/7 47/20 49/9 50/5 50/6
Tsosi [6]  16/14 17/14 18/11 19/25 20/2 20/22
turn [1]  39/11

**T**

turned [3]   6/6 6/19 13/5
turning [2]   44/3 44/4
two [10]   10/4 13/20 13/21 16/22
17/10 17/16 19/6 24/25 33/16
33/20
type [3]   5/16 45/21 49/9
types [2]   40/5 40/6

**U**

under [2]   29/2 32/6
understand [9]   7/9 27/10 28/22
31/4 31/8 32/20 40/15 45/4
48/11
understanding [4]   7/7 13/13
25/10 41/10
unfairly [1]   45/1
unless [6]   26/18 43/3 45/10
46/25 47/5 49/18
up [23]   6/11 6/13 10/21 11/2
11/8 14/19 19/2 24/25 27/24
32/1 33/5 34/5 34/10 34/23
42/10 45/25 46/8 46/11 47/24
51/1 51/2 52/1 52/5
upon [1]   31/25
upset [1]   10/12
us [6]   4/19 11/19 13/19 15/15
18/5 21/3
use [2]   34/25 48/22
using [1]   29/2
usually [2]   29/14 30/2

**V**

VEGAS [11]   1/3 3/1 4/15 5/18
11/9 11/9 20/11 20/14 20/16
22/10 33/11
very [3]   8/23 29/16 29/20
victim [3]   30/23 30/24 43/8
victimized [2]   31/1 48/24
video [2]   25/6 38/10
videotape [3]   26/6 26/8 26/18
violence [1]   30/19
vocabulary [1]   44/8

**W**

wait [6]   9/7 10/17 10/24 15/2
52/4 52/4
waiving [1]   40/21
walked [1]   33/5
want [25]   9/7 11/20 12/22 27/7
27/9 27/20 28/17 28/25 29/4
29/15 30/10 30/20 31/11 31/24
32/1 36/7 37/5 40/18 40/22 44/8
45/13 47/18 49/20 51/8 51/21
wanted [7]   5/11 6/24 8/1 9/6
13/19 16/20 30/14
wanting [1]   19/3
wants [2]   13/25 26/18
was [65]
wasn't [3]   9/2 20/4 33/4
way [13]   5/12 7/21 8/8 10/16
13/8 26/9 26/10 29/14 32/1 40/9
46/20 48/2 49/22
ways [1]   19/4
we [16]   13/18 16/23 17/10 17/13
17/17 17/18 20/18 26/17 27/23
35/24 40/4 40/12 48/17 48/24
50/1 51/6
we'll [4]   18/6 28/1 28/2 32/5
we're [5]   10/6 14/8 15/17 17/4
42/17
we've [2]   30/25 47/13

week [1]   32/21
welfare [4]   11/19 15/15 35/23
40/11
well [19]   7/9 7/11 9/2 10/23
14/11 16/7 16/7 16/22 27/5
30/25 31/11 32/25 33/1 35/15
35/20 42/4 42/4 42/8 46/13
went [7]   6/20 10/21 16/3 17/12
33/14 33/25 35/9
were [25]   4/25 5/3 9/5 13/18
13/23 15/2 17/25 19/18 23/15
25/16 25/20 29/10 32/22 34/25
36/10 36/23 40/23 42/22 43/10
44/6 46/12 49/5 50/6 50/7 51/6
what [72]
what's [7]   7/7 12/20 17/13 21/4
39/23 41/2 50/1
whatever [4]   17/6 19/11 19/13
20/7
whatsoever [1]   5/14
when [40]   6/5 6/19 7/13 8/22
10/20 11/13 11/14 11/16 11/20
12/24 13/4 13/7 13/18 14/12
16/2 16/13 16/21 17/11 18/23
19/8 19/18 19/19 20/2 25/23
25/8 25/11 25/16 25/17 25/19
27/11 30/2 32/18 34/11 35/21
36/2 36/21 38/19 39/19 42/10
50/2
whenever [1]   36/15
where [18]   8/3 8/7 13/1 14/5
19/6 22/23 23/5 24/15 33/8
34/14 40/6 42/2 42/3 42/5 45/25
47/25 49/12 50/20
wherever [1]   19/7
whether [2]   12/19 40/23
which [7]   8/8 11/2 17/5 19/3
32/23 42/23 44/22
who [8]   13/1 15/22 34/15 42/13
43/12 43/16 51/10 51/14
who's [3]   5/17 18/1 22/9
whole [5]   4/2 22/2 28/6 29/6
32/10
Whose [2]   43/15 43/15
why [31]   8/23 8/25 9/12 10/12
11/12 12/6 15/6 15/11 15/18
15/20 16/7 29/5 29/5 30/6 33/14
33/24 34/11 36/21 41/7 41/23
42/11 42/12 42/19 45/1 45/8
45/11 47/10 47/21 50/16 51/4
51/17
will [5]   3/9 4/22 16/25 23/13
40/8
WILSON [2]   2/13 28/12
window [9]   6/15 7/5 7/15 7/23
7/25 8/7 10/16 37/25 48/13
wish [1]   31/21
witness [7]   21/16 24/3 26/3
27/8 31/18 39/4 51/16
witnesses [4]   2/2 2/11 26/5
26/22
won't [4]   33/10 46/23 47/19
49/22
words [1]   38/1
work [4]   16/25 45/13 45/19
45/20
working [2]   4/25 23/15
worried [1]   45/20
worry [1]   49/22
worst [3]   41/21 41/22 41/23
would [22]   5/14 8/11 13/11
14/13 14/17 17/5 17/7 17/8 17/8

19/10 19/10 32/3 35/1 36/5
37/25 38/11 41/12 41/18 42/22
44/9 49/17 49/19
wouldn't [3]   33/6 46/20 52/8
wrap [1]   6/14
wrapped [2]   7/12 38/15
write [3]   45/7 46/19 52/8

**Y**

Yeah [4]   12/21 23/1 25/3 38/16
years [5]   9/20 16/3 31/14 33/16
33/20
yes [27]   3/17 4/13 4/18 4/20
5/5 5/7 6/23 7/6 7/23 7/20 8/13
10/14 11/4 15/25 22/22 23/3
23/8 23/17 23/20 24/14 24/20
25/7 25/21 26/24 27/5 32/4
34/10 36/14
yet [4]   11/8 32/24 42/10 46/6
you [312]
you'd [1]   31/9
you'll [3]   10/5 49/21 52/3
you're [44]   11/25 12/1 12/2
12/8 12/17 12/18 12/19 14/21
18/19 21/14 24/24 29/1 29/17
30/4 30/8 30/18 35/2 41/24 43/1
43/6 43/8 43/13 43/20 43/21
43/23 44/1 44/3 44/4 44/9 44/16
44/17 45/10 45/6 45/16 46/2
46/4 46/18 46/22 47/6 47/12
49/9 49/11 50/17 52/12
you've [8]   9/17 33/9 33/18 44/14
44/15 44/15 46/24 46/25 52/10
young [1]   33/3
your [59]
yours [1]   11/15
yourself [3]   31/22 44/5 49/2

**EXHIBIT 6**

**EXHIBIT 6**

## LAS VEGAS PAIUTE TRIBAL COURT
## LAS VEGAS, NEVADA

**ENTERED**

JAN 0 4 2013

LAS VEGAS PAIUTE
TRIBAL COURT

| | | |
|---|---|---|
| **THE LAS VEGAS PAIUTE TRIBE** | ) | Case No. <u>CR12-008</u> |
| | ) | |
| Plaintiff | ) | **ORDER AND JUDGMENT** |
| Vs. | ) | **OF CONVICTION** |
| | ) | |
| **CHRISTOPHER PHEBUS** | ) | |
| | ) | |
| Defendant | ) | |

The above-captioned matter came before this Court for a bench trial on Wednesday, December 27, 2012. Tribal prosecutor Patrick J. Murch, Esq. appeared on behalf of the Las Vegas Paiute Tribe, and defendant Christopher Phebus appeared *pro se*.

The Court having reviewed the oral and documentary evidence and the arguments of both parties, and good cause appearing, IT IS HEREBY ORDERED as follows:

1. Pursuant to Las Vegas Paiute Tribal Code 1-30-010, Christopher Phebus, DOB: 07/31/69 and SSN#: xxx-xx-5723 is found GUILTY of: IMPROPER INFLUENCE IN OFFICIAL MATTERS, Tribal Code 5-60-020, a class B offense and is adjudge convicted of the said offence.

2. Mr. Phebus shall be incarcerated for a period of Six (6) Months at a Bureau of Indian Affairs detention facility.

3. Mr. Phebus shall be remanded into immediate custody with Chief Belcher of the Las Vegas Paiute Tribal Police to begin serving his sentence.

4. Mr. Phebus' release date shall be Friday, June 28, 2013.

**SO ORDERED THIS 4th DAY OF JANUARY, 2012.**

Judge Cal J. Potter, III
Las Vegas Paiute Tribal Court Judge

CC:

Patrick J. Murch, Prosecutor, Las Vegas Tribe
Christopher Phebus, Defendant
Chief Don Belcher, Police Department

EXHIBIT 7

EXHIBIT 7

⑥                                                    01/10/13

LV Paiute Tribal Court

Filed in L.V. Paiute Court
Date: 1/10/13 Time: 130pm

Chris Phebus                    Court Clerk: KP . CR12-008
      VS                              Motion
LV Paiute Tribe              Requests that local LV Att.
                       Cal Potter be removed from all
future court cases regarding your affiant
     Chris Phebus. That Cal Potters decision
     for such a severe incarceration period was
     biasley made. Can be proven by fidiral
        contraling Bruce and the procedure
        used to impliment this law. Your affiant
        believes Cal Potters decision to be judge
        was for his own personal benefit and con-
        vienance despite the name LV Paiute.
        Can be proven by the best judge local LV
        Att. Gregg Koppl inter titled Interference
        with Court Procedure.


                    Sincerely,

                 Christopher Phebus

# EXHIBIT 8

# EXHIBIT 8

LAS VEGAS PAIUTE TRIBAL COURT
CLARK COUNTY, NEVADA

**ENTERED**

JAN 16 2013

LAS VEGAS PAIUTE
TRIBAL COURT

Las Vegas Paiute Tribe,                )   CR12-008
                                       )
          Plaintiff,                   )
                                       )
     vs.                               )
                                       )        **ORDER**
Christopher Phebus,                    )
                                       )
          Defendant                    )
_____)

     The Defendant, Christopher Phebus, having been convicted of Las Vegas Paiute Tribal Law & Code 5-60-020 Improper Influence on Official Matters, on or about December 27, 2012.  Mr. Phebus is in proper person and in the custody of the Las Vegas Paiute Chief of Police and having been transferred to the Owyhee Detention Facility.

     The Court hereby orders that Mr. Phebus' letter, entitled "Motion", will be treated as a Notice of Appeal and the remaining matters concerning future charges against Mr. Phebus are denied as being premature.

     The Clerk is directed to convene an appellate tribunal.

          Dated this 16th day of January 2013,


                         _____
                         Cal J. Potter, III
                         Chief Judge

- 1

**EXHIBIT 9**

**EXHIBIT 9**

05/07/2013 TUE 17:23  FAX 801 238 7981 UT Court Appeals                    ☑001/001



**LAS VEGAS PAIUTE TRIBAL COURT**
**Number One Paiute Drive**
**Las Vegas, NV 89146**

Christopher Phebus                    **Order of Stay on Appeal, Temporary**
SS#: xxx-xx-5723                     **Release and Restraining Order**
DOB: 07-31-69

                                     **CASE NO. CR13-001**

Las Vegas Paiute Tribal Court
                    Defendant

To the Keeper of the Owyhee Detention Facility, Bureau of Indian Affairs/ Office of
Justice Services; Hwy 225, Bldg 305; PO Box 99; Owyhee, NV 89832.

Upon review of the case file, transcript and pleadings on record, the appeals court panel
assigned to above matter hereby orders:

1.  A stay order is issued in the matter pending a hearing on the appeal filed.  Mr.
    Phebus is hereby ordered released forthwith and ordered to appear at the hearing
    scheduled below.  Failure to appear may be punished by contempt of court and/or
    imposition of the remainder of the jail term previously by the trail court.

2.  The appeal on this matter is set for hearing in the Paiute Tribal Court courtroom
    on May 17, 1013 at 2:00 pm.

3.  The panel of judges assigned to this matter hereby direct that the prosecutor file,
    at least 48 hours prior to the hearing, a brief not to exceed 25 pages, addressing
    two points.  First, the sufficiency of evidence to prove beyond a reasonable doubt
    the elements of the charge for which Mr. Phebus was convicted.  Second, whether
    the sentence imposed constitutes an abuse of discretion, i.e. whether the sentence
    imposed is unreasonable (or cruel and unusual) in light of all the circumstances
    relevant to this matter.

4.  Argument on this matter will focus on the two issues listed immediately above.

5.  This order shall constitute a restraining order and does hereby bar Mr. Phebus
    from presence within 100 feet of the Tribal Police Building and offices.

6.  A copy of this order shall be delivered to Mr. Phebus upon release.
*You are hereby directed to release him forthwith from custody.*

Entered this 6th day May 2013

                                     For the panel, Judge William Thorne

**EXHIBIT 10**

**EXHIBIT 10**

01/30/13                                          Pg. 610

ORIGINAL

# INTRODUCTION

Your affiant does believe it would be unfair to judge the worth of this Affidavit without considering a combination of events surrounding these civil matters known as the Las Vegas Paiute Tribe Disenrollments of 1999. It is because of these matters that have influenced and perverted your affiants action resulting in the LV Paiute Tribes criminal prosecution and incarceration for the charge Improper Influence in Official matters, 5-60-020.

# ARGUMENT

DISENROLLMENTS of 1999 did introduce resolutions that would have changed the definition of what a Las Vegas Paiute is. Tribes own court system ruled these resolutions were illegal, unenforcable and unconstitutional. Therefor the definition of tribe remains the same. That definition is and allways has been the tribes independant record of history known as the LV Indian Colony census roll dated January 1, 1940 or better known as the 1940 census roll.

Las Vegas Paiute Tribe enacted these disenrollments concerning two individual families (Frye Petitioners known as the Sacketts and these Carpenter Pet. your affiant).

Tribal Council along with it's enrollment committee formed of tribal members determined that their was mathematical ERRORS on the face of the tribes 1940 census roll exclusively used for enrollment/disenrollment purposes. These ERRORS will now constitute  for the

Filed in L.V. Paiute Court
Date: 2/16/13 Time: 2:00 pm
Court Clerk:

blood qtm's of 6 of the 7 tribal council members in-
cluding Chair and Vice Chair (Bennytea, Darren Tackett
Lucille Campa, Chris Spotted Eagle, Robert Segmiller, Curtis
Anderson). The breakdown of these individuals family
histories would be self-explanatory.

LVP Tribal Court Judge Cal Potter does not ques-
tion wether current tribal council are in violation of
their own constitution. LVPaiute Court of Appeals
for those disenrolled (Case #          ) and its Facts
and Conclusion of law will verify that they are.

BRUCE vs UNITED STATES used by
LVPT Law Enf. and Tribal Court will contradict it-
self if allowed to compare both your affiant and
other descendents of enrolled tribal members acc-
ording to the procedure used to establish a bld.
qtm.

Other known descendents (Examples, Drew Carter
Carlos Salazar Jr.) of tribal members prosecuted
and convicted by tribal court may possess a Paiute/
Indian bld. qtm sufficient to meet Bruce, but
does not meet Las Vegas Paiute as a standard.

THE name Las Vegas Paiute is now being used
by Law Enf. and tribal court in vain, convienance
and as a double standard when your affiant meets
Bruce as a descendant of an enrolled tribal mem-
ber as well as a potential tribal member with a
court order for reinstatement (Case #          ).

Todays present prosecuting attorney (local LV

Pg.? 760

Att Patrick J. Murch) and tribal judge (local LV
Att Cal Potter) as well as tribes own in-house
legal counsel (local LV Att. David Culvin) have rep-
resented and confirmed that those Disenrollments of
1989 as a court case still remains open. If this to
so, why does the current tribal judge Cal Potter
allow prosecution and incarceration for your affiant
under a federal law such as Bruce that requires
a bld. qtm. to fulfill it's purpose? This can be
answered by remittances and oas's own personal
agenda (will explain momentarily).

Bruce if used fairly by tribal Court would
oppose current tribal members as council members
and their bld. qtm's by comparison if broke
down by Equity ancestlry as was done for your
affiant to fulfill those Disenrollments and future
enrollments (Corbett Family Ancestory Pgs. 1 of 6).

## WHAT IS LAS VEGAS PAIUTE TRIBE?
According to tribal judge Cal Potter, tribal
council is supreme court. This in use so to protect
his own reputation and those council members and
their own history and bld. qtm's under the federal
law Martinez vs Santa Clara Pueblo. As used pre-
viously by tribe and it's legal counsel.

The fact that your affiant's LV Paiute history and
bld. qtm. is derived from the 1940 census roll predates
Martinez vs Santa Clara Pueblo and therefor
does not apply, etc.

Pg. 9 of 10

In order to be a tribal council member you must first be a tribal member. In order to be a tribal member you must first meet criteria such as a LV Paiute history and bld. qtm.

These Disenrollments now challenge current tribal council members own individual histories and bld. qtm's.

Current judge Cal Potter has never considered his own opinion of tribe as a question to be asked of current tribal council. If he did, the answer he would recieve would conflict council member Debra Faria as a previous Disenrolled.

Not to mention Debra Faria was arrested by tribes Law Enf. (Provided) as a Disenrolled, labled as a white person. Taken to county jail not recognized under tribes contract or 638 grant. This was done while Debra Faria was attempting to visit tribes medical facilities designated for Indians with native status. An obvious contradiction to your affiants present situation.

Your affiant believes judge Cal Potter for convience and personal gain (tribal/federal experience for future reference) relies independantly on tribal council as definition for tribe. What happened to the LV Paiute (1940 census roll)?

Tribal Council at the time of Debra Faria and Frye Petitioners reinstatement as tribal members were being threatened by Faria for claiming her tribal is arbitrary. Can be proven by video given to judge Potter previously.

Pg E #10

## LVPT LEGAL COUNCEL n PROS. ATT.

David Cullvin has represented by previous discussion that prior his employment of LVPD as tribes legal councel. Any documentation giving definition to tribes Const. n Bylaw (est. in 1920) in the form of tribal minutes that are tribes records. Counsel is unaware of, can not refer to, not in possession of.

One of those definitions to tribes Const. n Bylaws concerns the provision Art. 7, Sec. 1 (h). This ordinance allows tribal council to review, overlook or ignore it's own courts orders. Or so believed by tribal council and it's attorney.

David Cullvins definition of tribes Const. n Bylaw Art. 7, Sec. 1 (h) is a misrepresentation by face value. Conflicting tribes original local LV Attorneys presentation of this ordinance.

Your affiant believes tribes records have been removed and destroyed by previous tribal members as council members to conceal and secure their own unconstitutional tribal memberships (Sackett Family Errors).

Documentation can be supplied to prove the above accusations, points. Because of current tribal courts conduct your affiant does not want to implicate those other LV Attorneys at this time. Tribes counsel, Pros. Atty. and current tribal judge are stepping on fellow colleagues toes here in Las Vegas.

Prior to councilwoman Debra Faris and those Frye Pet. reinstatement as tribal members. Tribes counsel and his law firm filed suit against Debra

Faria for posting their law firms logo on her website (http://www.paiutescorruption.com/) for those disenrolled. Faria made a deal with tribes counsel and his firm to remove her website for her reinstatement as a tribal member. Your affiant believes this scinario shows misconduct and impropriety on behalf of tribes legal representative.

David Cullein a tribes attorney is only allowed to represent decisions of the tribal council. He can not speak on behalf of individual council members histories and bld. qtm's. Cullein will now contradict those decisions (DISENROLLMENTS / ERRORS) now that Debra Faria is a current tribal council member.

Questions to consider. ① If tribes in-house attorney can not represent individual members history, bld. qtm's. How can tribes Pros. Atty. when civil issues such as enrollment/disenrollment are not criminal matters within his department? ② How can tribes Pros. Atty. disobey it's own judicial systems orders reinstating your affiant as a tribal member with a valid explination defined by its Facts n Concl. of Law?

Tribes Pros. Att. may carry the title of Las Vegas Paiute Tribe as an employee. This does not mean in a physical sense as a person, history or bld. qtm.

CERTIFICATE of INDIAN BLOOD is a privilege granted to individuals recognized with that specific tribe as tribal members.

Pg-1. 110

The CIB when used by tribes Law Enf. is used for incarceration purpose of another. Not intended for that person as a tribal member it was made for.

The CIB will explain that the information itself is according to tribes enrollment/census (1940) records. This CIB will contradict tribes 1940 census roll. The 1940 census roll itself will reflect on behalf of your affiant's mother (Marie Wilson) bld. qtn. as 5/8 derived from two parents on the 1940 roll instead of 3/8 according to the CIB. Both your affiant and his mother can prove the information the CIB provides is false and violates both parties civil rights.

Shortley after these Disenrollments of 1944. Phariac tribal judge and local LV Atty. Greggory Koppe stated with written notice titled as "Interference with Court Procedure" explaines during his term as tribal judge that court records as well as enrollment files have been re-moved and tampered with. All to the demise of those disenrolled (your affiant).

Gregg Kopp addressed more than missing files and records. He also brought up the subject of impropriety and misconduct between the tribes legal counsel David Cullvin and the tribes previous judge Terry Coffing who Gregg Koppe replaced. Cullvin and Coffing as coworkers with the same bus firm.

This CIB and the permanent record it is being allowed to make is the subject of why your affiant recieved this charge of Improper Influence in Offical Matters. Will address momentarily.

LEGAL REPRESENTATION as a disenrolled alone has been trouble trying to find an attorney locally in Vegas. Whenever your affiant or his family members interview a potential candidate. When given paperwork and an explanation of the last thirteen years. All those local attorneys who have represented tribe one way or the other has been an automatic defendant.

The cost alone to start a case has been a problem financially as well.

Your affiant believes tribes current Judge and Pros. Atty take full advantage of the fact that your affiant can not represent himself on a level such as themselves.

CURRENT TRIBAL COURT without considering those disenrollments as a whole and what it has represented has allowed tribal judges through the years to preside over criminal cases as well as civil cases as important as child welfare where the name W/Paiute is being used in vain and once again for convenience.

Those Disenrollment cases and those Facts n Cord. of Law state that tribes body of government, Tribal Council is unconstitutional. What then is tribes judicial system? Who are allowed to use the name W/Paiute when those remaining disenrolled can not.

Current tribal court is believed to intentionally ignore those remaining disenrolled (your affiant) as well.

issue where the importance   as a case. has
the potential of changing Indian law across the
country. Revising federal law such as Martinez
vs Santa Clara Pueblo.

Their is no other tribe where tribes own
Judicial system ruled against Itself (Tribe) for
issues regarding enrollment/disenrollment.

## INTERFEARANCE with OFFICIAL MATTERS

Your affiant believes that his current conviction on
behalf of tribes police chief (Belchor) was brought on
in part by the fact that your affiant was in the proc-
ess of organizing documentation to file charges
with tribes police dept. against Police Chief Belchor for
the violation of H.I.P.P.A. which resulted in the removal
of personal documents from your affiants medical files.

Your affiant did threaten Belchor with the docu-
ment CIB tied to a rock to be thrown thrue no
particular window. After your affiant became suspicious
of his medical files being tampered with.

It was because of Police Chief Belchor who acqu-
ired the document CIB for prosecution and incarceration
purpose. Your affiant can prove that Chief Belchor is
responsible for the insert of the CIB into his medical
files which led to the removal of previous files. This can
be proven with documentation written by Belchor him-
self to the Bureo of Ind. Aff. for your affiants
incarceration needs.

It wasn't till after your affiant insisted that

an incident report (case#        ) be made regarding
his medical files that police Chief Belcher decided
to file charges for the threat.

Your affizint is unable to provide proof for case#
because of his present incarceration and where
he is located.

Would like to request oral presentation to clar-
ify any issues you may question regarding your
affizints appeal in person.

## CONCLUSION

Your affizint ask for this court to
consider the enclosed appeal.
To please except your affizints honest
apology for his mistake and grant TIME
SERVED for the charge of Improper Influence
in official Matters.

Sincerely,
Christopher Phelus

Jan 30 13 03:32p        BIA ENA 7757    551                     57572551              p.15

# FAMILY ANCESTRY

## COVER

Can be verified and confirmed by tribes court clerk /enrollment chairperson Krystal Plabero.



SACKETT FAMILY ERRORS

Opotune Kay, Las Vegas Paiute ½

Harry Sackett
Las Vegas Paiute 3/4

Eliza Sackett
Las Vegas Paiute ½

David Sackett
Las Vegas Paiute 1/4

Hazel Kay Henry
Las Vegas Paiute ½

Gladys Lopez
Las Vegas Paiute 5/8

Daisy D. Segmuller
Las Vegas Paiute 3/4

Belinda Lopez
Las Vegas Paiute 5/8

Beatrice Domingo
Moapa Paiute n/A

Bessy Hovietz
Moapa Paiute n/A

These are Bld.Qtms according to tribes own record of history, the 1940 census roll. CAN'T BE CHANGED

# BENNY TSO, ROBERT SEGMILLER FAMILY ERRORS [page 17 of ?]

Chair Person          Council Member

Opatunie Kay 1/2 (1940 Census Roll Base Enrollee)

1940 Census Roll

ERROR →

Daisy O. Segmiller 3/4 (1940 Census Roll Base Enrollee)

1940 Census Roll

Mildred Segmiller ?

Benjamin Segmiller
1940 Census Roll

4/4 Moopa
TSO
Nov 250 n/2

Benny Tso ?

Robert Segmiller P.

---

Those ERRORS determined for those Frye petitioners disenrollments was between those Frye Pet. mother Gladys Lopez's bld.qtm. of 5/8 and her mother Daisy O. Segmiller's bld.qtm. of 3/4. Tribal Council concluded those Frye Pet. reinstatement as tribal members who due to their mother as a base enrollee, Las Vegas Paiute.

These ERRORS now lie between Benny Tso's LV Paiute lineal ancestor and grandmother Daisy O. Segmiller of 3/4 bld.qtm. and her mother the family matriarch Opatunie Kay of 1/2 bld.qtm.

Benny Tso and his own LV Paiute history not only conflicts with his first cousin Debra Ferris's LV Paiute family history but will now conflict with those remaining tribal council members and family relations who's bld.qtm.s no longer equal mathimatically by reputation. Robert Segmiller equally related.



# DARREN SACKETT FAMILY ERRORS
### Vice Chair

Aperture Key
LV Paiute 1/2

← ERROR

Harry Sackett (1940 census roll Base Enrollee)
LV Paiute 2/4

Andrew Sackett LVP 3/8

Mary Bow
Moapa Paiute n/a

Darren Sackett Indian 3/16

Mother
White n/a

Vice Chair Darren Sackett does meet an Indian bld. qtm. (3/16) as a lineal
descendant of a 1940 census roll base enrollee. He does not meet the 1/4 bld. qtm.
as a LVPaiute without the bld. qtm of another individual ancestor (Mary Bow).

Darren Sackett and his bld. qtm. will conflict with family relation and
fellow council member Debra Faria as a Disenrollee who's bld qtm. is derived
directly from a parent and a 1940 base enrollee (Gladys Lopez 5/8). Those ERRORS are
now between grandfather Harry Sackett 3/4 (Base Enrollee) and family member Optima Bow 1/2 (Base Enrollee).

Darren Sackett's bld. qtm. if any is now in question?



HOVIETZ FAMILY LIES    Figure 8

Councilwoman LUCILLE CAMPA

Opaline Key ½ (1940 Base Enrollee)
Las Vegas Paiute

Bessey Hovietz ?
Moapa Paiute

Lila (Hovietz) Carter ?
Moapa Paiute

Alana Carter ?

Drew Carter ?

Tonia (Carter) Means ?

Dillon Means ?

Vera Hovietz ?
Moapa Hovietz

Alfredo Mitte ?

Lucille Campa ?

Jimmy Hovietz ¼/¼
Moapa Paiute

Without being acknowledged by the LVPaiute Tribes 1940 census roll. The persons Bessey Hovietz, Lila Hovietz, Vera Hovietz being born before 1940. Their bld. gtms. can only be assumed.

Such people as previous council members Tonia C. Means, Alfredo Mitte and current council member LUCILLE CAMPA are assumed as bilineal descendants to one individual base enrollee.

The person Bessy Hovietz was no valid ties to the person and base enrollee, Linskett family who were Original Key. Therefor children of the 1940 census roll blood quantum-wise to Councilwoman Lucille Campa bilineal membership is unconstitutional in two ways. By bld. qtm. and family ancestory via relation.

# ANDERSON FAMILY TIES

**Council Member CURTIS ANDERSON**

Opahne Kay 1/2 (1940 Base Enrollee)
Las Vegas Paiute

— Beatrice ?
  Moapa Paiute

— Kenneth Anderson ?
  Moapa Paiute

— Bill Anderson 4/4
  moapa Paiute

— Curtis Anderson ?

— Geneva Jake 4/4
  Utah Paiute

— Kenny Anderson ?

— Andrew Anderson ?

Without being acknowledged by the LVPaiute Tribes 1940 census roll. The person Beatrice, Kenneth Anderson being born before 1940. Their told qtm's can only be assumed.

Such people as previous council member Kenny Anderson and current council member CURTIS ANDERSON are assumed as invalid descendants to one individual base enrollee.

The person Beatrice has no valid ties to the person and base enrollee, Sackett family maintianed Opahne Kay. Therefor defeating the 1940 census roll blood quantum - wise.

Council Member Curtis Anderson's LVPaiute membership is unconstitutional in two ways. By bld. qtm and family ancestry viz relation.

# CHRIS PHEBUS FAMILY ANCESTRY

Boon Wilson 3/4   (1940 Base Enrollee)
LV Paiute

NO ERRORS

Juanita Weed Wilson 1/2   (1940 Base Enrollee)
LV Paiute

Marie Wilson 5/8
LV Paiute

Chris Phebus 5/16   (Your answer?)
LV Paiute

1940 Base Roll old.
#'s CAN not
BE CHANGED.

Jan 30 13 03:35p    BIA ENA 77575551                              57572551                    p.22
Jan. 15. 2013 10:54AM                                                     No. 3573   P. 6



# Las Vegas Paiute Tribe

Benny Tso
Tribal Chairman

February 9, 2009

## Certificate of Indian Blood

To Whom It May Concern:

This is to certify that **Christopher Phebus** Date of Birth **July 31, 1969** who is a Blood

descendant (son) of **Marie Wilson** Date of Birth **July 11, 1942** who is of **3/8 Southern Paiute**

Blood and an enrolled member of the Las Vegas Paiute Tribe with enrollment number of **LVPT**

**83-22/99-023**.

I hereby certify that the above information is true and exact based on the Enrollment/Census

records of the Las Vegas Paiute Indian Tribe.

Thank you,

Benny Tso
Tribal Chairman

**Native American Press/**
**Ojibwe News**

# . Paul law professor to hear Las Vegas Paiute appeal

*Clara NiiSka*

y Jo Brooks Hunter, Associate Clinical Professor at Hamline University School of Law in St. Paul, is one of the three judges appointed by the Vegas Paiute tribal council to hear a controversial tribal court appellate case of the Las Vegas Paiute tribal court, Krishna Terry Carpenter, et as Vegas Paiute Tribal Council.  Brooks Hunter has also served as an appellate judge for the Turtle Mountain Chippewa tribal court, the raska Winnebago tribal court, and the supreme tribal court of the Ho-Chunk Nation, formerly the Wisconsin Winnebagos.  She is an enrolled Chunk member.

oks Hunter declined to be interviewed by *Press/ON*, refusing to answer even general questions about her understanding of tribal courts and the ent legal system on U.S. reservations.  She did provide photocopies of two of her published articles, one of them a brief overview, "Tribal cou linnesota," written with Anita Fineday for the Minnesota State Bar Association in 1999.  That article and the other, entitled "Tribal court tions: justice and legitimacy," raise additional questions, some of which this writer emailed to Brooks Hunter.  She had not responded by pres :.

ert Clinton, Professor of Law at Arizona State University in Phoenix, has also been appointed in the *Carpenter et al. v. Las Vegas* Paiute Trib ncil case.  He is the chief justice of the Winnebago supreme tribal court, an associate justice of the Cheyenne River Sioux tribal court of :als, and has written extensively on federal Indian law and policy.

third appellate judge is Paiute from northern Nevada.

ough Brooks Hunter and the other appellate judges were appointed by the Las Vegas Paiute tribal council to hear one case, the tribal council' Vegas attorney, David A. Colvin, emphasized that they were "not hand-picked."  The tribal council is also represented at by least three :neys from the Minneapolis law firm Dorsey & Whitney.

## enrollment in Las Vegas

*penter et al. v. Las Vegas Paiute Tribal Council* arises from the Las Vegas Paiute tribal council's disenrollment of about a quarter of the ibership in what the appellant's brief describes as ex parte proceedings in June and July 1999.  (Black's Law Dictionary defines ex parte as, " side only, by or for one party; done for, n behalf of, or on the application of, one party only.")  The Las Vegas Paiutes own a smoke shop in L is, as well as other tribal enterprises including an "upscale golf and resort development" at Snow Mountain.  In May 1999, each tribal membe receiving a per capita payment of $5,845 per month.  (Disenrolling 25% of the membership means that the remaining members get a esponding raise in their per capitas.)

ording to one of the expatriate Las Vegas Paiutes, Debra Faria, in 1999 the tribal council is dominated by one family.  On July 6, 1999, the tri icil passed a resolution that, "the meaning of Paiute Indian Blood has consistently meant ancestry derived from Southern Paiute Blood," and t enrollment applications past and present are being reviewed to ensure all enrollment requirements have been met."

tribal council "corrected" Indian blood quantums under the redefined—or according to the tribal council "clarified"—enrollment criteria. Fo iple, Manuel Lopez, who was born in 1906, worked as a miner, and died in an explosion in 1930, was transformed from "Indian" to "non- in" on the Las Vegas Paiute rolls.  Documents obtained by *Press/ON* indicate that his mother, Saturnina, was "4/4 Paiute-Chemahuevi." uel's descendants, along with those of his brother Anthony, were among those disenrolled.  In a letter dated July 23, 1999, they were notified fied mail that their "tribal membership with the Las Vegas Paiute Tribe is hereby terminated, effective immediately."

e is a poignant irony to the disenrollments.  Although the Las Vegas Paiutes had lived in a "colony" on the outskirts of downtown since the 1900s, they were not federally recognized until 1970.  The tribal council disenrolled individuals federally-recognized as Las Vegas Paiute ins twenty-nine years earlier.

present tribal chairman, Curtis Anderson and his family, on the other hand, had been enrolled in the Indian Peaks Band of Paiute Indians of .  Expatriate Las Vegas Paiute Debra Faria posted documents on her website, http://www.paiutecorruption.com/, indicating that Curtis :rson was involved with Indian Peaks Band affairs as late as 1981.

expatriate Paiutes' assert in their appellate brief, on the other hand, that, "the loss of their membership in the Las Vegas Paiute Tribal Rolls ot be appreciated unless one considers that the Expatriate Members' ancestry, heritage, life commitments, cosmology and the fact that they ify themselves under no other appellation.  They are Las Vegas Paiute Indians whether the current Tribal council acknowledges that fact or

rding to the expatriates' attorney, "the BIA does not recognize the disenrollments."  Under the Indian Reorganization Act (IRA), the Secreta e Interior retains authority over tribal councils organized under THE IRA.  The Las Vegas Paiutes' tribal constitution provides that the tribal

**s Vegas tribal court**

e un-enrolled Indians went to tribal court—and won. In his June 2001 opinion, tribal court judge Terry Coffing, who also works as a Las Veg
>rney, concluded that, "by substituting the term 'Paiute Indian Blood' with 'Southern Paiute Blood'," the tribal council's 'clarification'
ffectively amends the Las Vegas Paiute Tribe Constitution in a manner not authorized under Article IX of the Constitution and is therefore
:nforceable." If the tribal constitution is to be amended, the tribal court ruled, a referendum would be required.

e tribal council argued that the tribal court is "a legislatively created court with a limited jurisdictional grant"—the constitution and bylaws of
as Vegas Tribe of Paiute Indians" does not provide for the creation of a tribal court. The tribal court asserted jurisdiction over the case.

ien the tribal court found for Carpenter, et al.—the disenrolled Las Vegas Paiutes—the tribal council appealed. The tribal court "has no gene:
hority to review acts of the Tribal Council, and certainly no authority to review Council actions to pass upon their constitutionality," the tribal
incil argued in its appeal brief.

ts reply brief, the tribal council expanded on its argument that tribal council authority was not subject to legal challenge in the tribal court.
orneys for the tribal council quoted "noted Indian law expert" Felix Cohen's observation, in the 1982 edition of the Handbook of Federal Indi
v, who observed that, "in practice, tribal courts are often subordinate to the political branches of tribal governments." Without any apparent
barrassment, the tribal council wholeheartedly agrees: "The tribal court for the Tribe is no exception. As the Tribal Council pointed out in its
:ning memorandum, the tribal court is not a constitutionally created court. As such, it is not a co-equal branch of the Las Vegas Paiute Tribal
rernment. Rather, it is a subordinate entity vested only with those powers given to it by the Tribal Council."

e Las Vegas Paiute constitution is among the few I.R.A. tribal constitutions which includes a Bill of Rights. Article I provides that, "no memt
ll be denied any rights or privileges enjoyed by other citizens of the United States, including but not limited to freedom of religion, speech, an
iscience, due process of law," and also incorporates the Indian Civil Rights Act into the tribal constitution.
'sovereign immunity" prevents the tribal court from reviewing actions of the tribal council, then presumably the applicable legal system for
orcing the rights guaranteed to Las Vegas Paiutes in their tribal constitution would be U.S. federal courts. Whether or not the tribal constituti(
lies a waiver of tribal council sovereign immunity is an interesting question. Does the "tribal sovereignty" of the tribal council negate the rig
iranteed to tribal members in the tribal constitution, rendering them, as the expatriate Paiutes claim, "nothing more than `a right without a
nedy. Such construction … ignores the mandate of the Supreme Court of the United States."

**nishment**

)atriate Debra Faria, who grew up in the Las Vegas Paiute colony, reacted to what she says is an attack by a "corrupt" government on her iden
a Las Vegas Paiute Indian: by posting a website and by planning to demonstrate at a televised golf tournament held at the Las Vegas Paiute's
ort on October 9th, 2001. Tribal court judge Coffing issued a restraining order barring her from demonstrating on-reservation, so she
nonstrated on the 'white side' of the reservation line. The tribal council responded by 'indefinitely' banishing Faria from the reservation, she
's "for exercising my freedom of speech."

press time, Faria was still banished: banned from visiting her friends and relatives who live on the reservation, as well as barred from the grav
her mother, grandmother, brother and other family members buried on the reservation.

**St. Paul law professor**

termination of the fate of Faria and the other expatriate Las Vegas Paiutes presently rests on the decision of an associate professor at Hamline
iversity School of Law, Dr. Brooks Hunter, along with the two other specially-appointed tribal court appellate judges.

)oks Hunter has written that the "presence" of tribal elders validates "the importance of the creation of a tribal court system to reflect what is
)ortant to a particular tribe," and cited as an example an individual "tribal elder" stating, in Ho-Chunk, that a judge of the tribal court of appea
:d not disqualify herself even though she was closely related to both the lay advocate and the trial court judge.

cording to Brooks Hunter, "the tribal elder stated that the justice understood her role within her culture and her tribe," and therefore her decisi
uld be fair despite the close family relationships.

)oks Hunter also writes of "incorporat[ing] tribal custom and tradition" into tribal court decisions, and gives as an example a tribal court's "uti
g] a text written by an anthropologist" as a "neutral source" of information about tribal customs.

e Las Vegas Paiute tribal court of appeals has not yet scheduled oral arguments in *Carpenter et al.* v. *Las Vegas Paiute Tribal Council*. The c:
rits watching.



LAS VEGAS PAIUTE TRIBAL COURT
CLARK COUNTY, NEVADA

**ENTERED**

JAN 16 2013

LAS VEGAS PAIUTE
TRIBAL COURT

Las Vegas Paiute Tribe,                          )
                                                 )   CR12-008
                    Plaintiff,                   )
                                                 )
        vs.                                      )
                                                 )          **ORDER**
Christopher Phebus,                              )
                                                 )
                    Defendant                    )
_____  )

The Defendant, Christopher Phebus, having been convicted of Las Vegas Paiute Tribal Law & Code 5-60-020 Improper Influence on Official Matters, on or about December 27, 2012. Mr. Phebus is in proper person and in the custody of the Las Vegas Paiute Chief of Police and having been transferred to the Owyhee Detention Facility.

The Court hereby orders that Mr. Phebus' letter, entitled "Motion", will be treated as a Notice of Appeal and the remaining matters concerning future charges against Mr. Phebus are denied as being premature.

The Clerk is directed to convene an appellate tribunal.

Dated this 16th day of January 2013,

Cal J. Potter, III
Chief Judge

- 1

EXHIBIT 11

EXHIBIT 11

IN THE COURT OF APPEALS

FOR THE LAS VEGAS PAIUTE TRIBAL COURT

CHRISTOPHER W. PHEBUS,                        No. CA13-001

      Appellant,

vs.

THE LAS VEGAS TRIBE OF PAIUTE
INDIANS,

      Respondent.

**RESPONDENT'S APPEAL BRIEF**
**APPEAL FROM ORDER AND JUDGMENT OF CONVICTION OF THE**
**LAS VEGAS PAIUTE TRIBAL COURT,**
**THE HON. CAL J. POTTER III, TRIBAL COURT JUDGE**

Filed in L.V. Paiute Court

Date: 8/15/13 Time: 2p

Court Clerk: _____

Patrick J. Murch
McDonald Carano Wilson LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Tel: (702) 873-4100
*Attorney for Respondent*

McDONALD·CARANO·WILSON℠
2300 WEST SAHARA AVENUE · SUITE 1200 · LAS VEGAS, NEVADA 89102-4393
PHONE (702) 873-4100 · FAX (702) 873-9966

## TABLE OF CONTENTS

STATEMENT OF THE ISSUES ........................................................................1

STATEMENT OF THE CASE ..........................................................................1

STATEMENT OF FACTS ................................................................................1

I.     INTRODUCTION ..................................................................................1

II.    RELEVANT FACTS ...............................................................................3

    A.    Relevant Background Facts. ............................................................3

        1.    General Background Information. ..........................................3

        2.    Jurisdictional Determination. ...............................................3

        3.    Phebus' Recent Tribal Court History .....................................4

            a.    Disorderly Conduct (Case No. CR11-004). ...................4

            b.    Harassment and Stalking (Case No. CR11-005). .............5

            c.    Contempt (Case Nos. CR11-004 and CR11-005). ............6

            d.    Trespass Petition (Case No. CV11-007). ......................7

            e.    Disorderly Conduct (Case No. CR11-007). ...................7

    B.    Current Conviction. ........................................................................8

        1.    Non-Party Witness Testimony. ..............................................8

            a.    Testimony Regarding Incident. ....................................8

            b.    Testimony Regarding Phebus' Certificate of Indian Blood. .9

        2.    Phebus' Defense and Admissions. ..........................................9

        3.    Conviction, Sentencing, and Incarceration. ...........................11

ARGUMENT .................................................................................................11

I.     SUMMARY OF ARGUMENT ...............................................................11

II.    STANDARDS OF REVIEW ..................................................................11

    A.    Conviction. .....................................................................................11

    B.    Sentencing. .....................................................................................12

III.   THE TRIBE PROVED ALL ELEMENTS OF THE CRIME BEYOND A REASONABLE DOUBT ......................................................................12

    A.    Legal Standards. .............................................................................12

        1.    Improper Influence in Official Matters. ...............................12

        2.    Reasonable Doubt. ..............................................................13

    B.    The Tribe Satisfied its Burden of Proof. ........................................13

        1.    Chief Belcher is a Public Servant. ........................................13

        2.    Phebus Threatened Harm to Chief Belcher. ..........................13

            a.    Phebus Admitted That He Threatened Chief Belcher. ....13

            b.    Phebus' Statement Constituted a Threat. .....................14

            c.    Phebus' Conduct Constituted a Threat. .......................14

McDONALD·CARANO·WILSON℠
2300 WEST SAHARA AVENUE • SUITE 1200 • LAS VEGAS, NEVADA 89102-4305
PHONE (702) 873-4100 • FAX (702) 873-9966

i

C.      Phebus Intended to Influence a Decision or Other Exercise of Discretion by Chief Belcher, and/or to Retaliate for a Past Official Action Taken by Chief Belcher. .........................................................................14

     1.      Phebus Intended to Influence Chief Belcher to Obtain a Court Order from Tribal Attorney Dave Colvin. .........................................15

     2.      Phebus Intended to Retaliate Against Chief Belcher for Submitting Phebus' Certificate of Indian Blood to the BIA. .....................15

IV.   PHEBUS' SENTENCE WAS APPROPRIATE ...........................................16

A.      General Legal Standards Pertaining to Sentence. ..........................................16

     1.      Sentencing Limits. ...........................................................................16

     2.      Sentencing Factors. .........................................................................16

B.      The Tribal Court Did Not Abuse its Discretion in Sentencing Phebus. .............16

     1.      The Tribal Court Did Not Fail to Consider a Relevant Factor that Should Have Received Significant Weight. ...........................................16

         a.      Phebus' Previous Conduct. ...........................................17

         b.      Circumstances Under Which Offense Was Committed. ............17

         c.      Willfulness of Offense. ..................................................17

         d.      Phebus' Attempt to Make Amends. ....................................18

         e.      State of Phebus' Mental Health. .......................................18

         f.      Disenrollment. ...........................................................18

         g.      Mitigation. ................................................................18

     2.      The Tribal Court Did Not Give Any Weight to an Improper or Irrelevant Factor. .........................................................................19

     3.      The Tribal Court Did Not Commit a Clear Error of Judgment in Weighing the Appropriate Factors. .....................................................19

C.      The Sentence Was Not Constitutionally Cruel and Unusual. ............................20

CONCLUSION. ...........................................................................................20

McDONALD·CARANO·WILSON℠
2300 WEST SAHARA AVENUE • SUITE 1200 • LAS VEGAS, NEVADA 89102-4593
PHONE (702) 873-4100 • FAX (702) 873-9966

ii

1

## TABLE OF AUTHORITIES

**Cases**

Coleman v. Johnson,
    132 S.Ct. 2060 (2012).................................................................12

Jackson v. Virginia,
    443 U.S. 307 (1979)..................................................................12

Rummel v. Estelle,
    445 U.S. 263 (1980)..................................................................20

United States v. Bruce,
    394 F.3d 1215 (9th Cir. 2005) ................................................passim

United States v. Gonzalez-Aparicio,
    663 F.3d 419 (9th Cir. 2011) ....................................................12

United States v. Haack,
    403 F.3d 997 (8th Cir. 2005) ..............................................12, 16

United States v. McDougherty,
    920 F.2d 569 (9th Cir.1990) ......................................................20

United States v. Mejia-Mesa,
    153 F.3d 925 (9th Cir. 1998) ....................................................20

United States, v. Daas,
    198 F.3d 1167 (9th Cir. 1999) ..................................................13

Tribal Code .........................................................................passim

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McDONALD·CARANO·WILSON⸱
2300 WEST SAHARA AVENUE • SUITE 1200 • LAS VEGAS, NEVADA 89102-4395
PHONE (702) 873-4100 • FAX (702) 873-9966

## STATEMENT OF THE ISSUES[1]

1)   Whether the evidence was sufficient to prove, beyond a reasonable doubt, the elements of the charge for which Phebus was convicted.

2)   Whether, in light of all of the circumstances relevant to this matter, the sentence imposed constitutes an abuse of the tribal court's discretion, or cruel and unusual punishment.

## STATEMENT OF THE CASE

The Tribe filed a criminal complaint in November 2012, charging Phebus with violating Tribal Code Section 5-60-020 (Improper Influence in Official Matters), based on Phebus' threats to throw a rock through the window of the office of Don Belcher, the tribal Chief of Police. Respondent's Appendix (RA) Tab 1.  Following a trial to the bench in December 2012, the tribal court adjudicated Phebus guilty as charged and imposed a six-month jail sentence. RA Tab 2.

On January 16, 2013, Phebus filed a document entitled "Motion" in the tribal court, wherein he requested that the sitting tribal court judge, Cal J. Potter III, "be removed from all future court cases" involving Phebus. RA Tab 3.  The same day, the tribal court entered and filed an order directing that Phebus' Motion would be "treated as a Notice of Appeal." RA Tab 4. The court denied Phebus' recusal motion as premature. Id.

Phebus' appeal brief (dated Jan. 10) was filed on March 18, 2013.  Phebus has not contested his conviction, but requests that the Court commute his sentence to time served.

## STATEMENT OF FACTS

### I.   INTRODUCTION

In 1999, the Las Vegas Paiute Tribal Council voted to disenroll approximately one-fourth of the then-tribal members, including Phebus.   Between 1999 and the present, Phebus has engaged in a continuous course of verbal abuse, harassment, intimidation, threats of physical violence, and other illegal or socially unacceptable conduct directed at tribal council members,

---

[1]   Appellant Christopher W. Phebus has only requested that the Court commute his sentence to time served; he has not contested the sufficiency of the conviction in the underlying case. Nevertheless, pursuant to the Order of Stay on Appeal, Temporary Release and Restraining Order entered by the Court on May 6, 2013, the Las Vegas Paiute Tribe addresses the two issues identified in this section.

McDONALD·CARANO·WILSON℠
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102-4355
PHONE (702) 873-4100 • FAX (702) 873-9966

McDONALD·CARANO·WILSON﹔
2300 WEST SAHARA AVENUE • SUITE 1200 • LAS VEGAS, NEVADA 89102-4395
PHONE (702) 873-4100 • FAX (702) 873-9966

1    members of the tribal police department, the tribal court, and any other individuals who he
2    believes have caused him harm relative to his disenrollment.  As a result, Phebus has compiled an
3    extensive history before the tribal court, including multiple stints in jail, thousands of dollars in
4    fines, and at least one extended banishment from tribal property.

5         The order and judgment of conviction from which the present appeal arises pertains to an
6    incident that is entirely consistent with Phebus' behavior during the past decade:  in November
7    2012, less than three weeks after being released from jail following an arrest and conviction on a
8    disorderly conduct charge stemming from an incident in which he used profanity and caused a
9    disturbance at the tribal police department, Phebus returned to the police department and
10   threatened to throw a rock through the front window of Chief Belcher's office because (1) Chief
11   Belcher would not assist Phebus in obtaining a copy of a court order pertaining to his
12   disenrollment from the Tribe's general counsel; and/or (2) Phebus believes that Chief Belcher
13   created a false Certificate of Indian Blood and/or removed or altered documents contained in
14   Phebus' medical file.  The next day, Phebus returned to the police department with a large rock
15   wrapped in a copy of his Certificate of Indian Blood, and informed the dispatcher that he "had
16   something" for Chief Belcher.

17        As a result of that incident, and based on his incriminating admissions and refusal to
18   accept responsibility or demonstrate remorse for his actions, Phebus was convicted of the crime
19   of Improper Influence in Official Matters and sentenced to six months in jail.  Phebus now seeks
20   an order commuting the sentence to time served, characterizing his conduct that led to the
21   sentence as a "mistake."

22        As discussed below, the Court should affirm the judgment of conviction and sentence
23   because the trial record clearly demonstrates that the Tribe met its burden of proving, beyond a
24   reasonable doubt, all elements of the crime for which Phebus was convicted.  Moreover, in light
25   of Phebus' extensive history of engaging in similar threatening conduct and repeatedly refusing to
26   comply with the tribal court's orders, the court did not abuse its discretion in sentencing Phebus
27
28

1    to the maximum term of imprisonment permitted for the crime.   Finally, Phebus' sentence was

2    not constitutionally cruel and unusual.

## II.    RELEVANT FACTS

### A.    Relevant Background Facts.

In order to fully address the questions raised by the Court, the Tribe must first briefly discuss certain relevant issues pertaining to Phebus' history with the Tribe, the tribal court, and the tribal police department.[2]

#### 1.    General Background Information.

Phebus was enrolled as a member of the Tribe between 1983 and 1999.   In July 1999, the Tribal Council voted to disenroll approximately one-fourth of the then-tribal members, including Phebus.

Following his disenrollment, Phebus has been cited, arrested, convicted, and/or sentenced numerous times for engaging in illegal and/or socially inappropriate conduct while attempting to persuade the tribal court, tribal members, tribal police officers, and tribal council members that his disenrollment was improper.   He has consistently disregarded the orders of the tribal court, which has resulted in several jail sentences for contempt, and at least one trespass order that barred him from being present on tribal property for a period of two years.

#### 2.    Jurisdictional Determination.

Phebus routinely raises his disenrollment as both a barrier to the tribal court's jurisdiction and a justification for his extensive criminal history.   On at least two occasions, however (most recently in October 2011), the tribal court expressly determined that it has jurisdiction over Phebus pursuant to United States v. Bruce, 394 F.3d 1215 (9th Cir. 2005), based on his status as an Indian.   See, e.g., RA Tab 5 at 6:10-11:11; Tab 6 at p. 2.

---

[2]    Certain information contained in this section was not specifically addressed at the trial to which this appeal pertains.   Nevertheless, a brief discussion of such information is warranted to provide the Court with the necessary context to resolve the sentencing issue presented in this appeal.   Information supporting any factual issues that were not addressed at trial should be contained in Phebus' tribal court file, the entirety of which the tribal court expressly took into account in connection with its sentencing decision.

McDONALD·CARANO·WILSON⸱
2300 WEST SAHARA AVENUE • SUITE 1200 • LAS VEGAS, NEVADA 89102-4355
PHONE (702) 873-4100 • FAX (702) 873-9966

### 3.  Phebus' Recent Tribal Court History.

Phebus' recent tribal court record demonstrates that he has engaged in threatening and/or disruptive conduct that is substantially similar to the conduct upon which his current conviction is based.[3]

### a.  Disorderly Conduct (Case No. CR11-004).

On January 31, 2011, the Tribe filed a criminal complaint in Case No. CR11-004, alleging that on January 28, 2011, Phebus entered the tribal police department and requested that Chief Belcher give Phebus his "original paperwork." RA Tab 7.  After Chief Belcher informed Phebus that Belcher would speak to the clerk of the court about Phebus' request, Phebus said, "you don't do a fucking thing." Id.  He ignored Chief Belcher's directives to calm down, continued using profanity, and slammed doors. Id.  Phebus was placed under arrest and charged with disorderly conduct. Id.

At the trial on February 17, 2011, among other things, Chief Belcher testified regarding certain allegations in the complaint, and stated that Phebus slammed the front door to the police department hard enough to cause the Chief to believe that the glass would shatter. RA Tab 8 at 5:11-11:21.  Tribal police officer Darryl Dawkins also testified that Phebus "was yelling at [Belcher] that it wasn't right, that he needed his paperwork . . . , and as he got ready to leave out the door he yelled out, 'Fuck you,' and slammed the door . . . ." Id. at 12:6-16:8.

Thereafter, Phebus admitted that he "did come over [to the police department] and did get upset," as alleged in the complaint. Id. at 17:13-21; 23:12-25.  He attempted to explain his conduct by stating that he was upset because the court clerk allegedly failed to return certain documents and a DVD that Phebus had previously submitted in connection with his disenrollment matter, and Chief Belcher did not immediately assist him in retrieving those items. Id.

After the tribal court heard all of the evidence, it adjudicated Phebus guilty as charged and imposed a fine of $2,000.00, with a credit of $100.00, payable by community service at the rate

---

[3]  The current tribal court judge, who was not involved in any of the court proceedings pertaining to Phebus' disenrollment, presided over all of the proceedings discussed in this section.

MCDONALD·CARANO·WILSON⸱
2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4395
PHONE (702) 873-4100 • FAX (702) 873-9966

4

McDONALD·CARANO·WILSON⸬
2300 WEST SAHARA AVENUE · SUITE 1000 · LAS VEGAS, NEVADA 89102-4355
PHONE (702) 873-4100 · FAX (702) 873-9966

1   of $100.00 per eight hours worked, plus incarceration for 20 days at the City of North Las Vegas

2   Detention Center, with credit for time served of 21 days. Id. at 24:3-26:3.

3              b.      Harassment and Stalking (Case No. CR11-005).

4        Also on January 31, 2011, the Tribe filed a separate criminal complaint in Case No.

5   CR11-005, alleging that on December 6, 2010, Phebus entered the tribal police department

6   (which also houses the tribal court) and demanded to speak to the court clerk. RA Tab 9.

7   Although Phebus did not have an appointment, the clerk agreed to meet with him, at which time

8   Phebus "launched into a verbal tirade wherein [he] threatened to throw rocks through the

9   windshields of the car belonging to [the clerk], as well as the cars of [the then-tribal judge and

10  tribal chair]." Id. Phebus was not arrested as a result of the incident.

11       The matter was tried to the bench on February 17, 2011. RA Tab 10. The Tribe called the

12  court clerk, Danae Bright-Shimp, as its only witness. Id. Ms. Bright-Shimp testified that Phebus

13  came in to see her on December 6, 2010, requesting "some paperwork." Id. at 7:8-15. When Ms.

14  Bright-Shimp declined to assist Phebus with completing certain forms, Phebus "went off on a

15  verbal tirade," stating that he was going to "cuss out" the then-sitting tribal court judge the next

16  time he went to court. Id. at 7:8-8:5. Phebus also stated that he was going to throw rocks through

17  Ms. Bright-Shimp's window and a window at the tribal administration office. Id. at 7:16-8:5.

18  Thereafter, he left Ms. Bright-Shimp's office through an alarmed side door, ignoring her request

19  that he not use that door. Id. at 8:9-22. Rather, Phebus "said he'd go out any fucking door he

20  wanted to[,] and he told [Ms. Bright-Shimp] to fuck off." Id. Ms. Bright-Shimp completed a

21  police report because she feared for her safety. Id. at 9:2-6.

22       Phebus then cross-examined Ms. Bright-Shimp, and inquired as to why she did not return

23  the DVD that was included with the paperwork that he had previously submitted to the tribal

24  court. Id. at 9:23-10:19. Ms. Bright-Shimp responded that Phebus did not request the DVD, she

25  could not return the original items that he had submitted, the DVD was included in his file, and

26  she would have made a copy of the DVD had he specifically requested it. Id.

27

28

After Phebus made a short statement to the court regarding, among other things, his need for the paperwork and DVD, the tribal court adjudicated Phebus guilty of the crime of harassment and sentenced him to a fine of $2,500.00 with a $100.00 credit, payable via community service at the minimum rate of 10 hours per week. Id. at 13:6-15:16; see also RA Tab 11.

c.    Contempt (Case Nos. CR11-004 and CR11-005).

Between the February trials and October 2011, the tribal court conducted monthly status check hearings to ascertain Phebus' progress toward satisfying the sentencing requirements imposed in the foregoing cases. Specifically:

- On March 31, 2011, the court entered an order requiring Phebus to show cause why he should not be held in contempt for failing to comply with the community service requirements that were imposed in connection with the February 17 convictions.

- On April 21, 2011, the court held a hearing on the order to show cause, and held Phebus in contempt of court. The court entered an order (the April 21 Order) sentencing Phebus to 60 days in jail, suspended. The court also suspended six days of jail time that were remaining on Phebus' conviction for disorderly conduct in Case No. CR11-004. In addition, the court ordered Phebus to attend anger management classes and complete the remainder of his community service at a rate of no fewer than 15 hours per week.[4]

- On May 19, 2011, the tribal court conducted a status check hearing, during which it determined that Phebus was satisfactorily completing his community service hours, but had not completed anger management classes.

- On June 16, 2011, the tribal court conducted another status check hearing, during which it determined that Phebus was satisfactorily completing his community service hours, but had not completed anger management classes.

- On July 20, 2011, the tribal court conducted another status check hearing, during which it determined that Phebus had not made satisfactory progress on his community service hours, and failed to complete anger management classes.

- On September 14, 2011, the tribal court conducted another status check hearing, during which it determined that Phebus had not made satisfactory progress on his community service hours, and failed to complete anger management classes. The court also entered

---

[4]   The tribal court granted Phebus a considerable amount of latitude during the April 21 hearing, providing Phebus with numerous opportunities to avoid an immediate jail sentence. RA Tab 12. In addition, the tribal court informed Phebus that the "next juncture [in Phebus' disenrollment case] is the tribal council. That's where you have to go. That's the supreme court of this judicial system." Id. at 11:18-13:2. The court also rescinded any prior orders that prohibited Phebus from entering the tribal administration office so that Phebus could appeal his disenrollment to the tribal council. Id. at 22:18-23:11.

6

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE · SUITE 1200 · LAS VEGAS, NEVADA 89102-4395
PHONE (702) 873-4100 · FAX (702) 873-9966

an order requiring Phebus to show cause why he had not complied with the February 17 trial order.

- On October 19, 2011, the tribal court held a hearing on the order to show cause, during which it reiterated that it has jurisdiction over Phebus pursuant to <u>Bruce</u>, 394 F.3d 1215. In addition, the court held Phebus in contempt for violating the April 21 Order. The court imposed the remainder of Phebus' 66-day suspended sentence.

RA Tab 6.

### d.   Trespass Petition (Case No. CV11-007).

Phebus was released from the custody of the Bureau of Indian Affairs on December 23, 2011. RA Tab 13. A mere three days later, Phebus allegedly entered the tribal police department and began harassing a tribal member. RA Tab 14, Exh. 1. Based on Phebus' tribal membership status and his extensive history before the tribal court, the tribal prosecutor filed a petition to permanently exclude Phebus from all tribal property. <u>Id.</u>[5]

With the exception of two status check hearings on the trespass petition, Phebus had no documented interactions with any tribal members, law enforcement officers, or employees between December 2011 and April 2012. Accordingly, on April 18, 2012, the Tribe withdrew the trespass petition without prejudice to refiling. RA Tab 15 at 4:17-6:20.

### e.   Disorderly Conduct (Case No. CR11-007).

Phebus had no more encounters with the tribal police until October 10, 2012, when he was arrested for disorderly conduct and transported to the Henderson Detention Center. RA Tab 16. Phebus was arraigned and released from custody the next day. RA Tab 17.

The matter was tried to the bench on October 17, 2012. The Tribe's evidence demonstrated that, on the afternoon of October 10, Chief Belcher was meeting with several tribal members and employees at the tribal police department. RA Tab 18 at 10:15-11:25. As he came out of the meeting, Phebus entered the police department and began yelling at him. <u>Id.</u> at 11:14-14:1. When Chief Belcher asked Phebus to stop yelling, Phebus yelled, "Fuck you, you're fucking my family." <u>Id.</u> at 12:1-11. Phebus continued yelling and using profanities as Chief Belcher went to speak to him, and he was eventually arrested. <u>Id.</u> at 12:1-17.

---

[5]   Pursuant to Title 17 of the Tribal Code, the prosecutor or the Tribe may initiate trespass proceedings against non-tribal members who engage in certain specified conduct on tribal land.

McDONALD·CARANO·WILSON®
2300 WEST SAHARA AVENUE • SUITE 1200 • LAS VEGAS, NEVADA 89102-4355
PHONE (702) 873-4100 • FAX (702) 873-9966

The tribal court noted its concern that Phebus' outburst was potentially protected speech under the First Amendment.  Id. at 15:24-14:10.  In addition, the court gave Phebus an opportunity to present and explain in detail a chart pertaining to his disenrollment matter.  Id. at 19:24-22:20.  Furthermore, the court acknowledged the procedural history of Phebus' disenrollment, and reminded him that while he could petition the Tribe about the disenrollment, he could not "go in and cause problems with [Chief Belcher.]"  Id. at 24:1-25:2.  The court also reminded Phebus that the court, the tribal prosecutor, Chief Belcher, and the tribal police could not do anything about his disenrollment.  Id. at 25:18-26:7.  Furthermore, the court advised Phebus that he might have a federal court remedy.  Id.; see also id. at 30:22-32:6.  Finally, the court reiterated that Phebus was subject to the court's jurisdiction based on his status as an Indian.  Id. at 26:8-27:18.

Following Phebus' presentation, the court adjudicated Phebus guilty as charged, and sentenced him to time served.  Id. at 30:22-31:6.

**B.  Current Conviction.**

Less than three weeks later, Phebus was arrested for the offense to which this appeal pertains.  RA Tab 1.  The matter was tried to the bench on December 27.

**1.  Non-Party Witness Testimony.**

**a.  Testimony Regarding Incident.**

Chief Belcher testified that Phebus entered the tribal police department on November 6, 2012, and demanded that Chief Belcher obtain a copy of a court order from Dave Colvin, general counsel for the Tribe.  RA Tab 19 at 4:24-5:19.  Chief Belcher informed Phebus that he could not provide Phebus with any court orders or other paperwork, and that Phebus should direct his request to Colvin or hire an attorney to obtain the information he was requesting.  Id.; see also id. at 14:2-17.  Phebus responded by getting loud and telling Chief Belcher that he had "kicked [Phebus'] family in the ass."  Id. at 6:3-20.

After Chief Belcher told Phebus to calm down, Phebus stated, "if I go up to the [tribal] health clinic and my Certificate of Indian Blood's in the file up there, I'm going to get it out, I'm

going to wrap it in a rock, and I'm going to throw it through your office window." Id. Shortly thereafter, Phebus left the police department. Id.

Phebus returned to the dispatch desk of the police department the next day, holding a rock that was approximately 6-8" in diameter and wrapped in a piece of paper. Id. at 22:6-25:14. He directed the dispatcher, Everson Nakai, to "tell Belcher when he comes in tomorrow I got something for him." Id. Phebus then left the police department.

In response to Phebus' threat, Chief Belcher had to inform any individuals who came to visit him in his office that someone had threatened to throw a rock through his window, which was accessible from the front of the building. Id. at 7:17-8:13.

b.      Testimony Regarding Phebus' Certificate of Indian Blood.

On cross-examination, Phebus accused Chief Belcher of "making a false document [presumably, the Certificate of Indian Blood contained in Phebus' medical file] to put [Phebus] in jail." Id. at 15:2-16.[6] Chief Belcher then explained the history of the CIB: during one of Phebus' previous BIA incarcerations, his mother requested that Chief Belcher assist Phebus in obtaining medical treatment. Id. at 15:17-21:2. Chief Belcher contacted the BIA, which informed him that it required a CIB to demonstrate that Phebus is a descendant of a Native American. Id.[7] Accordingly, the then-tribal judge ordered that a CIB be prepared. Id. After Chief Belcher received the CIB, he provided it to the BIA. Id. He does not know how the CIB came to be placed in Phebus' medical file at the tribal health clinic. Id.

2.      Phebus' Defense and Admissions.

After the Tribe presented its case-in-chief, Phebus presented oral testimony to the court in connection with his defense, wherein he failed to offer any substantive evidentiary opposition to the charge, and reiterated his ongoing argument that his disenrollment was improper. Id. at 35:8-

---

[6] Phebus contests the validity of his CIB because it allegedly does not accurately reflect his blood quantum – the CIB states that Phebus is 3/8 Southern Paiute, while Phebus maintains that he is 5/16 Paiute.

[7] Without the CIB, the Tribe would incur the cost of Phebus' medical treatment during his incarceration. Id.

McDONALD·CARANO·WILSON‐
2300 WEST SAHARA AVENUE • SUITE 1200 • LAS VEGAS, NEVADA 89102-4305
PHONE (702) 873-4100 • FAX (702) 873-9966

1   36:12.  Phebus also stated that he went to the police department on November 6 because he was

2   unable to obtain copies of certain papers that were allegedly previously included with his

3   Certificate of Indian Blood at the tribal health office, and he wanted to make an incident report to

4   that effect.  Id. at 32:14-35:2.  In addition, he stated that the court order that he requested from

5   Chief Belcher resulted in the sealing of the court files of certain disenrolled tribal members.  Id. at

6   13:12-24.

7        When Phebus finished testifying, the tribal prosecutor cross-examined him:

8        Q.    You admit that you spoke with Chief Belcher on November 6, 2012?

9        **A.**    **Mm-hmm.**

10       Q.    You admit that you stated to him that if your Certificate of Blood was at the

11  [tribal] health clinic, you would get it and throw it though his window with the rock, words to that

12  effect?

13       **A.**    **To that effect.**

14       Q.    Then you came back to the police station on November 7, 2012, correct?

15       **A.**    **Mm-hmm.**

16       Q.    And you had a rock in your hand?

17       **A.**    **Mm-hmm.**

18       Q.    And you heard Mr. Nakai describe the size of the rock?

19       **A.**    **And even got it on video.**

20       Q.    Would you agree that that statement is accurate, that the size of the rock was as he

21  described?

22       **A.**    **Just like that.**

23       Q.    [The rock] was wrapped in a piece of paper?

24       **A.**    **Yeah, and the paper was [my] Certificate of Indian Blood.**

25       Q.    You made a statement to the effect to tell Belcher when he comes in tomorrow I

26  have something for him?

27       **A.**    **Mm-hmm.**

28

McDONALD·CARANO·WILSON⸱
2300 WEST SAHARA AVENUE • SUITE 1200 • LAS VEGAS, NEVADA 89102-4505
PHONE (702) 873-4100 • FAX (702) 873-9966

. . .

1

2      Q.      You admit that?

3      A.      Mm-hmm.

4  Id. at 37:20-38:25.

5              3.      **Conviction, Sentencing, and Incarceration.**

6              As a result of his testimony and the other evidence presented at trial, the tribal court

7  adjudicated Phebus guilty of violating Tribal Code Section 5-60-020, Improper Influence in

8  Official Matters. Id. at 40:17-41:1. The court stated that it had read Phebus "entire file," and that

9  it "[knew] everything" about Phebus' disenrollment case. Id. at 47:11-22. The court also gave

10 Phebus multiple opportunities to present mitigating arguments to avoid the six-month jail

11 sentence that the Tribe requested. Id. at 41:15-47:22. However, Phebus continued to raise

12 tangential issues in an attempt to justify the conduct that led to his conviction. Id. Accordingly,

13 the tribal court sentenced Phebus to six months in jail. Id. at 48:3-49:11. Thereafter, Phebus was

14 remanded to the custody of the Owyhee Detention Facility, a BIA facility in northern Nevada.

15                                      **ARGUMENT**

16 I.     **SUMMARY OF ARGUMENT**

17            The Court should affirm the judgment of conviction because the trial record clearly

18 demonstrates that the Tribe met its burden of proving, beyond a reasonable doubt, all elements of

19 the crime for which Phebus was convicted.  Moreover, in light of Phebus' extensive history

20 before the tribal court (including his history of threatening tribal members, employees, and

21 officials, and repeatedly refusing to comply with the orders of the tribal court), the court did not

22 abuse its discretion in sentencing Phebus to the maximum term of imprisonment permitted for the

23 crime. Finally, the sentence was not constitutionally cruel and unusual.

24 II.    **STANDARDS OF REVIEW**

25            A.      <u>Conviction</u>.

26            In reviewing whether a conviction was proper, an appellate court must determine

27 "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

28

McDONALD·CARANO·WILSON℠
2300 WEST SAHARA AVENUE • SUITE 1200 • LAS VEGAS, NEVADA 89102-4355
PHONE (702) 873-4100 • FAX (702) 873-9966

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. Accordingly, the finder of fact has "broad discretion in deciding what inferences to draw from the evidence presented at trial," and may "draw reasonable inferences from basic facts to ultimate facts." Coleman v. Johnson, 132 S.Ct. 2060, 2064 (2012) (citations omitted).

**B.** **Sentencing.**

Appellate courts "generally review criminal sentences for abuse of discretion, and [they] will not overturn a district court's sentencing determination in the absence of procedural error or substantive unreasonableness." United States v. Gonzalez-Aparicio, 663 F.3d 419, 426 (9th Cir. 2011). "[A]n abuse of discretion may occur when (1) a court fails to consider a relevant factor that should have received significant weight; (2) a court gives significant weight to an improper or irrelevant factor; or (3) a court considers only the appropriate factors but in weighing those factors commits a clear error of judgment." United States v. Haack, 403 F.3d 997, 1004 (8th Cir. 2005) (citation and internal punctuation omitted).

**III.** **THE TRIBE PROVED ALL ELEMENTS OF THE CRIME BEYOND A REASONABLE DOUBT**

**A.** **Legal Standards.**

    **1.** **Improper Influence in Official Matters.**

Pursuant to Tribal Code § 5-60-020:

(a)    A person is guilty of improper influence in official matters if he threatens harm to any public servant, including but not limited to tribal officials and judges, or to the relatives of public servants with the purpose of influencing a decision, opinion, recommendation, or other exercise of discretion.

(b)    Retaliation of past official action shall be included under (a) above as a form of improper influence.

(c)    Improper influence is a Class B offense.

1          **2.**      **Reasonable Doubt.**

2         "Reasonable doubt" is "one based on reason.  It is not mere possible doubt, but is such a

3   doubt as would govern or control a person in the more serious affairs of life.  After considering all

4   the evidence, if the [finder of fact has] a sincere and lasting belief in the truth of the charge, there

5   is not a reasonable doubt."  Tribal Code § 4-60-060(b).

6        **B.**    <u>**The Tribe Satisfied its Burden of Proof.**</u>

7         The Tribe proved, beyond a reasonable doubt, all of the elements of the offense of

8   Improper Influence in Official Matters.

9        **1.**      **Chief Belcher is a Public Servant.**

10        The Tribal Code does not define "public servant."  When a statute uses a term which it

11  does not define, courts give that term its ordinary or plain meaning.  <u>United States. v. Daas</u>, 198

12  F.3d 1167, 1174 (9th Cir. 1999) (citation omitted).  A "public servant" is "a government official

13  or employee."  <u>Merriam Webster's Collegiate Dictionary</u>, 1006 (11th ed. 2012).  Chief Belcher is

14  employed by the Tribe as the Chief of the tribal police department.  RA Tab 19 at 4:7-16.

15  Accordingly, Chief Belcher is a "public servant," and the Tribe satisfied its burden of proof

16  relative to this element of the offense.

17       **2.**      **Phebus Threatened Harm to Chief Belcher.**

18        In at least three ways, the Tribe demonstrated that Phebus threatened harm to Chief

19  Belcher.

20          a.    <u>Phebus Admitted That He Threatened Chief Belcher.</u>

21        Phebus expressly admitted that he made a verbal threat to throw a rock through Chief

22  Belcher's window, and that he tied his CIB around a rock, took it to the tribal police department,

23  and instructed the dispatcher to inform Chief Belcher that Phebus "had something" for Belcher.

24  <u>Id.</u> at 37:18-38:25; <u>see also</u> Appeal Brief at p. 9 ("[I] did threaten Belcher with the document CIB

25  tied to a rock . . . .")  Accordingly, Phebus cannot reasonably contest the Tribe's proof of this

26  element of the offense beyond a reasonable doubt.

27

28

McDONALD·CARANO·WILSON™
2300 WEST SAHARA AVENUE · SUITE 1200 · LAS VEGAS, NEVADA 89102-4395
PHONE (702) 873-4100 · FAX (702) 873-9966

1

        b.     <u>Phebus' Statement Constituted a Threat</u>.

2       In addition, Chief Belcher testified that on November 6, 2012, Phebus entered the tribal

3 police department and demanded that Belcher obtain a copy of an unspecified order from tribal

4 attorney Dave Colvin. RA Tab 19 at 4:24-6:20. Upon hearing that Chief Belcher could not

5 comply with Phebus' request, Phebus stated that he was going to go to the tribal health office,

6 obtain his Certificate of Indian Blood, wrap it in a rock, and throw it through Chief Belcher's

7 window. <u>Id</u>. The Tribal Code does not require the accused to take any overt action and/or follow

8 through on a threat of harm to a public servant; a threat is all that is required. <u>See</u> Tribal Code §

9 5-60-020. Phebus' statement, standing alone, to is sufficient to satisfy this element of the offense.

10         c.     <u>Phebus' Conduct Constituted a Threat</u>.

11       Finally, all remaining doubt regarding this element of the offense is alleviated by the fact

12 that Phebus carried a large rock wrapped in a piece of paper into tribal police department, and

13 instructed the dispatcher to inform Chief Belcher that Phebus "had something" for Belcher. RA

14 Tab 19 at 22:6-25:14. Again, a threat of harm is all that is required; the individual being

15 threatened need not hear the threat or be aware that it has been made. <u>See</u> Tribal Code § 5-60-

16 030. Therefore, the fact that Chief Belcher was not present when Phebus presented the rock is

17 irrelevant.

18       In short, the Tribe satisfied its burden of proof relative to the second element of the

19 offense.

20     C.    **<u>Phebus Intended to Influence a Decision or Other Exercise of
Discretion by Chief Belcher, and/or to Retaliate for a Past Official</u>**

21         **<u>Action Taken by Chief Belcher.</u>**

22

23       Finally, the Tribe demonstrated that Phebus intended to influence a decision or other

24 exercise of Chief Belcher's discretion, and/or to retaliate for a past official action taken by Chief

25 Belcher.

26

27

28

**1.     Phebus Intended to Influence Chief Belcher to Obtain a Court Order from Tribal Attorney Dave Colvin.**

Immediately after Chief Belcher informed Phebus that Belcher could not assist Phebus in obtaining any court orders or other paperwork pertaining to Phebus' disenrollment case, Phebus threatened to wrap his CIB around a rock and throw it through Chief Belcher's window.  RA Tab 19 at 4:24-5:19.  Viewing this evidence in the light most favorable to the prosecution, it is entirely reasonable to conclude that the tribal court found that Phebus intended to scare Chief Belcher into requesting and/or obtaining a copy of a court order from Dave Colvin.  This finding, standing alone, is sufficient to satisfy the Tribe's burden regarding the final element of the offense.

**2.     Phebus Intended to Retaliate Against Chief Belcher for Submitting Phebus' Certificate of Indian Blood to the BIA.**

Phebus made the following admissions at trial:

- He is upset that his CIB is contained in his tribal medical file (RA Tab 19 at 10:23-11:20;

- He believes that Chief Belcher created the CIB (id. at 10:23-11:20; 15:2-16);

- He believes that the CIB is inaccurate or false (id. at 10:23-11:20; 15:2-16);

- He believes that the CIB was created "for purposes of getting [him] in jail" (i.e., the Tribe would not be able to put him in jail without the CIB) (id. at 19:24-20:16; 28:20-29:6); and

- He believes that the Tribe uses the CIB to put him in jail (id. at 28:20-29:6).

Viewing those statements in the light most favorable to the prosecution, coupled with: (a) the fact that Phebus specifically mentioned his CIB when he threatened Chief Belcher; and (b) the fact that Phebus followed up on his verbal threat by carrying a rock wrapped in his CIB into the tribal police department, it is also entirely reasonable to infer that the tribal court concluded that the purpose for Phebus' threat was to retaliate against Chief Belcher for the role that Belcher played (in his official capacity as the tribal Chief of Police) in obtaining the CIB and/or delivering it to the BIA.

15

1    In sum, when the evidence is viewed in the light most favorable to the prosecution, the

2    tribal court heard and considered sufficient evidence to determine that the Tribe proved the third

3    element of the offense beyond a reasonable doubt.  Therefore, the conviction was proper.

4    **IV.    PHEBUS' SENTENCE WAS APPROPRIATE**

5        In light of Phebus' recent criminal record and his disregard for the tribal court's orders,

6    the court did not abuse its discretion in sentencing Phebus to the maximum jail term permitted for

7    the crime.

8        A.    <u>General Legal Standards Pertaining to Sentence</u>.

9            **1.    Sentencing Limits.**

10       Under the Tribal Code, Improper Influence in Official Matters is designated as a Class B

11   offense, punishable by a maximum of six months' imprisonment, a fine of $4,000.00, or both.

12   <u>See</u> Tribal Code §§ 4-70-070 and 5-90-020.

13           **2.    Sentencing Factors.**

14       "In determining the nature and duration of the penalty to be imposed, the Court shall take

15   into consideration the previous conduct of the defendant, the circumstances under which the

16   offense was committed, whether the offense was malicious or willful, whether the offender has

17   attempted to make amends, and the state of the offender's mental health at the time of the offense

18   and sentencing." <u>Id</u>. at § 4-70-090(a).  The sentence imposed should be "consistent with the

19   protection of the public, the seriousness of the offense, and the rehabilitative needs of the

20   defendant." <u>Id</u>.

21       B.    <u>The Tribal Court Did Not Abuse its Discretion in Sentencing Phebus</u>.

22       When the abuse of discretion factors are applied to this case (<u>see</u> Haack, 403 F.3d at

23   1004), it is clear that the sentence does not constitute an abuse of the tribal court's discretion.

24           **1.    The Tribal Court Did Not Fail to Consider a Relevant Factor that**
             **Should Have Received Significant Weight.**

25

26       The tribal court expressly or impliedly considered all of the relevant sentencing factors

27   prior to issuing its sentencing decision:

28

McDONALD·CARANO·WILSON<sup>℠</sup>
2300 WEST SAHARA AVENUE • SUITE 1200 • LAS VEGAS, NEVADA 89102-4395
PHONE (702) 873-4100 • FAX (702) 873-9966

a.    Phebus' Previous Conduct.

The tribal court has reviewed Phebus' "entire file." RA Tab 19 at 47:11-22. In addition, the current tribal court judge presided over all of the proceedings discussed above in Section II(A)(3), so he is intimately familiar with Phebus' history of engaging in substantially similar threatening conduct and verbal abuse that is directed at the tribal members and employees against whom Phebus bears a grudge pertaining to his disenrollment. RA Tabs 5-18. He is also well aware of Phebus' contempt for court orders. RA Tab 6. Moreover, the court noted that Phebus engaged in the conduct to which this appeal pertains just days after being released from jail after causing a similar disturbance at the tribal police department. Id. at 42:15-43:9. Finally, the court recognized that Phebus' behavior is escalating. Id. at 48:3-49:6. Therefore, the court properly took Phebus' previous conduct into account.

b.    Circumstances Under Which Offense Was Committed.

Phebus committed the current offense shortly after being given credit for time served on his previous disorderly conduct conviction (Case No. CR11-007). RA Tab 19 at 42:15-43:11. In addition, his behavior escalated from a loud, profanity-laced outburst to a loud, profanity-laced outburst that included a threat to harm Chief Belcher, followed by an overt demonstration of his intent to follow through on the threat. The tribal court obviously recognized that Phebus learned nothing from his prior conviction, and it properly considered the circumstances under which the offense was committed.

c.    Willfulness of Offense.

Phebus' historical course of conduct, coupled with his express admissions in the case to which this appeal pertains, demonstrates that his conduct is willful. Moreover, the tribal court expressly considered the willfulness of the offense, calling Phebus a "terrorist" who continues to engage in a course of conduct that is intended to "cause trouble for the Tribe," and who shows no remorse for his behavior. Id. at 42:15-43:19. The court also noted that Phebus "won't take responsibility for anything [he's] ever done." Id. at 46:22-47:1. Accordingly, the tribal court appropriately considered this factor.

McDONALD·CARANO·WILSON℠
2300 WEST SAHARA AVENUE · SUITE 1200 · LAS VEGAS, NEVADA 89102-4355
PHONE (702) 873-4100 · FAX (702) 873-9966

17

d.      Phebus' Attempt to Make Amends.

The court also noted that Phebus has made no attempts to make amends or otherwise apologize for his conduct. Id. at 43:3-9 ("you're here to cause problems for the Tribe, and you don't have any remorse. You feel you're the victim in all of these cases, and you continue to terrorize people."); 47:11-22 ("all you want to do is cause more problems and you won't do anything constructive . . . ."); 48:12-49:6 ("I've let you get away and express yourself here in the court, but your response then was to bring a rock here and threaten the chief, and you haven't denied that. In fact, you felt that you were responsible for it."); 49:15-24 ("all you want to do is make further accusations . . . .") Therefore, the court properly considered this factor.

e.      State of Phebus' Mental Health.

While the court did not expressly address the state of Phebus' mental health, the trial transcript demonstrates that Phebus was fully able to participate in and understand the entire trial proceeding. See generally RA 19. His coherent appeal brief provides further support for this conclusion. Therefore, Phebus' mental health did not impede his ability to obtain a fair trial and sentence.

f.      Disenrollment.

The tribal court also gave due consideration to Phebus' disenrollment. As previously discussed, the court has reviewed Phebus' entire tribal court file, and "know[s] everything about his [disenrollment] case." Id. at 47:11-22. Nevertheless, Phebus' disenrollment has no effect on the tribal court's jurisdiction over Phebus, nor does it permit Phebus to engage in "terroristic" conduct. Accordingly, the tribal court gave Phebus' disenrollment all of the consideration that it was due.

g.      Mitigation.

Finally, the tribal court gave Phebus numerous opportunities to present a mitigation argument against the Tribe's request that Phebus receive the maximum jail sentence permitted for the offense. RA Tab 19 at 41:15-47:22. Rather than taking advantage of those opportunities, Phebus continued to argue with the tribal court about the validity of his disenrollment, the

18

1    jurisdiction of the tribal court, and other tangential issues.  Id.  Phebus cannot now complain that

2    his sentence is unfair, especially when the trial transcript makes clear that the tribal court would

3    have accepted even the most simple mitigation argument (i.e., had Phebus merely apologized for

4    his conduct, or shown the slightest amount of remorse, the tribal court would not have imposed

5    the full sentence).  Id.

6           **2.    The Tribal Court Did Not Give Any Weight to an Improper or**
                    **Irrelevant Factor.**

7

8           All of the court's comments regarding sentencing pertained to Phebus' escalating course

9    of conduct, his refusal to accept responsibility for his actions, his unwillingness to learn from

10   previous encounters with the court, and the court's concern for the safety of tribal members and

11   employees.  Id. at 41:17-52:13.  As discussed in the preceding section, all of those issues are

12   directly relevant to a proper sentencing analysis.  Therefore, the tribal court did not give any

13   weight (let alone any significant weight) to an improper or irrelevant factor.

14          **3.    The Tribal Court Did Not Commit a Clear Error of Judgment in**
                    **Weighing the Appropriate Factors.**

15

16          Finally, the tribal court expressly took "the protection of the public, the seriousness of the

17   offense, and the rehabilitative needs of the defendant" into account during sentencing.  Tribal

18   Code § 4-70-090(a).  See, e.g., RA Tab 19 at 45:28-23 ("What about the Tribe?  What about the

19   people that work here every day that are afraid of you that come to work every day worried about

20   Chris Phebus flipping out and causing some kind of problem[?]"); 48:3-49:6 (discussing

21   seriousness of offense); and 51:19-23 ("Because you haven't learned, okay?  I've given you every

22   break I can, and all you want to do is blame other people.")  For that reason, and for the reasons

23   discussed above, the tribal court did not commit a clear error of judgment in weighing the

24   appropriate sentencing factors.

25

26

27

28

McDONALD·CARANO·WILSON
2300 WEST SAHARA AVENUE • SUITE 1200 • LAS VEGAS, NEVADA 89102-4305
PHONE (702) 873-4100 • FAX (702) 873-9966

1  **C.    The Sentence Was Not Constitutionally Cruel and Unusual.**

2  "A punishment within legislatively mandated guidelines is presumptively valid." United

3  States v. Mejia-Mesa, 153 F.3d 925, 930 (9th Cir. 1998) (citing Rummel v. Estelle, 445 U.S. 263,

4  272 (1980)). "Generally, so long as the sentence imposed does not exceed the statutory

5  maximum, it will not be overturned on eighth amendment grounds." Id. (citing United States v.

6  McDougherty, 920 F.2d 569, 576 (9th Cir.1990)).  The maximum sentence in this case permits

7  the imposition of a six-month term of imprisonment, plus a $4,000.00 fine.  The tribal court only

8  imposed the prison sentence; it did not impose a fine of any amount.  Therefore, the sentence was

9  well within the permissible limits, and was not constitutionally cruel and unusual.  Id.

10  **CONCLUSION**

11  Based on the foregoing, the Court should enter an order affirming Phebus' conviction and

12  sentence.

13  Dated: May 15, 2013.

14  McDONALD CARANO WILSON LLP

15  By: _Patrick Murch_____

16  Patrick J. Murch
   2300 West Sahara Avenue, Suite 1200

17  Las Vegas, Nevada  89102
   *Attorney for Respondent*

18  278230

19

20

21

22

23

24

25

26

27

28

McDONALD·CARANO·WILSON®
2300 WEST SAHARA AVENUE · SUITE 1200 · LAS VEGAS, NEVADA 89102-4355
PHONE (702) 873-4100 · FAX (702) 873-9966

# EXHIBIT 12

# EXHIBIT 12

Page 3

```
 1  CASE NO. CA13-001
 2
 3          LAS VEGAS PAIUTE TRIBAL COURT
 4
 5                    -oOo-
 6
 7  CHRISTOPHER PHEBUS,        )
 8       Appellate,           ) REPORTER'S TRANSCRIPT
 9       vs.                  )        OF
10  LAS VEGAS PAIUTE TRIBE,   ) ARGUMENTS ON APPEAL
11       Respondent.          )
12
13
14          BEFORE THE TRIBUNAL
15
16          HON. WILLIAM THORNE
            HON. JOHN ST. CLAIR
17          HON. ABBY ABINANTI
18          FRIDAY, MAY 17, 2013
               2:00 p.m.
19  APPEARANCES:
20   For the Appellate:   In Proper Person
21   For the Respondent:  PATRICK J. MURCH, ESQ.
                          SETH FLOYD, ESQ.
22
23
24
25  Reported by:  CHERYL GARDNER, RMR-RPR
                  CCR No. 230
```

**Page 2**

1  LAS VEGAS, CLARK COUNTY, NV, FRIDAY, MAY 17, 2013
2          2:00 p.m.
3          -oOo-
4      P R O C E E D I N G S
5      JUDGE THORNE: Good afternoon and
6  welcome. Because you may not be familiar with the
7  panel members, I've asked before we start they
8  introduce themselves so you know who we are and
9  where we come from and then we'll begin argument.
10     What we anticipate doing is proceeding
11 just a little bit different. We'll ask the
12 prosecutor to go first because there were some
13 questions the panel have, and then we'll give
14 Mr. Phebus a chance to respond and add anything he
15 thinks is important that we need to hear, then
16 we'll recess.
17     Hopefully we'll come to some consensus
18 about the result, and it's our intention to come
19 back and try to announce an opinion orally and then
20 follow it up with an order. We know in tribal
21 court people are not used to waiting months to get
22 a written opinion the way they do in state or
23 appellate court.
24     Is that process okay with you?
25     MR. MURCH: That's fine.

1      MR. PHEBUS: Uh-huh.
2      JUDGE THORNE: I'll ask Judge Abinanti
3  to introduce herself first.
4      JUDGE ABINANTI: I am an enrolled
5  member of the Yurok Tribe in Northern California
6  where I sit currently as the chief judge. I'm also
7  admitted to the superior court bench in San
8  Francisco where I currently act as what they call a
9  duty judge.
10     I'm on duty for a 72-hour shift to do
11 all the probable causes and TPOs, and before the
12 last couple of years I was on the San Francisco
13 bench for a number of years. He wants us to say
14 how many. I don't know that I want to. Let's just
15 say for a long time.
16     And prior to that I was a CFR judge
17 for my tribe for fishing court and during the time
18 I was a San Francisco judicial officer I also was
19 the chief judge at Yurok through an agreement
20 between tribal court and administrative office of
21 the court for the state because we were trying to
22 establish an ongoing court. I will say that it's
23 more than 20 years but not-- less than 50. All
24 right.
25     JUDGE THORNE: What school did you

**Page 4**

1  graduate from?
2      JUDGE ABINANTI: I'm sorry. I
3  graduated from the University of New Mexico some
4  time ago.
5      JUDGE THORNE: John.
6      JUDGE ST. CLAIR: Good afternoon.
7  Thank you. My name is John St. Clair. I'm the
8  chief judge currently of the Eastern Shoshone and
9  Northern Arapaho tribal court in central Wyoming.
10 I graduated from the University of Wyoming in
11 1973.
12     I've been working as a chief judge in
13 the tribal court since 1983 which is right now 30
14 years. We had originally been a CFR court. The
15 tribe asked me to draft a law and order code to
16 make the Shoshone/Arapaho tribal court so that's
17 what I did in 1997 so we've been a tribal court
18 since that time. We have two tribes on our
19 reservation, 2.3 million acres, 35 miles by 35
20 miles. We have the Northern Arapaho tribe and the
21 Eastern Shoshone.
22     JUDGE THORNE: I'm Bill Thorne, Pomo
23 and Coast Miwok from Northern California, graduate
24 of Stanford Law School. I've been a judge for 34
25 years now, the last 13 on the Utah Court of

CA13-001                      CondenseIt!™                      5/17/13

Page 5

1 Appeals.  So you know a little bit about us.
2         Counsel, if you'd make an appearance,
3 we'll start with you.
4         MR. MURCH:  Good afternoon.  My name
5 is Patrick Murch.  I'm the tribal prosecutor, and
6 I've brought Seth Floyd from my office with me who
7 is fairly fresh off a clerkship with the State of
8 Nevada supreme court.
9         JUDGE THORNE:  In the matter of Phebus
10 versus Las Vegas Paiute Indian tribe, go ahead.
11        MS. MURCH:  Good afternoon.  The Court
12 asked the Tribe to address two issues.  The
13 elements of the crime are improper influence in
14 official matters met beyond a reasonable doubt and
15 then the second issue is was the sentence an abuse
16 of the judge's discretion or was it cruel and
17 unusual punishment given the facts and
18 circumstances.
19        Addressing the first issue, the
20 elements of the crime are threat of harm to a
21 public servant.
22        JUDGE THORNE:  Let me interrupt you.
23 Having reviewed the transcript which is fairly
24 short, what's the threat to the chief?  It was
25 clearly a threat to his window.  What's the threat

Page 6

1 to the chief?
2         MR. MURCH:  It's his office and if
3 he's sitting in there, he certainly should feel
4 threatened for his safety if a rock is going to
5 come through the window and also Mr. Phebus has
6 admitted that I threatened the chief with this rock
7 so I don't know --
8         JUDGE THORNE:  Again, reading the
9 transcript I remember him saying that he agreed he
10 threatened to throw a rock through the window but I
11 think there's no characterization about whether he
12 threatened the chief.
13        There's where I'd like you to let me
14 make that connection because I don't see those as
15 necessarily tied.  It's certainly reasonable but to
16 be beyond a reasonable doubt I need some help.
17        MR. MURCH:  Okay.  I don't know that
18 you need to have a direct threat of harm.  I'm
19 going to hit you with this rock.  I think you need
20 to have a threat that could cause harm to an
21 individual that that's sufficient to satisfy the
22 statute.
23        JUDGE THORNE:  Isn't the context -- if
24 I say in a laughing and joking manner to a friend,
25 oh, buddy, I'm going to kick your ass, is that a

Page 7

1 threat or if instead I'm angry and I'm just about
2 to punch him and I say to say those words, would
3 that be a threat?  So help me with the context.
4         MR. MURCH:  There's two elements to
5 the context.  There's the context of Mr. Phebus
6 walks in and says I need you to get the order for
7 me from Dave Colvin, the general counsel for the
8 tribe.  The chief says I can't do that.  I'm not
9 able to do that.
10        This is the response.  I'm going to go
11 to the tribal health office.  I'm going to see if
12 my certificate of Indian blood is there and if it
13 is, I'm going to come back, throw it through your
14 window wrapped around a rock, and the next day he
15 shows up and manifests his intent to follow through
16 with that threat by presenting it to the dispatcher
17 and asks for Chief Belcher.
18        The dispatcher says Chief Belcher is
19 not here so he says The next time he comes in, tell
20 him I've got something for him.  He shows him the
21 rock.  I think that's sufficient to show harm.
22        The elements as you said threatening
23 harm to a public servant or retaliation for past
24 conduct and I think all of those elements have been
25 met.  We talked briefly about the threatening harm

Page 8

1 so I'll carry on with that.
2         JUDGE ST. CLAIR:  Excuse me.  How far
3 away from the window is the chief's desk?
4         MR. MURCH:  It's right next to it.
5 It's right up front.  I know that's not in the
6 record.  That isn't reflected.
7         JUDGE ST. CLAIR:  That's the reason I
8 asked.
9         MR. MURCH:  If I may go outside the
10 record for a second, the tribal court judge is very
11 familiar with the location of the chief's desk.  He
12 knows the area.  He walks past when he comes in to
13 sit.  You have to have gone past the chief's office
14 which is on the left as you walk in.  He's been in
15 there speaking with the chief and myself on a
16 number of occasions also.
17        It's certain that if Mr. Phebus felt
18 like he wanted to follow through with that threat,
19 the chief would be sitting close enough to the
20 window that he could be harmed.
21        JUDGE THORNE:  If he wanted to follow
22 through with the threat, I mean if it really was a
23 true treat, why didn't a rock come through the
24 window?
25        MR. MURCH:  I don't think that -- I

Page 9

1  can't answer that.  Mr. Phebus may be able to
2  answer that, but I think that's not the proper
3  inquiry.  I think the inquiry is was a threat
4  made.  I don't think we need to go so far as a
5  threat made and carried through.
6          JUDGE THORNE:  You don't think that
7  the law implies an ability and an intent or at
8  least opportunity to follow through immediately.
9          MR. MURCH:  I don't think so.
10         JUDGE THORNE:  So threat in the future
11 some day I'm going to do it as opposed I'm going to
12 do it to you or the next time I see you I'm going
13 to do it.
14         MR. MURCH:  It implies a threat that's
15 connected to another, there's another element which
16 is retaliation.
17         JUDGE THORNE:  Interpreting most state
18 laws there's a requirement of imminence to go with
19 the threat or at least some sort of time connection
20 rather than just a generic some day it's going to
21 happen.
22         MR. MURCH:  If you take the past
23 conduct into account and the fact that Mr. Phebus
24 had just gotten out of jail a few weeks before that
25 and this was an escalation on that past conduct, I

Page 10

1  think the threat is sufficiently inferred.
2          I don't know.  The statute doesn't say
3  anything about an imminent threat.  I'm going to do
4  it right now.  It just says threatens harm, no time
5  period involved there.  Threatens harm and it has
6  to relate to a decision.
7          JUDGE THORNE:  It's my impression most
8  state codes also don't spell that out yet it's
9  implied in case law.
10         MR. MURCH:  I can't speak to that
11 issue directly but --
12         JUDGE THORNE:  I know that's beyond
13 what we asked you specifically to brief so . . . .
14         MR. MURCH:  But I would say that there
15 is sufficient evidence in Mr. Phebus's own
16 admission, yes, I did threaten him with a rock.  I
17 think that in and of itself is sufficient to
18 satisfy the statute.  I don't think he needed to
19 follow through with it immediately.  I think you
20 can --
21         JUDGE THORNE:  Is there someplace that
22 he actually said I admit I threatened the chief or
23 that I admit I threatened to throw the rock through
24 the window?
25         MR. MURCH:  That's a good question.

Page 11

1  In your appendix of exhibits, 19, on page 15.
2          I'm sorry.  On Exhibit 19 is the
3  transcript of the hearing of the trial that we're
4  talking about now, this incident.  On page 15 at
5  line 6 the Court asks Mr. Phebus why do you believe
6  that the chief, Chief Belcher is the individual to
7  contact Colvin, meaning Dave Colvin the tribal
8  attorney, about the order that Mr. Phebus
9  originally came in to get.
10         I don't believe he needs to.  I'm
11 accusing him about the certificate of Indian blood
12 and making false documents to put me in jail.
13 That's why I came down here to threaten him with
14 that rock.
15         There's a direct admission from
16 Mr. Phebus.  He came to threaten the chief, and
17 while we're on that little paragraph there, that's
18 one of the elements of the crime is retaliation.  I
19 came down here to threaten him.
20         I'm sure Mr. Phebus is going to talk
21 to the Court about the certificate of Indian blood
22 and the significance, not just this issue.  I'm
23 sure he's going to get into his disenrollment and
24 the issues pertaining to that.  I think this is
25 outside the scope of the appeal but they are part

Page 12

1  of an ongoing theme from Mr. Phebus, and I've
2  included a couple other transcripts from other
3  hearings.
4          JUDGE THORNE:  Certificate of blood
5  reminds me I have a question of how the Court has
6  jurisdiction over Mr. Phebus if he's not a tribal
7  member.
8          MR. MURCH:  Pursuant to United States
9  versus Bruce as an Indian.
10         JUDGE THORNE:  As a generic Indian as
11 opposed to a tribal member?
12         MR. MURCH:  Correct.  United States
13 versus Bruce an Indian is defined as -- it sets out
14 a list of factors.
15         JUDGE THORNE:  Is that the major
16 crimes act?  It was a federal prosecution, wasn't
17 it, as opposed to a tribal prosecution?
18         MR. MURCH:  It was in federal court so
19 I assume it was a federal prosecution but the Court
20 has determined on two occasions that it has
21 jurisdiction over Mr. Phebus.
22         JUDGE THORNE:  Again, I need you to
23 help me walk through that process because under
24 U.S. versus Duro and then the federal legislation
25 that followed Duro it gave tribal courts criminal

Page 13

1 jurisdiction at least recognized tribal courts
2 criminal jurisdiction over tribal members and
3 members of other tribes.
4         Now, the federal court pursuant to
5 major crimes act, assimilated crimes act, and
6 general crimes act has jurisdiction over Indians,
7 and I think the case you cited, Bruce, helped
8 define for the ninth circuit what Indian meant for
9 purposes of those federal prosecutions, but I'm not
10 familiar with a case that applies that definition
11 within the context of Duro and then the legislation
12 that followed that so if you can help me.
13        MR. MURCH: If we could have the
14 Court's indulgence for one second. The tribal code
15 I believe sets forth the jurisdiction of the
16 Court.
17        JUDGE ABINANTI: Take a moment and
18 find it because I think we are interested in it.
19        JUDGE THORNE: It's probably easier
20 when you're sitting down. Just take as long as you
21 need.
22        MR. MURCH: I apologize. I thought
23 that the tribal code said the tribal court has
24 jurisdiction over Indians. That issue's --
25        JUDGE ABINANTI: It does or does not?

Page 14

1         MR. MURCH: The tribal court has
2 criminal jurisdiction. The heading of the section
3 I just looked at does not say it has jurisdiction
4 over Indians.
5         JUDGE ABINANTI: What does it say?
6         MR. MURCH: As enumerated in the
7 code --
8         JUDGE ABINANTI: So it doesn't refer
9 to this defendant.
10        MR. MURCH: It's what that says.
11        JUDGE ST. CLAIR: You mentioned some
12 decisions that the court had decided in the past,
13 the tribal court.
14        MR. MURCH: The tribal court.
15        JUDGE THORNE: Not the appellate
16 court.
17        MR. MURCH: No. And that issue has
18 not been --
19        JUDGE THORNE: Jurisdiction is
20 always --
21        MR. MURCH: I understand. Let's back
22 up a little bit and look at this in a bigger
23 picture because Mr. Phebus is going to get up and
24 talk about how does the Court have jurisdiction
25 over him when he decided I'm not a member but I

Page 15

1 should be able to come in here and test my
2 disenrollment.
3         I don't know how familiar the Court is
4 with the history behind Mr. Phebus's disenrollment
5 but there is an appellate court order and I don't
6 know if any --
7         JUDGE THORNE: We've seen reference to
8 it.
9         MR. MURCH: There is an appellate
10 court order that says the disenrollment was
11 improper, and Mr. Phebus has an issue with that not
12 being upheld by the tribal council so he wants the
13 benefit of the tribal court for that purpose in the
14 civil context of disenrollment and his behavior
15 over and over again is related to his disenrollment
16 but then he doesn't want the benefit of the tribal
17 court for other purposes when it doesn't suit him.
18        JUDGE THORNE: It could be said the
19 tribe has the same argument on both sides, that
20 they don't want him as a member until they can
21 throw him in jail.
22        MR. MURCH: You're correct. It could
23 be seen both ways. I guess my answer to your
24 question is I didn't brief that issue but it has
25 been briefed to the tribal court. I know that I

Page 16

1 briefed it one time and I believe that there is
2 United States case law from one of the circuit
3 courts, not the supreme court.
4         JUDGE ABINANTI: That's really not
5 going to help us unless we have some citation.
6         MR. MURCH: I can get my office --
7         JUDGE THORNE: We'll certainly let you
8 do that.
9         MR. MURCH: If you would call Melissa
10 and ask her to send me the brief on jurisdiction.
11 Have her e-mail Andre that decision. Certainly
12 that issue has been addressed and now that you
13 mentioned it I don't remember. I know that there's
14 a significant discussion about the Bruce case.
15        I don't know if there's also a
16 discussion about tribal court having jurisdiction
17 over Indians and again, another aspect of this
18 argument is Mr. Phebus wants to be able to go to
19 the city of North Las Vegas or the city of Las
20 Vegas and get put in jail and say, hey, you don't
21 have jurisdiction over me. I'm an Indian. So,
22 again, I understand the Court's point and if we can
23 find that information, I'll sure give it to you.
24        So the next element is the chief a
25 public servant. I don't know if the Court has any

Page 17

1 questions about --
2        JUDGE THORNE: I don't think there's
3 any question about that.
4        MR. MURCH: Oh, I think we're okay
5 with that. So we've got the threat of harm which
6 the Court is going to determine whether that was a
7 threat of harm but we've got at least three
8 different instances spelled out in the brief. He
9 comes in, admits it.
10        JUDGE THORNE: It certainly appears to
11 be a logical problem if not a legal one.
12        MR. MURCH: Say that again.
13        JUDGE THORNE: It certainly appears to
14 be a logical or a practical problem and not a
15 tactical legal issue.
16        MR. MURCH: Correct. Chief Belcher
17 gets up and says what happens and then the
18 dispatcher comes in and says Mr. Phebus was like
19 you described just like that, he walked in with the
20 rock.
21        That's the argument that there is a
22 threat of harm. I don't know that it needs to be
23 imminent and given the fact that Mr. Phebus had
24 just gotten out of jail three weeks before that for
25 behavior that was slightly less aggressive and also

Page 18

1 directed at someone, I think the chief is
2 appropriate and the Court was appropriate in
3 interpreting that as a threat of harm.
4        And the last element of that statute
5 is either purpose for influencing the decision or
6 the retaliation. The first one is the order from
7 Dave Colvin. The chief says I can't get it for
8 you. That's an issue the Tribe has to deal with.
9 You've got to go to the tribe for that or Dave
10 Colvin himself. The Tribe is represented and I
11 can't get in the middle of that. Okay. Then I'm
12 going to throw a rock through the window. We went
13 through that analysis.
14        The second part of that is the
15 retaliation and Mr. Phebus explicitly references in
16 the paragraph that we just read his certificate of
17 Indian blood. He says Chief Belcher created, made
18 this certificate of Indian blood in order to put
19 him in jail.
20        The contents of the certificate of
21 Indian blood are not entirely relevant either for
22 purpose of jurisdiction or for purposes of the
23 appeal or for the conviction. It says what it
24 says.
25        Chief Belcher explained the history of

Page 19

1 the certificate of Indian blood and where it came
2 from. The judge ordered it because Mr. Phebus
3 wasn't able to get medical care from the BIA when
4 he was in prison at a BIA facility so the judge
5 said, we'll get you a certificate of Indian blood
6 and then the BIA can pay for it, and Chief Belcher
7 the whole time is the middle man so Mr. Phebus sees
8 him as the person responsible for getting the
9 certificate of Indian blood. Mr. Phebus is going
10 to get up and say that's why I'm in jail.
11        That's not the case. You'll see
12 shortly you'll see our analysis of the Bruce
13 factors and the certificate of Indian blood and I
14 believe it's part of the record which Mr. Phebus
15 included with his papers. It says three-eighths
16 Southern Paiute or three-eighths. He claims to be
17 five-sixteenths.
18        JUDGE THORNE: Which is less.
19        MR. MURCH: Which is more.
20        (Overlapping speakers.)
21        MR. MURCH: That's why I'm an
22 attorney. I don't have anything to do with math.
23 Anyway, he claims some discrepancy not what that
24 says versus what he is. So that's not at issue
25 here but that's what's going to be discussed I'm

Page 20

1 sure.
2        He believes that Chief Belcher is the
3 middle man for this piece of paper and was
4 responsible for its creation and delivery to the
5 BIA. That's why the Court has jurisdiction over
6 him. That's not the case.
7        So that gets, you know, that covers
8 the retaliation aspect of it so I believe that the
9 Tribe proved beyond a reasonable doubt all three or
10 four elements of the crime depending on how you
11 characterize the number of elements.
12        And then the second issue that the
13 Court asked us to discuss was the sentence and was
14 the sentence an abuse of the judge's discretion.
15        Now, given that the tribal code
16 doesn't contain a definition of what an abuse of
17 discretion is, there's very few cases at all. We
18 looked at a case from the eighth circuit. There's
19 other cases from other circuits that say different
20 things about what an abuse of discretion is in
21 different contexts.
22        I think the one we chose is fairly
23 generally accurate, and I'm sure the Court will
24 correct me if I'm wrong. Did the Court look at the
25 right things? Did it analyze the right factors?

Page 21

1 Did it put too much weight on one of the factors?
2 Did analyze the right factors or did it not analyze
3 the right factors or did it put too much weight on
4 the wrong factors?
5         We've gone through the analysis of
6 what factors the Court looked at and that are
7 important actually and what are required by the
8 tribal code and basically the three most important
9 are let's look at prior conduct. We put a couple
10 of different transcripts in from different --
11         JUDGE THORNE: It's clear from the
12 record that there's a series of continuous
13 encounters.
14         MR. MURCH: That's correct, Your
15 Honor, and I only put in the encounters with this
16 judge. Mr. Phebus has an extensive history in
17 front of the Court. The file I have is the size of
18 this table, and I wanted the Court to know that
19 we're not going back to 2004, 2002 in looking at
20 all of his conduct.
21         We're looking at what the judge said
22 because this judge is making the determination as
23 to sentencing and even though this judge has said
24 he's read his entire file which I think is
25 important, I think he understands the

Page 22

1 jurisdictional aspect.
2         He understands the disenrollment
3 aspect of it. I think that the record shows that
4 this judge has been more than fair and given
5 Mr. Phebus more than sufficient opportunity to fix
6 his behavior. He's given him suggestions about
7 what he can do next, how he can do things
8 differently.
9         JUDGE THORNE: Clearly there are
10 judges who want to change people's behavior but the
11 law doesn't let the judge just say you need to
12 change, but the legislative branch created a series
13 of rules that the Court is supposed to say, you
14 violated this, here's the sanction that comes from
15 that as opposed to just you're not behaving
16 properly.
17         MR. MURCH: Correct. But when you
18 look at the behavior, we consider all three of the
19 elements met, the code --
20         JUDGE THORNE: For argument we assume
21 that there's grounds but I guess one of my concerns
22 is six months in jail for a nonviolent offense
23 seems to be a lot. Maybe -- I understand that the
24 judge knew Mr. Phebus, knew the background, wanted
25 to change his conduct but just the appropriateness

Page 23

1 of six months for a nonviolent offense seems to
2 be unusual.
3         MR. MURCH: I would respectfully take
4 issue with the characterization it's a nonviolent
5 offense. When somebody says I'm going to throw a
6 rock through your window and then he shows up with
7 a rock and it's a good sized rock the next day and
8 this is three weeks after getting out of jail for
9 behavior that's a little bit less but it's still
10 proven at the -- in the tribal police department
11 where there's other employees working, it's not
12 just him and the chief having the conversation,
13 which is a few months after the trespass petition
14 was filed.
15         JUDGE ABINANTI: Well, I think you
16 might be confusing outrageous behavior with violent
17 behavior.
18         MR. MURCH: Mr. Phebus has a problem
19 with the disenrollment.
20         JUDGE ABINANTI: Clearly.
21         JUDGE THORNE: It seems to be the --
22 at least one appellate panel agreed with him.
23         MR. MURCH: Correct. Possibly on more
24 than one occasion. It's not for the tribal
25 prosecutor to take issue with. It's not for the

Page 24

1 tribal judge in the context of a criminal trial and
2 sentencing. That's not that. You can be
3 displeased with conduct with the result without
4 showing your displeasure but displaying --
5         JUDGE THORNE: I think his anger is
6 probably reasonable. His method of demonstrating
7 that is probably unacceptable so we're trying to
8 draw that rein.
9         MR. MURCH: I think the judge who was
10 sitting in your chair there said the same thing a
11 few weeks ago. He's given him opportunity after
12 opportunity. If you read the transcripts, he says
13 it's possible -- the one he just got off before
14 this one -- he says it's possible that there's a
15 first amendment issue here.
16         Mr. Phebus is expressing his
17 displeasure with the disenrollment so I'm going to
18 let him out and give him credit for time served,
19 and I believe in the same transcript if not the
20 hearing before that he said you can't behave like
21 this. You can't act in this manner.
22         You need to go across the street and
23 if the tribal council said we're the supreme court
24 of this tribe whether that's right or wrong, I'm
25 not the person to decide that, but that's what they

Page 25

1  said and the federal court has said on at least one
2  occasion maybe two that you haven't exhausted your
3  tribal remedy so we can't help you.
4        Instead of going to the tribal council
5  and the tribal court judge here has offered to lift
6  any orders from tribal judges saying you can't go
7  across the street because he's done the same types
8  of behavior out there, making threats to people on
9  the tribal council who he believes have done him
10 wrong.
11       So for Mr. Phebus to get out of jail
12 after the judge gives him a break and then to come
13 back in and just a short time later engage in
14 conduct that's more disturbing -- I know disturbing
15 is not the standard but it is a threat and that's a
16 threat. That's sufficient given the fact that
17 Mr. Phebus has a history of harassing people.
18       He's got a stalking conviction. He's
19 got disorderly conduct convictions. I don't know
20 that he has an assault conviction, but there's a
21 series of convictions for threatening people who he
22 believes have done him wrong and this goes right in
23 line with that and for the judge to have given to
24 him -- as you can see from the transcript, there's
25 a long order where he makes a number of findings of

Page 26

1  fact.
2        He says he showed up on the day and he
3  was doing community service but no anger management
4  and then the next one is he wasn't do either. He
5  has disregard for the Court's order. He has
6  disregard for due process. He has disregard for
7  the bench.
8        The tribal members, the tribal police
9  have a right to be safe and feel safe. If the only
10 way to deal with that is by giving Mr. Phebus a
11 criminal sentence -- the Court was hamstrung. You
12 can see in the transcript there's four or five
13 different occasions where it says you tell me, give
14 me the reason why I shouldn't put you in jail. The
15 Tribe asked for six months. You tell me why I
16 shouldn't put you in jail. He didn't do --
17       JUDGE THORNE: He kept saying the
18 disenrollment is -- they're out to get me. The
19 judge said I've given you enumerable
20 opportunities. Mr. Phebus said I'm sorry, I
21 overreacted. I'm listening to you and I can go to
22 the tribal council if you'll lift that order. If
23 anything, I think that he would have -- I think the
24 judge would have not given him six months.
25       JUDGE ST. CLAIR: On the transcript

Page 27

1  page 37 it says I'm sorry I did what I did and came
2  in here with that rock. Do you see it?
3        MR. MURCH: I see it.
4        JUDGE THORNE: Line 10, page 37.
5        MR. MURCH: I see it. That's in the
6  context of Mr. Phebus's presentation to the Court,
7  not in the context of sentencing and certainly not
8  in the context of what happens between then and the
9  end of the hearing.
10       JUDGE ST. CLAIR: That's part of the
11 evidence then.
12       MR. MURCH: Correct. I would agree
13 with that, but given Mr. Phebus's continued
14 arguments, I would suggest that he wasn't really
15 sorry. That's not the issue. And given the fact
16 that this is a pattern --
17       JUDGE ABINANTI: In he could better
18 present himself, we wouldn't be in this position.
19 What you've got is somebody who's got a personal
20 stake in something, and that's why we create a
21 system. He got caught up in that. Which is not to
22 excuse it. I'm just saying that's a classic
23 example of it.
24       MR. MURCH: I appreciate that. I'm
25 sure if you read the transcript the judge

Page 28

1  appreciates that, but at some point you've got to
2  say enough is enough, and I think the judge did
3  that in this instance.
4        It goes to the escalated behavior. It
5  goes to the fact that he met all the elements of
6  the crime. It goes to the fact that he had
7  mentioned that he was sorry but his behavior
8  afterwards, his comments afterwards didn't suggest
9  that he was sorry at all, and I think if this court
10 allows him to get out and remain out and overturns
11 the conviction or reduces the sentence to time
12 served, I think that sends Mr. Phebus a message
13 that, hey, it's okay for me to do it because I've
14 got some people who are willing to have my back
15 because they understand my plight. They understand
16 the disenrollment. There's issues with the
17 disenrollment.
18       That's opening the door for Mr. Phebus
19 to continue to try to persuade people that his
20 disenrollment was improper using threats of
21 violence, other improper means, and then trying to
22 get a conviction overturned based on the fact that
23 he's in front of the panel now.
24       JUDGE THORNE: Okay. We'll give you a
25 moment to confer with your colleague while I ask

Page 29

1  Mr. Phebus for his comments so, Mr. Phebus,
2  whatever you think we need to hear.
3        MR. PHEBUS: Okay. Let's see now.
4  When I -- when we had this incident with that rock
5  I did come in here and I had a rock and I did tell
6  Belcher previously that I was upset with him that
7  he was going to, that I threatened him with the
8  rock through his window, but I didn't say through
9  his office window.
10       I couldn't -- as angry as I was what
11 was going through my head was his car window
12 actually but after that incident the law
13 enforcement, Belcher wrote a complaint and filed
14 charges against me.
15       In the meantime they gave me 30 days.
16 I didn't do anything. I didn't follow-up on the
17 threat. I didn't mean it. I was angry because of
18 the certificate of Indian blood ended up in my
19 medical files and the rest of my files were missing
20 and I didn't know where they went and again it was
21 Belcher as a middle man that made that certificate
22 of Indian blood and asked for it that it ended up
23 in my medical files because I have the paperwork
24 between him and the BIA and that's what I was angry
25 with.

Page 30

1        I apologized in the court but the
2  judge didn't accept it but again I always go back
3  to how this Court has jurisdiction over me because
4  in his brief he says that -- am I allowed to talk
5  about this?
6        JUDGE THORNE: You can talk about --
7  within time limits you can talk about anything you
8  think we need to know.
9        MR. PHEBUS: Okay. Well, as far as
10 Bruce I have a problem with Bruce because I don't
11 feel it's being used fairly. It may be used fairly
12 on me because I am now just an Indian and I may
13 have been a tribal member previously but it ain't
14 fair when he does it to other member descendants in
15 this court because if he did do that, it would
16 prove that their memberships were wrong.
17       JUDGE THORNE: Help me understand.
18 I'm not sure I tracked what you were talking
19 about.
20       MR. PHEBUS: Bruce breaks down my
21 history. After those disenrollments breaks down my
22 history. Those disenrollments on our 1940 census
23 role which is used for tribal membership I have two
24 grandparents on there which is all of my blood
25 quantum and all of my mom's blood quantum.

Page 31

1        The tribal council in 1999 did not
2  want to use my grandma's so my mom's quantum got
3  halved into three-eighths. My blood quantum got
4  lowered to three-sixteenths. In his brief right
5  here he even mentions what happened why my blood
6  quantum is, he even gives me a three-sixteenth
7  blood quantum, mentions my blood quantum and why I
8  was disenrolled and why the Tribe didn't want to
9  accept my blood quantum. Okay? He did that as
10 prosecuting attorney.
11       Bruce comes in after that and is
12 allowed to be used because I am no longer a tribal
13 member with a quarter or more blood quantum. I am
14 between an eighth and a quarter so they're allowing
15 abuse but when they do that, what about these other
16 descendants of tribal members which I wrote down in
17 my brief. I gave two examples.
18       Well, when you break their family
19 history down to allow testimony to use Bruce on
20 them they don't have a Las Vegas Paiute blood
21 quantum because when you track their history down
22 it shows the history because I was on the
23 enrollment committee two months before I got
24 disenrolled or two years so I know their history.
25       But the judge, he don't listen to that

Page 32

1  because he only prosecutes them simply because
2  they're descendants of a tribal member and he's
3  doing the same thing to me but he doesn't realize
4  that my blood quantum is more.
5        JUDGE THORNE: Okay. I think I
6  understand that point. Let's go back to what you
7  were doing.
8        MR. PHEBUS: Another thing that Bruce
9  does that is unfair is because Bruce only makes
10 reference to me as being an Indian. Well, my
11 grandmother is on that 1940 census role and it
12 gives her blood quantum and it says that she is a
13 Paiute.
14       Well, how come Bruce can't recognize
15 her as an Indian when it's written, when she's
16 written down as one. They're allowing themselves
17 to use Bruce when my blood quantum is not -- I do
18 not fall under Bruce. I'm a tribal member because
19 I have a blood, more than a quarter blood quantum
20 but Bruce is being used to prosecute me but yet it
21 won't recognize my other Indian blood. It's a
22 written blood, you know. Do you understand what
23 I'm saying?
24       JUDGE THORNE: I do.
25       MR. PHEBUS: Okay. And I just feel

Page 33

1 that Bruce is being used unfairly against me and
2 the certificate of Indian blood -- he says that he
3 had asked the judge and got a court order. Well, I
4 haven't got nothing, no paperwork from him where he
5 asks the judge. I've asked for it. I've gotten no
6 court order where the judge gave him permission to
7 have it.
8          JUDGE THORNE: Okay. I think we
9 understand the enrollment issue. Apparently
10 there's an appeals court decision that agrees with
11 you so we accept what you're telling us is the
12 case, but what I need you to talk about is the
13 offense that landed you in jail this most recent
14 time and why you think that might be okay or not
15 okay.
16          MR. PHEBUS: No, I don't think it was
17 okay. I shouldn't have did what I did but again,
18 once again I was angry at the fact that I went to
19 equity health -- okay? -- and found the certificate
20 of Indian blood in my medical health files with --
21 all my other paperwork was missing. I had came
22 down here and asked one of the police officers to
23 go up to the equity health and make an incident
24 report with me.
25          I had a hard time getting cooperation

Page 34

1 from that police officer because in his incident
2 report he did it twice because the first incident
3 report wasn't, I didn't agree with it because it
4 wasn't right.
5          He didn't write the information they
6 needed to show the Court what happened to my
7 previous paperwork and then, and so he had to come
8 back two weeks later. It wasn't 'til after I feel
9 that Belcher found out about this incident report
10 'cause I was going to write a complaint with the
11 police department about my paperwork that he
12 decided to file charges and you can see that in the
13 dates between the charges he filed and my incident
14 report that I feel that he was just doing it to
15 cover himself for him for producing that
16 certificate of Indian blood which ended up in my
17 medical files.
18          JUDGE THORNE: Okay.
19          MR. PHEBUS: And the dates will match
20 that I had my incident report made before I was
21 going to start my complaint but it was too late.
22          JUDGE ABINANTI: Do you see at all
23 that even though you're right that your approach is
24 hanging you out to dry here. Do you get that?
25          MR. PHEBUS: Yes. I know it is 'cause

Page 35

1 I can't afford an attorney.
2          JUDGE ABINANTI: It isn't just because
3 you can't afford an attorney. You're a bright man
4 and I'm sure your mother has told you this a
5 million times because I see her sitting in the
6 back. You've got to figure out a way to
7 communicate without crossing the line.
8          JUDGE THORNE: Even when you're right.
9          JUDGE ABINANTI: Especially when
10 you're right. I mean I understand getting angry
11 and I'm not going to tell you not to get angry.
12 I'm just going to suggest to you that you have
13 every right in the world to be angry. It's when
14 you step over the line that causes the problem.
15          If I was in your position, I would be
16 angry but it's what we do with that that's the
17 problem. I think you know that. Like I said,
18 you're a bright man. This is not the first time
19 you thought of it or heard of it. You've got to
20 figure it out. Right?
21          It seems to me what you're saying
22 you've got a higher court saying yeah, you are
23 right. You've got a long political fight here and
24 if you're going to stay in for the duration --
25 which I think you are -- you're going to have to

Page 36

1 figure out a way to do it a way it doesn't end up
2 with you spending an inordinate amount of time in
3 jail because that's not going to happen.
4          MR. PHEBUS: I have tried to go across
5 the street and have even written the tribal council
6 to meet with the council. I got my paperwork right
7 here from the Tribe's attorney and again when I try
8 to and my situation with law enforcement and
9 everything that I wanted to speak with them about
10 but the tribe's attorney writes on behalf of the
11 council and he makes reference to the
12 disenrollments and why I cannot go in front of the
13 council.
14          He makes reference so I can't help
15 myself and try to go across the street to explain
16 things because I do feel Belcher is wrong. What
17 can I do to the police chief who is a public
18 servant when he's getting into our enrollment files
19 and allowed to have documents that he shouldn't.
20          JUDGE ABINANTI: That's kind of a
21 separate issue. I think at that point he was
22 trying to help you and it got fouled up for both of
23 you. Let's set that aside. I think the bigger
24 issue is how do you resolve an ongoing very
25 difficult political issue, and what you're saying

Page 37

1  is that you feel thwarted and not able to do --
2       MR. PHEBUS: Yeah. I can't do it.
3       JUDGE ABINANTI: You haven't been able
4  to do it. I wouldn't say you can't. Politics.
5       JUDGE THORNE: Sooner or later you may
6  figure out a way to win but it's going to be hard
7  to do that if you're in jail all the time because
8  nobody's going to take you serious.
9       JUDGE ABINANTI: You've got to figure
10  this is a long haul situation. Look at the history
11  of this problem. Politics goes on and on and on
12  and it's really who is standing at the last call
13  here. We're not at the last call on any panel or
14  political issue.
15       It is a major political issue for this
16  tribe. It's not just you. There's a number of
17  people. You have to figure out how to be that last
18  person standing or -- this is a political problem,
19  you know, and you've got to separate those arenas
20  and, like the judge said, not end up -- your
21  ability to resolve it is compromised by going over
22  the top.
23       You have to figure out a political
24  response and I get that you've tried political
25  responses and it's not worked, and that is very

Page 38

1  frustrating. I get that. If I had the answer if I
2  sat up here and thought if he did this, that would
3  do it. I don't have the answer. I'm not saying
4  it's an easy problem. I don't see that.
5       MR. PHEBUS: But him saying I want to
6  go to North Las Vegas or to a city jail where I can
7  say the tribe kicked me out and whatnot there was
8  an incident here with another party of the
9  disenrollment where one of the people who is now a
10  council member was taken from the colony and put in
11  the county jail as a white person as a non-Indian
12  but yet is allowed to sit up on tribal council so
13  it's like they get to fix whatever they do wrong
14  under the name of the tribe Las Vegas Paiute but,
15  you know, I don't get no --
16       JUDGE THORNE: Mr. Phebus, as Judge
17  Abby said, if all of that is absolutely true, and I
18  have no reason to believe that it's not, the
19  difficulty is with you're charged with breaking a
20  criminal law.
21       Even if you're justified, even if
22  you're absolutely right about all of the enrollment
23  problems and the political problems, it doesn't
24  help your cause to end up sitting in jail in
25  northern Nevada. And I agree I don't know the

Page 39

1  answer for you either but being in jail isn't the
2  answer.
3       JUDGE ST. CLAIR: That much I know.
4       JUDGE THORNE: So we're here because
5  you sent a letter to the Court basically boiling it
6  down you didn't think it was fair.
7       MR. PHEBUS: No, I didn't.
8       JUDGE THORNE: That's why we're here
9  to listen to you. Is there something you can give
10  us? I think we understand the enrollment part. We
11  don't even disagree with you about that but what
12  can we do to solve this problem? You winding up in
13  jail someplace, that's not going to help.
14       MR. PHEBUS: Okay. Mr. Thorne, you
15  and Mr. St. Clair were here on another appeal. In
16  your guys' order you guys had wrote 'cause again it
17  was about due process and that I had said that I
18  wasn't getting due process of the law. Well, I'm
19  not.
20       I feel I'm not getting due process
21  under the law because of the disenrollment and how
22  it affects me in the court system here. It does
23  affect me. As a subordinate organization this
24  Court is not Las Vegas Paiute but you guys allow it
25  to make a certificate of Indian blood for me and be

Page 40

1  used against me, then isn't that -- in my appeals I
2  had wrote a misrepresentation of the Tribe's
3  constitution and bylaws where the tribal council
4  and the judge believe that tribal council is the
5  supreme court but it's not like that.
6       In here you write according to the
7  1970 constitution and bylaws that they have the
8  right to do that. These guys weren't even tribal
9  members in 1970. There's no way they can use it
10  they weren't members of the tribe which I tried to
11  show you but when they're allowed to misrepresent
12  that constitution and bylaws, it affects me here.
13  When this -- I'm trying to prove that I'm a Las
14  Vegas Paiute but yet the Court is telling me that
15  no, I'm not. And I get angry over it.
16       JUDGE THORNE: Although I think the
17  Court said as far as the Court's concerned you
18  are. That was the appellate decision was the
19  disenrollments were wrong that you are a member so
20  it's not the Court that's saying you're not.
21       MR. PHEBUS: Okay. Well, the way I
22  handle the certificate of Indian blood at Indian
23  health was wrong. I did apologize to the judge and
24  he did feel it wasn't enough but, you know, what
25  can I do now because the certificate of blood has

Page 41

1 already been made. It was made long, way before
2 this instance. It was made back when I was put --
3 history about the certificate -- this is about my
4 charge. It's not the certificate of Indian blood,
5 right?
6         JUDGE THORNE: That's right. We
7 believe you about the certificate.
8         MR. PHEBUS: Again, I did come into
9 this -- I came into the office twice, once when he
10 was speaking with Belcher again asking him about
11 helping me get some paperwork from Colvin because
12 Colvin wouldn't cooperate with me and then I did
13 get upset with him like I have many times before
14 and stormed out of this office and I did say, what
15 if I had thrown a rock through your window. Okay?
16        Days later I did come back when
17 Belcher wasn't here. I didn't -- shouldn't have
18 done that. I apologized for that in court. But I
19 didn't do it. They gave me 30 days until my court
20 date and no incidents had happened. I didn't mean
21 to say that and I wasn't going to carry through on
22 that but it happened and six months I don't think
23 was right.
24        JUDGE THORNE: So let me make sure
25 that I'm understanding what you're saying. You

Page 42

1 said the words but you didn't mean it as a threat.
2 It was just an expression of anger.
3         MR. PHEBUS: That's right. I did walk
4 into the office because at the door of me on video
5 as they say with a rock in my hand. That rock
6 wasn't just a plain rock. It had the certificate
7 of Indian blood, the one that Belcher made that was
8 in my medical file because that's where I just came
9 from to get a copy of that certificate of Indian
10 blood and I had it notarized by equity health.
11        They were wrapped together and I had
12 came in and that's when I said this is for Belcher
13 and that was it and walked out and nobody, and the
14 Tribe's testimony that included influence, improper
15 influence in official matters is I didn't stop or
16 delay anybody's work. I didn't. It didn't harm
17 anybody. It didn't stop anybody from doing their
18 work. Like I said, they went over a month until I
19 went to court until the judge put me in jail.
20        JUDGE THORNE: Do you have any other
21 questions for Mr. Phebus?
22        JUDGE ABINANTI: No.
23        JUDGE THORNE: John.
24        JUDGE ST. CLAIR: Mr. Phebus, you
25 know, I sympathize with your position on the

Page 43

1 enrollment. Our tribe had the same problem not
2 with disenrollment but with enrollment. A mom was
3 married to someone on the outside. Her children
4 weren't eligible. The tribal court rules in her
5 favor and the tribal council won't enforce it so,
6 you know, it's a familiar problem that, you know,
7 we know about and we're aware of and so I
8 sympathize with your position, and where you're
9 getting off track is your way of trying to solve
10 that and it's not going to matter.
11        I mean if you break the law, you'll be
12 prosecuted whether it's by the Tribe here or by the
13 people that took that other lead. You know, there
14 will be prosecution someplace so that's not going
15 to help you at all. It's going to hurt you.
16        So you're just going to have to find
17 some way maybe politically with organizing people,
18 doing something to try to get your problem solved
19 because, yeah, it's inconsistent, you know.
20        As lawyers we know about criminal
21 jurisdiction, civil jurisdiction. The lay people
22 don't quite know it that well. How can they say
23 I'm not an Indian yet they're prosecuting me.
24 That's kind of what I get out of your brief. So I
25 guess my suggestion to you is just for you to think

Page 44

1 of ways to proceed without crossing that line.
2         JUDGE THORNE: Counsel.
3         MR. MURCH: I do have the brief. If I
4 could address two points before we talk about the
5 brief. Your Honor mentioned kind of an important
6 civil discourse in terms of protesting the
7 disenrollment. That's something that Mr. Phebus
8 has to figure out. He hasn't figured it out yet.
9 It has been ongoing and I'm sure a frustrating
10 process for him.
11        I can't comment on that, but I can say
12 that there are better ways to do things than to
13 threaten people with a rock and when the behavior
14 is such that the Tribe takes notice and prosecutes
15 his criminal behavior and the tribal court judge
16 has heard everything and there wasn't, it wasn't
17 about an expression of anger.
18        The evidence showed that it was a
19 threat, then that is sufficient to satisfy the
20 elements of crime so I think there's enough here
21 that we don't need to overturn the decision to get
22 to the jurisdictional argument.
23        I do have the brief if I can
24 approach. This is from the-- I think we submitted
25 this in October 2011. The Court had asked us to

Page 45

1  address the jurisdictional evidence because
2  Mr. Phebus got --
3          JUDGE ABINANTI:  Could you give us
4  just a second to read it.
5          MR. MURCH:  Sure.
6          (Pause in proceedings.)
7          JUDGE THORNE:  We have a recollection
8  of a case but we can't pull up the site where
9  recently the federal court has said before they can
10 prosecute under -- they cannot without proof of
11 enrollment.
12         JUDGE THORNE:  That's certainly what
13 it used as well in our context like the Indian
14 Child Welfare Act and so forth.
15         MR. MURCH:  I think the federal
16 court -- and I don't want to add fuel to the fire
17 here.
18         JUDGE THORNE:  We can't remember the
19 site.
20         MR. MURCH:  I think the federal court
21 has jurisdiction over certain offenses which
22 Indians or tribal members as the case may be and
23 doesn't have jurisdictions over other people who
24 belong to certain groups but in the case the
25 supreme court has said that in Lara that the --

Page 46

1  authorizes Congress to permit tribes -- exercised
2  its tribal authority to -- 25 USC 1301(2).
3          JUDGE ABINANTI:  Nonmember Indians are
4  members somewhere else; is that correct?
5          MR. MURCH:  I believe that is the way
6  that's interpreted.
7          JUDGE ST. CLAIR:  That was the fact of
8  the case, wasn't it?
9          MR. MURCH:  I don't know that's the
10 fact of the case.
11         JUDGE ABINANTI:  He was a member of
12 the tribe.
13         MR. MURCH:  I don't know that's the
14 fact of the case.
15         JUDGE ST. CLAIR:  I do.
16         MR. MURCH:  My interpretation of that,
17 and I could be wrong, is my interpretation is
18 nonmember Indian that's why they go through the
19 analysis.  The analysis was cut off at tribal
20 member then they would say nonmember Indians who
21 are members of another tribe and they said
22 nonmember Indians and they go through the analysis
23 of what is an Indian, not necessarily somebody who
24 is just a member of a recognized tribe.
25         Do they hold themselves out as a

Page 47

1  Indian?  Do they identify themselves as an Indian?
2  They wouldn't have to go through that test if he
3  had a piece of paper that says I'm a member of a
4  tribe.  They wouldn't have to do that analysis.
5          My argument is going to be nonmember
6  Indians means you do that analysis to figure out if
7  somebody is an Indian and if they are regardless if
8  they're a member of a federally recognized tribe
9  the Tribe has authority to prosecute them.
10         JUDGE THORNE:  Okay.  Thank you.
11 Anything else, counsel?  I'm not suggesting -- I
12 just want to make sure I don't cut you off.
13         MR. MURCH:  You haven't cut me off,
14 but I'll think of it as you leave.
15         JUDGE THORNE:  Mr. Phebus, anything
16 else you would to say?
17         MR. PHEBUS:  In his brief he defines
18 my mom as three-eighths Indian and that's according
19 to Tribe's reference and stuff?  Okay.  And this is
20 being justify Bruce and my prosecution in this
21 court.  Well, when this disenrollment started in
22 1999 there was a casualty, there's another incident
23 that resulted from the disenrollment square where
24 two tribal members one who was a council member and
25 a police chief and one was just a tribal member,

Page 48

1  well, said -- in this incident I have brought in my
2  little brief to you because where I feel that the
3  judge and the prosecuting attorney and the Tribe's
4  attorney take a -- their positions are for
5  convenience.
6          I wrote it like I said when he made
7  reference to my mom's blood quantum and my native
8  status this one incident where the police chief had
9  got a court order to the judge to kick in the door
10 and retrieve all the property -- okay? -- well,
11 that person whose door was kicked in by the police
12 chief had filed charges against the police chief
13 and the Tribe -- okay? -- and in the court between
14 a judge and the prosecuting attorney the
15 prosecuting attorney of that case 'cause I got them
16 right here wasn't the prosecuting attorney took the
17 defense of the tribe, of the police chief and --
18 okay? -- took the defense of the police chief and
19 was able to defend the police chief because she was
20 a tribal member but yet he's going against my mom
21 as a tribal member putting information against
22 her.
23         When this case had appeared what was
24 discovered with they kicked in that door of that
25 person's house was that that person had collected a

Page 49

1  bunch of information in reference to that person's
2  native status that they were not family members
3  which actually meant they shouldn't have been
4  enrolled. What the judge allowed and by letting
5  the prosecuting attorney defend that person, the
6  judge had allowed them to resolve that case out of
7  court but that don't happen here.
8           He gets to make reference to my
9  family's status but yet when it comes to somebody
10 else's court case it was just, that's where I get
11 the -- from. Okay? And the same with, when that
12 judge quit, another judge came named Greg Koppe.
13          I'm upset because again the police
14 chief's allowed to get the certificate of Indian
15 blood and say that the judge let him. Well, we
16 have another judge who wrote a letter saying that
17 enrollment files have been removed and tampered
18 with. How can he make the certificate of Indian
19 blood after a judge had wrote that and it affects
20 me in court -- and, well, that's it.
21          JUDGE THORNE: Okay.
22          MR. PHEBUS: But, again, I just don't
23 feel that he should be allowed to prosecute or to
24 make reference using Bruce because it's not being
25 used fairly. Bruce would show how wrong everybody

Page 50

1  else's enrollment is around here but it's only
2  being used to convict me and to justify their
3  convictions and I don't think it's fair.
4           JUDGE THORNE: Okay. We'll take the
5  matter under advisement. Give us a few moments to
6  see if we can reach an agreement among us. If so,
7  we'll come back and let you know what the decision
8  is. If we can't reach an agreement, then we have
9  to prolong the discussion and issue something more
10 detailed in writing so give us just a few moments.
11 Walk outside, get some fresh air. We'll send
12 Mr. Franklin after you if we're able to reach each
13 an agreement. Thank you.
14          Court will be in recess.
15          (Whereupon a recess was
16          taken at 3:09 p.m. and
17          the proceedings resumed
18          at 3:24 p.m.)
19          JUDGE THORNE: On behalf of the panel
20 let me tell you first thank you for the help that
21 you've given us. This is a relatively difficult
22 issue to try and sort through. There are certainly
23 legal complications. There are practical
24 complications and we are experienced enough in
25 tribal court matters to understand that we really

Page 51

1  have to try to blend those together.
2           I want to thank you for the initial
3  brief that you filed with all of your help on the
4  supplemental as well.
5           We're going to issue an oral decision
6  this afternoon. We're going to follow it up in a
7  couple of weeks with a more detailed written
8  decision.
9           The essence of our opinion is that
10 we're going to hold that the Tribe does not have
11 authority to prosecute a nonmember, non-enrolled
12 Indian for a criminal offense based on supreme
13 court precedent as modified by federal especially
14 the Duro case so to the extent that the Tribe is or
15 may be the supreme court of the, the tribal council
16 is the supreme court for the final decision on
17 legal matters to the extent that they consider
18 Mr. Phebus not an enrolled member, they forego the
19 ability to prosecute him criminally.
20          Mr. Phebus, what that means, though,
21 is that if you choose to conduct yourself the way
22 you did on that day, understand that that may well
23 be that certainly is the classic disturbing the
24 peace kind of thing. I think there may be an open
25 question whether or not that's a threat.

Page 52

1           Under the tribal court there clearly
2  is a violation of conduct that would subject you to
3  prosecution. You may get prosecuted in the city or
4  the county and face penalties there and with
5  appellate opportunities that you don't have here.
6           There you may be required to follow a
7  much more formal procedure. They may not interpret
8  a letter as an appeal so it will be much more
9  difficult for you if you should end up in that
10 system and I think the panel has tried to tell you
11 before, you have to figure out a way. Anger isn't
12 going to solve it for you even when you're right.
13          But we're going to reverse the
14 conviction, absolve the jail sentence until such
15 time as the Tribe chooses to enroll you as a member
16 at which time they then are allowed to prosecute
17 you. Or if you should become a member of another
18 tribe, they can prosecute you for criminal conduct
19 but under supreme court precedent the Tribe is not
20 allowed to prosecute in our minds a nonmember of a
21 tribe or at least someone who is not a member of
22 another tribe.
23          The federal court precedence that
24 deals with unenrolled Indians tends to deal with
25 benefits, health benefits, or qualifications under

Page 53

1  specific federal criminal statutes but that has not
2  been extended to tribes that we know of. We
3  certainly could be wrong but that's our decision
4  and we'll follow it up with a written order from
5  there.
6       JUDGE ABINANTI: I would like to say a
7  couple things. One is that I do believe that the
8  chief is trying to help you with that certificate,
9  that he was trying to help you because of the
10  health issues because you are qualified to receive
11  health benefits, and I think he was trying to do a
12  good deed and it kind of took off on its own, and
13  you need to be careful about perceiving things as
14  an attack which they're not meant to be.
15       I think he was from everything I read
16  trying to do something for you, and I did know from
17  my own personal experience that those certificates
18  are problematic. I have a brother. We have the
19  same parents and we have different CIBs which as I
20  understand science which is theoretically and
21  practically impossible but there you have it, you
22  know, so he didn't do that or cause that.
23       He was trying to do something kind and
24  got himself caught up in something. How you
25  conducted yourself here today led me to believe

Page 54

1  that you do know how to conduct yourself. You do
2  have proper home training. You know better. I
3  don't know how else to say it, you know, and you've
4  got to do better.
5       MR. PHEBUS: Yes, I know.
6       JUDGE ABINANTI: And if you don't, I
7  think you're going to find yourself running afoul
8  of the state courts and they're just going to
9  process you like you were, you know what's going to
10  happen.
11       JUDGE THORNE: They're just going to
12  use you like a number. They're not going to worry
13  about you as an individual so be careful.
14       JUDGE ABINANTI: Yes, be careful.
15       JUDGE ST. CLAIR: The other grounds
16  for the decision is that the tribal code here does
17  not specifically say or define what the
18  jurisdiction, criminal jurisdiction is.
19       JUDGE THORNE: Yes. The code
20  specifically or at least does not specifically say
21  that it's limited to tribal members or who and
22  again based on federal supreme court precedent and
23  the jurisdiction modifications that were made by
24  Congress after the Duro case led us to conclude
25  that we have to read it into it limitation on the

Page 55

1  tribal members or members of other Indian tribes.
2       MR. MURCH: If I could address the
3  Court briefly.
4       JUDGE THORNE: You need clarification.
5       MR. MURCH: Clarification and a point
6  to make. My legal career is relatively short. I
7  was a teacher in the past life and it has been one
8  of the highlights of my seven-year legal career. I
9  appreciate the opportunity to appear in front of
10  all of you. I appreciate the Court's decision. I
11  just want a clarification in case we end up back in
12  here with Mr. Phebus on the issue of the Court. I
13  understand the Court's ruling to mean criminal
14  jurisdiction. There's a provision in the code that
15  relates to --
16       JUDGE THORNE: We're not trying to
17  preclude that at all. It's limited to just they
18  cannot prosecute him criminally as a tribal member
19  or member of another Indian tribe. It can in no
20  way limit powers of exclusion, other kind of
21  remedies that are available for any person who
22  violates the peace and order of the community.
23       MR. MURCH: Thank you.
24       MR. PHEBUS: Thank you.
25

Page 56

1            REPORTER'S CERTIFICATE
2
3
   STATE OF NEVADA          )
4                           ) ss
5  COUNTY OF CLARK          )
6       I, Cheryl Gardner, RMR-RPR, CCR 230,
7  do hereby certify that I took down in Stenotype all
8  of the proceedings had in the before-entitled
9  matter at the time and place indicated and that
10  thereafter said shorthand notes were transcribed
11  into typewriting by me and that the foregoing
12  transcript constitutes a full, true, and accurate
13  record of the proceedings had.
14       IN WITNESS WHEREOF, I have hereunto
15  set my hand and affixed my signature in the County
16  of Clark, State of Nevada, this 28th day of May,
17  2013.
18
19
20
21
22            /s/ Cheryl Gardner
23            CHERYL GARDNER, RMR-RPR, CCR 230
24
25

**–'–**

'til [1]    34:8

**– – –**

-oOo [2] 1:5        2:3

**–/–**

/s/ [1]    56:22

**–1–**

10 [1]      27:4
13 [1]     4:25
1301 [1] 46:2
15 [2]     11:1      11:4
17 [2]     1:17      2:1
19 [2]     11:1      11:2
1940 [2] 30:22    32:11
1970 [2] 40:7     40:9
1973 [1] 4:11
1983 [1] 4:13
1997 [1] 4:17
1999 [2] 31:1     47:22

**–2–**

2 [1]       46:2
2.3 [1]    4:19
20 [1]     3:23
2002 [1] 21:19
2004 [1] 21:19
2011 [1] 44:25
2013 [1] 3:17      2:1
56:17
230 [3]   1:25      56:6
56:23
25 [1]      46:2
28th [1]  56:16
2:00 [1]   1:18      2:2

**–3–**

30 [3]      4:13      29:15
41:19
34 [1]      4:24
35 [2]      4:19      4:19
37 [2]      27:1      27:4
3:09 [1]   50:16
3:24 [1]   50:18

**–5–**

50 [1]      3:23

**–6–**

6 [1]        11:5

**–7–**

72-hour [1]        3:10

**–A–**

Abby [2]                   1:16
38:17
ability [3]                  9:7
37:21      51:19
Abinanti [25]          1:16
3:2        3:4        4:2
13:17     13:25     14:5
14:8      16:4       23:15
23:20     27:17     34:22
35:2      35:9       36:20
37:3      37:9       42:22
45:3      46:3       46:11
53:6      54:6       54:14
able [9]    7:9        9:1
15:1      16:18     19:3
37:1      37:3       48:19
50:12
absolutely [2]       38:17
38:22
absolve [1]           52:14
abuse [5]               5:15
20:14     20:16     20:20
31:15
accept [3]              30:2
31:9      33:11
according [1]        40:6
47:18
account [1]           9:23
accurate [2]         20:23
56:12
accusing [1]         11:11
acres [1]14:19
act [7]     3:8        12:16
13:5      13:5       13:6
24:21     45:14
add [2]    2:14       45:16
address [4]            5:12
44:4      45:1       55:2
addressed [1]       16:12
Addressing [1]    5:19
administrative [1]
3:20
admission [2]      10:16
11:15
admit [2]              10:22
10:23
admits [1]            17:9
admitted [2]          3:7
6:6
advisement [1]    50:5
affect [1]              39:23
affects [1]           39:22
40:12     49:19
affixed [1]           56:15
afford [1]             35:1
35:3
afoul [1]54:7
afternoon [5]        2:5
4:6        5:4        5:11
51:6
afterwards [2]     28:8

28:8
again [17]             6:8
12:22     15:15     16:17
16:22     17:12     29:20
30:2      33:17     33:18
36:7      39:16     41:8
41:10     49:13     49:22
54:22
against [6]           29:14
33:1      40:1       48:12
48:20     48:21
aggressive [1]    17:25
ago [2]    4:4        24:11
agree [3]27:12     34:3
38:25
agreed [2]             6:9
23:22
agreement [4]      3:19
50:6      50:8       50:13
agrees [1]            33:10
ahead [1]              5:10
ain't [1]30:13
air [1]     50:11
allow [1]              31:19
39:24
allowed [11]         30:4
31:12     36:19     38:12
40:11     49:4       49:6
49:14     49:23     52:16
52:20
allowing [1]        31:14
32:16
allows [1]            28:10
always [2]            14:20
30:2
amendment [1]    24:15
among [1]            50:6
amount [1]           36:2
analysis [8]         18:13
19:12     21:5       46:19
46:19     46:22     47:4
47:6
analyze [3]          20:25
21:2      21:2
Andre [1]             16:11
anger [5]             24:5
26:3      42:2       44:17
52:11
angry [10]             7:1
29:10     29:17     29:24
33:18     35:10     35:11
35:13     35:16     40:15
announce [1]       2:19
answer [7]             9:1
9:2        15:23     38:1
38:3      39:1       39:2
anticipate [1]      2:10
anybody's [1]     42:16
Anyway [1]         19:23
apologize [2]      13:22
40:23
apologized [2]    30:1
41:18
appeal [5]            1:10

11:25     18:23     39:15
52:8
appeals [3]            5:1
33:10     40:1
appear [1]            55:9
appearance [1]    5:2
APPEARANCES [1]
1:19
appeared [1]        48:23
appellate [9]         1:8
1:20      2:23       14:15
15:5      15:9       23:22
40:18     52:5
appendix [1]        11:1
applies [1]           13:10
appreciate [3]     27:24
55:9      55:10
appreciates [1]    38:1
approach [1]        44:23
44:24
appropriate [2]    18:2
18:2
appropriateness [1]
22:25
Arapaho [2]          4:9
4:20
area [1]    8:12
arenas [1]            37:19
argument [7]         2:9
15:19     16:18     17:21
22:20     44:22     47:5
arguments [1]       1:10
27:14
aside [1]36:23
asks [3]  7:17      11:5
33:5
aspect [4]            16:17
20:8      22:1       22:3
ass [1]     6:25
assault [1]           25:20
assimilated [1]    13:5
assume [1]           12:19
22:20
attack [1]             53:14
attorney [13]        11:8
19:22     31:10     35:1
35:3      36:7       36:10
48:3      48:4       48:14
48:15     48:16     49:5
authority [1]        46:2
47:9      51:11
authorizes [1]      46:1
available [1]        55:21
aware [1]             43:7
away [1]8:3

**–B–**

background [1]    22:24
based [3]              28:22
51:12     54:22
become [1]           52:17

before-entitled [1]
56:8
begin [1]               2:9
behalf [2]             36:10
50:19
behave [1]            24:20
behaving [1]        22:15
behavior [13]       15:14
17:25     22:6       22:10
22:18     23:9       23:16
23:17     25:8       28:4
28:7      44:13     44:15
behind [1]             15:4
Belcher [17]          7:17
7:18      11:6       17:16
18:17     18:25     19:6
20:2      29:6       29:13
29:21     34:9       36:16
41:10     41:17     42:7
42:12
believes [3]          20:2
25:9      25:22
belong [1]             45:24
bench [2]               3:7
3:13      26:7
benefit [2]            15:13
15:16
benefits [3]          52:25
52:25     53:11
better [1]             27:17
44:12     54:2       54:4
between [6]            3:20
27:8      29:24     31:24
34:13     48:13
beyond [4]             5:14
6:16      10:12     20:9
BIA [5]   19:3      19:4
19:6      20:5       29:24
bigger [1]            14:22
36:23
Bill [1]   4:22
bit [4]    2:11      5:1
14:22     23:9
blend [1]               51:1
blood [41]             7:12
11:11     11:21     12:4
18:17     18:18     18:21
19:1      19:5       19:9
19:13     29:18     29:22
30:24     30:25     31:3
31:5      31:7       31:7
31:9      31:13     31:20
32:4      32:12     32:17
32:19     32:19     32:21
32:22     33:2       33:20
34:16     39:25     40:22
40:25     41:4       42:7
42:10     48:7       49:15
49:19
boiling [1]           39:5
branch [1]            22:12
break [3]              25:12
31:18     43:11
breaking [1]         38:19
breaks [2]            30:20

30:21
**brief** [14]            10:13
  15:24   16:10   17:8
  30:4    31:4    31:17
  43:24   44:3    44:5
  44:23   47:17   48:2
  51:3
**briefed** [2]          15:25
  16:1
**briefly** [2]          7:25
  55:3
**bright** [2]           35:3
  35:18
**brother** [1]          53:18
**brought** [2]          5:6
  48:1
**Bruce** [20]           12:9
  12:13   12:13   16:14
  19:12   30:10   30:10
  30:20   31:11   31:19
  32:8    32:9    32:14
  32:17   32:18   32:20
  33:1    47:20   49:24
  49:25
**buddy** [1]            6:25
**bunch** [1]            49:1
**bylaws** [3]           40:3
  40:7    40:12

——————————
          **–C–**
——————————

**C** [1]                2:4
**CA13-001** [1]         1:1
**California** [2]       3:5
  4:23
**cannot** [3]           36:12
  45:10   55:18
**car** [1]              29:11
**care** [1]             19:3
**career** [2]           55:6
  55:8
**careful** [3]          53:13
  54:13   54:14
**carried** [1]          9:5
**carry** [2] 8:1        41:21
**case** [23] 1:1        10:9
  13:7    13:10   16:2
  16:14   19:11   20:6
  20:18   33:12   45:8
  45:22   45:24   46:8
  46:10   46:14   48:15
  48:23   49:6    49:10
  51:14   54:24   55:11
**cases** [2]            20:17
  20:19
**casualty** [1]         47:22
**caught** [2]           27:21
  53:24
**causes** [1]           3:11
  35:14
**CCR** [3] 1:25         56:6
  56:23
**census** [2]           30:22
  32:11
**central** [1]          4:9

**certain** [3]          8:17
  45:21   45:24
**certainly** [11]       6:3
  6:15    16:7    16:11
  17:10   17:13   27:7
  45:12   50:22   51:23
  53:3
**certificate** [28]     7:12
  11:11   11:21   12:4
  18:16   18:18   18:20
  19:1    19:5    19:9
  19:13   29:18   29:21
  33:2    33:19   34:16
  39:25   40:22   40:25
  41:3    41:4    41:7
  42:6    42:9    49:18
  49:18   53:8    56:1
**certificates** [1]     53:17
**certify** [1]          56:7
**CFR** [2] 3:16         4:14
**chair** [1] 24:10
**chance** [1]           2:14
**change** [3]           22:10
  22:12   22:25
**characterization** [2]
  6:11    23:4
**characterize** [1]
  20:11
**charge** [1]           41:4
**charged** [1]          38:19
**charges** [4]          29:14
  34:12   34:13   48:12
**Cheryl** [4]           1:24
  56:6    56:22   56:23
**chief** [35]           3:6
  3:19    4:8    4:12
  5:24    6:1    6:6
  6:12    7:8    7:17
  7:18    8:15   8:19
  10:22   11:6   11:6
  11:16   16:24  17:16
  18:1    18:7   18:17
  18:25   19:6   20:2
  23:12   36:17  47:25
  48:8    48:12  48:12
  48:17   48:18  48:19
  53:8
**chief's** [4]          8:3
  8:11    8:13   49:14
**Child** [1]            45:14
**children** [1]         43:3
**choose** [1]           51:21
**chooses** [1]          52:15
**chose** [1]            10:22
**CHRISTOPHER** [1]
  1:7
**CIBs** [1] 53:19
**circuit** [3]          13:8
  16:2    20:18
**circuits** [1]         20:19
**circumstances** [1]
  5:18
**citation** [1]         16:5
**cited** [1] 13:7

**city** [4]  16:19      16:19
  38:6    52:24
**civil** [3] 15:14      43:21
  44:6
**claims** [2]           19:16
  19:23
**Clair** [14]           1:16
  4:6    4:7    8:2
  8:7    14:11   26:25
  27:10   39:3   39:15
  42:24   46:7   46:15
  54:15
**clarification** [3]
  55:4    55:5    55:11
**Clark** [3]            2:1
  56:5    56:16
**classic** [1]          27:22
  51:23
**clear** [1] 21:11
**clearly** [4]          5:25
  22:9    23:20  52:1
**clerkship** [1]        5:7
**close** [1] 8:19
**Coast** [1]            4:23
**code** [10]            4:15
  13:14   13:23   14:7
  20:15   21:8   22:19
  54:16   54:19  55:14
**codes** [1]            10:8
**colleague** [1]        28:25
**collected** [1]        48:25
**colony** [1]           38:10
**Colvin** [7]           7:7
  18:10   41:11  41:12
**comment** [1]          44:11
**comments** [2]         28:8
  29:1
**committee** [1]        31:23
**communicate** [1]
  35:7
**community** [2] 26:3
  55:22
**complaint** [1]        29:13
  34:10   34:21
**complications** [2]
  50:23   50:24
**compromised** [1]
  37:21
**concerned** [1]        40:17
**concerns** [1]         22:21
**conclude** [1]         54:24
**conduct** [13]         7:24
  9:23    9:25   21:9
  21:20   22:25  24:3
  25:14   25:19  51:21
  52:2    52:18  54:1
**conducted** [1]        53:25
**confer** [1]           28:25
**confusing** [1]        23:16
**Congress** [1]         46:1
  54:24
**connected** [1]        9:15

**connection** [2]  6:14
  9:19
**consensus** [1]        2:17
**consider** [2]         22:18
  51:17
**constitutes** [1]      56:12
**constitution** [3]
  40:3    40:7    40:12
  39:5    39:20   39:24
  40:5    40:14   40:17
  40:20   41:18   41:19
  42:19   43:4    44:15
  44:25   45:9    45:16
  45:20   45:25   47:21
  48:9    48:13   49:7
  49:10   49:20   50:14
  50:25   51:13   51:15
  51:16   52:1    52:19
  52:23   54:22   55:3
  55:12
**contact** [1]          11:7
**contain** [1]          20:16
**contents** [1]         18:20
**context** [11]         6:23
  7:3    7:5    7:5
  13:11   15:14   24:1
  27:6    27:7    27:8
  45:13
**contexts** [1]         20:21
**continue** [1]         28:19
**continued** [1]        27:13
**continuous** [1]       21:12
**convenience** [1]
  48:5
**conversation** [1]
  23:12
**convict** [1]          50:2
**conviction** [6]       18:23
  25:18   25:20   28:11
  28:22   52:14
**convictions** [3] 25:19
  25:21   50:3
**cooperate** [1]        41:12
**cooperation** [1] 33:25
**copy** [1] 42:9
**correct** [9]          12:12
  15:22   17:16   20:24
  21:14   22:17   23:23
  27:12   46:4   46:4
**council** [17]         15:12
  24:23   25:4   25:9
  26:22   31:1   36:5
  36:6    36:11  36:13
  38:10   38:12  40:3
  40:4    43:5    47:24
  51:15
**counsel** [4]          5:2
  7:7    44:2    47:11
**county** [5]           2:1
  38:11   52:4   56:5
  56:15
**couple** [5]           3:12
  12:2    21:9    51:7
  53:7
**court** [98]           1:3
  2:21    2:23   3:7
  3:17    3:20   3:21
  3:22    4:9    4:13
  4:14    4:16   4:17
  4:25    5:8    5:11
  8:10    11:5   11:21
  12:5    12:18  12:19
  13:4    13:16  13:23
  14:1    14:12  14:13
  14:14   14:16  14:24
  15:3    15:5    15:10
  15:13   15:17  15:25

  16:3    16:16   16:25
  17:6    18:2    20:5
  20:13   20:23   20:24
  21:6    21:17   21:18
  22:13   24:23   25:1
  25:5    26:11   27:6
  28:9    30:1    30:3
  30:15   33:3    33:6
  33:10   34:6    35:22
  **Court's** [6]        13:14
  16:22   26:5    40:17
  55:10   55:13
**courts** [4]           12:25
  13:1    16:3    54:8
**cover** [1]            34:15
**covers** [1]           20:7
**create** [1]           27:20
**created** [2]          18:17
  22:12
**creation** [1]         20:4
**credit** [1]           24:18
**crime** [4]            5:13
  5:20    11:18   20:10
  28:6    44:20
**crimes** [4]           12:16
  13:5    13:5    13:6
**criminal** [13]        12:25
  13:2    14:2    24:1
  26:11   38:20   43:20
  44:15   51:12   52:18
  53:1    54:18   55:13
**criminally** [2]       51:19
  55:18
**crossing** [2]         35:7
  44:1
**cruel** [1] 5:16
**cut** [3]  46:19       47:12
  47:13

——————————
          **–D–**
——————————

**D** [1]                2:4
**date** [1] 41:20
**dates** [2] 34:13      34:19
**Dave** [4] 7:7         11:7
  18:7    18:9
**days** [3] 29:15       41:16
  41:19
**deal** [3]  18:8       26:10
  52:24
**deals** [1] 52:24
**decide** [1]           24:25
**decided** [1]          14:12
  14:25   34:12

CA13-001                     CondenseIt!™                     decision - grandma's
5/17/13

**decision** [13]        10:6
  16:11   18:5   33:10
  40:18   44:21   50:7
  51:5    51:8   51:16
  53:3    54:16  55:10
**decisions** [1]       14:12
**deed** [1]  53:12
**defend** [2]          48:19
  49:5
**defendant** [1]       14:9
**defense** [2]         48:17
  48:18
**define** [2]           13:8
  54:17
**defined** [1]         12:13
**defines** [1]         47:17
**definition** [2]      13:10
  20:16
**delay** [1]           42:16
**delivery** [1]        20:4
**demonstrating** [1]
  24:6
**department** [2]     23:10
  34:11
**depending** [1]      20:10
**descendants** [3]
  30:14   31:16  32:2
**described** [1]       17:19
**desk** [2]  8:3     8:11
**detailed** [2]        50:10
  51:7
**determination** [1]
  21:22
**determine** [1]      17:6
**determined** [1]     12:20
**different** [8]        2:11
  17:8   20:19  20:21
  21:10  21:10  26:13
  53:19
**differently** [1]     22:8
**difficult** [3]       36:25
  50:21   52:9
**difficulty** [1]      38:19
**direct** [2]           6:18
  11:15
**directed** [1]        18:1
**directly** [1]        10:11
**disagree** [1]        39:11
**discourse** [1]       44:6
**discovered** [1]      48:24
**discrepancy** [1] 19:23
**discretion** [4]       5:16
  20:14   20:17  20:20
**discuss** [1]         20:13
**discussed** [1]       19:25
**discussion** [3]     16:14
  16:16   50:9
**disenrolled** [2]     31:8
  31:24
**disenrollment** [19]
  11:23   15:2   15:4
  15:10   15:14  15:15

  22:2    23:19  24:17
  26:18   28:16  28:17
  28:20   38:9   39:21
  43:2    44:7   47:21
  47:23
**disenrollments** [1]
  30:21   30:22  36:12
  40:19
**disorderly** [1]      25:19
**dispatcher** [3]      7:16
  7:18   17:18
**displaying** [1]      24:4
**displeased** [1]      24:4
**displeasure** [2]     24:4
  24:17
**disregard** [3]       26:5
  26:6   26:6
**disturbing** [3]      25:14
  25:14   51:23
**documents** [2]      11:12
  36:19
**doesn't** [10]        10:2
  14:8   15:16  15:17
  20:16   22:11  32:3
  36:1   38:23  45:23
**done** [4]  25:7     25:9
  25:22   41:18
**door** [5]  28:18   42:4
  48:9   48:11  48:24
**doubt** [3]            5:14
  6:16   20:9
**down** [12]           11:13
  11:19   13:20  30:20
  30:21   31:16  31:19
  31:21   32:16  33:22
  39:6   56:7
**draft** [1]  4:15
**draw** [1]  24:8
**dry** [1]  34:24
**due** [4]  26:6       39:17
  39:18   39:20
**duration** [1]       35:24
**during** [1]          3:17
**Duro** [5] 12:24     12:25
  13:11   51:14  54:24
**duty** [2]  3:9      3:10

            -E-

**E** [2]      2:4     2:4
**e-mail** [1]         16:11
**easier** [1]         13:19
**Eastern** [2]         4:8
  4:21
**easy** [1]  38:4
**eighth** [2]         20:18
  31:14
**either** [4]          18:5
  18:21   26:4   39:1
**element** [3]         9:15
  16:24   18:4
**elements** [1]       5:13
  5:20   7:4   7:22
  7:24   11:18  20:10

  20:11   22:19  28:5
  44:20
**eligible** [1]        43:4
**employees** [1]      23:11
**encounters** [1]     21:13
  21:17
**end** [6]   27:9      36:1
  37:20   38:24  52:9
  55:11
**ended** [3]          29:18
  29:22   34:16
**enforce** [1]         43:5
**enforcement** [2]
  29:13   36:8
**engage** [1]         25:13
**enroll** [1]         52:15
**enrolled** [3]        3:4
  49:4   51:18
**enrollment** [10] 31:23
  33:9   36:18  38:22
  39:10   43:1   43:2
  45:11   49:17  50:1
**entire** [1]         21:24
**entirely** [1]       18:21
**enumerable** [1]     26:19
**enumerated** [1]     14:6
**equity** [3]         33:19
  33:23   42:10
**escalated** [1]       28:4
**escalation** [1]      9:25
**especially** [2]      35:9
  51:13
**ESQ** [2] 1:21        1:21
**essence** [1]         51:9
**establish** [1]       3:22
**everybody** [1]      49:25
**evidence** [4]       10:15
  27:11   44:18  45:1
**example** [1]        27:23
**examples** [1]       31:17
**exclusion** [1]      55:20
**excuse** [2]          8:2
  27:22
**exercised** [1]       46:1
**exhausted** [1]      25:2
**Exhibit** [1]        11:2
**exhibits** [1]       11:1
**experience** [1]     53:17
**experienced** [1] 50:24
**explain** [1]        36:15
**explained** [1]      18:25
**explicitly** [1]     18:15
**expressing** [1]     24:16
**expression** [2]     42:2
  44:17
**extended** [1]       53:2
**extensive** [1]      21:16
**extent** [2]         51:14
  51:17

            -F-

**face** [1]  52:4
**facility** [1]         19:4
**fact** [12] 9:23      17:23
  25:16   26:1   27:15
  28:5   28:6   28:22
  33:18   46:7   46:10
  46:14
**factors** [8]        12:14
  19:13   20:25  21:1
  21:2   21:3   21:4
  21:6
**facts** [1] 5:17
**fair** [4]  22:4      30:14
  39:6   50:3
**fairly** [6]           5:7
  5:23   20:22  30:11
  30:11   49:25
**fall** [1]  32:18
**false** [1] 11:12
**familiar** [5]        2:6
  8:11   13:10  15:3
  43:6
**family** [2]         31:18
  49:2
**family's** [1]       49:9
**far** [4]   8:2       9:4
  30:9   40:17
**favor** [1]           43:5
**federal** [14]       12:16
  12:18   12:19  12:24
  13:4   13:9   25:1
  45:9   45:15  45:20
  51:13   52:23  53:1
  54:22
**federally** [1]       47:8
**felt** [1]  8:17
**few** [6]   9:24      20:17
  23:13   24:11  50:5
  50:10
**fight** [1] 35:23
**figure** [10]         35:6
  35:20   36:1   37:6
  37:9   37:17  37:23
  44:8   47:6   52:11
**figured** [1]         44:8
**file** [4]  21:17     21:24
  34:12   42:8
**filed** [5] 23:14     29:13
  34:13   48:12  51:3
**files** [7] 29:19     29:16
  29:23   33:20  34:17
  36:18   49:17
**final** [1] 51:16
**findings** [1]       25:25
**fine** [1]  2:25
**fire** [1]  45:16
**first** [8]  2:12     3:3
  5:19   18:6   24:15
  34:2   35:18  50:20
**fishing** [1]         3:17
**five** [1]  26:12

**five-sixteenths** [1]
  19:17
**fix** [2]    22:5     38:13
**Floyd** [2]          1:21
  5:6
**follow** [2]          2:20
  7:15   8:18   8:21
  9:8   10:19  51:6
  52:6   53:4
**follow-up** [1]      29:16
**followed** [2]       12:25
  13:12
**forego** [1]         51:18
**foregoing** [1]      56:11
**formal** [1]         52:7
**forth** [2] 13:15     45:14
**fouled** [1]         36:22
**found** [2]          33:19
  34:9
**four** [2]  20:10     26:12
**Francisco** [3]       3:8
  3:12   3:18
**Franklin** [1]       50:12
**fresh** [2] 5:7       50:11
**FRIDAY** [2]         1:17
  2:1
**friend** [1]          6:24
**front** [5] 8:5       21:17
  28:23   36:12  55:9
**frustrating** [2]    38:1
  44:9
**fuel** [1]  45:16
**full** [1]  56:12
**future** [1]          9:10

            -G-

**G** [1]     2:4
**Gardner** [4]        1:24
  56:6   56:22  56:23
**general** [2]         7:7
  13:6
**generally** [1]      20:23
**generic** [1]        9:20
  12:10
**given** [13]          5:17
  17:23   20:15  22:4
  25:14   24:11  25:16
  25:23   26:19  26:24
  27:13   27:15  50:21
**giving** [1]         26:10
**goes** [5] 25:22      28:4
  28:5   28:6   37:11
**gone** [2] 8:13       21:5
**good** [7] 2:5       4:6
  5:4   5:11   10:25
  23:7   53:12
**graduate** [1]        4:1
  4:23
**graduated** [2]       4:3
  4:10
**grandma's** [1]      31:2

**CHERYL GARDNER, CCR 230, RPR, RMR**

grandmother [1]
   32:11
grandparents [1]
   30:24
Greg [1] 49:12
grounds [2]        22:21
   54:15
groups [1]         45:24
guess [3]          15:23
   22:21   43:25
guys [3] 39:16  39:24
   40:8
guys' [1]          39:16

**-H-**

halved [1]         31:3
hamstrung [1]    26:11
hand [2] 42:5    56:15
handle [1]         40:22
hanging [1]       34:24
harassing [1]     25:17
hard [2] 33:25   37:6
harm [13]          5:20
   6:18   6:20   7:21
   7:23   7:25   10:4
   10:5   17:5   17:7
   17:22   18:3   42:16
harmed [1]         8:20
haul [1] 37:10
head [1] 29:11
heading [1]        14:2
health [9]         7:11
   33:19   33:20   33:23
   40:23   42:10   52:25
   53:10   53:11
hear [2]  2:15     29:2
heard [2]          35:19
   44:16
hearing [3]        11:3
   24:20   27:9
hearings [1]       12:3
help [16] 6:16     7:3
   12:23   13:12   16:5
   25:3   30:17   36:14
   36:22   38:24   39:13
   43:15   50:20   51:3
   53:8   53:9
helped [1]         13:7
helping [1]        41:11
hereby [1]         56:7
hereunto [1]      56:14
herself [1]        3:3
hey [2]  16:20   28:13
higher [1]         35:22
highlights [1]    55:8
himself [4]       18:10
   27:18   34:15   53:24
history [12]       15:4
   18:25   21:16   25:17
   30:21   30:22   31:19
   31:21   31:22   31:24
   37:10   41:3

hit [1]    6:19
hold [2]  46:25   51:10
home [1]           54:2
HON [3]            1:15
   1:16   1:16
Honor [2]         21:15
   44:5
Hopefully [1]     2:17
house [1]         48:25
hurt [1] 43:15

**-I-**

identify [1]       47:1
immediately [2]
   9:8   10:19
imminence [1]    9:18
imminent [2]      10:3
   17:23
implied [1]       10:9
implies [2]        9:7
   9:14
important [5]     2:15
   21:7   21:8   21:25
   44:5
impossible [1]   53:21
impression [1]   10:7
improper [5]      5:13
   15:11   28:20   28:21
   42:14
incident [13]      11:4
   29:4   29:12   33:23
   34:1   34:2   34:9
   34:13   34:20   38:8
   47:22   48:1   48:8
incidents [1]     41:20
included [3]       12:2
   19:15   42:14
inconsistent [1]
   43:19
Indian [44]        5:10
   7:12   11:11   11:21
   12:9   12:10   12:13
   13:8   16:21   18:17
   18:18   18:21   19:1
   19:5   19:9   19:13
   29:18   29:22   30:12
   32:10   32:15   32:21
   33:2   33:20   34:16
   39:25   40:22   40:22
   41:4   42:7   42:9
   43:23   45:13   46:18
   46:23   47:1   47:1
   47:7   47:18   49:14
   49:18   51:12   55:1
   55:19
Indians [10]       13:6
   13:24   14:4   16:17
   45:22   46:3   46:20
   46:22   47:6   52:24
indicated [1]     56:9
individual [3]    6:21
   11:6   54:13
indulgence [1]   13:14
inferred [1]      10:1

influence [3]      5:13
   42:14   42:15
influencing [1]   18:5
information [4] 16:23
   34:5   48:21   49:1
initial [1]        51:2
inordinate [1]    36:2
inquiry [2]        9:3
   9:3
instance [2]      28:3
   41:2
instances [1]     17:8
instead [2]        7:1
   25:4
intent [2]         7:15
   9:7
intention [1]     2:18
interested [1]    13:18
interpret [1]     52:7
interpretation [2]
   46:16   46:17
interpreted [1]   46:6
interpreting [2] 9:17
   18:3
interrupt [1]     5:22
introduce [2]     2:8
   3:3
involved [1]      10:5
issue [26]         5:15
   5:19   10:11   11:22
   14:17   15:11   15:24
   16:12   17:15   18:8
   19:24   20:12   23:4
   23:25   24:15   27:15
   33:9   36:21   36:24
   36:25   37:14   37:15
   50:9   50:22   51:5
   55:12
issue's [1]       13:24
issues [4]         5:12
   11:24   28:16   53:10
itself [1] 10:17

**-J-**

J [1]      1:21
jail [22]  9:24    11:12
   15:21   16:20   17:24
   18:19   19:10   22:22
   23:8   25:11   26:14
   26:16   33:13   36:3
   37:7   38:6   38:11
   38:24   39:7   39:13
   42:19   52:14
John [4]  1:16     4:5
   4:7   42:23
joking [1]         6:24
judge [149]        2:5
   3:2   3:3   3:4
   3:6   3:9   3:16
   3:19   3:25   4:2
   4:5   4:6   4:8
   4:12   4:22   4:24
   5:9   5:22   6:8
   6:23   8:2   8:7

influence [3]
8:10    8:21    9:6
9:10    9:17    10:7
10:12   10:21   12:4
12:10   12:15   12:22
13:17   13:19   13:25
14:5    14:8    14:11
14:15   14:19   15:7
15:18   16:4    16:7
17:2    17:10   17:13
19:2    19:4    19:18
21:11   21:16   21:21
21:22   21:23   22:4
22:9    22:11   22:20
22:24   23:15   23:20
23:21   24:1    24:5
24:9    25:5    25:12
25:23   26:17   26:19
26:24   26:25   27:4
27:10   27:17   27:25
28:2    28:24   30:2
30:6    30:17   31:25
32:5    32:24   33:3
33:5    33:6    33:8
34:18   34:22   35:2
35:8    35:9    36:20
37:3    37:5    37:9
37:20   38:16   38:16
39:3    39:4    39:8
40:4    40:16   40:23
41:6    41:24   42:19
42:20   42:22   42:23
42:24   44:2    44:15
45:3    45:7    45:12
45:18   46:3    46:7
46:11   46:15   47:10
47:15   48:3    48:9
48:14   49:4    49:6
49:12   49:12   49:15
49:16   49:19   49:21
50:4    50:19   53:6
54:6    54:11   54:14
54:15   54:19   55:4
55:16
judge's [2]        5:16
   20:14
judges [2]        22:10
   25:6
judicial [1]       3:18
jurisdiction [24]
   12:6   12:21   13:1
   13:2   13:6   13:15
   13:24   14:2   14:3
   14:19   14:24   16:10
   16:16   16:21   18:22
   20:5   30:3   43:21
   43:21   45:21   54:18
   54:18   54:23   55:14
jurisdictional [3]
   22:1   44:22   45:1
jurisdictions [3]
   45:23
justified [1]     38:21
justify [2]       47:20
   50:2

**-K-**

kept [1] 26:17
kick [1]  6:25    48:9

kicked [3]         38:7
   48:11   48:24
kind [7] 36:20   43:24
   44:5   51:24   53:12
   53:23   55:20
knew [2]           22:24
   22:24
knows [1]          8:12
Koppe [1]         49:12

**-L-**

landed [1]        33:13
Lara [1] 45:25
Las [11]  1:3      1:10
   2:1   5:10     16:19
   16:19   31:20   38:6
   38:14   39:24   40:13
last [6]  3:12     4:25
   18:4   37:12   37:13
   37:17
late [1]  34:21
laughing [1]      6:24
law [12] 4:15     4:24
   9:7   10:9     16:2
   22:11   29:12   38:16
   38:20   39:18   39:21
   43:11
laws [1] 9:18
lawyers [1]       43:20
lay [1]  43:21
lead [1]  43:13
least [8] 9:8      9:19
   13:1   17:7    23:22
   25:1   52:21   54:20
leave [1] 47:14
led [2]  53:25    54:24
left [1]  8:14
legal [6]  17:11   17:15
   50:23   51:17   55:6
   55:8
legislation [1]   12:24
   13:11
legislative [1]   22:12
less [4]  3:23     17:25
   19:18   23:9
letter [3] 39:5   49:16
   52:8
letting [1]        49:4
life [1]  55:7
lift [2]  25:5     26:22
limit [1] 55:20
limitation [1]    54:25
limited [2]       54:21
   55:17
limits [1]        30:7
line [6]  11:5     25:23
   27:4   35:7    35:14
   44:1
list [1]  12:14
listen [2]        31:25
   39:9
listening [1]     26:21

location [1]         8:11
logical [2]         17:11
17:14
longer [1]         31:12
look [5]  14:22    20:24
21:9   22:18   37:10
looked [1]         14:3
20:18   21:6
looking [2]         21:19
21:21
lowered [1]         31:4

-M-

major [1]         12:15
13:5   37:15
makes [4]         25:25
32:9   36:11   36:14
man [5]  19:7   20:3
29:21   35:3   35:18
management [1]
26:3
manifests [1]         7:15
manner [2]         6:24
24:21
married [1]         43:3
match [1]         34:19
math [1] 19:22
matter [2]         5:9
43:10   50:5   56:9
matters [4]         5:14
42:15   50:25   51:17
may [16] 1:17    2:1
2:6    8:9    9:1
30:11   30:12   37:5
45:22   51:15   51:22
51:24   52:3   52:6
52:7   56:16
mean [7]         8:22
29:17   35:10   41:20
42:1   43:11   55:13
meaning [1]         11:7
means [3]         28:21
47:6   51:20
meant [1]         13:8
49:3   53:14
meantime [1]         29:15
medical [6]         19:3
29:19   29:23   33:20
34:17   42:8
meet [1] 36:6
Melissa [1]         16:9
member [27]         3:5
12:7   12:11   14:25
15:20   30:13   30:14
31:13   32:2   32:18
38:10   40:19   46:11
46:20   46:24   47:3
47:8   47:24   47:25
48:20   48:21   51:18
52:15   52:17   52:21
55:18   55:19
members [15]         2:7
13:2   13:3   26:8
31:16   40:9   40:10

45:22   46:4    46:21
47:24   49:2    54:21
55:1   55:1
membership [1]
30:23
memberships [1]
30:16
mentioned [4]   14:11
16:13   28:7   44:5
mentions [2]   31:5
31:7
message [1]   28:12
met [4]  5:14   7:25
22:19   28:5
method [1]   4:7
Mexico [1]   4:3
middle [4]   18:11
19:7   20:3   29:21
might [2]   23:16
33:14
miles [1]   4:19
4:20
million [2]   4:19
35:5
minds [1]   52:20
misrepresent [1]
40:11
misrepresentation [1]
40:2
missing [2]   29:19
33:21
Miwok [1]   4:23
modifications [1]
54:23
modified [1]   51:13
mom [2] 43:2   47:18
48:20
mom's [1]   30:25
31:2   48:7
moment [1]   13:17
28:25
moments [2]   50:5
50:10
month [1]   42:18
months [8]   2:21
22:22   23:1   23:13
26:15   26:24   31:23
41:22
most [4] 9:17   10:7
21:8   33:13
mother [1]   35:4
MS [1]   5:11
Murch [59]   1:21
2:25   5:4   5:5
5:11   6:2   6:17
7:4   8:4   8:9
8:25   9:9   9:14
9:22   10:10   10:14
10:25   12:8   12:12
12:18   13:13   13:22
14:1   14:6   14:10
14:14   14:17   14:21
15:9   15:22   16:6
16:9   17:4   17:12

17:16   19:19   19:21
21:14   22:17   23:13
23:18   23:23   24:9
27:3   27:5   27:12
27:24   44:3   45:5
45:15   45:20   46:5
46:9   46:13   46:16
47:13   55:2   55:5
55:23

-N-

N [1]   2:4
name [3]   4:7
5:4   38:14
named [1]   49:12
native [2]   48:7
49:2
necessarily [2]  6:15
46:23
need [16]   2:15
6:16   6:18   6:19
7:6   9:4   12:22
13:21   22:11   24:22
29:2   30:8   33:12
44:21   53:13   55:4
needed [2]   10:18
34:6
needs [2]   11:10
17:22
Nevada [4]   5:8
38:25   56:4   56:16
New [1]   4:3
next [8]  7:14   7:19
8:4   9:12   16:24
22:7   23:7   26:4
ninth [1] 13:8
nobody [1]   42:13
nobody's [1]   37:8
non-enrolled [1]
51:11
non-Indian [1]  38:11
nonmember [7]  46:3
46:18   46:20   46:22
47:5   51:11   52:20
nonviolent [2]  22:22
23:1   23:4
North [1]   16:19
38:6
northern [5]   3:5
4:9   4:20   4:23
38:25
notarized [1]   42:10
notes [1]   56:10
nothing [1]   33:4
notice [1]   44:14
now [12] 4:13   4:25
10:4   11:4   13:4
16:12   20:15   28:23
29:3   30:12   38:9
40:25
number [6]   3:13
8:16   20:11   25:25
37:16   54:12
NV [1]   2:1

-O-

O [1]   2:4
occasion [2]   23:24
25:2
occasions [3]   8:16
12:20   26:13
October [1]   44:25
off [7]   5:7   24:13
43:9   46:19   47:12
47:13   53:12
offense [5]   22:22
23:1   23:5   33:13
51:12
offenses [1]   45:21
offered [1]   25:5
office [10]   3:20
5:6   6:2   7:11
8:13   16:6   29:9
41:9   41:14   42:4
officer [1]   2:15
34:1
officers [1]   33:22
official [2]   5:14
42:15
once [2] 33:18   41:9
one [24]  11:18   13:14
16:1   16:2   17:11
18:6   20:22   21:1
22:21   23:22   23:24
24:13   24:14   25:1
26:4   32:16   33:22
38:9   42:7   47:24
47:25   48:8   53:7
55:7
ongoing [4]   3:22
12:1   36:24   44:9
open [1] 51:24
opening [1]   28:18
opinion [3]   2:19
2:22   51:9
opportunities [2]
26:20   52:5
opportunity [5] 9:8
22:5   24:11   24:12
55:9
opposed [4]   9:11
12:11   12:17   22:15
oral [1]   51:5
orally [1]   2:19
order [17]   2:20
4:15   7:6   11:8
15:5   15:10   18:6
18:18   25:25   26:5
26:22   33:3   33:6
39:16   48:9   50:4
55:22
ordered [1]   19:2
orders [1]   25:6
organization [1]
39:23
organizing [1]  43:17
originally [2]   4:14
11:9

outrageous [1]  23:16
outside [1]   8:9
11:25   43:3   50:11
Overlapping [1]
19:20
overreacted [1] 26:21
overturn [1]   44:21
overturned [1]  28:22
overturns [1]   28:10
own [3]  10:15   53:12
53:17

-P-

P [1]   2:4
p.m [4]   1:18   2:2
50:16   50:18
page [4]  11:1   11:4
27:1   27:4
Paiute [1]   1:3
1:10   5:10   19:16
31:20   32:13   38:14
39:24   40:14
panel [1]   2:7
2:13   23:22   28:23
37:13   50:19   52:10
paper [2]   20:3
47:3
papers [1]   19:15
paperwork [7]  29:23
33:4   33:21   34:7
34:11   36:6   41:11
paragraph [1]  11:17
18:16
parents [1]   18:14
part [5]  11:25   18:14
19:14   27:10   39:10
party [1]38:8
past [7]  7:23   8:12
8:13   9:22   9:25
14:12   55:7
Patrick [2]   1:21
5:5
pattern [1]   27:16
Pause [1]   45:6
pay [1]   19:6
peace [2]   51:24
55:22
penalties [1]   52:4
people [13]   2:21
25:8   25:17   25:21
28:14   28:19   37:17
38:9   43:13   43:17
43:21   44:13   45:23
people's [1]   22:10
perceiving [1]  53:13
period [1]   10:5
permission [1]  33:6
permit [1]   46:1
person [9]   1:20
19:8   24:25   37:18
38:11   48:11   48:25
49:5   55:21

person's [2]        48:25
  49:1
personal [2]        27:19
  53:17
persuade [1]        28:19
pertaining [1]      11:24
petition [1]        23:13
Phebus [68]          1:7
  2:14    3:1    5:9
  6:5     7:5    8:17
  9:1     9:23   11:5
  11:8    11:16  11:20
  12:1    12:6   12:21
  14:23   15:11  16:18
  17:18   17:23  18:15
  19:2    19:7   19:9
  19:14   21:16  22:5
  22:24   23:18  24:16
  25:11   25:17  26:10
  26:20   28:12  28:18
  29:1    29:1   29:3
  30:9    30:20  32:8
  32:25   33:16  34:19
  34:25   36:4   37:2
  38:5    38:16  39:7
  39:14   40:21  41:8
  42:3    42:21  42:24
  44:7    45:2   47:15
  47:17   49:22  51:18
  51:20   54:5   55:12
  55:24
Phebus's [4]        10:15
  15:4    27:6   27:13
picture [1]         14:23
piece [2] 20:3      47:3
place [1]           56:9
plain [1] 42:6
plight [1]          28:15
point [5] 16:22     28:1
  32:6    36:21  55:5
points [1]          44:4
police [14]         23:10
  26:8    33:22  34:1
  34:11   36:17  47:25
  48:8    48:11  48:12
  48:17   48:18  48:19
  49:13
political [8]       35:23
  36:25   37:14  37:15
  37:18   37:23  37:24
  38:23
politically [1]     43:17
Politics [2]        37:4
  37:11
Pomo [1]            4:22
position [4]        27:18
  35:15   42:25  43:8
positions [1]       48:4
possible [2]        24:13
  24:14
Possibly [1]        23:23
powers [1]          55:20
practical [2]       17:14
  50:23
practically [1]     53:21

precedence [1]      52:23
precedent [3]       51:13
  52:19   54:22
preclude [1]        55:17
present [1]         27:18
presentation [1]
  27:6
presenting [1]      7:16
previous [1]        34:7
previously [2]      29:6
  30:13
prison [1]          19:4
probable [1]        3:11
problem [13]        17:11
  17:14   23:18  30:10
  35:14   35:17  37:11
  37:18   38:4   39:12
  43:1    43:6   43:18
problematic [1] 53:18
problems [2]        38:23
  38:23
procedure [1]       52:7
proceed [1]         44:1
proceeding [1]      2:10
proceedings [4] 45:6
  50:17   56:8   56:13
process [8]         2:24
  12:23   26:6   39:17
  39:18   39:20  44:10
  54:9
producing [1]       34:15
prolong [1]         50:9
proof [1]           45:10
proper [3]          1:20
  9:2     54:2
properly [1]        22:16
property [1]        48:10
prosecute [10]      32:20
  45:10   47:9   49:23
  51:11   51:19  52:16
  52:18   52:20  55:18
prosecuted [2]      43:12
  52:3
prosecutes [2]      32:1
  44:14
prosecuting [7] 31:10
  43:23   48:3   48:14
  48:15   48:16  49:5
prosecution [6] 12:16
  12:17   12:19  43:14
  47:20   52:3
prosecutions [1]
  13:9
prosecutor [3]      2:12
  5:5     23:25
protesting [1]      44:6
prove [2]           30:16
  40:13
proved [1]          20:9
proven [1]          23:10
provision [1]       55:14
public [1]          5:17
  7:23    16:25  36:17

pull [1]   45:8
punch [1]           7:2
punishment [1] 5:17
purpose [3]         15:13
  18:5    18:22
purposes [2]        13:9
  15:17   18:22
pursuant [1]        12:8
  13:4
put [12]   11:12   16:20
  18:18   21:1   21:3
  21:9    21:15  26:14
  34:26   38:10  41:2
  42:19
putting [1]         48:21

                —Q—

qualifications [1]
  52:25
qualified [1]       53:10
quantum [15]        30:25
  30:25   31:2   31:3
  31:6    31:7   31:7
  31:9    31:13  31:21
  32:9    32:12  32:17
  32:19   48:7
quarter [3]
  31:14   32:19
questions [3]       2:13
  17:1    42:21
quit [1]  49:12
quite [1] 43:22

                —R—

R [1]      2:4
rather [1]          9:20
reach [3]           50:6
  50:8    50:12
read [7]  18:16   21:24
  24:12   27:25  45:4
  53:15   54:25
reading [1]         6:8
realize [1]         32:3
really [5]          8:22
  16:4    27:14  37:12
  50:25
reason [3]          8:7
  26:14   38:18
reasonable [5]      5:14
  6:15    6:16   20:9
  24:6
receive [1]         53:10
recent [1]          33:13
recently [1]        45:9
recess [2]          2:16
  50:14   50:15
recognize [2]       32:14
  32:21
recognized [3]      13:1
  46:24   47:8
recollection [1] 45:7
record [6]          8:6

8:10    19:14   21:12
  22:3    56:13
reduces [1]         28:11
refer [1] 14:8
reference [9]       15:7
  32:10   36:11  36:14
  47:19   48:7   49:1
  49:8    49:24
references [1]      18:15
reflected [1]       8:6
regardless [1]      47:7
rein [1]  24:8
relate [1]          10:6
related [1]         15:15
relates [1]         55:15
relatively [2]      50:21
  55:6
relevant [1]        18:21
remain [1]          28:10
remedies [1]        55:21
remedy [1]          25:3
remember [3]        6:9
  16:13   45:18
reminds [1]         12:5
removed [1]         49:17
report [6]          33:24
  34:2    34:3   34:9
  34:14   34:20
Reported [1]        1:24
REPORTER'S [2]
  1:8     56:1
represented [1] 18:10
required [2]        21:7
  52:6
requirement [1] 9:18
reservation [1]     4:19
resolve [1]         36:24
  37:21   49:6
respectfully [1] 23:3
respond [1]         2:14
Respondent [2] 1:11
  1:21
response [2]        7:10
  37:24
responses [1]       37:25
responsible [2] 19:8
  20:4
rest [2]  29:19
  24:3
result [2]          2:18
  24:3
resulted [1]        47:23
resumed [1]         50:17
retaliation [6]     7:23
  9:16    11:18  18:6
  18:15   20:8
retrieve [1]        48:10
reverse [1]         52:13
reviewed [1]        5:23
right [29]          3:24
  4:13    8:4    8:5
  10:4    20:25  20:25

21:2    21:3   24:24
  25:22   26:9   31:4
  34:4    34:23  35:8
  35:10   35:13  35:20
  35:23   36:6   38:22
  40:8    41:5   41:6
  41:23   42:3   48:16
  52:12
RMR-RPR [3]  1:24
  56:6    56:23
rock [24] 6:4       6:6
  6:10    6:19   7:14
  7:21    8:23   10:16
  10:23   11:14  17:20
  18:12   23:6   23:7
  23:7    27:2   29:4
  29:5    29:8   41:15
  42:5    42:5   42:6
  44:13
role [2]  30:23  32:11
rules [2] 22:13  43:4
ruling [1]          55:13
running [1]         54:7

                —S—

S [1]      2:4
safe [2]  26:9       26:9
safety [1]          6:4
San [2]   3:7       3:12
  3:18
sanction [1]        22:14
sat [1]   38:2
satisfy [2]         6:21
  10:18   44:19
says [25] 7:6       7:8
  7:18    7:19   10:4
  14:10   15:10  17:17
  17:18   18:7   18:17
  18:23   18:24  19:15
  19:24   23:5   24:12
  24:14   26:2   26:13
  27:1    30:4   32:12
  33:2    47:3
school [2]          3:25
  4:24
science [1]         53:20
scope [1]           11:25
second [6]          5:15
  8:10    13:14  18:14
  20:12   45:4
section [1]         14:2
see [16]  6:14   7:11
  9:12    19:11  19:12
  25:24   26:12  27:2
  27:3    27:5   29:3
  34:12   34:22  35:5
  38:4    50:6
sees [1]  19:7
send [2]  16:10  50:11
sends [1]           28:12
sent [1]  39:5
sentence [6]        5:15
  20:13   20:14  26:11
  28:11   52:14

CA13-001                    CondenseIt!™                    sentencing - twice
5/17/13

sentencing [3]  21:23
24:2    27:7
separate [1]    36:21
37:19
series [3]      21:12
22:12   25:21
serious [1]     37:8
servant [4]     5:21
7:23    16:25   36:18
served [2]      24:18
28:12
service [1]     26:3
set [2]    36:23   56:15
Seth [2]  1:21   5:6
sets [2]  12:13  13:15
seven-year [1]  55:8
shift [1] 3:10
short [3] 5:24   25:13
55:6
shorthand [1]   56:10
shortly [1]     19:12
Shoshone [1]    4:8
4:21
Shoshone/Arapaho [1]
4:16
show [4] 7:21   34:6
40:11   49:25
showed [2]      26:2
44:18
showing [1]     24:4
shows [5]       7:15
7:20    22:3    23:6
31:22
sides [1] 15:19
signature [1]   56:15
significance [1]
11:22
significant [1] 16:14
simply [1]      32:1
sit [3]   3:6    8:13
38:12
site [2]  4:8   45:19
sitting [6]     6:3
8:19    13:20   24:10
35:5    38:24
situation [2]   36:8
37:10
six [5]   22:22  23:1
26:15   26:24   41:22
size [1]  21:17
sized [1] 23:7
slightly [1]    17:25
43:9    52:12
solve [1]       39:12
solved [1]      43:18
someone [3]     18:1
43:3    52:21
someplace [1]   10:21
39:13   43:14
somewhere [1]   46:4
Sooner [1]      37:5
sorry [7] 4:2   11:2

26:20   27:1    27:15
28:7    28:9
sort [2]  9:19   50:22
Southern [1]    19:16
speak [2]       10:10
36:9
speakers [1]    19:20
speaking [2]    8:15
41:10
specific [1]    53:1
specifically [4] 10:13
54:17   54:20   54:20
spell [1] 10:8
spelled [1]     17:8
spending [1]    36:2
square [1]      47:23
ss [1]    56:4
St [14]   1:16    4:6
4:7     8:2     8:7
14:11   26:25   27:10
39:3    39:15   42:24
46:7    46:15   54:15
stake [1] 27:20
stalking [1]    25:18
standard [1]    25:15
standing [2]    37:12
37:18
Stanford [1]    4:24
start [3] 2:7    5:3
34:21
started [1]     47:21
state [8] 2:22   3:21
5:7     9:17    10:8
54:8    56:4    56:16
States [3]      12:8
12:12   16:2
status [3]      48:8
49:2    49:9
statute [4]     6:22
10:2    10:18   18:4
statutes [1]    53:1
stay [1]  35:24
Stenotype [1]   56:7
step [1]  35:14
still [1] 23:9
stop [2]  42:15  42:17
stormed [1]     41:14
street [4]      24:22
25:7    36:5    36:15
stuff [1] 47:19
subject [1]     52:2
submitted [1]   44:24
subordinate [1] 39:23
such [2]  44:14  52:14
sufficient [1]  6:21
7:21    10:15   10:17
22:5    25:16   44:19
sufficiently [1] 10:1
suggest [3]     27:14
28:8    35:12
suggesting [1]  47:11

suggestion [1]  43:25
suggestions [1] 22:6
suit [1]  15:17
superior [1]    3:7
supplemental [1]
51:4
supposed [2]    22:13
supreme [10]    5:8
16:3    24:23   40:5
45:25   51:12   51:15
51:16   52:19   54:22
sympathize [2] 42:25
43:8
system [3]      27:21
39:22   52:10

-T-

table [1] 21:18
tactical [1]    17:15
takes [1] 44:14
tampered [1]    49:17
teacher [1]     55:7
telling [2]     33:11
40:14
tends [1]       52:24
terms [1]       44:6
test [2]  15:1   47:2
testimony [2]   31:19
42:14
thank [7]       4:7
47:10   50:13   50:20
51:2    55:23   55:24
theme [1]       12:1
themselves [1]  2:8
32:16   46:25   47:1
theoretically [1]
53:20
thereafter [1]  56:10
thinks [1]      2:15
Thorne [70]     1:15
2:5     3:2     3:25
4:5     4:22    4:22
5:9     5:22    6:8
6:23    8:21    9:6
9:10    9:17    10:7
10:12   10:21   12:4
12:10   12:15   12:22
13:19   14:15   14:19
15:7    15:18   16:7
17:2    17:10   17:13
19:18   21:11   22:9
22:20   23:21   24:5
26:17   27:4    28:24
30:6    30:17   32:5
32:24   33:8    34:18
35:8    37:5    38:16
39:4    39:8    39:14
40:16   41:6    41:24
42:20   42:23   44:2
45:7    45:12   45:18
47:10   47:15   49:21
50:4    50:19   54:11
54:19   55:4    55:16
thought [3]     13:22

35:19   38:2
threat [28]     5:20
5:24    5:25    5:25
6:18    6:20    7:1
7:3     7:16    8:18
8:22    9:3     9:5
9:10    9:14    9:19
10:1    10:3    17:5
17:7    17:22   18:3
25:15   25:16   29:17
42:1    44:19   51:25
threaten [5]    10:16
11:13   11:16   11:19
44:13
threatened [7]  6:4
6:6     6:10    6:12
10:22   10:23   29:7
threatening [3] 7:22
7:25    25:21
threatens [2]   10:4
10:5
threats [2]     25:8
28:20
three [6] 17:7   17:24
20:9    21:8    22:18
23:8
three-eighths [4]
19:15   19:16   31:3
47:18
three-sixteenth [1]
31:6
three-sixteenths [1]
31:4
through [26]    3:19
6:5     6:10    7:13
7:15    8:18    8:22
8:23    9:5     9:8
10:19   10:23   12:23
18:12   18:13   21:5
23:6    29:8    29:8
29:11   41:15   41:21
46:18   46:22   47:2
50:22
throw [6]       6:10
7:13    10:23   15:21
18:12   23:5
thrown [1]      41:15
thwarted [1]    37:1
tied [1]  6:15
times [3]       35:5
41:13
today [1]       53:25
together [2]    42:11
51:1
too [3]   21:1   21:3
34:21
took [5]  43:13  48:16
48:18   53:12   56:7
top [1]   37:22
TPOs [1]        3:11
track [2] 31:21  43:9
tracked [1]     30:18
training [1]    54:2
transcribed [1] 56:10
transcript [10]  1:8

5:23    6:9     11:3
24:19   25:24   26:12
26:25   27:25   56:12
transcripts [3] 12:2
21:10   24:12
treat [1] 8:23
trespass [1]    23:13
trial [1] 11:3   24:1
tribal [71]     1:3
2:20    3:20    4:9
4:13    4:16    4:17
5:5     7:11    8:10
11:7    12:6    12:11
12:17   12:25   13:1
13:2    13:14   13:23
13:23   14:1    14:13
14:14   15:12   15:13
15:16   15:25   16:16
20:15   21:18   23:10
23:24   24:1    24:23
25:3    25:4    25:5
25:6    25:9    26:8
26:8    26:22   30:13
30:23   31:1    31:12
31:16   32:2    32:18
36:5    38:12   40:3
40:4    40:8    43:4
43:5    44:15   45:22
46:2    46:19   47:24
47:25   48:20   48:21
50:25   51:15   52:1
54:16   54:21   55:1
55:18
tribe [39]      1:10
3:5     3:17    4:15
4:20    5:10    5:12
7:8     15:19   18:8
18:9    18:10   20:9
24:24   26:15   31:8
37:16   38:7    38:14
40:10   43:1    43:12
44:14   46:12   46:21
46:24   47:4    47:8
47:9    48:13   48:17
51:10   51:14   52:15
52:18   52:19   52:21
52:22   55:19
tribe's [6]     36:7
36:10   40:2    42:14
47:19   48:3
tribes [2]      4:18
13:3    46:1    53:2
55:1
TRIBUNAL [1]
1:14
tried [2] 36:4   37:24
40:10   52:10
true [3]  8:23   38:17
56:12
try [7]   2:19   28:19
36:7    36:15   43:18
50:22   51:1
trying [12]     3:21
24:7    28:21   36:22
40:13   43:9    53:8
53:9    53:11   53:16
53:23   55:16
twice [2]       34:2

41:9
**two** [12]  4:18      5:12
7:4       12:20     25:2
30:23     31:17     31:23
31:24     34:8      44:4
47:24
**types** [1]               25:7
**typewriting** [1] 56:11

### -U-

**U.S** [1]   12:24
**unacceptable** [1]
24:7
**under** [9]            12:23
32:18     38:14     39:21
45:10     50:5      52:1
52:19     52:25
**understand** [15] 14:21
16:22     22:23     28:15
28:15     30:17     32:6
32:22     33:9      35:10
39:10     50:25     51:22
53:20     55:13
**understands** [2]
21:25     22:2
**unenrolled** [1]   52:24
**unfair** [1]              32:9
**unfairly** [1]           33:1
**United** [3]             12:8
12:12     16:2
**University** [2]   4:3
4:10
**unless** [1]            16:5
**unusual** [2]          5:17
23:2
**up** [27]      2:20     7:15
8:5       14:22     14:23
17:17     19:10     23:6
26:2      27:21     29:18
29:22     33:23     34:16
36:1      36:22     37:20
38:2      38:12     38:24
39:12     45:8      51:6
52:9      53:4      53:24
55:11
**upheld** [1]           15:12
**upset** [3]             29:6
41:13     49:13
**USC** [1]  46:2
**used** [11]            2:21
30:11     30:11     30:23
31:12     32:20     33:1
40:1      45:13     49:25
50:2
**using** [2]              28:20
49:24
**Utah** [1]  4:25

### -V-

**Vegas** [11]           1:3
1:10      2:1       5:10
16:19     16:20     31:20
38:6      38:14     39:24
40:14

**versus** [5]           5:10
12:9      12:13     12:24
19:24
**video** [1]              42:4
**violated** [1]         22:14
**violates** [1]         55:22
**violation** [1]       52:2
**violence** [1]         28:21
**violent** [1]          23:16
**vs** [1]      1:9

### -W-

**waiting** [1]          2:21
**walk** [4] 8:14       12:23
42:3      50:11
**walked** [2]          17:19
42:13
**walks** [2]             7:6
8:12
**wants** [3]             3:13
15:12     16:18
**ways** [3] 15:23       44:1
44:12
**weeks** [6]            9:24
17:24     23:8      24:11
34:8      51:7
**weight** [2]           21:1
21:3
**welcome** [1]         2:6
**Welfare** [1]          45:14
**whatnot** [1]          38:7
**WHEREOF** [1] 56:14
**white** [1]              38:11
**whole** [1]              19:7
**WILLIAM** [1]  1:15
**willing** [1]            28:14
**win** [1]  37:6
**winding** [1]          39:12
**window** [14]         5:25
6:5       6:10      7:14
8:3       8:20      8:24
10:24     18:12     23:6
29:8      29:9      29:11
41:15
**within** [2]            13:11
30:7
**without** [4]          24:3
35:7      44:1      45:10
**WITNESS** [1]       56:14
**words** [2]             7:2
42:1
**worked** [1]           37:25
**world** [1]              35:13
**worry** [1]              54:12
**wrapped** [2]          7:14
42:11
**write** [3] 34:5       34:10
40:6
**writes** [1]            36:10
**writing** [1]           50:10
**written** [7]          2:22

32:15     32:16     32:22
36:5      51:7      53:4
**wrong** [13]           20:24
21:4      24:24     25:10
25:22     30:16     36:16
38:13     40:19     40:23
46:17     49:25     53:3
**wrote** [7]            29:13
31:16     39:16     40:2
48:6      49:16     49:19
**Wyoming** [2]   4:9
4:10

### -Y-

**years** [6]             3:12
3:13      3:23      4:14
4:25      31:24
**yet** [8]    10:8      32:20
38:12     40:14     43:23
44:8      48:20     49:9
**yourself** [4]         51:21
53:25     54:1      54:7
**Yurok** [2]             3:5
3:19

# EXHIBIT 13

# EXHIBIT 13

# IN THE COURT OF APPEALS

## FOR THE LAS VEGAS PAIUTE TRIBAL COURT

| | |
|---|---|
| CHRISTOPHER W. PHEBUS, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| vs. | )   No. CA13-001 |
| | ) |
| THE LAS VEGAS TRIBE OF PAIUTE | ) |
| INDIANS | ) |
| | ) |
| Respondent. | ) |
| | ) |

PER CURIAM:

Honorable William Thorne, Chief Judge of the Appellate Panel, Honorable John St. Clair, Appellate Justice, and Abby Abinanti, Appellate Justice, sitting en banc on May 17, 2013 in Las Vegas, Nevada.

Appearing for Appellant, self-represented was Christopher W. Phebus. Appearing for Respondent, was Patrick J. Murch, attorney .

The intended decision was announced by Chief of the Panel Justice Thorne following submission by the parties and a conference of the panel. Herein is the written confirmation of that decision.

This appeal is hopefully the final legal chapter of an on going dispute between the parties. (Which is not to say that the dispute is resolved, rather this Court has urged upon the Appellant the need to conduct his protest of certain of the Respondent's actions in a legally acceptable manner. Specifically, to address or redress those claims in the political arena in a manner that does not cross into illegal acts.)

The Appellant has been outraged by the 1999 action of Respondent to disenroll certain tribal members, including Appellant. His conduct in addressing this issue has at times crossed the line of acceptable behavior. Most recently resulting in a criminal complaint filed in November of 2012, which resulted in a conviction for violation of Tribal Code Section 5-60-020, Improper Influence in Official Matters, wherein the Appellant was sentenced to a term of six months of incarceration.  On May 6, 2013 the Chief Judge of this panel issued an immediate stay of that sentence, ordering the release of Appellant forthwith, with conduct and appearance orders, setting this matter for briefing and argument.

The argument addressed in detail the issues of the factual basis for the conviction (whether or not one existed) and whether or not the sentence imposed was pursuant to the Indian Civil Rights Act of 1968 an infliction of "cruel and unusual punishments" and therefor void. The arguments of both parties were repeatedly and inexorably drawn to the disenrollment dispute, which clearly motivated all of Appellant's behavior. He claimed it also should be considered to have mitigated his behavior.  The Court listened to these arguments but did not have to resolve these issues because the threshold argument of jurisdiction trumped all such concerns.

In the end it, the disenrollment, was in fact definitive, but not in a manner either party had fully contemplated. Though in fairness Appellant did touch on the exonerating factor of the disenrollment. As the Chief Judge of the Appellate Panel pointed out the Respondent, in seeking to punish the behavior of Appellate had relied upon their belief that they had the legal authority to do so, that their sovereign powers extended to jurisdiction over the person of Appellant, specifically that they had criminal jurisdiction over said Appellant. Yet, they clearly had specifically deprived Appellant of his enrolled status, and continued to do so even in the face of a 2005 Court decision to the contrary. In so doing they left Appellant with the status of Indian ONLY in terms of certain services definitions, e.g., IHS. So that if Respondent had criminal conduct jurisdiction over the Appellant it must flow from that status and/or unless as the Chief Judge noted the basis for that assertion somehow resulted from his status as a "generic Indian".

However, to date "generic Indian" is not, nor has it ever been successfully claimed as a basis for tribal court criminal jurisdiction. Criminal jurisdiction on Indian reservations has many limitations the most important limitation for the purpose of this discussion is the need for the defendant to be an Indian. Indian in this situation is very specifically defined as ENROLLED Tribal member, which was initially taken to mean enrolled tribal member of the Tribe seeking to prosecute. In recent years following the Duro v. Reina, 495 U.S. 676 (1990) decision and the subsequent "Duro" fix of 25 U.S.C.A. 1301(2) the authority of a tribe to prosecute an offending ENROLLED tribal member for a violation on reservation lands other than those lands where the offender was enrolled has been confirmed.

In this instance, the Respondent could point to no jurisdictional constitutional or statutory language extending criminal jurisdiction to non-enrolled tribal members. If Appellant had met that standard the panel may well have felt comfortable to extend Respondent's authority based on the current state of the law. However, that is not the case, nor was Respondent able to point to any constitutional or statutory language for the basis of a prosecution of a former member and/or generic Indian. (This decision makes no claims as to the validity of such an attempt should it be contemplated for future actions.)

Respondent without jurisdiction over Appellate cannot maintain a criminal action against him. The act of disenrollment, so long as it stands, precludes criminal

prosecution by Respondent. Basic concepts of estoppel and fairness prevent the Tribe from depriving Appellant of tribal membership and then prosecuting him criminally as they would have been entitled to do had he not been disenrolled. (The panel cautioned Appellant that criminal prosecution by the State is NOT precluded; this decision is not a free pass to engage in criminal behavior. Criminal conduct precluded by the State may be prosecuted in the State. It should be noted that those possible sanctions far outweigh the possible sanctions in Tribal Court and Appellant should consider himself cautioned. The panel repeatedly instructed/implored Respondent to engage in legal political actions to try and reverse the decision of disenrollment, which has so distressed him. Further criminal actions will in our opinion result in harsh consequences and not lead to resolution of this essentially political question.)

Based on the above it is our decision that the underlying criminal conviction and sentence be vacated and Appellant suffer no further legal consequences from said conviction.

Entered this 10th day of June, 2013.

William A. Thorne, Jr.
For the Panel