**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| LAS VEGAS TRIBE OF PAIUTE INDIANS, | ) ) | |
| Plaintiff, | ) ) | 2:13-cv-02000-RCJ-CWH |
| vs. | ) ) | |
| CHRISTOPHER W. PHEBUS, | ) ) | **ORDER** |
| Defendant. | ) ) ) | |

This case arises out of an Indian tribe's criminal prosecution of one of its former members.  Pending before the Court is a Motion for Declaratory Judgment (ECF No. 8). Defendant has not timely responded.  For the reasons given herein, the Court grants the motion in part and denies it in part.

## I.      FACTS AND PROCEDURAL HISTORY

Plaintiff Las Vegas Tribe of Paiute Indians (the "Tribe") is a federally recognized Indian tribe with a tribal constitution approved by the Secretary of the Interior pursuant to the Indian Reorganization Act of 1934. (*See* Compl. ¶ 1, Oct. 30, 2013, ECF No. 1).  Defendant Christopher Phebus is a resident of the State of Nevada and a former member of the Tribe. (*See id.* ¶ 2).[1]  He resides on the Las Vegas Paiute Colony, which is located near downtown Las Vegas, Nevada.

---

[1]He is presumably a citizen of the United States pursuant to either § 1 of the Fourteenth Amendment or the Indian Citizenship Act of 1924.

1    (*Id.*).  Phebus was an enrolled member of the Tribe from 1983 until July 1999, when the Tribal

2    Council disenrolled approximately one-fourth of the Tribe's members, including Phebus. (*Id.*

3    ¶¶ 4–5).

4           Since his disenrollment, Phebus has been cited, arrested, convicted, and sentenced by the

5    Tribal Court several times for offenses such as contempt, trespass, and disorderly conduct. (*See*

6    *id.* ¶ 6).  Phebus has objected that his disenrollment from the Tribe destroyed the criminal

7    jurisdiction of the Tribal Court over him, but the Tribal Court has nevertheless asserted criminal

8    jurisdiction over him under *United States v. Bruce*, 394 F.3d 1215 (9th Cir. 2005), because

9    although he is not a member of the Tribe, he is still an Indian. (*Id.* ¶ 7).

10          In November 2012, the Tribe charged Phebus with Improper Influence in Official Matters

11   under Tribal Code section 5-60-020 for threatening to throw a rock through the window of the

12   Tribal Chief of Police's office. (*Id.* ¶ 9).  In December 2012, the Tribal Court held a bench trial,

13   pronounced Phebus guilty, sentenced him to six months imprisonment, and remanded him to the

14   custody of the Bureau of Indian Affairs. (*Id.*).  In January 2013, Phebus filed a motion in the

15   Tribal Court, asking the tribal judge to recuse himself from all future matters involving Phebus.

16   (*Id.* ¶ 10).  The Tribal Court treated the motion as a notice of appeal, and the Tribe convened a

17   three-judge Tribal Court of Appeals pursuant to the Tribal Code. (*Id.* ¶¶ 10–11).  The Tribal

18   Court of Appeals ruled that the Tribal Court did not have criminal jurisdiction over Phebus.

19   (*Id.* ¶ 12; *Phebus v. Las Vegas Tribe of Paiute Indians*, No. CA13-001 (Las Vegas Paiute Ct.

20   App. 2013), ECF No. 1-1).  The Tribal Court of Appeals noted that the term "Indian" had

21   different legal definitions in different contexts and concluded that because Phebus had been

22   disenrolled, the Tribe could maintain no criminal jurisdiction over him unless he were enrolled in

23   some tribe, even if he might be an Indian for the purposes of receiving certain governmental

24   services. *See Phebus*, No. CA13-001, at 2 (citing *Duro v. Reina*, 495 U.S. 676 (1990); 25 U.S.C.

25   § 1301(2)).  The Tribal Court of Appeals noted that the State of Nevada could prosecute Phebus

1   for the offenses, however. *See id.* 3.[2]   The Tribal Court of Appeals is the Tribe's court of last

2   resort, so all tribal remedies have been exhausted. (*Id.* ¶¶ 13–14).

3         The Tribe sued Phebus in this Court for a declaratory judgment that it may assert criminal

4   jurisdiction over any person satisfying the definition of "Indian" under the Indian Civil Rights

5   Act ("ICRA"), including Phebus.  Phebus has not appeared.  He was personally served on

6   October 31, 2013, (*see* Proof of Service, Nov. 1, 2013, ECF No. 6, at 2), and his answer, which

7   was due on November 21, 2013, is delinquent.  The Tribe has now moved for offensive summary

8   judgment.

9   **II.   LEGAL STANDARDS**

10        A court must grant summary judgment when "the movant shows that there is no genuine

11   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

12   Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson v.*

13   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there

14   is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  A

15   principal purpose of summary judgment is "to isolate and dispose of factually unsupported

16   claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary

17   ─────────────────────

18        [2]This is not quite correct.  If a non-Indian commits a crime against a non-Indian in Indian
     country, jurisdiction lies only in the state courts under state law. *See United States v. McBratney*,
19   104 U.S. 621, 624 (1881).  However, if the victim of a non-Indian's crime committed in Indian
     country is an Indian, as appears to be the case here, the state courts have no jurisdiction, and the
20   nature of federal jurisdiction depends upon whether the crime is one applicable to federal
     enclaves by statute.  If so, jurisdiction to prosecute the applicable crime lies in the federal courts
21   under the Indian Country Crimes Act, 18 U.S.C. § 1152.  If not, jurisdiction lies in the federal
     courts under the Assimilative Crimes Act, 18 U.S.C. § 13, under which the local state's criminal
22   law is applied in federal court.  The latter act probably applies here as to a disorderly conduct-
     type offense if Phebus is a non-Indian.  So the Tribal Court of Appeals was correct that Phebus,
23   as a putative non-Indian committing a minor crime against an Indian in Indian country, could be
     prosecuted under state law, but jurisdiction to prosecute the state-law offense would only lie in
24   federal court.  For a concise summary of the complex area of criminal jurisdiction in Indian
     country, see David H. Getches et al., *Federal Indian Law* 488–92 (5th ed. 2005).

25

judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and

1  determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477

2  U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are

3  to be drawn in his favor." *Id*. at 255.  But if the evidence of the nonmoving party is merely

4  colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

5  **III.    ANALYSIS**

6      **A.    Federal Jurisdiction**

7      **1.    Article III**

8      Congress has plenary power over the Indian tribes, *see, e.g.*, *Lone Wolf v. Hitchcock*, 187

9  U.S. 553, 565 (1903), which exist as "domestic dependent nations," *Cherokee Nation v. Georgia*,

10  30 U.S. 1, 17 (1831).  As a starting point in American history, Indian tribes existed as sovereign

11  nations. *Id.* at 59–60.  However, the tribes' sovereignty has been "necessarily diminished" via

12  conquest by other sovereigns, such as England, France, Holland, Spain, and Portugal, all of

13  whom recognized the principal that a conquered people retained the right to occupy the land, but

14  that certain aspects of sovereignty were necessarily lost. *Johnson v. M'Intosh*, 21 U.S. 543,

15  574–76 (1823).  Congressionally recognized tribes retain all aspects of sovereignty they enjoyed

16  as independent nations before they were conquered, with three exceptions: (1) they may not

17  engage in foreign commerce or foreign relations, *see Worcester v. Georgia*, 31 U.S. 515, 559

18  (1832); (2) they may not alienate fee simple title to tribal land without the permission of

19  Congress, *see M'Intosh*, 21 U.S. at 574; and (3) Congress may strip a tribe of any other aspect of

20  sovereignty at its pleasure, *see Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 208 (1978),

21  *superseded on other grounds by* 25 U.S.C. § 1301(2), (4) (1990).  In summary, all aspects of

22  sovereignty consistent with the tribes' dependent status, and which have not been taken away by

23  Congress, remain with the tribes.

24      Because the tribes retain their sovereignty generally, and because this sovereignty

25  predates the Constitution and does not depend upon it, the Constitution does not bind tribal

governments with respect to their members. *Talton v. Mayes*, 163 U.S. 376, 382–84 (1896).  In 1968, however, Congress passed the ICRA to provide certain protections for Indians as against their tribal governments.  These protections roughly parallel the protections afforded by the Bill of Rights, but the only remedy available is habeas corpus, not injunctive or declaratory relief. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58–62 (1978) (holding that the ICRA stripped sovereign immunity only as to the rights enumerated therein, and only with respect to the remedy of habeas corpus, not injunctive or declaratory relief).

Federal courts are of limited jurisdiction, possessing only those powers granted by the Constitution and statute. *See United States v. Marks*, 530 F.3d 799, 810 (9th Cir. 2008) (citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *United States v. Van Cauwenberghe*, 934 F.2d 1048, 1059 (9th Cir. 1991)).  Section 1331 does not permit a district court to accept appellate jurisdiction over state court rulings, because that statute provides only for original jurisdiction, not appellate jurisdiction. *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923).  However, a district court may accept original jurisdiction under § 1331 to adjudicate the tribal assertion of criminal or civil regulatory jurisdiction over a non-Indian, because the ability of a tribe to regulate the affairs of non-Indians is a matter of federal common law. *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 850–53 (1985).  A federal court has jurisdiction to adjudicate such disputes only after the tribal courts have been given an opportunity to review the jurisdictional questions, which appears to be the case here. *See id.* at 856–57.  The Court finds that the question of whether Phebus is an "Indian" for the purposes of criminal prosecution by the Tribe is a matter of federal common law, and, because tribal remedies have been exhausted, the Court may review the matter under § 1331.

**2.    Mootness**

The Court must also address whether the Tribe has standing in the present matter,

because it appears that the case may be moot. According to the Complaint, Phebus was remanded to custody on the six-month sentence in December 2012, and the Tribal Court of Appeals' did not reverse his conviction until June 10, 2013. It is therefore possible that no portion of his sentence remains to be served. The Tribe does not allege any supervised release, restitution, or collateral consequences of Phebus's sentence that were nullified by the Tribal Court of Appeals' ruling. The Court finds, however, that even assuming no portion of the sentence imposed by the Tribal Court remains to be served, such a case is capable of repetition, yet evading review. *See In re Grand Jury Proceedings*, 863 F.2d 667, 669 (9th Cir. 1988) ("This exception to the rule against mootness applies when two elements coexist. First, the challenged action must be of inherently short duration, a period too brief for effective judicial review; second, the party raising the challenge must have a reasonable expectation that he or she will again be subjected to the same type of action."). That is, it is reasonably probable that Phebus may again be convicted for another minor crime in the Tribal Court, but that the sentence will likely be so short as to prevent a decision here before the sentence is served and the case becomes moot, especially because this Court cannot accept jurisdiction under *Crow Tribe* until the Tribal Court of Appeals has ruled.

### B.     The Merits

The Tribe seeks a declaration that it may assert criminal jurisdiction over any person qualifying as an Indian under the ICRA and that Phebus so qualifies. The Tribe relies upon *United States v. Bruce*, which case concerned a defendant's argument that because she was an Indian she should have been tried if at all under the Major Crimes Act, 18 U.S.C. § 1153, not under the Indian Country Crimes Act, 18 U.S.C. § 1152, for having allegedly assaulted an Indian in Indian country. *See* 394 F.3d 1215, 1217 (9th Cir. 2005). The Court of Appeals reversed the conviction, finding that the defendant had "presented sufficient evidence that, if believed, established her Indian status." *Id.* In the context of federal criminal prosecutions, Indian status is

proved by showing two things: (1) sufficient degree of Indian blood; and (2) sufficient tribal or governmental recognition as an Indian. *Id.* at 1223.  The first prong has been satisfied upon a showing of as little as 1/8 Indian blood. *See id.* at 1223–24 (collecting cases).  In analyzing the second prong, courts consider, in declining order of importance: (1) tribal enrollment; (2) government recognition formally and informally through receipt of assistance reserved only to Indians; (3) enjoyment of the benefits of tribal affiliation; and (4) social recognition as an Indian through residence on a reservation and participation in Indian social life. *Id.* at 1224.  The *Bruce* court found that the defendant there had produced enough evidence to show she was an Indian:

> Bruce presented evidence to establish both her Indian blood and recognition. With respect to Indian blood, she offered evidence that she is one-eighth Chippewa Indian and introduced a certificate of Indian blood confirming this fact.  She also offered evidence that her mother is an enrolled member of the Turtle Mountain Tribe of Oklahoma, and that two of Bruce's children are enrolled members of an Indian tribe.  With respect to recognition, she presented evidence that she was born on an Indian reservation and currently lives on one; that she participates in Indian religious ceremonies; that she has, on several occasions, been treated at Indian hospitals; and that she was "arrested tribal" all her life.

*Id.*  The court ruled that the district court had erred in treating lack of tribal enrollment dispositively.  *See id.*  The court acknowledged the dissenting judge's equal protection concerns as to the blood-quantum prong but rejected a proposed test making enrollment or eligibility for enrollment in a federally recognized tribe dispositive, believing the panel was not free to depart from the existing law of the Circuit absent intervening action by the Court of Appeals sitting en banc, the Supreme Court, or Congress. *See id.* at 1225.

Where a defendant challenges his alleged Indian status in a § 1153 case, i.e., where positive Indian status is an element of the offense, the prosecution must allege Indian status in the indictment and prove it to the jury beyond a reasonable doubt, just as it must allege and prove any other substantive element of the offense. *See id.* at 1229 (citing *United States v. James*, 980 F.2d 1314, 1317–19 (9th Cir. 1992)).  However, a defendant's objection in a § 1152 case that he is in fact an Indian and cannot therefore be prosecuted under that statute is an affirmative defense

1   that the government need not initially allege. *See id.* at 1222–23. Rather, once a defendant in

2   such a case "come[s] forward with enough evidence of her Indian status to permit a fact-finder to

3   decide the issue in her favor," the burden of persuasion shifts to the government, which then

4   must disprove the affirmative defense beyond a reasonable doubt. *Id.* at 1223. Although the

5   requirement that the defendant be a non-Indian is included in § 1152 the same way the

6   requirement that the defendant be an Indian is included in § 1153, the Court of Appeals adopted

7   the burden-shifting framework for § 1152 cases because it would be impracticable to require the

8   government to allege a negative in an indictment, i.e., that the defendant is not an Indian. *See*

9   *United States v. Hester*, 719 F.2d 1041, 1043 (9th Cir. 1983) ("It is far more manageable for the

10  defendant to shoulder the burden of producing evidence that he is a member of a federally

11  recognized tribe than it is for the Government to produce evidence that he is not a member of any

12  one of the hundreds of such tribes. We accordingly hold that the Government need not allege the

13  non-Indian status of the defendant in an indictment under section 1152, nor does it have the

14  burden of going forward on that issue. Once the defendant properly raises the issue of his Indian

15  status, then the ultimate burden of proof remains, of course, upon the Government."). The *Bruce*

16  court found that the defendant had produced enough evidence of her Indian status to submit the

17  question to the jury, and that the district court's failure to do so was reversible error. *See id.* at

18  1226–27.

19      The question here is whether the Tribal Court of Appeals erred in ruling that Phebus was

20  not an Indian simply because he was not enrolled in a federally recognized tribe. A federal court

21  reviews tribal rulings concerning tribal court jurisdiction *de novo* in a *Crow Tribe*-type appeal.

22  *Smith v. Salish Kootenai Coll.*, 434 F.3d 1127, 1130 (9th Cir. 2006). *De novo* review also

23  applies to mixed questions of law and fact, e.g., whether a particular person is an Indian. *See*

24  *Bruce*, 394 F.3d at 1218. The Court finds that the Tribal Court of Appeals erred if it meant to

25  rule that enrollment is dispositive to Indian status for the purposes of tribal prosecution in all

cases.  The Court can find no case law establishing such a standard.  The only available case law

confirms the *Bruce* court's two-prong test, under which enrollment in a federally recognized tribe

is simply one factor of four (though the most important factor) under the second conjunctive

prong.[3]  Having exhausted its tribal remedies in this case concerning the extent of the Tribe's

ability to regulate the affairs of a person whose Indian status was disputed, the Tribe properly

brought the present case pursuant to § 1331 and *Crow Tribe*, seeking a declaration that it has

criminal jurisdiction "over Phebus and all other individuals who satisfy the definition of 'Indian'

under the Indian Civil Rights Act." (Compl. 3:27–28).

The question cannot be determined simply by referring to the *Bruce* line of cases,

however.  To fully answer the question, the Court must examine not only whether the Tribal

Court applied the correct substantive standards, but also whether it honored Phebus' procedural

rights in making the determination, i.e., whether the question was properly determined by the

Tribal Court as opposed to being submitted to a jury, and whether the Tribal Court examined the

issue under the correct standard of proof.  The Court must also examine the scope of the Tribe's

ability to prosecute non-members generally, a question that is not so clear as the Tribe suggests.

### 1.    Tribal Prosecution of Non-Members

Phebus's argument appears to have been that he considered himself to be a Las Vegas

Paiute, but that the Tribe could not in fairness strip him of his membership and then treat him

like an Indian for the purposes of criminal prosecution.  It is true that under *Lara*, Congress has

the power to permit the tribes to prosecute non-member Indians.  But this case presents a novel

question: when a person whose Indian affiliation is purely with a particular tribe, and when that

---

[3]If the Tribal Court of Appeals had ruled that the tribal enrollment requirement was a jurisdictional requirement under *tribal* common law, this Court would have to honor that ruling, regardless of whether federal common law would permit the Tribe to assert its jurisdiction more broadly.  But the Tribal Court of Appeals clearly based its ruling upon its perception that federal law did not permit the prosecution.

1  tribe has revoked or rejected his membership, can the tribe then fairly prosecute him under

2  *Oliphant* and *Duro* if he has no affiliation with any other tribe?  In other words, if a person's only

3  tribal affiliation has been positively adjudicated by the relevant tribe to be insufficient for

4  membership, can that tribe still prosecute him as an Indian based purely upon his affiliation with

5  that tribe without showing sufficient affiliation with at least one other tribe?  The result appears

6  to present an equal protection problem.  That is, under such a regime a person may, due purely to

7  his blood quantum or particular lineage, be subject to criminal prosecution in Indian courts yet be

8  ineligible for membership in the prosecuting tribe or *any* Indian tribe, the latter consideration

9  being the only distinction traditionally held to insulate the blood/lineage nexus from equal

10  protection infirmity.  This is different from saying that actual enrollment is dispositive.  Rather, it

11  is to say that rejection or revocation of membership in a particular tribe may preclude prosecution

12  as an Indian based upon political affiliation with that tribe.  Perhaps the Tribal Court of Appeals

13  meant to say something like this.  If so, the Court agrees.

14        The *Lara* Court determined that Congress had the power under the Indian Commerce

15  Clause to permit tribes to prosecute non-member Indians as a general matter, *see United States v.*

16  *Lara*, 541 U.S. 193, 210 (2004), but the *Lara* Court did not consider the defendant's due process

17  and equal protection challenges in that case, because the defendant's double jeopardy claim was

18  the only claim cognizable in the context of the case before it, *see id.* at 209.  That is, *Lara* was a

19  double jeopardy-based appeal from a federal prosecution.  The defendant's due process and equal

20  protection challenges as to an earlier tribal prosecution could not be litigated in *Lara*, but only

21  the initial power of Congress to authorize the first tribal prosecution and whether it was a

22  "federal" prosecution for the purposes of the Double Jeopardy Clause.  The *Lara* Court

23  specifically noted that although it could affirm the conviction in that case over the double

24  jeopardy objection, it retained "reservations" concerning due process and equal protection as to

25  the prosecution of non-member Indians in tribal court, as noted in Part III of the opinion. *See id.*

at 210.  *Lara* did not address, much less overrule, the *Duro* Court's previously expressed

concerns that prosecution of non-member Indians might violate equal protection or due process

principles. *See generally United States v. Duro*, 495 U.S. 676 (1990).  In fact, three members of

the *Lara* Court who remain on the Court today indicated variously in dissent or concurrence that

Congress could not overrule *Duro* as to tribal power to prosecute non-member Indians or that it

could but that such a prosecution would be problematic if directly challenged under equal

protection or due process principles.  The two members of the *Lara* majority who remain on the

Court today also recognized the potential for a direct equal protection or due process challenge

not confronted in that case.  The viewpoint that *Lara* wrote the tribes a blank check as to criminal

prosecution of non-member Indians is therefore highly problematic.  *Lara* simply noted that

*Duro* had been superseded by statute and affirmed Congress' power to do so under the Indian

Commerce Clause, without addressing any equal protection or due process issues that might

manifest themselves as a result.

Although the *Lara* Court answered only the question of Congressional power and left the

equal protection and due process questions open, the Court cannot rule that equal protection or

due process principles prevent all prosecutions of non-member Indians under any circumstances,

because the Court of Appeals has permitted such prosecutions over such objections, so long as

the defendant is in fact an enrolled or *de facto* member of another tribe. *See Means v. Navajo

Nation*, 432 F.3d 924, 931–35 (9th Cir. 2005) (citing *Morton v. Mancari*, 417 U.S. 535 (1974))

(ruling that a tribe may properly prosecute enrolled or *de facto* members of other tribes, because

the resulting discrimination as between non-member Indians and non-Indians is political, not

racial) ("[T]he only Indians subjected to tribal court jurisdiction are enrolled or *de facto* members

of tribes, not all ethnic Indians.").  For the same reason, however, the Court has no problem

ruling that equal protection principles prevent a tribe's prosecution of a non-member whose only

putative tribal affiliation is with the prosecuting tribe itself and where that tribe has in fact

1  rejected or revoked the person's membership.  Under such circumstances, the political distinction

2  that may be permissibly drawn between non-member Indians and non-Indians has been pulled

3  away, leaving behind a purely racial distinction between Indians and non-Indians, which is a

4  constitutionally impermissible basis for unequal treatment under the law. *See Rice v. Cayetano*,

5  528 U.S. 495, 512–17 (2000).

6  **2.      Procedural Requirements of Proving Indian Status in Tribal Court**

7         The Court of Appeals's rulings upon the procedural requirements of proving Indian or

8  non-Indian status in federal prosecutions under §§ 1152 and 1153 are born of federal

9  constitutional and statutory constructions.  Case law concerning those federal statutes does not

10  directly resolve the question of which procedural requirements of proving Indian status apply in

11  tribal courts, because Indian tribes and their courts are not bound by either the federal

12  Constitution or federal procedural rules that Congress has not explicitly applied to them. *See*

13  *Talton*, 163 U.S. 376 at 382–84.  The Court of Appeals has noted that the fact the ICRA refers to

14  the Major Crimes Act to define "Indian" is relevant only to the substantive issue of Indian status

15  under a tribal prosecution; it does not necessarily require that an Indian prosecutor prove Indian

16  status beyond a reasonable doubt in tribal court. *See Eagle v. Yerington Paiute Tribe*, 603 F.3d

17  1161, 1164 (9th Cir. 2010).  The *Eagle* court, however, did not need to resolve that question

18  because the defendant in *Eagle* had failed in the Indian trial court to raise the issue of her alleged

19  non-Indian status. *See id.* at 1164–65.  Here, Phebus objected in the Tribal Court that he was not

20  an Indian for the purposes of criminal jurisdiction.

21         Where positive Indian status is required for criminal jurisdiction, as in § 1153 cases, the

22  prosecution properly bears the burden of production on the Indian-status issue.  That will be the

23  default rule in tribal prosecutions, because, absent Congressional exceptions not applicable here,

24  Indian tribes may only prosecute Indians.  So the Tribe bore the burden of production on the

25  issue of Phebus's Indian status.  That means the Tribe was, at a minimum, bound to allege

1    Phebus's Indian status in the charging instrument and bound to prove it to the court by a

2    preponderance of the evidence.

3         That is the standard for proving facts necessary to "constitutional jurisdiction," i.e., facts

4    relevant to the power of the court over the transaction as a general matter, such as territorial

5    nexus. *See United States v. Zakharov*, 468 F.3d 1171, 1175–78 (9th Cir. 2006).  The territorial

6    nexus between a crime and the forum has been compared to the due process "minimal contacts"

7    requirement. *See, e.g.*, *United States v. Klimavicius–Viloria*, 144 F.3d 1249, 1257 (9th Cir.

8    1998).  Facts of "constitutional jurisdiction" are those facts necessary for the defendant to be

9    haled into court but not constituting any part of the substance of the offense itself. *See Zakharov*,

10   468 F.3d at 1177 (quoting *Klimavicius–Viloria*, 144 F.3d at 1257) ("Unlike statutory jurisdiction,

11   the constitutional nexus requirement is not an express element of the crime but is 'a judicial gloss

12   applied to ensure that a defendant is not improperly haled before a court for trial.'").  Facts of

13   "statutory jurisdiction," on the other hand, must be found by a jury beyond a reasonable doubt

14   under *Apprendi v. New Jersey*, 530 U.S. 466 (2000) because they are elements of the substantive

15   offense, even if "not formally identified as elements of the offense charged." *See id.* at 1176

16   (citing *United States v. Perlaza*, 439 F.3d 1149, 1165–67 (9th Cir. 2006)).  So factual questions

17   need not be explicitly identified in a statute to qualify as facts necessary to statutory jurisdiction.

18   *Perlaza* "present[ed] one of the 'limited circumstances' in which 'facts not formally identified as

19   elements of the offense charged' must be submitted to the jury and proved beyond a reasonable

20   doubt." *Perlaza*, 439 F.3d at 1166 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 85 (1986)).

21   Where jurisdiction depends upon disputed factual issues such as where a maritime vessel was

22   intercepted, or upon disputed mixed questions of law and fact such as whether such a vessel was

23   "stateless" when intercepted, the question is for a jury, regardless of whether the criminal statute

24   lists those issues as elements, and a court's failure to submit such issues to a jury is reversible

25   due process error. *See id.* at 1167 (citing *United States v. Smith*, 282 F.3d 758, 767 (9th Cir.

2002) (citing *In re Winship*, 397 U.S. 358, 364 (1970))) ("The 'jurisdictional issue'—whether the United States has jurisdiction over the waters where a vessel is allegedly intercepted—can and should be decided by the trial court as a preliminary question of law.  The 'factual issue'—whether the vessel was actually intercepted in those waters—is a wholly different matter, one that must be decided by the jury.).

Here, the issues of whether the Tribe had jurisdiction over non-member Indians and what the test for Indian status should be were for the Tribal Court, but the facts relevant to Phebus's Indian status and the mixed question of law and fact of whether Phebus was in fact an Indian was for a jury.  The Tribal Court's criminal jurisdiction over Phebus for the charged offense—a charge under which Phebus faced imprisonment—turned upon the contested mixed question of law and fact of Phebus's Indian status.  The Tribal Court therefore erred in not submitting this question to a jury for a finding beyond a reasonable doubt.  The Court is convinced that an Indian court asserting criminal jurisdiction over a person who objects to his alleged Indian status must submit the question of Indian status to a jury if the defendant faces incarceration, and the jury must then find Indian status beyond a reasonable doubt.  Even if such a defendant waives the right to a jury—and there is no evidence of waiver in the record here—the court must find the fact beyond a reasonable doubt, and there is no indication in the record here that the Tribal Court made the finding of Indian status to that standard of proof.

Even if Indian status were not to be considered an element of a tribal offense, but only an affirmative defense, as under § 1152, once Phebus raised the objection of his non-Indian status in the Tribal Court as an affirmative defense, the Tribe was bound to prove his Indian status beyond a reasonable doubt, and it was in fact required to prove it to a jury, because Phebus faced incarceration. *See Bruce*, 394 F.3d at 1222–23.  This is true whether Phebus is "really" an Indian or not by anyone's reckoning. *See* 25 U.S.C. § 1302(a)(8), (10) (requiring Indian courts to provide "any person" due process of law and to honor the right to conviction by a jury of at least

1   six peers where an offense is punishable by imprisonment); *In re Winship*, 397 U.S. at 364 ("Lest

2   there remain any doubt about the constitutional stature of the reasonable-doubt standard, we

3   explicitly hold that the Due Process Clause protects the accused against conviction except upon

4   proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

5   charged.").  So long as Phebus "c[ame] forward with enough evidence of h[is] Indian status to

6   permit a fact-finder to decide the issue in h[is] favor," the burden of persuasion shifted to the

7   Tribe, which was then bound to disprove the affirmative defense beyond a reasonable doubt. *See*

8   *id.* at 1223.  He did.  The Tribal Court therefore committed reversible error in declaring Phebus

9   to be an Indian for the purposes of tribal criminal jurisdiction without submitting the question to

10  a jury for a finding beyond a reasonable doubt, assuming Phebus did not properly waive his right

11  to a jury under the ICRA.

12      The Court is convinced that Indian status must be treated as an element of any criminal

13  offense in an Indian court as under § 1153, because criminal jurisdiction in an Indian court

14  requires positive Indian status as under § 1153, not negative Indian status as under § 1152.  So,

15  although he did, Phebus was not even required to object to his alleged Indian status.  This result

16  is compelled by the rule that an Indian tribe may not subject a non-Indian to criminal prosecution

17  unless expressly permitted by Congress. *See Oliphant*, 435 U.S. at 210 ("By submitting to the

18  overriding sovereignty of the United States, Indian tribes therefore necessarily give up their

19  power to try non-Indian citizens of the United States except in a manner acceptable to

20  Congress.").[4]  The *Oliphant* Court did not address the standard of proof applicable to an Indian

21  court's jurisdictional finding that a defendant is an Indian, but the Court finds that it must be

22  beyond a reasonable doubt.

23      It is not dispositive that Indian status primarily concerns the power of the court over the

24  _____

25      [4]Congress has since given federally recognized Indian tribes the authority to prosecute
    non-Indians for certain domestic violence offenses not at issue here. *See* 25 U.S.C. § 1304(b)(1).

1    defendant as opposed to the defendant's guilt or innocence under the crime as defined.  That

2    cannot be the crux of the test, because the Indian status requirements in §§ 1152 and 1153 clearly

3    concern the power of the court over the defendant rather than guilty conduct, and the Court of

4    Appeals appears quite comfortable treating Indian status as a matter of statutory rather than

5    constitutional jurisdiction under those statutes.  The crux of the test therefore appears to be

6    whether the requirement stems from legislative choice as opposed to an inherent limitation upon

7    the power of the sovereign.  The question is difficult here, because the answer is a hybrid.  That

8    is, the limitation upon an Indian court's ability to try non-Indians stems from Congress'

9    legislative choice whether to limit the sovereign power of the tribes.  But the very fact that

10   Congress can choose whether to limit the tribes' power in this regard shows that the limitation,

11   unlike territorial limitations, is not inherent.  Indeed, *Lara* specifically held that the limitation

12   upon the prosecution of non-member Indians was not inherent like the restrictions concerning

13   foreign commerce, but was discretionary with Congress under the Indian Commerce Clause.  *See*

14   541 U.S. at 200 ("Thus the statute seeks to adjust the tribes' status.  It relaxes the restrictions,

15   recognized in *Duro*, that the political branches had imposed on the tribes' exercise of inherent

16   prosecutorial power.  The question before us is whether the Constitution authorizes Congress to

17   do so.").

18        The Court finds that because criminal prosecution of a non-Indian in an Indian court

19   requires express Congressional permission, Indian status is properly regarded as an implicit

20   element of every offense charged in an Indian court where Congress has made no exception.  The

21   relevant Indian code need not include Indian status as an express element of the offense for the

22   issue to be considered one of statutory rather than constitutional jurisdiction, because the

23   requirement applies automatically where not explicitly excepted by Congress.  One might argue

24   that like Indian status in an Indian court, territorial nexus (in any court) is a requirement that

25   necessarily applies to all assertions of criminal jurisdiction, so Indian status should also be

considered a matter of constitutional jurisdiction, not statutory jurisdiction, if not explicitly

identified in the Indian code as an element of the offense.  But unlike the Indian status

requirement for prosecution in Indian courts, the territorial nexus requirement is something that

Congress cannot constitutionally waive by statute.  The Indian status requirement for criminal

prosecution in an Indian court is therefore not akin to a constitutional limitation upon a court's

power such as territorial nexus, but rather is the result of a legislative choice by Congress that

positive Indian status is required for a criminal offense to have been committed against an Indian

tribe under Indian law, just as Congress made a similar legislative choice that positive Indian

status is required for a criminal offense to have been committed against the United States under

§ 1153. *See Lara*, 541 U.S. at 205 ("To the contrary, *Oliphant* and *Duro* make clear that the

Constitution does not dictate the metes and bounds of tribal autonomy, nor do they suggest that

the Court should second-guess the political branches' own determinations.").  Indeed, Congress'

choice to continue to require positive Indian status for tribal prosecution in most cases was made

explicit in the "*Duro*-fix" amendments to the ICRA when Congress contemporaneously lifted the

restriction against prosecution of non-member Indians. *See* Pub. L. 101-511, 104 Stat. 1856

(codified at 25 U.S.C. § 1301(2) (1990)) ("'[P]owers of self-government' means and includes all

governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all

offices, bodies, and tribunals by and through which they are executed, including courts of Indian

offenses; and means the inherent power of Indian tribes, hereby recognized and affirmed, to

exercise criminal jurisdiction over all Indians."); *id.* (codified at 25 U.S.C. § 1301(4) (1990))

("'Indian' means any person who would be subject to the jurisdiction of the United States as an

Indian under section 1153, Title 18, if that person were to commit an offense listed in that section

in Indian country to which that section applies.").  So Congress has made the legislative choice to

include the Indian status requirement as to any tribal prosecution in exactly the same way it had

previously included the requirement in § 1153 cases.  In both cases—prosecution of an Indian in

1    federal court, and prosecution of an Indian in a tribal court—positive Indian status is a

2    Congressionally determined prerequisite for prosecution that is not relevant to the substance of

3    the prohibited activity.  In the latter case, the legislative choice has not been made by the Indian

4    tribe that drafted the criminal statute, of course, but that is irrelevant where the Indian tribe does

5    not have the power to make the choice.  The legislative choice has been made by the only

6    sovereign with the power to make it, and it applies to all Indian criminal statutes, not only under

7    the federal common law, but also under § 1301(4).  *Oliphant* recognizes the common law default

8    rule that an Indian tribe may only prosecute Indians.  Congress may change that default, *see Lara*,

9    541 U.S. at 200 ("Congress does possess the constitutional power to lift the restrictions on the

10   tribes' criminal jurisdiction over nonmember Indians . . . ."), but where it has not done so,

11   positive Indian status must under *Oliphant* and *Dura* be viewed as a default common law

12   element of any crime prosecuted by an Indian court.  The dependent sovereign does not retain the

13   power to make the legislative choice at issue here, so an Indian tribe's failure to include the

14   superfluous element of positive Indian status in its own criminal statutes tells us nothing of the

15   relevant legislative choice, i.e., Congress'.

16        The record provided by Plaintiff as to the first trial for disorderly conduct indicates

17   neither that the question of Phebus's Indian status was put to a jury nor that it was determined

18   beyond a reasonable doubt even by the tribal judge.  The record indicates that Phebus's case was

19   to be tried on October 17, 2012, and that Phebus represented himself on that day. (*See* Trial Tr.

20   2–3, Oct. 17, 2012, ECF No. 8, at 19).  The Tribal Court discussed with Phebus that he was an

21   Indian who could be prosecuted regardless of whether he were a member of the Tribe, and

22   Phebus at times did not appear to object to the fact that he was an Indian, at least for the purposes

23   of personal pride and certain federal benefits. (*See id.* 3–9).  After the prosecution rested and

24   Phebus declined to present any witnesses, he argued to the Tribal Court that he was not in fact an

25   Indian who could be prosecuted and that he had not committed the crime as a general matter.

1  (*See id.* 20–23).  The Court then declared Phebus guilty without indicating the standard of proof

2  it had used as to the Indian status issue. (*See id.* 30).  At the sentencing hearing before the Tribal

3  Court on October 19, 2013, the parties again argued over whether Phebus was an Indian under

4  *Bruce*, and the Tribe specifically asked the Tribal Court itself to rule that Phebus was an Indian

5  who could be prosecuted in that court. (*See* Sent. Hr'g Tr. 2–3, Oct. 19, 2013, ECF No. 8, at 29).

6  Phebus argued that he was not an Indian because he had been disenrolled as a Las Vegas Paiute.

7  (*See id.* 4–5).  He maintained that he was not an Indian under the *Bruce* test. (*See id.* 6 ("Now

8  I'm sitting in here fighting over whether I can be prosecuted under this *Bruce* test or not.")).  The

9  Tribal Court questioned Phebus as to the *Bruce* factors and reaffirmed its assertion of jurisdiction

10  over him based thereon. (*See id.* 6–14 ("I'm making a finding I have jurisdiction.")).  Phebus

11  objected again. (*See id.* 15 ("I committed the crime was my choice.  It was never my choice to

12  decide my ethnicity.  You people have been doing it for me.")).  The Tribal Court sentenced him

13  to sixty (60) days imprisonment. (*See id.* 16).

14      The record provided by Plaintiff as to the second trial for improper influence on official

15  matters indicates that the Tribal Court declared him guilty and that the question of Phebus's

16  Indian status was not determined at all on the record. (*See generally* Trial Tr., Dec. 27, 2012,

17  ECF No. 8, at 52).  The Tribal Judge sentenced Phebus to six (6) months imprisonment. (*See* J.,

18  Jan. 4, 2013, ECF No. 8, at 74).

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion for Declaratory Judgment (ECF No. 22) is GRANTED IN PART and DENIED IN PART.  The Court DECLARES that the Tribe may assert criminal jurisdiction over any person qualifying as an Indian under the ICRA, as interpreted in cases such as *United States v. Bruce*, 394 F.3d 1215 (9th Cir. 2005), but in such a prosecution the Tribe must prove Indian status beyond a reasonable doubt, and the Tribal Court must submit the question to a jury where the crime is punishable by imprisonment, unless the jury right is properly waived, and there is no evidence that these procedures were followed as to Phebus in the cases cited.  Furthermore, if the Tribe seeks to prosecute a non-member whose membership it has revoked or rejected, the Indian status analysis in such a prosecution may not rely upon political affiliation with the Tribe, but only upon actual or *de facto* membership in another tribe.

IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

IT IS SO ORDERED.

Dated this 24th day of March, 2014.

_____
ROBERT C. JONES
United States District Judge